**U.S. District Court**
**Middle District of Florida**
**Tampa Division**

**GOVERNMENT EXHIBIT**

**Exhibit No.:** 9A thru 9G

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: 12/14/21

Date Admitted: 12/14/21



U.S. Attorney's Office
Middle District of Florida

SA:
sha Asokan

Date:
12/2021

Jail Calls for
Detention Hearing
United States vs. Jeremy Brown
8:21-cr-348-SCB-SPF

**U.S. District Court**
**Middle District of Florida**
**Tampa Division**

## GOVERNMENT EXHIBIT

**Exhibit No.:**_____9I_____

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified:___12/15/21___

Date Admitted:___12/15/21___



**U.S. District Court**
**Middle District of Florida**
**Tampa Division**

**GOVERNMENT EXHI**

Exhibit No.: 9A -T

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: 12/14/2

Date Admitted: 12/14/2

**Audio:** 1639145114_223_13_172_708: 12/10 call with Alondra Propes (22:22-23:41)

**PARTICIPANTS:**

JMB: Jeremy Michael Brown

AP: Alondra Propes

**TRASLATION KEY:**

UI: UNINTELLIGIBLE

IA: IAUDIBLE

PH: PHONETIC

SC: SIMULTANEOUS CONVERSATION

OV: OVERLAPPING VOICES

[]: NOISE NOTATIONS OR TRANSLATOR'S NOTES

RC: RECORDED MESSAGE

==================================================================

[BEGIN TAPE 22:22]

JMB: It looks like we're gonna have a bond hearing on Tuesday so, um my attorney is fairly confident that the Judge will grant me bond and I'll be able to [OV]

AP: Are you?

JMB: Um…I believe that he will grant me bond under conditions that I um…alright, so I'm gonna tell you this but you can't tell anybody else.

AP: Okay.

JMB: Um…he's likely gonna grant me bond under conditions that I will refuse because it would be violations of my constitutional rights and I will be basically held in jail on principle. Of course we'll appeal the conditions on constitutional grounds but I'll probably be [chuckles] the first inmate in American history [chuckles] to be offered bond

AP: [chuckles]

JMB: and refuse it. [chuckles]

AP: Yeah.

JMB: Don't tell Bill I told you that because I told him not to tell anybody.

AP:  Alright.

JMB: So, it will probably be a shocker um to everybody who shows up.
     Um...but I mean this is what I have to do.

[END TAPE 23:41]

U.S. District Court
**Middle District of Florida**
Tampa Division

## GOVERNMENT EXHIBIT

**Exhibit No.:** 9B-T

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: 12/14/21

Date Admitted: 12/14/21

1  **Audio:** 1638996436_438_13_157_868: 12/8 call with Tylene
2      Aldridge (11:47 to 13:05)

3  **PARTICIPANTS:**

4  JB: Jeremy Michael Brown

5  TA: Tylene Aldridge

6  **TRANSLATION KEY:**

7  UI:  UNINTELLIGIBLE

8  IA:  INAUDIBLE

9  PH:  PHONETIC

10  SC:  SIMULTANEOUS CONVERSATION

11  OV:  OVERLAPPING VOICES

12  []:  NOISE NOTATIONS OR TRANSLATOR'S NOTES

13  RC:  RECORDED MESSAGE

14

15  ================================================================

16  [BEGIN TAPE][00:11:47]

17  TA: Did you- Did you give the saliva, did you finally give it?

18  JB:  No.

19  TA: Oh, cause you haven't um-

20  JB: Well I told Bill that I will- that I will only agree to
21  doing it if they give me-

22  TA: Right.

23  JB: Um they give me the copy of the warrant.

24  TA: Right.

25  JB: And so, obviously they didn't agree to that or else they
26  would've been back here to give me the copy of the warrant and
27  take my saliva. He's like, well you know, you're probably not
28  gonna be able to um the judges probably gonna rule that you have
29  to give it and I go that's fine, but let's make them do it the
30  right way.

31  TA: M-hm.

32  JB: We're not just gonna give in just because they say and just
33  because we know the outcome if it goes, we still don't just,
34  give up.

35  TA: Right.

36  JB: and I like were playi- like we can play the delay tactic as
37  well.

38  Ta: Uh-huh.

39  JB: You know? The judge says all and then he can file a response
40  and you have seven days and they wait till the last day, well we
41  can do the same thing.

42  TA: Yup.

43  JB: Alright well-

44  TA: That's right.

45  JB: Alright so, I'll deny you go back to the judge, he does the
46  motion- you guys do a motion to compel-

47  TA: So what judge does that go to? Flynn or to Bucklew or who?

48  JB: No some other magistrate judge.

49  TA: Oh.

50  JB: It's all ridiculous. But my- the bo-bottom line is, Bill, we
51  have to, maximize our delay tactics as well just like they're
52  doing.

53  TA: Right.

**U.S. District Court**
**Middle District of Florida**
**Tampa Division**

## GOVERNMENT EXHIBIT

Exhibit No.: _9C − T_

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: _12/14/21_

Date Admitted: _12/14/21_

1 **Audio:** 1639017454_223_12_171_475: 12/8 call with Scott Olson
2 (7:36 to 9:57, 11:11 to 11:50)

3 **PARTICIPANTS:**

4 JB: Jeremy Michael Brown

5 SO: Scott Olson

6 **TRANSLATION KEY:**

7 UI: UNINTELLIGIBLE

8 IA: INAUDIBLE

9 PH: PHONETIC

10 SC: SIMULTANEOUS CONVERSATION

11 OV: OVERLAPPING VOICES

12 []: NOISE NOTATIONS OR TRANSLATOR'S NOTES

13 RC: RECORDED MESSAGE

14

15 =================================================================

16 [BEGIN TAPE][00:07:36]

17 JB: I sit there and they're like we have this and they slide
18 like it's uh- like it's uh- multimillion dollar business offer
19 right, just slide it-

20 SO: Yeah.

21 JB: We have a warrant for your DNA. And so-

22 SO: Yeah.

23 JB: there blabbering right, and they're like you have to give us
24 your DNA, I mean, you can refuse, but if you do we're just gonna
25 go to the judge, he's gonna you know order you and then we'll
26 come back in and you refuse again then we're just gonna have to
27 press charges.

28 SO: M-hm.

29 JB: And I'm like- okay. And I go well, uh I'll be exercising my
30 Sixth Amendment right to counsel and I'll also be exercising my
31 Fifth Amendment right to not incriminate myself so I will not be

32   providing the sample. And dude they like- both like pissed. And
33   bolt out of the room [Laughter]. They're like, we'll be right
34   back. Then they're gone-

35   SO: Yeah.

36   JB: like ten minutes. They come back and they're like, we're
37   trying to call your attorney, I'm like oh okay no problem. So
38   they give me two sheets of paper, the front of the warrant,
39   which ju- has no information on it all-

40   SO: M-hm, m-hm.

41   JB: and then the back of the warrant which basically just says,
42   collect, you know a buccal swab of his-

43   SO: Yeah.

44   [UI: BACKGROUND NOISE 8:36 to 8:43]

45   JB: [UI] into your mouth, but attachment A, which is actually
46   all the information about the warrant, not in there.

47   SO: It's not there, yeah.

48   JB: So they come back and they're like well, you can go back to
49   your cell now and I'm like well I- maybe this was an oversight
50   on your part I understand, I go but this isn't the warrant, this
51   is only the front and back page of it, where the rest of it? Oh
52   well we can't give that to you. We gave that to your attorney,
53   he has it. And I'm like, okay. [Laughter] Like have a nice day.

54   SO: Yeah.

55   JB: But like [UI} they totally tried just like, I mean, and I
56   was telling one of the guys here I'm like, wh-what pisses me off
57   is that, if I wasn't in this jail cell, these guys would be
58   sitting at the bar buying me drinks asking me-

59   SO: Yeah.

60   JB: So what's it like? Right?

61   SO: Yeah. Yeah.

62   JB:  But now here these guys are like mean-mugging me and I mean
63   they're- and they're- relatively young guys I guess.

64   SO: Yeah.

65   JB: Um- and it was just kinda comical man, it's like, oh my gosh
66   so I came back and called Bill and of course they're at the

67  house uh um and Bill, you know Bill just a consummate attorney,
68  he's like well I don't know that we can- I mean we're gonna have
69  to comply, I'm like Bill it's not about complying it's about
70  playing the same-

71  SO: Yeah.

72  JB: delay games that they play with us.

73  SO: Yeah.

74  JB: I go- we just need to tell them, we're not gonna do anything
75  until they do it the right way. Cause-

76  SO: Yeah.

77  JB: what they're trying to do is prevent me from having any
78  information.

79

80  [Clip 11:11 to 11:50]

81  JB: It's all a delay game.

82  SO: M-hm.

83  JB: They're just full of shit. They're just delaying- delaying
84  it, they don't-

85  SO: M-hm.

86  JB: Wanna go to trial because once people start going to trial,
87  these judges start-

88  SO: M-hm.

89  JB: ordering that discovery that be released, and it gets out to
90  the public-

91  SO: Yeah.

92  JB: and everybody knows it's all bullshit.

93  SO: Yeah.

94  JB: Um.

95  SO: Yeah.

96  JB: and so- its- it's hilarious.

97   SO: Yeah so [UI] - wh-when Bill I was there when Bill was there,
98   talking to you and-

99   JB: Yeah.

100   SO: after he got off he's like, Jeremy makes some fantastic
101   points, he goes, just showing that they have to play the game,
102   if we play the game he's like, that is a fantastic point and I
103   totally agree.

104   JB: [Laughter]

105   SO:  I haven't even thought of that. That's great. So.

106   [00:09:57][END TAPE]

**U.S. District Court**
**Middle District of Florida**
**Tampa Division**

## GOVERNMENT EXHIBIT

Exhibit No.: _9D - T_

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: _12/14/21_

Date Admitted: _12/14/21_

**Audio:** 1635342093_438_12_171_871: 10/27 call with Erin Olzewski (13:04 to 16:39)

**PARTICIPANTS:**

JB: Jeremy Michael Brown

EO: Erin Olzewski

**TRASLATION KEY:**

UI: UNINTELLIGIBLE

IA: IAUDIBLE

PH: PHONETIC

SC: SIMULTANEOUS CONVERSATION

OV: OVERLAPPING VOICES

[]: NOISE NOTATIONS OR TRANSLATOR'S NOTES

RC: RECORDED MESSAGE

=================================================================

[BEGIN TAPE] [00:13:04]

JB: Um- we submitted the motion for a new bond hearing, um, either Monday afternoon or yesterday. I am not sure yet. Tylene is going to talk to my attorney today. Um-

[OV] EO: Okay.

JB: -and then that will be dependent on the Judge's calendar. You know? Hopefully he doesn't have any golf matches or uh you know charity-

[OV] EO: Yeah.

JB: -events to attend. Um but at the worst case the no later than is November 5th, which is my arraignment and what he said is- that if for some reason we can't get on Judge Flynn's calendar before the 5th then that arraignment will also act as a bond hearing. And that will be in front of my actual- the District Judge who is gonna actually try the case. The Judge I have been before up to this point is just the Magistrate Judge.

[OV] EO: Mhm.

JB: Uhm and so, if it goes to November 5th I'll be in front of uh a Judge Buckler. I think is her name. She is like a 77 year old woman. Um. And that will act as a- hopefully it doesn't go that long. I was hoping to maybe get a hearing this week but I mean honestly as I lay here and I am thinking- okay, I mean I don't want to be Owen Shroyer and just be like I'll do whatever you want just let me out. Um. Th-

The reality is what they are gonna likely do is they're going to put unconstitutional restrictions on me.

EO: Yeah.

JB: And you know and at that point now I have a moral dilemma. Do I accept these unconstitutional limits like a gag order or a fucking ankle bracelet? Because I mean the Fourth Amendment says that I am not allowed to be deprived of life, liberty, or property without due process. Well- tha-part of that is the Eighth Amendment requirement that you can't have excessive bond. Well, you are going to strip me of constitutional rights simply because I wanna be out and prepare for my case as an innocent man until proven guilty? Like-

[OV] EO: Right

JB: -it's all, its all- Fuck. It all builds on itself and of course because everyone has gone along with it for so long to even say that you are violating my First, my Second, my Fourth, my Fifth, my Sixth, my Eighth Amendment rights, you can't do that. People are like well they do that all the time. It's like that doesn't matter [laughs]

EO: Yeah.

JB: It doesn't matter

[OV] EO: Yeah.

JB: Like they can't do it, so. I'm like should I just-

[OV] EO: Oh

JB: -reject bond? And then that would put me in a position to now be able to challenge all these unconstitutional grounds but then it's like alright well who would even take that case up? Or should I just get out and just do what everybody else does? Just go along, to get along. [Sighs] It's just-

[OV] EO: Well-

JB: - it's frustrating because I don't want to be in here but I also don't want-

[OV] EO: Do you want?

JB: -to obey the man-

[OV] EO: Yeah.

JB: -telling me that I have to do things that I don't have to do. So, I have-

[OV] EO: I think that-

JB: -to talk to my attorney about it.

EO: I think that the-the number one thing that they absolutely hate is public attention. Um. That's why-

[OV] JB: Well, right that's the reason why they gag everybody.

EO: Yeah. I mean- they look at- they put a gag order on me and I talk anyway.

[OV] JB: Right.

EO: So, I'm like fuck you. Like- you- you're do- this is wrong and you know it.

JB: Right

EO: And so like- who cares.

[00:16:39][END TAPE]

**U.S. District Court**
**Middle District of Florida**
**Tampa Division**

## GOVERNMENT EXHIBIT

**Exhibit No.:** 9E - T

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: 12/14/21

Date Admitted: 12/14/21

**Audio:** 1636647445_438_13_151_590: 11/11 call with Cathi Chamberlain (20:00 to 23:04)

**PARTICIPANTS:**

JB:   Jeremy Michael Brown

CC:   Cathi Chamberlain

**TRASLATION KEY:**

UI:  UNINTELLIGIBLE

IA:  IAUDIBLE

PH:  PHONETIC

SC:  SIMULTANEOUS CONVERSATION

OV:  OVERLAPPING VOICES

[]:  NOISE NOTATIONS OR TRANSLATOR'S NOTES

RC:  RECORDED MESSAGE


================================================================

[BEGIN TAPE][00:20:00]

JMB:  The sense I get is that the District Judge is allowing him to correct himself, so that she doesn't have to overturn him. [OV] Or…

CC:   Got it, okay.

JMB:  You know what I'm saying?

CC:   Yes, I do.

JMB:  Because, the bottom line is he knows he's wrong which is why when I asked him on Friday.  I said, "Can you please restate the grounds on which I'm being held?"  Right? Remember, remember..[OV}

CC:   Yep.

JMB:  He refused to answer it. [chuckle]

CC:   Yeah, okay.

JMB:  He gave the old, "I've already explained that to the Judge, right? Cause he knows that he's wrong.

CC:   Yeah, right.

JMB:  And so uh, that's why we've order the transcripts

CC:   [clearing throat]

JMB:  in order to get his exact words. Because in his initial ruling on October 5th, he, he throws out all the reasons the federal government

gave. He said "I'm not a flight risk, he said, "uh that he doesn't agree with any of the things that the [UI], but the one thing was that sign. So, I wanna

CC: Yeah, right.

JMB: have Bill have that transcript and his words because what, what he's probably gonna try to do when he does give me bond is put a bunch of restrictions on me that again are unconstitutional like an ankle monitor or seizing all my firearms and then I'm gonna say, "Well, no wait a minute. You said that none of those reasons were the reason I was denied bond…

CC: Yes.

JMB: so, now why are you violating my constitutional rights?" And, and

CC: Yeah.

JMB: and I wanna make the case that why is it that the 2nd Amendment is the only Amendment that they seem to want to ever revoke in these situations so I'm innocent until proven guilty, right? So, I'm an innocent man [OV]

CC: Yep.

JMB: I'm on constitutionally protected bond as an innocent man. But then what gives you the grounds to confiscate my weapons and violate my 2nd Amendment. You have you aren't confiscating any of my other rights? So why is there

CC: Um hum.

JMB: only one of the 10. So to me that's an equal protection under the law argument as well as a violation of the 2nd Amendment argument. Because in essence the Court is saying, "while you are innocent we're gonna deny you the right to self-defense by having you arbitrarily give up your weapons. Even though there's no, there's no uh..there's no evidence of any violence of anything like that. And there likely gonna have Tylene also give up her weapons. Right? Because I'm staying..[OV}

CC: Yeah, yeah.

JMB: in the house with her. So since when does somebody associated with you lose their constitutional rights simply because you're innocent until proven guilty beyond a reasonable doubt. So, these are some [OV]

CC: Well, if it's a condition of the Judge for your release and you're staying with her um…[OV} that would kinda make sense

JMB: Right, but it an unconstitutional condition.

CC: Yeah, ok, ok…well, yeah.

JBM: I mean, just because you're accused of a crime doesn't mean that you ah..forfeit your constitutional rights.

CC: Right, right, right. How are you feeling about everything?   [OV]

JBM: Now, if you're convicted of a crime, obviously then you lose things, so.

CC: Yeah, obviously.  Yeah, I got you. Yeah, it goes back to the guilty until proven innocent.

JMB: Right.

[00:23:04][END TAPE]

**U.S. District Court**
**Middle District of Florida**
**Tampa Division**

## GOVERNMENT EXHIBIT

**Exhibit No.:** 9F - T

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified:  12/14/21

Date Admitted:  12/14/21

**Audio:** 1635123880_438_13_212_374: 10/24 call with Kristie Tertel (7:22 to 9:03)

**PARTICIPANTS:**

JB: Jeremy Michael Brown

KT: Kristie Tertel

**TRASLATION KEY:**

UI: UNINTELLIGIBLE

IA: IAUDIBLE

PH: PHONETIC

SC: SIMULTANEOUS CONVERSATION

OV: OVERLAPPING VOICES

[]: NOISE NOTATIONS OR TRANSLATOR'S NOTES

RC: RECORDED MESSAGE

================================================================

[00:07:22][BEGIN TAPE]

JB: Brandon is in the process of putting together a video with all the-

[OV] KT: Mhm

JB: -surveillance footage that we took, as well as Tylene's iPhone footage of the arrest. Um-

KT: I have stuff for him if you want from my footage from January 6th

JB: Okay. Um, well th-this is more about the day that they arrested me-

[OV] KT: Okay.

JB: -and put me in here. Because there's very damning stuff in that footage, right? So- that's where they admit that they don't know what they are looking for in the search warrant yet and shit like that. Um- so, what I'm- what I'm wanting to do is if he finishes editing that I want him t- I wanna have you guys review it. If it's acceptable for release on a wide scale meaning-

KT: Mhm

JB: -you know, it might be something that a Tucker Carlson would show or OAN or-or-or whatever. Then what I would like to do-

KT: Mhm

JB:- is pre-distribute it with the agreement that it's not released any earlier than the start of my hearing because once we are in the

hearing they're not going to interrupt it and be like "oh my god your Honor look at this shit" [laughs]. You know? So-

KT: Right. Right. Now make sure-

[OV] JB: -that way-

KT: - you run that by your lawyer as well. You know? Because-

[OV] JB: Yeah. Yeah

KT: -you don't wanna have evidence, you know, given out in advance cause that would not be good.

JB: Well I mean the-the-the reality is that I'm not worried about them knowing what they did wrong because-

[OV] KT: Mhm

JB: -this-this going to be [shouting in background] this is going to be a case heavily fought in the-the court of public opinion and-

[OV] KT: Mhm

JB: -it's very likely that the judge is probably going to try to gag me as conditions-

[OV] KT: Mhm

JB: -my bond. Um, which that's going to go really well. [Laughs]

[00:09:03] [END TAPE]

**U.S. District Court**
**Middle District of Florida**
**Tampa Division**

## GOVERNMENT EXHIBIT

**Exhibit No.:** 9G - T

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: 12/14/21

Date Admitted: 12/14/21

1  **Audio:** 1635991211_438_12_196_361, 11/3 call with Tylene Aldridge (22:30 to
2  24:16)

3  **PARTICIPANTS:**

4  JB: Jeremy Michael Brown

5  TA: Tylene Aldridge

6  **TRASLATION KEY:**

7  UI: UNINTELLIGIBLE

8  IA: IAUDIBLE

9  PH: PHONETIC

0  SC: SIMULTANEOUS CONVERSATION

1  OV: OVERLAPPING VOICES

2  []: NOISE NOTATIONS OR TRANSLATOR'S NOTES

3  RC: RECORDED MESSAGE

4

5  =================================================================

6  [BEGIN TAPE][00:22:30]

7  JB: So, the way it's supposed to work is they charge you with-

8  [OV] TA: [coughs]

9  JB: -a crime. They arrest you. They tell you what your charges are. They
0      issue a bond. Right? Like, for example, uh- your house. Your-your
1      bond is set at three hundred and seventy seven thousand dollars.

2  TA: Right. No. I understand that part. Yeah.

3  JB: With federal cases, they don't actually pay the three seventy seven
4      but if I don't show up to trial then they take your house. That's how
5      it works.

6  TA: Right.

7  JB: So, therefore-

8  [OV] TA: I know.

9  JB: -there is no reason for me to be held in jail. There is no reason for
0      me to have an ankle monitor. There is no reason for any of this shit
1      because that's what bond serves the purpose of doing. It's ensuring-

2  [OV] TA: Right

3  JB: -that you show up to your trial.

4  TA: Right.

5   JB: And so, their entire purpose- their entire reason for denying bond,
6       unconstitutional.

7   TA: Right.

8   JB: Because the Judge even admitted, "I don't think you're a flight risk.
9       I don't think this. I don't think that." The only thing that he
0       denied me bond on was that stupid sign and the only reason he could
1       deny me that bond on that stupid sign is because he, in his opinion,
2       he felt that it could possibly be a threat. Well, I'm not being
3       charged with a threat. And-

4   [OV] TA: Right.

5   JB: -the sign was an if, then statement. If you violate the law, you
6       better- you better bring a bigger tactical package. That's it.

7   [OV] TA: [UI]

8   JB: It didn't say if- if you're- you just happen to be wearing a badge, I
9       am going to attack you. It didn't say that.

0   [OV] TA: Right. Mhm

1   JB: So, the whole purpose, the whole reason he denied the bond was
2       completely ridiculous. He knows it which is why he said, "Uh,
3       alright, we will have another bond hearing."

4   [00:24:16][END TAPE]

**U.S. District Court**
**Middle District of Florida**
**Tampa Division**

## GOVERNMENT EXHIBIT

**Exhibit No.:** 10

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: 12/14/21

Date Admitted: 12/14/21

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
A RESIDENCE LOCATED AT ▮▮▮▮▮▮▮▮▮▮ A )  Case No. 21-sw-315
RECREATIONAL VEHICLE (▮▮▮▮▮▮▮▮▮▮ PARKED AT )
▮▮▮▮▮▮▮▮▮ A BLACK TRAILER ▮▮▮ )
▮▮▮▮▮▮▮▮▮▮▮▮ AND A )
CELL PHONE CURRENTLY BEING USED BY JEREMY BROWN UNDER RULE
41

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

located in the _____ Middle _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 371 (conspiracy); 231(a)(2) (transport of firearms or explosives for use in civil disorder); 844(a)(2) (transportation of explosives) and 1752(a) (1) and (2) (unlawful entry on restricted buildings or grounds). | |

The application is based on these facts:

See attached Affidavit (incorporated by reference).

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Katie M. Hill*

*Applicant's signature*

Katie Hill, Special Agent, FBI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 09/29/2021 _____

Zia M. Faruqui
2021.09.29 19:35:42 -04'00'

*Judge's signature*

City and state: Washington, D.C.

Zia M. Faruqui, U.S. Magistrate Judge

*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>A RESIDENCE LOCATED AT ▉▉▉▉▉▉▉A<br>RECREATIONAL VEHICLE ▉▉▉▉▉ PARKED AT<br>▉▉▉▉ A BLACK TRAILER ▉▉▉▉▉<br>▉▉▉▉▉ , AND<br>A CELL PHONE CURRENTLY BEING USED BY JEREMY BROWN UNDER<br>RULE 41 | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No.  21-sw-315 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Middle _____ District of _____ Florida _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

**YOU ARE COMMANDED** to execute this warrant on or before _____ October 13, 2021 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Zia M. Faruqui, U.S. Magistrate Judge _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   09/29/2021

Zia M. Faruqui
2021.09.29 19:36:09 -04'00'

*Judge's signature*

City and state:      Washington, D.C.

Zia M. Faruqui, U.S. Magistrate Judge
*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>21-sw-315 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |

Inventory of the property taken and name(s) of any person(s) seized:

| Certification |
|---|

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

                                            _____
                                                *Executing officer's signature*

                                            _____
                                                  *Printed name and title*

## **ATTACHEMENT A**

### PREMISES TO BE SEARCHED

The property and curtilage to be searched is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ located in the Middle District of Florida, further described as a single-story residence

located at the corner of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The residence

is a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Next to the front door ▮▮▮▮ is affixed

to the mailbox.

## **Photograph**



## **Map**



## **ATTACHEMENT B**

### PREMISES TO BE SEARCHED

A recreational vehicle parked at ███████████████████████ located

in the Middle District of Florida, registered to ██████████████████████

███████

## **Photograph**



## **Map**



## **ATTACHEMENT C**

### PREMISES TO BE SEARCHED

A black trailer parked at [                    ] located in the

Middle District of Florida, registered to [                    ]

## **Photograph**



## Map



45

## **ATTACHMENT D**

*Property to be searched*

The property to be searched is a cellular phone (the "**TARGET PHONE**") associated with

phone number          which is to be seized from the person of Jeremy Brown (born on

          vicinity of Jeremy Brown, or locations listed in Attachments A, B, and C

within the state of Florida.

## **ATTACHMENT E**

### *Property to be seized*

1.     All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 USC 371 (conspiracy); 18 USC 231(a)(2) (transport of firearms or explosives for use in civil disorder); 18 USC 844(a)(2) (transportation of explosives) and 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds) (the "Subject Offenses") that have been committed by BROWN and/or other identified and unidentified persons, as described in the affidavit submitted in support of this Warrant, including:

      a.  Records and information that constitute evidence of use, control, ownership, or occupancy of the PREMISES and things therein;

      b.  Evidence of the Subject Offenses, to include clothing, protective/tactical gear worn during the offenses, as described and depicted in the attached affidavit, and firearms, explosives, precursor materials, other weapons and cases to hold or transport weapons or explosives, and instructions or documents showing an intent to obtain, manufacture, or employ weapons or explosives;

      c.  records and information concerning:

          i.  the identification of BROWN and other persons, including photographs and videos depicting clothing and other articles and paraphernalia that reflect evidence of having been present at or near the U.S. Capitol Building on or around January 6, 2021;

          ii.  the identification of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the SUBJECT

> OFFENSES; or (ii) communicated about matters relating to the SUBJECT
> OFFENSES, including records that help reveal their whereabouts;

   iii. the U.S. Capitol Building, including any maps or diagrams of the Building
        or its internal offices, or presence at, or inside of or on the grounds of, the
        Building on or around January 6, 2021, including any planning, preparation,
        or travel;

   iv. challenges to or questions about the legitimacy of the 2020 Presidential
       Election, including awareness of, or any efforts or intent to disrupt, the
       certification process of the 2020 Presidential Election, or otherwise
       influence the policy or composition of the United States government by
       intimidation or coercion;

   v. materials, devices, tools, plans, or strategies to enter or assist others in
      entering the U.S. Capitol Building on or about January 6, 2021, by deceit or
      by force, including weapons and elements used to breach the building or to
      counter efforts by law-enforcement, such as pepper spray or smoke
      grenades;

   vi. communication devices, including closed circuit radios, walkie-talkies, or
       secure or encrypted "apps," related to the directing of others or direct
       presence at, inside of, or on the grounds of, the U.S. Capitol Building on or
       around January 6, 2021;

   vii. any conspiracy, planning, or preparation to commit the SUBJECT
        OFFENSES, or efforts to conceal evidence of the SUBJECT OFFENSES

from law enforcement, or to flee prosecution for the SUBJECT OFFENSES;

    viii.  the state of mind of BROWN and/or co-conspirators, *e.g.*, intent, absence of mistake, or evidence indicating preparation, planning, knowledge, or experience, including but not limited to tactical training or tactical equipment, related to the SUBJECT OFFENSES;

    ix.  affiliation or communication with the Oath Keepers, including members thereof.

2.    For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

    a.  evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

    b.  evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

    d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

    e. evidence of the times the Device(s) was used;

    f. passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

    g. documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

    h. records of or information about Internet Protocol addresses used by the Device(s);

    i. records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.    As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

4.    The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

5.    The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-

ROMs, and other magnetic or optical media.

6.     The United States government will conduct a search of the property described in Attachment A-D and determine which information is within the scope of the information to be seized specified above. That information that is within the scope of this warrant may be copied and retained by the United States.

7.     Law enforcement personnel will then seal any information from the property searched that does not fall within the scope of this warrant and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

8.     This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

9.     During the execution of the search of the PREMISES described in Attachment A-D, law enforcement personnel are also specifically authorized to obtain from BROWN (but not any other individuals present at the PREMISES at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any Device(s) requiring such biometric access

subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned persons' physical biometric characteristics will unlock the Device(s), to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of:

      (a)     any of the Device(s) found at the PREMISES,

      (b)     where the Device(s) are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments,

for the purpose of attempting to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant.

      10.     While attempting to unlock the Device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the Device(s). Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) is permitted. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make

clear that providing any such information is voluntary and that the person is free to refuse the request.

## PART II – INFORMATION AND DATA
## TO BE SEIZED FROM THE DEVICES

The following records and information located on the Devices and related to violations of

18 U.S.C. §§ 371 (conspiracy); and 1752(a)(1) and (2) (unlawful entry on restricted buildings or

grounds); (the "Subject Offenses") that have been committed by BROWN and/or other identified

and unidentified persons, including:

a.     The records and information described in Part I, above, in any electronic form;

b.     Evidence of who used, owned, or controlled the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, "chat," instant messaging logs, photographs, and correspondence;

c.     Evidence of software that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

d.     Evidence of the lack of such malicious software;

e.     Evidence indicating how, when, and where the Devices were accessed or used to determine the chronological context of device access, use, and events relating to crime under investigation and to the Devices user;

f.     Evidence indicating the Devices user's state of mind as it relates to the crime under investigation;

g.     Evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

h.     Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Devices;

i.     Documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

j.      Records of or information about Internet Protocol addresses used by the Devices;

k.      Records of or information about the Devices' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

l.      Contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
A RESIDENCE LOCATED AT ▮▮▮▮
▮▮▮▮▮▮▮▮▮ A
RECREATIONAL VEHICLE ▮▮▮▮
▮▮▮▮▮▮▮▮ PARKED AT
▮▮▮▮▮▮▮▮▮▮▮▮
A BLACK TRAILER ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ AND A CELL
PHONE CURRENTLY BEING USED BY
JEREMY BROWN UNDER RULE 41



SW No. 21-sw-315

## AFFIDAVIT IN SUPPORT OF
## APPLICATIONS FOR A SEARCH WARRANT

Your affiant, Katie Hill, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      Your affiant is a Special Agent with the Federal Bureau of Investigation ("FBI"),
and, as such, am a "federal law enforcement officer" within the meaning of Federal Rule of
Criminal Procedure 41(a)(2)(C). Your affiant joined the FBI as a Special Agent in August 2009.
Your affiant is currently assigned to the FBI's Tampa Division Joint Terrorism Task force
("JTTF"). Your affiant's official duties include, but are not limited to, investigating individuals
and groups who have committed violations of federal laws, including federal laws related to
threats, international terrorism, and domestic terrorism. As a special agent, your affiant has
participated in numerous investigations and have executed both arrest and search warrants. The
facts in this affidavit come from my personal observations, my training and experience, and
information obtained from other agents and witnesses.  This affidavit is intended to show merely
that there is sufficient probable cause for the requested warrant and does not set forth all of my
knowledge about this matter.

2.      Based on the facts set forth in this affidavit, there is probable cause to believe that

violations of 18 USC 371 (conspiracy); 18 USC 231(a)(2) (transport of firearms or explosives for

use in civil disorder); 18 USC 844(a)(2) (transportation of explosives) and 1752(a)(1) and (2)

(unlawful entry on restricted buildings or grounds) (the "Subject Offenses") have been

committed by JEREMY BROWN and/or other identified and unidentified persons. In addition,

there is probable cause to believe that evidence of these crimes will be found within the Middle

District of Florida at the following locations (collectively "the **Premises**"):

- The residence (the "**Residence**" further described in Attachment A) that BROWN
  currently resides in located at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

  ▮▮▮▮▮▮

- The recreation vehicle ▮▮▮▮▮▮▮▮▮▮▮▮ (the "**RV**" further
  described in Attachment B) that is parked at ▮▮▮▮▮▮▮▮▮▮▮

  ▮▮▮▮▮▮▮

- A black trailer ▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "**Trailer**" further
  described in Attachment C) that is parked at ▮▮▮▮▮▮▮▮▮▮▮

  ▮▮▮▮▮▮

- a cell phone associated with the phone number ▮▮▮▮▮ (the "**TARGET**
  **PHONE**" further described in Attachment D) currently being used by BROWN.

## JURISDICTION

3.      Although the PREMISES are located outside this district, this Court has jurisdiction

under Federal Rule 41(b)(3) because this is an investigation of domestic terrorism as that term is

defined in Title 18, U.S.C. Section 2331(5)(b):

2

[T]he term "domestic terrorism" means activities that- (A) involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State; (B) appear to be intended- (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily within the territorial jurisdiction of the United States.

18 U.S.C. § 2331(5).

## **PROBABLE CAUSE**

### *Background*

4.     The US Capitol Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 on January 6, 2021.

### *The 2020 United States Presidential Election and the Official Proceeding on January 6, 2021*

5.     The 2020 United States Presidential Election occurred on November 3, 2020.

6.     The United States Electoral College is a group required by the Constitution to form every four years for the sole purpose of electing the president and vice president, with each state appointing its own electors in a number equal to the size of that state's Congressional delegation.

7.     On December 14, 2020, the presidential electors of the U.S. Electoral College met in the state capital of each state and in the District of Columbia and formalized the result of the 2020 U.S. Presidential Election: Joseph R. Biden Jr. and Kamala D. Harris were declared to have won sufficient votes to be elected the next president and vice president of the United States.

3

8.      On or about December 19, 2020, President Donald J. Trump tweeted, "Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!"

9.      On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate ("the Joint Session") convened in the United States Capitol building (the "Capitol" or the "U.S. Capitol") to certify the vote of the Electoral College of the 2020 U.S. Presidential Election (the "Certification").

### Criminal Activity Before the Riot

10.      Based on my knowledge, training, and experience, I know that participants in the kinds of criminal activities described herein tend to, and often did here, take certain preparatory steps before committing their crimes, including: researching and purchasing materials and supplies such as burner phones, tactical vests and helmets, and weapons including bear spray, pepper spray, asps (police batons), guns and ammunition, and zip tie restraints; mapping and reconnoitering the location of the planned crime and possible entry and escape routes, including checking for surveillance cameras and other potential security surrounding such locations; training in how to use their weapons and other tools and techniques involved in their planned criminal activity; and organizing with other co-conspirators on social media and elsewhere for planned travel and methods of attack.

11.      Beginning after the election in November 2020, text and other communications show that some groups of subjects planned and attended military-style training in preparation for opposing the results of the election. Multiple groups that forcibly entered the Capitol appeared to consist of individuals who had coordinated their actions. Some groups at the riot included members who dressed in similar uniforms with the same insignia, and members of some groups

4

can be heard on video giving and following instructions. Based on my training and experience, and this investigation, these groups' manner of dress, movements, and communication demonstrate that they had prepared together. Furthermore, the movement of these groups within the Capitol demonstrates an intent to, among other things, oppose by force Congress's authority, and to prevent, hinder, or delay the execution of the Joint Session's legal responsibilities.

12.    Beginning in December 2020, using social media, text messaging, and messaging applications, subjects planning to participate in the riot sent incendiary messages aimed at recruiting as large a following as possible to go to Washington, D.C. to interfere with the official Congressional proceeding on January 6, 2021. This investigation has shown that many of the subjects of this investigation came from out of state and coordinated using social media, text messaging, and messaging applications on their cell phones.

13.    During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and helmets. The common equipment and paraphernalia that groups inside and outside the Capitol possessed, such as bear spray, eye protection, tactical vests, and helmets, are evidence of some prior agreement among individuals to engage in the conduct described herein.

### *The Riot at the U.S. Capitol on January 6, 2021*

14.    At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres. The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point. The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol. On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of

5

open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor. On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway. All this area was barricaded and off limits to the public on January 6, 2021.

15.     The U.S. Capitol is secured 24 hours a day by USCP. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

16.     On January 6, 2021, the area of the U.S. Capitol grounds was established as a restricted area. This restricted area consisted of both permanent and temporary security barriers as well as posts manned by USCP to include bike racks. The restricted area was bounded to the north of the U.S. Capitol along Constitution Avenue; to the south of the U.S. Capitol along Independence Avenue; to the west of the U.S. Capitol along the eastern side of First Street; and, on the east side of the U.S. Capitol, between the East Front and the grassy areas located between the Plaza and First Street. Within the grassy area, a designated area for media was restricted by bike racks. This bounded area is hereinafter referred to as the "Restricted Grounds." People could lawfully be on the Capitol grounds outside of the Restricted Grounds including on the East Front, east of the bike racks along the Capitol Plaza, including all of the grassy areas on the East Front.

17.     Within the West Front of the Restricted Grounds were additional temporary barriers due to preparations and ongoing construction for the Presidential Inauguration including perforated green plastic sheeting attached to stakes at regular intervals, known as snow fencing, and signage stating "Area Closed by order of the United States Capitol Police Board." The exterior plaza of the U.S. Capitol was also closed to members of the public.

6

18.     A map of the area of the U.S. Capitol showing the Restricted Grounds is below,

the red line marks the police line at the edges of the Restricted Grounds:



Figure 2: Restricted Grounds around the U.S. Capitol on January 6, 2021.

19.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.     During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020.  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m., the House and Senate

7

adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

20. As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

21. At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol. Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

22. At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.

23. Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence." I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

24. At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials. At such time, the

8

certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

25.     Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



26.     Multiple groups that forcibly entered the Capitol appeared to consist of individuals who had practiced and/or coordinated their actions. For example, some groups included members who dressed in similar uniforms with the same insignia, and members of some groups can be heard on video giving and following instructions. Based on my training and experience, and this investigation, these groups' manner of dress, movements, and communication demonstrate that

certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

25.     Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



26.     Multiple groups that forcibly entered the Capitol appeared to consist of individuals who had practiced and/or coordinated their actions. For example, some groups included members who dressed in similar uniforms with the same insignia, and members of some groups can be heard on video giving and following instructions. Based on my training and experience, and this investigation, these groups' manner of dress, movements, and communication demonstrate that

9

an extended magazine. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

30.     Also, at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

31.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

32.     At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video on the news media website of The New Yorker shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



33.     After subjects forced entry into the Senate Chamber, the same publicly available video shows that an individual asked, "Where the fuck is Nancy?" Based upon other comments

and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



34.  A subject left a note on the podium on the floor of the Senate Chamber. This note, captured by the filming reporter on the same video, stated, "Its Only A Matter of Time Justice is Coming."

12



35.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

36.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

37.     At around 4:52 p.m. EST, at a staging area for the media set up outside of the U.S. Capitol building on the east side, unknown subjects assaulted members of the media and stole and destroyed equipment owned by various members of the media and media companies.

38.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

39.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at

13

approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

40. Beginning around 8:00 p.m., the Senate resumed work on the Certification.

41. Beginning around 9:00 p.m., the House resumed work on the Certification.

42. Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

## *Cell Phone Usage at the Riot*

43. During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there. Subjects also posted comments, pictures, and video before, during, and after breaching the Capitol grounds and the Capitol building.

44. Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to coordinate with other participants at the gatherings, to communicate with other individuals about the gatherings, to allow individuals to capture photographs and video footage of the gatherings, and to post on social media and digital forums about the gatherings. Nearly every phone is internet equipped and allows individuals to access the internet, including Google.

45. Many subjects, including those detailed below, seen on news footage in the area of the U.S. Capitol were using a cell phone in some capacity. Based on my participation in this investigation, I know some subjects were recording the events occurring in and around the U.S.

14

Capitol and others took photos, to include photos and video of themselves after breaking into the U.S. Capitol itself. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

46.     Photos available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot. In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos.

47.     In addition, organized groups within the rioters used social media, text messaging, and messaging applications and other apps on their cell phones to plan and coordinate their activities before, during, and after the riot. As described further below, Oath Keepers and individuals associated with the Oath Keepers engaged in substantial use of internet connected cellular devices during the riots of January 6, 2021.

### *Criminal Activity After the Riot*

48.     Following the riot, many subjects posted pictures, video, and texts showing and describing their participation in the riot. These included selfies and videos apparently taken with their personal cell phones. Many of these posts were subsequently deleted. I know from my knowledge, training, and experience that people who commit criminal acts will often delete such information in an attempt to thwart any subsequent criminal investigation. Some subjects subsequently fled their homes and went into hiding.

15

### Facts Specific to This Application

#### The Oath Keepers Militia

49.    Law enforcement and news-media organizations observed that members of an organization known as the Oath Keepers were among the individuals and groups who forcibly entered the Capitol on January 6, 2021. The Oath Keepers are a large but loosely organized collection of individuals, some of whom are associated with militias. Some members of the Oath Keepers believe that the federal government has been coopted by a cabal of elites actively trying to strip American citizens of their rights. Though the Oath Keepers will accept anyone as members, they explicitly focus on recruiting current and former military, law enforcement, and first-responder personnel. The organization's name alludes to the oath sworn by members of the military and police to defend the Constitution "from all enemies, foreign and domestic." The Oath Keepers are led by PERSON ONE.

50.    In a widely disseminated video[1] recorded by a photojournalist on January 6, 2021, a "stack" of individuals dressed in matching uniforms consisting of camouflaged-combat attire, to include confirmed Oath Keeper members (further described below), moves up and through a crowd on the east side of the U.S. Capitol. A screenshot of the video is below, with a portion of the "stack" encircled by a red oval:

---

[1] See https://apnews.com/article/ex-military-cops-us-capitol-riot-a1cb17201dfddc98291edead5badc257/gallery/0ecd1781c66d437f92c61b3f4848a74e

16



51.     Law enforcement reports that a stack or line formation is a tactical formation used by infantryman in the military. One defining feature of this formation is that members keep their hands on the backs or vests of the person in front of them to remain together while entering a room or weaving through a crowd. The purpose of maintaining direct physical contact with one another is to efficiently communicate with one another, especially in crowded or noisy areas.

52.     A service called "News2Share" uploaded to YouTube a video of the January 6, 2021, attack at the Capitol. At the approximate 3-minute-and-8-second mark, the video shows eight-to-ten individuals in matching uniforms consisting of camouflaged-combat attire aggressively approaching an entrance to the Capitol.[2] These individuals, who are wearing helmets, reinforced vests, and clothing with Oath Keeper logos and insignia, can be seen moving in an

---

[2] See https://www.youtube.com/watch?v=b76KfHB0QO8&feature=youtu.be.

17

organized and practiced fashion and forcing their way to the front of the crowd gathered around a set of doors to the Capitol.



53.   A close-up view of the badges on the vest of one of these individuals, seen just under the Oath Keepers emblem on his shirt, displays the Oath Keepers motto, "Not On Our Watch." The badge also says, "I don't believe in anything. I'm just here for the violence."



54.   Based on the foregoing observations of the video, and information gained in the course of the investigation, it is reasonable to believe that the organized group of individuals marching to the doors of the Capitol in the video above are members and affiliates of the Oath Keepers. More than a dozen Oath Keepers, including Jessica Watkins, Kelly Meggs, and

18

approximately eight individuals from Florida (including Defendant Four as referenced below), have been charged for their involvement in the January 6 riots.

### Facts Specific to Jeremy Brown

55.     On January 25, 2021, FBI WFO received a complaint from Witness 1 who has known JEREMY BROWN for multiple years. Witness 1 provided publicly available photos of BROWN in tactical gear from January 5, 2021, but was unsure about whether BROWN entered the Capitol during the riots. Your affiant has provided one of the photos here:



A man who said he was an Oath Keeper attends a Washington, D.C., protest over the 2020 election results on Jan. 5. (Shannon Stapleton/Reuters)

56.     Your affiant was able to identify BROWN'S whereabouts on January 6 by comparing the publicly available photo of Brown (above) from January 5th to photography and video from January 6. Your affiant located a publicly available photo of him on Twitter wearing the same distinctive attire standing just before the steps of the East side steps of the Capitol during the riots of January 6. He was more than 100 feet within the restricted grounds that law enforcement had originally set up to protect Congress and Vice President Pence during the certification of the Electoral College vote. Brown wore full military gear, including a helmet, radio,

19

a tactical vest, and prominently displayed large surgical trauma shears tucked into a pack sitting on the vest, nearly the exact attire that he wore on the prior day. Your affiant has provided the Twitter photo below:



57.     Your affiant reviewed body worn camera footage from January 6, 2021 and was able to identify BROWN by his distinctive attire outside the East doors of the Capitol at approximately 4:27 PM. During this period, Brown remained at least one hundred feet past the barriers that law enforcement had initially set up to protect the Capitol. On the body worn camera video, BROWN carried zip ties attached to his belt, as well as a radio, surgical trauma shears, and tactical gear. Metropolitan Police Officers, in attempting to resecure the Capitol Grounds,

20

advanced in a line and yelled "Back" in unison. Instead of voluntarily complying with police orders, BROWN only retreated when pushed with police baton sticks. During this encounter, BROWN repeatedly claimed that the officers were, in his opinion, violating the laws and the Constitution of the United States. Your affiant has included a screenshot below:



58.    In the course of this investigation, your affiant has also reviewed a statement from Defendant 4 who has pled guilty to Conspiracy to Obstruct an Official Proceeding relating to his conduct and the conduct of other Oath Keepers in breaching the US Capitol on January 6, 2021.

59.    According to Defendant 4, Defendant 4 utilized a ride share to travel to BROWN'S house on January 4 in preparation for traveling to Washington D.C. Your affiant has obtained records from the ride share company indicating that Defendant 4 entered an address consistent with BROWN's home address of                                          (the "**Residence**").

60.    According to Defendant 4, Brown and other individuals associated with the Oath Keepers coordinated their activity via a Signal[3] chat of Florida Oath Keepers. They caravanned in a recreational vehicle (the "**RV**") that was, according to Defendant 4, loaded with a cache of

---

[3] Signal is an encrypted chat application.

21

weapons, ammunition, and gas. Defendant 4 followed the **RV** in BROWN'S girlfriend's van. Kelly

Meggs, currently indicted for his role in the conspiracy and the leader of the Florida branch of the

Oath Keepers, informed Defendant 4 that Brown was a "loose cannon" and had explosives inside

the RV. Defendant 4 positively identified Brown in the publicly available Twitter photo referenced

above.

61.     Your affiant has reviewed the Signal chat referenced by Defendant 4. In the chat,

BROWN coordinated travel plans with other Oath Keepers and rendezvous points. On December

23, 2020, he messaged, "We have a RV an Van going. Plenty of Gun Ports left to fill. We can pick

you up." On January 1, 2021, BROWN, referring to his RV as "GROUND FORCE ONE" wrote:

GROUND FORCE ONE Departure Plan:

If you can, come to my house anytime Saturday. You can stop by and drop stuff
off, or stay the night. This way we can load plan, route plan, and conduct PCIs
(Pre Combat Inspections).

I would LIKE to depart by 0645 on Sunday morning, Jan 3rd. Push through to the
NC linkup on the 3rd, RON (Rest Over Night) there, then push to DC on the 4th.
This will give us the 4th/5th to set up, conduct route recons, CTR (Close Target
Reconnaissance) and any link ups needed with DC elements.

If you need to be picked up, then we will work that into route plan and will
provide exact pickup time by Saturday evening. Please have EVERYTHING
ready once we arrive. It will be an ERO (Engine Running Onload).

IF YOU ARE RIDING WITH ME, dm me with your plan to come here or be
picked up. I will send address via the dm.

I am willing to make adjustments all the way up until we pass your ass headed
north, but it is now time to shit or get on someone else's pot. READY? GO!!!

62.     Your affiant has also reviewed statements made by BROWN and other Oath

Keepers following the riots of January 6, 2021. On that day, BROWN wrote:

Everything you are watching on the Media and Houses of Congress is a LIE! I was
shot in the neck with pepper balls and beating in the forearm with a night stick
trying to shield unprotected Civilians from being hit in the head. This was an
exercise in the unrestrained addiction to power.

22

Other indicted Oath Keepers also participated on additional Signal chats with BROWN. On the afternoon of January 7, 2021, Jessica Watkins, who has been indicted on charges of Conspiracy and Obstruction of an Official Proceeding for her actions on January 6, "Proud to go in with you all! I'd say 'I'll follow you into the gates of hell' but we did that already." Law enforcement has been able to retrieve portions, but not all of this chat from the phones of other conspirators. Some messages in the chat appear to have been deleted including those sent by Kelly Meggs, who, like Watkins, has also been indicted for Conspiracy and various charges with other Oath Keepers.

63. Your affiant also has reviewed Parler posts from BROWN'S account (@brownforcongress2020). Based on this review, your affiant was able to confirm that BROWN intended to travel to DC for the January 5 protests in an RV with other individuals:

**1:52** 

 @BrownForCongress2020 Comm... 

 **Jeremy Brown** @BrownForCongress2020
2 days ago

Mr. Stone, This is Jeremy Brown, retired Green Beret that ran for FL-14. I am headed to DC on or about the 3rd in our RV with myself and some others. We have a spot 10 miles outside DC and will have a van as well. If you need transportation or Security, we can adjust to pick you up.

 3          ♡ 0           71

Hide Conversation

23

64.     Your affiant also reviewed publicly available video podcasts of BROWN and PERSON ONE. In an interview posted on July 12, 2021,[4] BROWN stated that he was present with other Oath Keepers on January 6. Prior to the riots, he deposited his guns with other Oath Keepers in Virginia and retrieved them after the riots. During the riots, BROWN stated that he was present with other Oath Keepers, including those who have been indicted for actions relating to their breach of the Capitol, and encouraged other Oath Keepers, such as Jessica Watkins, not to enter the Capitol.

65.     Your affiant has reviewed a statement given by BROWN to federal agents. Law enforcement agents called BROWN at XXX-XXX-4564 (the "**TARGET PHONE**") on or about January 6 and 7, 2021 and inquired regarding his whereabouts. Agents spoke briefly with BROWN on January 6, 2021 but could not hear him well due to apparent crowd noise. BROWN spoke to agents in more detail on January 7, 2021. He told them that he was present in Washington, D.C. and provided security for VIPs at the "Stop the Steal" rally. He stated that he had no information about anyone who entered the Capitol.

66.     According to records obtained through a search warrant which was served on Verizon, on January 6, 2021, in and around the time of the incident, the cellphone associated with the **TARGET PHONE** was identified as having utilized a cell site consistent with providing service to a geographic area that included the interior of the United States Capitol building. Your affiant has not yet identified BROWN inside the Capitol but has identified him within the restricted ground.

67.     Your affiant has learned from an individual who has known BROWN for multiple years that he intends to sell his current house located at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[4] https://freeworldnews.tv/watch?id=60ecff8474feb85ab1adec2f

24

FLORIDA (the "**RESIDENCE**") and vacate by approximately October 2, 2021. According to publicly available information on Zillow, a real estate website, BROWN'S residence is currently for sale. On a photo from what appears to be BROWN'S office, your affiant identified a large white board containing lists of items corresponding to the following column: "Food," "Clothing," "Shelter," "Currency," "Communicate," "Move," and "Shoot." In the "Shoot" column, there are numerous firearms listed and explosive devices such as "flash bangs." "Flash bangs" are prohibited explosive devices under 26 USC 5861, unless registered with the Bureau of Alcohol, Tobacco, and Firearms (ATF). Your affiant has queried information with the ATF. BROWN is not registered to possess explosive devices.

68. At the bottom of the white board, "Good" is written in red marker, "Better" is written in blue marker, "Best" is written in green marker, "On hand" is written in black marker. All items listed under "Shoot," including flash bangs, are written in black marker indicating that they are on hand. Your affiant has included a zoomed in screen shot of the photo below and has circled flash bangs in red:



69. Your affiant has spoken to an individual who has known BROWN for multiple years. This individual did not have any specific knowledge about BROWN possessing or seeking

to possess explosives such as "flash bangs." BROWN is currently living both in the **RV** and in the

**RESIDENCE**. The **RV** is the same **RV** he used to travel to Washington, D.C. The **RV** is parked

in front of his house. FBI agents observed the RV on September 21, 2021 and photographed it

below:



70.     Both the **RV** and a black trailer (the "**Trailer**"), which is also parked on the

property are registered to                              who according to multiple individuals who

have known BROWN for multiple years, is BROWN'S current girlfriend. On her driver's

license,            lists her home address as of                              . BROWN

resides with                                               .

26

71.     A family member of Witness 1 informed Witness 1 that IT was present inside the **RESIDENCE** prior to the house going on the market. The house was full of BROWN'S possessions with multiple boxes and weapons scattered throughout the house. Publicly available photos on Zillow now show an organized home, inconsistent with the description of the house by the family member of Witness 1. Witness 1 stated that BROWN now alternates sleeping in the house and in the RV.

72.     Based on my training, experience, general familiarity with the small confines of an RV, the fact that the trailer was purchased approximately one month ago and sits next to the RV and the house within the property line of ▮▮▮▮▮▮▮▮▮ and that it is unlikely that an individual would market a home available for public inspection with guns and explosives inside of the home, it is probable that many of BROWN'S possessions, including electronics, guns, ammunition, and explosives, which constitute potential evidence in the investigation, have been moved to the **RV** or the **TRAILER**.

### *The Collective Premises*

73.     On September 21, 2021, law enforcement agents observed the **RESIDENCE** (further described in Attachment A), the **RV** (further described in Attachment B), which is registered to BROWN'S girlfriend, and the **TRAILER** (further described in Attachment C) also registered to BROWN's girlfriend. Public records indicate that ▮▮▮▮▮ currently owns the property. BROWN has previously told agents that he resides at the address. BROWN has posted on Facebook that he is actively selling items at the property in preparation for vacating the premises by September 30, 2021. Witness 1 informed your affiant that BROWN is currently sleeping in the RV.

27

## *Facts Specific to This Seizure of the TARGET PHONE*

74.     On or about September 30, 2021, your affiant anticipates arresting BROWN for violations of federal law. Due to officer safety considerations, your affiant and other federal agents anticipate arresting BROWN when he is away from his suspected cache of weapons and explosives that BROWN likely keeps at the **RESIDENCE, RV,** or **TRAILER.** In the last week, agents have observed BROWN leave his property. Based on my training and experience, your affiant knows that individuals typically carry their cell phones when they exit their property. Investigators seek this warrant for authority to stop BROWN, search his person for the **TARGET PHONE** (further described in Attachment D), to seize **the TARGET PHONE,** and to search the **TARGET PHONE** for evidence of the offenses under investigation, as described above and in Attachment E.

### *Cellular Devices*

75.     There is probable cause to believe that BROWN'S cellular telephone and other electronic devices contain evidence of the criminal conduct under investigation. Because BROWN traveled to Washington, D.C., from Florida, there is also probable cause to believe that BROWN would have used any cellular telephone in his possession to communicate with others during his trip about his activities in Washington, D.C., navigate during travel, conduct searches for food and lodging, and for other purposes that would serve as evidence of his whereabouts and activities at various points during his trip. All of this type of electronically-stored evidence will help investigators prove BROWN'S presence and activities at the U.S. Capitol on January 6, 2021, his intent when traveling to Washington, D.C., and the identities of his coconspirators.

76.     It is well-known that virtually all adults in the United States use mobile digital devices like cellular telephones. In a fact sheet from June 12, 2019, The Pew Research Center for

28

Internet & Technology estimated that 96% of Americans owned at least one cellular phone, and that that same 2019 report estimated that 81% of Americans use at least one smartphone. *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile. Given cellular telephones' ubiquity, portable size, and ability to store uniquely personal information, your affiant knows that cellular telephone users generally keep his cellular telephone on or near himself.

## CELLULAR TELEPHONES AND OTHER ELECTRONIC DEVICES

77. As used herein, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

78. Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, your affiant knows the terms described below have the following meanings or characteristics:

    a. "Digital device," as used herein, includes the following three terms and their respective definitions:

        i. A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

        ii. "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital

versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

iii.  "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

iv.  A cellular telephone is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, cellular telephone offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device. Many cellular telephones are minicomputers or "smart phones" with immense storage capacity.

v.  A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that

30

> antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

79.    As described above and in Attachment E, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the **PREMISES**, in whatever form they are found. One form in which such items might be found is data stored on one or more digital devices. Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; cellular telephones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, your affiant respectfully submits that, if digital devices are found on the PREMISES, there is probable cause to believe that the items described in Attachment E will be stored in the Devices for at least the following reasons:

> a.    Individuals who engage in criminal activity, including traveling interstate to commit riots and taking and transmitting photos and videos of themselves while committing rioting activity, use digital devices, like the Devices, to access websites to facilitate illegal activity, obtain directions to places of interest, communicate with co-conspirators online, use social media applications like Facebook, and, among other things, store documents and records relating to their illegal activity. As a result, Devices used for such purposes often contain evidence like logs of online chats with co-conspirators, device location information, email correspondence, text or other "Short Message Service" ("SMS") messages,

31

> internet browsing history, and contact information of co-conspirators, which
> could include telephone numbers, email addresses, identifiers for instant
> messaging accounts, and social medial accounts.
>
> b.     Individuals who engage in the foregoing criminal activity, in the event that
> they change digital devices, will often "back up" or transfer files from their old
> digital devices to that of their new digital devices, so as not to lose data, including
> that described in the foregoing paragraph, which would be valuable in facilitating
> their criminal activity.
>
> c.     Digital device files, or remnants of such files, can be recovered months or
> even many years after they have been downloaded onto the medium or device,
> deleted, or viewed via the Internet. Electronic files downloaded to a digital
> device can be stored for years at little or no cost. Even when such files have been
> deleted, they can be recovered months or years later using readily-available
> forensics tools. When a person "deletes" a file on a digital device such as a home
> computer, a smart phone, or a memory card, the data contained in the file does not
> actually disappear; rather, that data remains on the storage medium and within the
> device unless and until it is overwritten by new data. Therefore, deleted files, or
> remnants of deleted files, may reside in free space or slack space – that is, in
> space on the digital device that is not allocated to an active file or that is unused
> after a file has been allocated to a set block of storage space – for long periods of
> time before they are overwritten. In addition, a digital device's operating system
> may also keep a record of deleted data in a "swap" or "recovery" file. Similarly,
> files that have been viewed via the Internet are automatically downloaded into a
> temporary Internet directory or "cache." The browser typically maintains a fixed
> amount of electronic storage medium space devoted to these files, and the files are
> only overwritten as they are replaced with more recently viewed Internet pages.
> Thus, the ability to retrieve "residue" of an electronic file from a digital device
> depends less on when the file was downloaded or viewed than on a particular
> user's operating system, storage capacity, and computer, smart phone, or other
> digital device habits.

80.     As further described in Attachment E, this application seeks permission to locate

not only electronic evidence or information that might serve as direct evidence of the crimes

described in this affidavit, but also for forensic electronic evidence or information that establishes

how the digital devices were used, the purpose of their use, who used them (or did not), and when.

Based on my knowledge, training, and experience, as well as information related to me by agents

and others involved in this investigation and in the forensic examination of digital devices, your

affiant respectfully submits there is probable cause to believe that this forensic electronic evidence

and information will be in any of the Devices at issue here because:

> a. Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

> b. Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

> c. A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

> d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.
>
> e. Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

81. The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises. Therefore, in searching for information, records, or evidence, further described in Attachment E, law enforcement personnel executing this search warrant will employ the following procedures: Upon securing the PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment E and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES.

34

## UNLOCKING CELLULAR TELEPHONES USING BIOMETRIC DATA

82.    This warrant permits law enforcement agents to obtain from the person of BROWN

(but not any other individuals present at the PREMISES at the time of execution of the warrant)

the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or

facial characteristics) necessary to unlock any Devices requiring such biometric access subject to

seizure pursuant to this warrant for which law enforcement has reasonable suspicion that

BROWN'S physical biometric characteristics will unlock the Devices.  The grounds for this

request are as follows:

83.    Your affiant knows from my training and experience, as well as from information

found in publicly available materials published by device manufacturers, that many electronic

devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the

device through biometric features in lieu of a numeric or alphanumeric passcode or password.

These biometric features include fingerprint scanners, facial recognition features, and iris

recognition features.  Some devices offer a combination of these biometric features, and the user

of such devices can select which features they would like to utilize.

84.    If a device is equipped with a fingerprint scanner, a user may enable the ability to

unlock the device through his or her fingerprints.  For example, Apple offers a feature called

"Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once

a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the

device's Touch ID sensor, which is found in the round button (often referred to as the "home"

button) located at the bottom center of the front of the device.  The fingerprint sensors found on

devices produced by other manufacturers have different names but operate similarly to Touch ID.

35

85.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

86.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

87.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

36

88.     As discussed in this Affidavit, your affiant has reason to believe that one or more digital devices, the Devices, will be found during the search. The passcode or password that would unlock the Devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the Devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

89.     Your affiant also knows from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

90.     Due to the foregoing, if law enforcement personnel encounter any Devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from BROWN the display of any physical biometric characteristics (such as fingerprint/ thumbprint or facial characteristics) necessary to unlock any Devices, including to (1) press or swipe the fingers

(including thumbs) of the aforementioned person to the fingerprint scanner of the Devices found at the PREMISES; (2) hold the Devices found at the PREMISES in front of the face of the aforementioned person to activate the facial recognition feature; and/or (3) hold the Devices found at the PREMISES in front of the face of the aforementioned person to activate the iris recognition feature, for the purpose of attempting to unlock the Devices in order to search the contents as authorized by this warrant.

91.     The proposed warrant does not authorize law enforcement to require that BROWN state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the Devices. Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned persons to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned persons would be permitted under the proposed warrant. To avoid confusion on that point, if agents in executing the warrant ask BROWN for the password to any Devices, or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Devices, the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

## CONCLUSION

92.    Based upon the foregoing facts and information, there is probable cause to believe

that violations of 18 U.S.C. §§ 371 (conspiracy); and 1752(a)(1) and (2) (unlawful entry on

restricted buildings or grounds) (the "Subject Offenses") have been committed by BROWN and/or

other identified and unidentified persons, and that fruits, evidence, and instrumentalities of those

violations will be found at the PREMISES.

_Katie M. Hill_

Katie Hill, Special Agent
Federal Bureau of Investigation

Subscribed and sworn by telephone pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on September
29, 2021.

Zia M. Faruqui
2021.09.29
19:37:14 -04'00'

HON. ZIA M. FARUQUI
United States Magistrate Judge

Middle District of Florida
Tampa Division

**GOVERNMENT EXHIBIT**

**Exhibit No.:** 11

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: 12/14/21

Date Admitted: 12/14/21

Middle District of Florida
Tampa Division

**GOVERNMENT EXHIBIT**

**Exhibit No.:** 11

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: 12/19/21

Date Admitted: 12/19/21



Middle District of Florida
Tampa Division

**GOVERNMENT EXHIBIT**

**Exhibit No.:** 12

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: 12/14/21

Date Admitted: 12/14/21

7-1 LIMS (Rev. 10-2-17)

UNCLASSIFIED



**FBI Laboratory**

2501 Investigation Parkway
Quantico, Virginia 22135

4940 Fowler Road
Huntsville, Alabama 35898

## LABORATORY REPORT

To: Tampa

Date: October 13, 2021

Case ID No.: ▮▮▮▮▮▮▮

Lab No.: 2021-02111-1

Communication(s):     October 6, 2021

Agency Reference(s):

Subject(s):

Victim(s):

Discipline(s):     Explosives Device

This document may contain personally identifiable information and must be afforded the protections required by applicable law, regulation, and policy. If you are not the intended recipient of this document, please destroy it promptly without further retention or dissemination, unless otherwise required by law.

FBI Laboratory Evidence Designator(s):

| | |
|---|---|
| Item 1 | One (1) grenade body with fuze (1B1; E7005015) |
| Item 1-1 | Tape from item 1 (1B1; E7005015) |
| Item 1-2 | One (1) swabbing from Item 1 grenade pin ring |
| Item 1-3 | Fuze assembly |
| Item 1-4 | Material from Item 1 |
| Item 2 | One (1) grenade body with fuze (1B2; E7005016) |
| Item 2-1 | Tape from Item 2 (1B2; E7005016) |
| Item 2-2 | One (1) swabbing from Item 2 grenade pin ring |
| Item 2-3 | Fuze assembly |
| Item 2-4 | Material from Item 2 |
| Item 3 | TEDAC Trace Secondary Evidence (2 slides) |

This report contains the final results of the of the hazardous device examinations performed by the Explosives Unit.

Page 1 of 5

- Lab Report-Released-(104389).pdf

UNCLASSIFIED

**Conclusion:**

It is the opinion of this Explosives and Hazardous Devices Examiner that present in the submitted items of evidence are two (2) U.S. Military M67 fragmentation hand grenades.

**Destructive Device Determination:**

It is the opinion of this Explosives and Hazardous Devices Examiner that the two (2) fragmentation hand grenades present in the submitted items are military high explosive ordnance designed as a weapon and, therefore, considered destructive devices.

**Results of Examination:**

Present in Items 1 and 2 are two (2) U.S. Military M67 fragmentation hand grenades. Manufacturer markings around the circumference of each grenade body include:

"GRENADE HAND FRAG DELAY M67"
"7-69 COMP B MA-11-12F"

The fuze assemblies associated with each grenade were removed during analysis and designated as Items 1-3 and 2-3 respectively. With the exception of a missing safety clip, the fuze assemblies did not appear to have been modified. Manufacturer markings on top of the safety lever of each fuze assembly include:

"FUZE M213 MEI86A009-001"

Material was removed from each grenade body interior and designated as Items 1-4 and 2-4 respectively. Items 1-4 and 2-4 were analyzed by the Explosives Chemistry discipline. For the results and detailed information on the chemical analyses conducted, see the FBI Laboratory Report for Laboratory number 2021-02111-5, dated October 14, 2021, and authored by Kerri L. Moloughney.

Two (2) lengths of green colored tape were removed from the grenade in Item 1 and designated as Item 1-1. One (1) length of green colored tape was removed from the grenade in Item 2 and designated as Item 2-1. The tape in Items 1-1 and 2-1 are visually consistent with a green colored duct tape.

Items 1-2, 2-2, and 3 were not examined by the Explosive Device discipline.

General Characteristics of the M67 Fragmentation Hand Grenade

According to the United States Army Technical Manual Army Ammunition Data Sheets for Grenades TM43-0001-29 and the Department of the Army Field Manual (FM) 23-30 for Grenades and Pyrotechnic Signals, the M67 fragmentation hand grenade is used to supplement

Page 2 of 5

2021-02111-1

UNCLASSIFIED

- Lab Report-Released-(104389).pdf

UNCLASSIFIED

small arms fire against the enemy in close combat. The M67 fragmentation grenade is designed to produce a uniform pattern of high-velocity fragmentation resulting from the detonation of the high explosives contained within it. The killing radius for the M67 is 5 meters (16.4 feet) and the casualty-producing radius is 15 meters (49.2 feet), although fragments can disperse as far as 230 meters (754.6 feet).

The M67 contains 6.5 ounces of the military high explosive Composition B, or Comp B. Comp B is comprised of approximately 40% trinitrotoluene (TNT) and 60% RDX and has a detonation velocity of approximately 7800 meters/second (26,600 feet/second).

The body of the M67 grenade is comprised of a steel sphere approximately 2.5 inches in diameter. It is olive drab in color with yellow markings around its circumference. The markings include: "GRENADE, HAND, FRAG, M67" and "COMP B". A lot number consisting of a series of letters and numbers is also present.

The M67 grenade is supplied with the M213 fuze assembly secured into the neck of the grenade body. The M213 is a delay-detonating fuze comprised of a striker, striker spring, safety lever (spoon), safety pin, safety clip, and a detonator assembly.

The explosive train within the detonator assembly of the M213 fuze consists of a pyrotechnic delay composition, two (2) primary high explosives (lead styphnate and lead azide), and a secondary high explosive base charge (RDX). Approximately 2 grams of high explosives are present in the detonator assembly of the M213 fuze.

## M67 Fragmentation Grenade Functioning

To function the M67 fragmentation grenade as designed, the operator would need to remove the safety clip from the safety lever of the M213 fuze. Next, while maintaining pressure on the safety lever, the safety pin would need to be removed from the fuze assembly. When the pressure is removed from the safety lever, such as by throwing the grenade, the tension that was maintained on the striker and striker spring assembly will cause the safety lever to be thrown off and enable the striker to impact the percussion primer to initiate the explosive train within the detonator assembly.

The pyrotechnic delay composition, initiated from the percussion primer, will begin to slowly burn within the fuze assembly. After approximately 4 to 5 seconds (delay) the burning pyrotechnic composition will initiate the high explosives within the detonator assembly resulting in a detonation. This detonation is transferred to the Comp B main charge within the grenade body resulting in its detonation and the subsequent fragmentation of the steel grenade body.

**Methods:**

The methods utilized during the analysis of the evidentiary items included the following:

- visual examinations of observable, physical characteristics;

Page 3 of 5

2021-02111-1

UNCLASSIFIED

DISC-00967

UNCLASSIFIED

- measurements of physical characteristics;
- visual examinations of photographs;
- visual examinations of x-ray images;
- reviews of references; and
- reviews of relevant case documentation.

**Interpretations and Limitations:**

- Conclusive identifications of the source of an item may not be realized in every case due to the absence or alterations of specific manufacturer or other unique markings on items of evidence.

- Item source identifications that refer to a specific distributor or manufacturer have not been confirmed with that distributor or manufacturer unless otherwise stated in this report.

- The physical characteristics, such as, but not limited to, material type, shape, and color of all evidentiary items described in this report are based on visual and/or microscopical observations, unless otherwise noted. Other parameters such as, but not limited to, distances, angles, and voltages associated with individual evidentiary items are based on physical measurements and are approximate, unless otherwise noted. Should a more complete characterization of these items be required, additional examinations can be requested of the appropriate forensic discipline. Diagrams such as, but not limited to, drawings and schematics are not to scale, unless otherwise noted.

- Conclusive determinations of the exact design and functioning of a rendered safe or disassembled improvised explosive or incendiary device may not be realized in every case due to the condition of the components.

**References:**

Technical Manual (TM) 43-0001-29 United States Army Technical Manual Army Ammunition Data Sheets for Grenades;  Pages 2-15 and 2-16;  June 1994

Field Manual (FM) 23-30 Grenades and Pyrotechnic Signals;  Pages 1-1 through 1-6;  September 2000

Explosives, 6th Edition; Meyer, Kohler, Homburg;  Page 62;  2007

**Remarks:**

For questions about the content of this report or the status of your submission, please contact Forensic Examiner Travis D. McCrady at 703-632-7654 or tdmccrady@fbi.gov.

Page 4 of 5

2021-02111-1

UNCLASSIFIED

- Lab Report-Released-(104389).pdf

DISC-00968

UNCLASSIFIED

The evidence will be temporarily stored at the Huntsville Laboratory.

This report contains the opinions and interpretations of the issuing examiner(s) and is supported by records retained in the FBI Laboratory files. Please allow a minimum of thirty days from the date of a discovery request for the FBI Laboratory to provide the related materials. The FBI cannot ensure timely delivery of discovery requests received in less time.

The work described in this report was conducted at the Huntsville Laboratory.

Travis D. McCrady
Explosives Unit

Page 5 of 5

2021-02111-1

UNCLASSIFIED

DISC-00969

U.S. District Court
Middle District of Florida
Tampa Division

## GOVERNMENT EXHIBIT

Exhibit No.: 13

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: 12/14/21

Date Admitted: 12/14/21



U.S. ..... Court
Middle District of Florida
Tampa Division

**GOVERNMENT EXHIBIT**

**Exhibit No.:** 14

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: 12/14/21

Date Admitted: 12/14/21

## CLASSIFIED INFORMATION NONDISCLOSURE AGREEMENT

AN AGREEMENT BETWEEN ___Brown, Jeremy M.___ AND THE UNITED STATES
(Name of Individual – Printed or typed)

1. Intending to be legally bound, I hereby accept the obligations contained in this Agreement in consideration of my being granted access to classified information. As used in this Agreement, classified information is marked or unmarked classified information, including oral communications, that is classified under the standards of Executive Order 12356, or under any other Executive order or statute that prohibits the unauthorized disclosure of information in the interest of national security; and unclassified information that meets the standards for classification and is in the process of a classification determination as provided in Sections 1.1(c) and 1.2(e) of Executive Order 12356, or under any other Executive order or statute that requires protection for such information in the interest of national security. I understand and accept that by being granted access to classified information, special confidence and trust shall be placed in me by the United States Government.

2. I hereby acknowledge that I have received a security indoctrination concerning the nature and protection of classified information, including the procedures to be followed in ascertaining whether other persons to whom I contemplate disclosing this information have been approved for access to it, and that I understand these procedures.

3. I have been advised that the unauthorized disclosure, unauthorized retention, or negligent handling of classified information by me could cause damage or irreparable injury to the United States or could be used to advantage by a foreign nation. I hereby agree that I will never divulge classified information to anyone unless: (a) I have officially verified that the recipient has been properly authorized by the United States Government to receive it; or (b) I have been given prior written notice of authorization from the United States Government Department or Agency (hereinafter Department or Agency) responsible for the classification of the information or last granting me a security clearance that such disclosure is permitted. I understand that if I am uncertain about the classification status of information, I am required to confirm from an authorized official that the information is unclassified before I may disclose it, except to a person as provided in (a) or (b), above. I further understand that I am obligated to comply with laws and regulations that prohibit the unauthorized disclosure of classified information.

4. I have been advised that any breach of this Agreement may result in the termination of any security clearances I hold; removal from any position of special confidence and trust requiring such clearances; or the termination of my employment or other relationships with the Departments or Agencies that granted my security clearance or clearances. In addition, I have been advised that any unauthorized disclosure of classified information by me may constitute a violation, or violations, of United States criminal laws, including the provisions of Sections 641, 793, 794, 798, and ×952, Title 18, United States Code, the provisions of Section 783(b), Title 50, United States Code, and the provisions of the Intelligence Identities Protection Act of 1982. I recognize that nothing in this Agreement constitutes a waiver by the United States of the right to prosecute me for any statutory violation.

5. I hereby assign to the United States Government all royalties, remunerations, and emoluments that have resulted, will result or may result from any disclosure, publication, or revelation of classified information not consistent with the terms of this Agreement.

6. I understand that the United States Government may seek any remedy available to it to enforce this Agreement including, but not limited to, application for a court order prohibiting disclosure of information in breach of this Agreement.

7. I understand that all classified information to which I may obtain access by signing this Agreement is now and will remain the property of, or under the control of the United States Government unless and until otherwise determined by an authorized official or final ruling of a court of law. I do not now, nor will I ever, possess any right, interest, title, or claim whatsoever to such information. I agree that I shall return all classified materials which have, or may come into my possession or for which I am responsible because of such access: (a) upon demand by an authorized representative of the United States Government; (b) upon the conclusion of my employment or other relationship with the Department or Agency that last granted me a security clearance or that provided me access to classified information; or (c) upon the conclusion of my employment or other relationship that requires access to classified information. If I do not return such materials upon request, I understand that this may be a violation of Section 793, Title 18, United States Code, a United States criminal law.

8. Unless and until I am released in writing by an authorized representative of the United States Government, I understand that all conditions and obligations imposed upon me by this Agreement apply during the time I am granted access to classified information, and at all times thereafter.

9. Each provision of this Agreement is severable. If a court should find any provision of this Agreement to be unenforceable, all other provisions of this Agreement shall remain in full force and effect.

(Continue on reverse)

NSN 7540-01-280-5499

STANDARD FORM 312 (9-88)
Prescribed by GSA/ISOO
32 CFR 2003 E.O. 12356

10. I have read this Agreement carefully and my questions, if any, have been answered. I acknowledge that the briefing officer has made available to me Sections 641, 793, 794, 798, and *952, Title 18, United States Code, *Section 783(b), Title 50, United States Code, the Intelligence Identities Protection Act of 1982, Executive Order 12356 or its successor, and Section 2003.20, Title 32, Code of Federal Regulations, so that I may read them at this time, if I so choose.

| SIGNATURE | DATE | SOCIAL SECURITY NUMBER (See Notice below) |
|---|---|---|
| *Jeremy M. Brain* | 17 Oct 95 | ▮▮▮▮▮ |

ORGANIZATION (IF CONTRACTOR, LICENSEE, GRANTEE OR AGENT, PROVIDE NAME, ADDRESS AND, IF APPLICABLE, FEDERAL SUPPLY CODE NUMBER) (Type or print)

B Co 1/75 RGR REGT

| WITNESS | ACCEPTANCE |
|---|---|
| THE EXECUTION OF THIS AGREEMENT WAS WITNESSED BY THE UNDERSIGNED. | THE UNDERSIGNED ACCEPTED THIS AGREEMENT ON BEHALF OF THE UNITED STATES GOVERNMENT. |

| SIGNATURE | DATE | SIGNATURE | DATE |
|---|---|---|---|
| *C Houghton* | 17 OCT 95 | | |

| NAME AND ADDRESS (Type or print) | NAME AND ADDRESS (Type or print) |
|---|---|
| Houghton, JASON C<br>HHC (S-2) 1/75<br>HAAF, GA 31409 | |

## SECURITY DEBRIEFING ACKNOWLEDGMENT

I reaffirm that the provisions of the espionage laws, other federal criminal laws and executive orders applicable to the safeguarding of classified information have been made available to me; that I have returned all classified information in my custody; that I will not communicate or transmit classified information to any unauthorized person or organization; that I will promptly report to the Federal Bureau of Investigation any attempt by an unauthorized person to solicit classified information, and that I (have) (have not) (strike out inappropriate word or words) received a security debriefing.

| SIGNATURE OF EMPLOYEE | DATE |
|---|---|
| | |

| NAME OF WITNESS (Type or print) | SIGNATURE OF WITNESS |
|---|---|
| | |

NOTICE: The Privacy Act, 5 U.S.C. 552a, requires that federal agencies inform individuals, at the time information is solicited from them, whether the disclosure is mandatory or voluntary, by what authority such information is solicited, and what uses will be made of the information. You are hereby advised that authority for soliciting your Social Security Account Number (SSN) is Executive Order 9397. Your SSN will be used to identify you precisely when it is necessary to 1) certify that you have access to the information indicated above or 2) determine that your access to the information indicated has terminated. Although disclosure of your SSN is not mandatory, your failure to do so may impede the processing of such certifications or determinations, or possibly result in the denial of your being granted access to classified information.

*NOT APPLICABLE TO NON-GOVERNMENT PERSONNEL SIGNING THIS AGREEMENT.

STANDARD FORM 312 BACK (9-88)

U.S. District Court
Middle District of Florida
Tampa Division

## GOVERNMENT EXHIBIT

**Exhibit No.:** _15_

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: _12/14/21_

Date Admitted: _12/14/21_

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN THE MATTER OF THE SEARCH OF
saliva samples from the mouth of Jeremy
Michael Brown

Case No. 8:21-mj-2169-JSS

**Filed under seal**

### UNITED STATES' MOTION FOR AN ORDER TO SHOW CAUSE

The United States of America hereby moves for an order requiring the

Defendant to show cause why he should not be held in contempt for failure to

comply with a search warrant for the Defendant's saliva sample.

### BACKGROUND

On December 1, 2021, this Court issued a warrant authorizing federal agents

to obtain a saliva sample from the Defendant's mouth. *See* 8:21-mj-2169-JSS. The

Court also entered an order placing the warrant, the accompanying application, and

affidavit in support of the warrant under seal until the saliva sample is collected.

On Wednesday, December 8, 2021, at approximately 9:00 a.m., FBI agents

attempted to execute the search warrant at the Pinellas County Jail where the

Defendant presently is in custody. Upon arrival, the agents identified themselves to

the Defendant, explained that they had a warrant for his saliva sample, and showed

him Attachment B-1 to the warrant. The Defendant subsequently refused to comply,

apparently invoking his Fifth and Sixth Amendment rights, and requested to speak

with counsel. The agents did not attempt to exercise any kind of force in obtaining

the sample and notified the undersigned of the Defendant's response. At that time,

1

the undersigned contacted the Defendant's counsel and informed him that the Defendant had refused to comply with the warrant before speaking with counsel. The undersigned explained that arrangements were being made to allow the Defendant to speak with his counsel. The Defendant thereafter returned to his jail pod and spoke privately with his attorney.

At approximately 10:00 a.m. on December 8, defense counsel informed the undersigned that the Defendant would not voluntarily comply with the warrant unless and until he was provided a copy of the affidavit in support of the warrant to review. The undersigned explained that the affidavit is under seal until further order of the Court, and, therefore, the Defendant would not be provided a copy until after execution. The undersigned also explained that the warrant is a court order and that the Defendant's recourse in challenging its validity was to file a motion to suppress after execution.

Defense counsel thereafter requested that the government allow him an opportunity to speak with the Defendant in person the following morning, to which the undersigned agreed. The undersigned also agreed that the United States would not seek the Court's intervention until 1:00 p.m. the following day, allowing the Defendant ample time to confer with counsel as to his compliance.

At approximately 1:48 p.m. on Thursday, December 9, defense counsel contacted the undersigned via telephone and stated that the Defendant would not voluntarily submit to the swab until he has reviewed the affidavit in support of the search warrant with defense counsel. The undersigned stated that the United States

2

immediately would be seeking the Court's intervention to obtain compliance with the warrant.

## MEMORANDUM OF LAW

As an initial matter, the Defendant has no Sixth Amendment right to have counsel present, and therefore, no right to confer with counsel, while DNA is being collected. *See United States v. Bullock*, 71 F.3d 171, 177 (5th Cir. 1995) (taking of blood and hair samples is not a "critical confrontation" by the prosecution during which a defendant has a right to counsel). Nor is the taking of a DNA sample a testimonial communication subject to protection under the Fifth Amendment. *See Kaemmerling v. Lappin*, 553 F.3d 669, 687 (D.C. Cir. 2008).

Under 18 U.S.C. § 401, this Court has the power "punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." *Id.* § 401(3).

In refusing to comply with a duly issued warrant, the Defendant, in essence, is demanding that he be permitted to make his own probable cause determination before complying with the Court's command. This Court already has made a determination that probable cause exists to search the Defendant's person and seize a saliva sample as set forth in Attachments A-1 and B-1 to the warrant. There is no legal basis for the Defendant to refuse compliance with the warrant at this stage of the proceedings.

Indeed, if the government were to provide the Defendant with a copy of the

3

affidavit in support of the search warrant—to which he is not entitled at this time—

the Defendant very well could determine that probable cause was lacking and again

refuse compliance, requiring the United States to seek this Court's intervention once

again. The Defendant's knowing and willful disobedience of this Court's authority

should not be tolerated.

## CONCLUSION

For all of the foregoing reasons, the United States respectfully requests that the

Court issue an order requiring the Defendant to show cause why he should not be

held in contempt for failure to comply with a duly issued search warrant.

Respectfully submitted,

KARIN HOPPMANN
Acting United States Attorney

By:

Risha Asokan
Assistant United States Attorney
Florida Bar No. 1003398
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:  (813) 274-6000
Facsimile:  (813) 274-6358
E-mail:  risha.asokan2@usdoj.gov

4

**U.S. District Court**
**Middle District of Florida**
**Tampa Division**

## GOVERNMENT EXHIBIT

**Exhibit No.:** 16

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: 12/14/21

Date Admitted: 12/14/21

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN THE MATTER OF THE SEARCH OF    Case No. 8:21-mj-2169-JSS
saliva samples from the mouth of Jeremy
Michael Brown                **Filed under seal**

## ORDER TO SHOW CAUSE

Upon the written motion of the United States of America for an order

requiring the Defendant to show cause why he should not be held in contempt for

failure to comply with a search warrant for the Defendant's saliva sample issued by

this Court:

The Court finds that the Defendant has disobeyed the Court's command that

he submit to saliva samples being collected by an authorized federal law enforcement

officer.

**IT IS THEREFORE ORDERED** that the Motion for Order to Show Cause is

**GRANTED;**

1

**IT IS FURTHER ORDERED** that the Defendant, Jeremy Brown, must

**APPEAR** before this Court on 12/14/2021 at 1:30 PM via Zoom and show

cause why he should not be held in **CONTEMPT** for his failure to comply with the

search warrant issued for his saliva sample issued in this matter.

**DONE AND ORDERED** at TAMPA, Florida this 16 day of December,
2021.

JULIE S. SNEED
United States Magistrate Judge

2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN THE MATTER OF THE SEARCH OF      Case No. 8:21-mj-2169-JSS
saliva samples from the mouth of Jeremy
Michael Brown

## IN CAMERA ORDER

Upon the written motion of the United States of America to seal the (1)

Motion for Order to Show Cause, (2) any accompanying Order, and (3) this Motion

to Seal until further order of the Court:

The Court finds that the interests of justice require that the Motion for Order

to Show Cause, any accompanying Order, and this Motion be sealed; therefore

IT IS ORDERED that the Motion to Seal is Granted;

IT IS FURTHER ORDERED that the (1) Motion for Order to Show Cause,

(2) any accompanying Order, and (3) this Motion to Seal until further order of the

Court be sealed by the Clerk of the Court until further order of the Court;

DONE AND ORDERED at TAMPA, Florida this ___9___ day of December,

2021.

JULIE S. SNEED
United States Magistrate Judge

U.S. District Court
Middle District of Florida
Tampa Division

**GOVERNMENT EXHIBIT**

Exhibit No.: 17

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: 12/14/21

Date Admitted: 12/14/21

1    **UNITED STATES DISTRICT COURT**
     **MIDDLE DISTRICT OF FLORIDA**
2    **TAMPA DIVISION**

3    UNITED STATES OF AMERICA,

4                          Plaintiff,

5         vs.                      CASE NO.  8:21-mj-1990-SPF
                                        and 8:21-mj-1991-SPF
6                                  October 5, 2021
                                   Tampa, Florida
7                                  11:05 a.m. - 1:03 p.m.

8    JEREMY BROWN,

9                          Defendant.
     _____/

10

11                  TRANSCRIPT OF DETENTION HEARING
                BEFORE THE HONORABLE SEAN P. FLYNN
12               UNITED STATES MAGISTRATE JUDGE

13
     **APPEARANCES:**
14
     For the Government:      RISHA ASOKAN, ESQ.
15                            Assistant U.S. Attorney
                              400 N. Tampa Street, Suite 3200
16                            Tampa, Florida 33602
                              813/274-6000
17
     For the Defendant:       WILLIAM FARGO SANSONE, ESQ.
18                            Sansone Law, PA
                              609 West De Leon Street
19                            Tampa, Florida 33606
                              813/361-0874
20
     Court Reporter:          Howard W. Jones, RDR, RMR, FCRR
21                            801 N. Florida Avenue, Suite 15A
                              Tampa, Florida 33602
22                            813/301-5024

23

24   Proceedings transcribed via courtroom digital audio
     recording by transcriptionist using computer-aided
25   transcription.

                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                          TAMPA DIVISION

2

```
 1                        I N D E X

 2                                                  PAGE

 3   ARGUMENT BY MS. ASOKAN:                          4

 4   ARGUMENT BY MR. SANSONE:                        14

 5   ARGUMENT BY MS. ASOKAN:                         34

 6   CERTIFICATE OF COURT REPORTER:                  50

 7

 8                 *  *  *  *  *  *  *  *  *  *

 9

10                    E X H I B I T S

11   GOVERNMENT                               PAGE
     EXHIBIT NO.          IDENTIFIED          RECEIVED
12
        1                    5                  6
13      2A                   5                  6
        2B                   5                  6
14      2C                   5                  6
        2D                  10                  6
15      2E                  10                  6
        2F                  10                  6
16      2G                  11                  6
        2H                  12                  6
17      2I                  12                  6
        3                    7                  6
18      4                    5                  6
        5                    5                  6
19      6                    5                  6
        7                    5                  6
20      8                    5                  6

21

22   DEFENDANT                                PAGE
     EXHIBIT NO.          IDENTIFIED          RECEIVED
23
        1                   18                 18
24

25                 *  *  *  *  *  *  *  *  *  *
```

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

3

```
 1              P R O C E E D I N G S

 2              (Court called to order.)

 3              THE COURT:  Good morning, everyone.  Would you

 4   please call the case.

 5              THE DEPUTY CLERK:  In the matter of the United

 6   States of America vs. Jeremy Brown.  The criminal case

 7   number is 8:21-mj-1990 and 8:21-mj-1991.

 8              THE COURT:  Counsel, please make appearances.

 9              MS. ASOKAN:  Good morning, Your Honor.  Risha

10   Asokan for the United States.  And with me at counsel table

11   are AUSA Sherri Critzman (ph) and HSI Special Agent Britt

12   Lindsay (ph), who is the case agent.

13              THE COURT:  Good morning.

14              MR. SANSONE:  Good morning, Your Honor.  Bill

15   Sansone on behalf of Mr. Jeremy Brown, who is present.

16              THE COURT:  Good morning, Mr. Brown.

17              THE DEFENDANT:  Good morning, Your Honor.

18              THE COURT:  All right.  Mr. Brown, we are here

19   today for your detention hearing in both of these cases.  As

20   you may recall, you appeared before me by videoconference

21   last week and at that time the government moved for a

22   continuance of the detention hearing and the detention

23   hearing was reset for today.  So at this hearing I will take

24   up the issue of bond or your detention.

25              Now, Ms. Asokan, last week you indicated that the
```

```
 1   government's intention is to move for detention.  Is that
 2   still the case?
 3             MS. ASOKAN:  Yes, Your Honor.
 4             THE COURT:  All right.  Let me hear the basis for
 5   that motion.
 6             MS. ASOKAN:  Yes, Your Honor.  We believe that a
 7   detention hearing is appropriate under the Bail Reform Act,
 8   specifically Section 3142 -- sorry, that's my laptop,
 9   3142(f)(1)(E).  The defendant has been charged with a felony
10   that involves possession of a firearm as defined in
11   18 U.S.C. Section 921.
12             Detention is also appropriate under
13   Section (f)(2), that the defendant is a serious risk --
14   sorry, there is a serious risk that the defendant will flee.
15             I'm prepared to address more argument on this --
16   on these points when you're ready, Your Honor.
17             THE COURT:  I'm ready.
18             MS. ASOKAN:  Your Honor, under Section 3142(e),
19   there are no conditions or combination of conditions that
20   will reasonably assure the appearance of the defendant as
21   required and the safety of any other person or the
22   community.
23             Now, Your Honor, I have handed up to the Deputy a
24   number of exhibits noted on the government's exhibit list
25   that we intend to offer for purposes of this detention
```

5

```
 1   hearing.  We've also provided copies to defense counsel.

 2            THE COURT:  All right.  Ms. Asokan, is the

 3   government moving these exhibits into evidence at this time

 4   or do you intend to offer them through witnesses?

 5            MS. ASOKAN:  Yes, Your Honor, at this time.

 6            THE COURT:  All right.  Any objection to

 7   Government's Exhibits 1 through 8 being admitted into

 8   evidence, Mr. Sansone?

 9            MR. SANSONE:  Let me ask Mr. Brown about one of

10   them.

11            THE COURT:  All right.

12            (Brief pause in proceedings.)

13            MR. SANSONE:  Judge, I was just asking Mr. Brown

14   about Exhibit 3, which is a podcast.  I think the government

15   sent it to me, but I was unable to open it, so I was just

16   asking about that, because I had heard it, he says he has no

17   problem with the Court hearing it.

18            The other ones I have no objection to, Judge.

19            THE COURT:  All right.  So just so the record is

20   clear, Mr. Sansone, your client is not objecting to the

21   admission of any of the exhibits offered by the government

22   here today?

23            MR. SANSONE:  Correct, Your Honor.

24            THE COURT:  All right.  So the Court will admit

25   Government's Exhibits 1, 2A, 2B, 2C, 2D, 2E, 2F, 2G, 2H, 2I,
```

```
 1    3, 4, 5, 6, 7, and 8 into evidence with no objection from

 2    the defense.  So admitted.

 3              Ms. Asokan, you may continue.

 4              (Government's Exhibit Nos. 1, 2A, 2B, 2C, 2D, 2E,

 5    2F, 2G, 2H, 2I, 3, 4, 5, 6, 7, and 8 received in evidence.)

 6              MS. ASOKAN:  Thank you, Your Honor.  May I

 7    approach and speak from the lecturn?

 8              THE COURT:  You may.

 9              MS. ASOKAN:  Thank you.

10              THE COURT:  And as long as you maintain social

11    distance, if you would like to remove your mask, you're free

12    to do so, but you're also not required to.

13              MS. ASOKAN:  Thank you, Your Honor.  One moment,

14    Your Honor.

15              Your Honor, may I proceed?

16              THE COURT:  You may.

17              MS. ASOKAN:  Thank you.  So as I just mentioned to

18    the Court, Your Honor, we believe that under Section 3142(e)

19    there are no combinations -- conditions or combination of

20    conditions that will reasonably assure the appearance of the

21    defendant or the safety of any other person in the

22    community.

23              Now, turning to the factors under Section 3142(g),

24    beginning with the nature and circumstances of the offense.

25    The defendant has been charged with violating 26 U.S.C.
```

1    5861(d), possession of firearms that are not registered in

2    the National Firearms Registration and Transfer Record.  At

3    this time I just refer the Court back to the complaint

4    affidavit filed in this case, as well as Special Agent

5    Nicolussi's testimony last week at the preliminary hearing.

6           Just briefly, the firearms at issue here are a

7    short-barreled rifle and a sawed-off shotgun.  Both of these

8    items were found during the search of the defendant's

9    residence last week.

10          Now, I'm not a gun expert, but it's my

11   understanding that these kinds of modifications that are

12   made to firearms such as rifles and shotguns are typically

13   done so to make concealment easier.

14          The offense that the defendant has been charged

15   with carries a maximum penalty of ten years in prison.  So

16   the defendant is facing real prison time for this offense.

17   Accordingly, the factor favors detention.

18          Now turning to the second factor, the weight of

19   the evidence.  To prove a violation under Section 5861(d),

20   the government need to show the following two elements:

21          First, that the defendant knowingly possessed an

22   unregistered firearm; and,

23          Second, that the firearm had characteristics that

24   place it within the statutory definition of a firearm.

25          Now, critically, the defendant does not need to

8

```
1   know that the firearm meets the statutory definition.

2          So beginning with the short-barrel rifle, the

3   government will easily meet its burden on this.  The rifle

4   meets the statutory definition without a doubt; that is, a

5   rifle with a barrel less than 16 inches in length.  A photo

6   of the rifle at issue is on page five or the complaint

7   affidavit in this case.

8          It's also already been established that he

9   defendant knowingly possessed it.  Not only was it found in

10  the master bedroom of his house among his other belongings,

11  but his girlfriend admitted to agents during the search that

12  that short-barrel rifle was in fact his.  Indeed, she

13  actually told agents that of the numerous guns that were

14  found in the house during the search, only four of them were

15  hers.  She actually identified for the agents which four

16  guns were hers, none of which were the short-barrel rifle or

17  the shotgun, which is the other firearm at issue.

18         And, of course, this leads me to the sawed-off

19  shotgun.  Now, last week there was some uncertainty

20  expressed during a preliminary hearing as to the defendant's

21  knowing possession of the shotgun.  I submit today that the

22  evidence on this point is overwhelming.

23         First, the sawed-off shotgun was found in the RV

24  on the defendant's property.  Now, although the RV is

25  registered in the defendant's girlfriend's name, there is
```

```
 1   uncontroverted evidence that the defendant lived in and
 2   stored his own possessions in the RV.
 3          Now, to start, when the defendant was arrested and
 4   taken into custody, his girlfriend apparently was never
 5   upset and made spontaneous comments to the agents, including
 6   that the defendant was the only one who could drive the RV.
 7   But there's much more than that.
 8          Your Honor, at this time, I'd like to direct the
 9   Courts attention to what's been marked as Government's
10   Exhibit 1, the affidavit in support of the criminal
11   complaint out of the District of Colombia.  Specifically,
12   I'd like to call the Court's attention to the images
13   included after paragraphs 40, 41, and 42.
14          Now, looking at all three of these images, we can
15   see that the defendant is wearing tactical gear.  He's
16   wearing a tactical vest with a distinctive chest rig or an
17   ammo belt.
18          Now, the belt, if you look closely at the end of
19   it, you can see has a water bottle pouch hanging off of it.
20   There's also a place carrier that's clearly visible in the
21   images.  The plate carrier also has distinctive
22   characteristics, namely a pouch of the American flag with a
23   skull that has two arrows and a sword cutting through it.
24          Now, with that background, I'd like to show the
25   Court a couple of images recovered during the search of the
```

1  defendant's RV.

2       Your Honor, at this time, I'm pulling up what's

3  been marked as Government's Exhibit 2A. Thank you.

4       THE COURT: Ms. Asokan, is that too dark for you

5  to --

6       MS. ASOKAN: No. No, Your Honor.

7       Your Honor, in Government's Exhibit 2A, you can

8  see in this photo a chest rig or ammo belt with a water

9  bottle holder that closely resembles the one that the

10  defendant is pictured wearing in the affidavit. You can

11  even see a water bottle still in it.

12       You can also see at the top of the photo in 2A a

13  plate carrier with the same distinctive patch that's visible

14  in the affidavit photos. That patch, as I understand it, is

15  the Special Forces flag patch. So if you see in the photo,

16  it's affixed to the plate carrier and the same orientation

17  as the patch is visible in the affidavit photos form

18  January 6th.

19       Now, both the chest rig and the plate carrier that

20  are shown in this photo were found in the master bedroom of

21  the RV.

22       MR. SANSONE: Just, at this point, I mean, we can

23  agree he's been charged in Washington, D.C., with a

24  misdemeanor trespass, essentially standing somewhere he

25  hasn't -- he shouldn't have been standing. That's the

```
 1    charge.  All of this, I'm not sure what this is going to to
 2    try and prove the case that he's actually -- was standing
 3    someplace he shouldn't have been standing.  So I'm not sure
 4    what the relevance of this is.
 5              THE COURT:  All right.  To the extent it's an
 6    objection, the objection is overruled, Mr. Sansone.  The
 7    government, as I understand it, is addressing one of the
 8    factors in part -- in 3142(g), particularly the strength of
 9    the evidence against the defendant.
10              Now, for purposes of the detention hearing, if the
11    defendant wants to concede that the strength of the evidence
12    against him is strong, then perhaps we can move on to
13    another factor.
14              Mr. Sansone, what I said is the government, as I
15    understand it, is trying to offer proof that the weight of
16    the evidence against your client is strong.  They're for
17    purposes of the detention hearing only, if the defendant
18    wants to concede that factor, then I'm sure Ms. Asokan could
19    move on, but how would you like to proceed, Mr. Sansone?
20              MR. SANSONE:  Well, as to whether he was standing
21    someplace in Washington, D.C., he shouldn't have been
22    standing --
23              THE COURT:  No, I believe in Ms. Asokan's --
24              MR. SANSONE:  Yeah, that --
25              THE COURT:  Sorry, Mr. Sansone.
```

```
 1            MR. SANSONE:  I'm sorry, Your Honor.
 2            THE COURT:  Ms. Asokan can correct me if I'm
 3   wrong, but I believe what she's trying to establish here is
 4   that the vest that was recovered and the belt that was
 5   recovered in the RV where the shotgun was also recovered
 6   appears to be the same article of clothing that he was
 7   identified in in Washington D.C.  So she's trying to tie the
 8   two together and say that that was his clothing and,
 9   therefore, he was -- either, as she said, lived in the RV or
10   had access to the RV and not only was the clothing his, but
11   by circumstantial evidence the shotgun was as well.
12            Ms. Asokan, do I have that correct?
13            MS. ASOKAN:  Yes, Your Honor.
14            MR. SANSONE:  We'll let them proceed.
15            THE COURT:  All right.
16            MS. ASOKAN:  Thank you, Your Honor.
17            Now, with the image of the defendant from the
18   criminal complaint out of D.C. in mind, I'd like to now show
19   the Court what's been marked as Government's Exhibit 2B.
20   Your Honor, this photo looks a lot like the ones included in
21   the D.C. criminal complaint.  It's clearly a photo of the
22   defendant in D.C. from January 6th.  You can see the
23   distinctive Special Forces patch, the shears tucked into the
24   front pocket, just like the ones -- just like the images in
25   the criminal complaint that was filed in D.C.  Agents found
```

1    this photo in the RB.

2         But let's stick with the master bedroom for just a

3    little bit longer.  At the preliminary hearing, the agent

4    testified to observing male clothing.  Agents who

5    participated in the search of the RV in fact did not recall

6    seeing any female clothing or possessions in the RV.  Among

7    other things they found in the master bedroom camo pants and

8    shirts, the kind you would expect a military or former

9    military person to have.  They also found a T-shirt that

10   said something to the effect of Special Operations

11   Recruitment Battalion.  As the Court is now aware, the

12   defendant is retired Army Special Forces.

13        And to the extent there remains any doubt that the

14   defendant kept his possessions in the RV and that he

15   therefore knowingly possessed a shotgun, I'm now going to

16   show what's been marked as Government's Exhibit 2C.

17        This photo, which is clearly in the master bedroom

18   of the recreational vehicle depicts a massive framed

19   commemorative photo of the defendant in Special Forces gear.

20   The frame even identifies him by name.  And like I said,

21   this was found in the master bedroom of the RV.

22        Your Honor, there is no doubt that the defendant

23   knowingly possessed the shotgun that was found in the RV.

24   It's clearly his space and doesn't appear to be used by

25   anybody else.

1           And just briefly, as to the second element that
2    the government must prove, as set forth in the complaint
3    affidavit, as well as in Special Agent Nicolussi's testimony
4    last week, neither the short-barrel rifle, nor the shotgun
5    are registered to Mr. Brown.
6           In sum, Your Honor, as to this factor, there is
7    doubt that the defendant knowingly possessed the firearms at
8    issue.  The weight of evidence -- the weight of evidence
9    against him is overwhelming and this factor favors
10   detention.
11          Now, turning to the third factor listed in Section
12   3142(g), history and characteristics of the person.  Your
13   Honor, I'd like to begin with the defendant's character.  If
14   the Court would please turn back to the Government's Exhibit
15   1's, the complaint affidavit in the D.C. case.  The photo
16   beneath paragraph 40 shows that the defendant is a
17   self-identified Oath Keeper.
18          Now, as Your Honor is likely aware, the Oath
19   Keepers are a large organization of individuals who believe,
20   among other things, that America or our Republic has fallen,
21   that the government is trying to erode American civil
22   liberties.  The Oath Keepers heavily recruit from former
23   military and law enforcement persons --
24          MR. SANSONE:  Objection, Your Honor.  I'm just not
25   sure where she's getting this information from.

15

```
 1            THE COURT:  I'm not aware where you're getting
 2   that information from either, Ms. Asokan.  What are you
 3   offering right now?
 4            MS. ASOKAN:  Just background on the Oath Keepers,
 5   Your Honor.
 6            THE COURT:  All right.  I'll hear your proffer.
 7            MS. ASOKAN:  Thank you, Your Honor.
 8            THE COURT:  But, Ms. Asokan, let's not go too far
 9   afield, here.
10            MS. ASOKAN:  I understand.  I can move on, Your
11   Honor.
12            Now, the defendant's association with this group
13   is not a secret and also being that the defendant himself
14   keeps closely held.  And at this time, I'd like to play a
15   clip from the podcast that we mentioned earlier, what's been
16   marked as the Government's Exhibit 3.
17            THE COURT:  You may.
18            MS. ASOKAN:  Your Honor, this podcast series is
19   produced by the MAGA Institute, or Make America Great Again
20   Institute.  It's from June 25th of this year, Episode 52,
21   titled Retired Green Beret Jeremy Brown, colon, the Republic
22   has Fallen, Here's What You Can Do.  You'll hear in this
23   short clip the defendant being introduced on the show and
24   talking about his background and affiliation with the Oath
25   Keepers.  I just want to emphasize that this was a voluntary
```

16

 1   interview that the defendant participated in.  He wanted

 2   this information to get out to the public.

 3              (Government's Exhibit 3 played.)

 4              MS. ASOKAN:  Your Honor, I have paused -- for the

 5   record, I paused the recording at three minutes and 50

 6   seconds.

 7              Your Honor, we just heard the defendant state that

 8   he joined the Oath Keepers in November of last year after

 9   the election, knowing who they were, knowing what they did.

10   He said he needed to start linking up with these

11   organizations and preparing them for what is coming.

12              Defendant's been working close coordination with

13   the Oath Keepers.  He said in the podcast that he met with

14   Florida leadership.  He's been working in what sounds like a

15   consulting role regarding their security and vulnerability.

16              Now, flipping back to the D.C. complaint affidavit

17   in Exhibit 1, starting at paragraph 43, we are offered a

18   window into the degree of coordination ahead of January 6th

19   regarding logistics and defendant's getting to D.C.

20              In paragraph 46 you can see he used Signal to

21   coordinate travel.  Now, Signal is an encrypted app that is

22   typically used to conceal communications.  The defendant

23   calls his RV Brown Force 1, noting that he'll be taking an

24   RV and van to D.C.  He says, quote, plenty of gun ports left

25   to fill, suggesting that firearms were in tow.

1        And then we see in a December 2020 message in the

2   same paragraph he goes on to detail his travel plans,

3   assuming what looks like a leadership role of sorts.   In

4   just a month since he joined in November of 2020, the

5   defendant had already embedded himself in the Oath Keepers.

6        Now, back to the podcast briefly, Your Honor.   I'm

7   going to resume playing at three minutes and 50 seconds.

8        (Government's Exhibit 3 resumed playing.)

9        MS. ASOKAN:   Your Honor, for the record, I have

10  stopped the recording at six minutes and 42 second.

11       Your Honor, we just heard the defendant describe

12  an interview with FBI agents from December of 2020.  The way

13  he speaks about the interview the defendant is clearly

14  suspicious of federal law enforcement.  He even somehow

15  recorded the interview.  He then talked about January 6th.

16  He apparently was there to provide security for VIPs.  He

17  said he got a call from federal agents checking on him,

18  again, expressed with scepticism and cynicism of law

19  enforcement.

20       Based on these remarks, it's clear, or at least an

21  inference can be drawn that the defendant presently has no

22  trust in the government or federal law enforcement.   He

23  thinks they've been lying to the public regarding a number

24  of things, including January 6th.

25       I'm going to stop the podcast here for now, but

18

1   I'll be coming back to it.

2          Now, in the vein, regarding the defendant's

3   apparent deep distrust of law enforcement and government,

4   I'm show -- at this time I'd like to show the Court what's

5   been marked as Government's Exhibit 4.

6          This is a public post that the defendant made on

7   Facebook on June 27th of this year, just a few months ago.

8   Now, he talks about a number of things, including his former

9   campaign, he ran for local -- or, sorry, United States

10  Congress for I believe Florida's 14th District.

11         But the part that I want the Court to focus on

12  towards the end, beginning with:  The greatest depression is

13  here.  WAR will soon follow.  And for the record, war is in

14  all caps.  Again, war in all caps:  A WAR that will come to

15  your front door.  If you are not prepared, I suggest that

16  you -- I suggest you start now.  If you don't believe this

17  could ever happen in, quote, America, read the Founding

18  Fathers.  They warned us and they gave us the tools to

19  resist it.  But will we?

20         Your Honor, based on what I've just presented, I

21  submit that the defendant's Oath Keeper affiliation and his

22  public statements on the state of our government show a

23  severe and sincere distrust for our systems, for the rule of

24  law.  He advocates openly for resistance.  This is not

25  someone who can be trusted on bond.

1       Now, moving on to the defendant's mental

2  condition.  Your Honor, this area should give the Court

3  particular concern.

4       The defendant met with Pretrial Services last

5  Friday ahead of his initial appearance.  But, Your Honor, we

6  have reason to believe that the defendant was less than

7  candid in his interview.  Turning to his Pretrial Services

8  report, the very first line says:  Mr. Brown informed

9  Pretrial Services he has never been diagnosed with a mental

10  health condition.

11       He mentions seeing a counselor voluntarily,

12  working through his divorce, experiencing some general

13  suicidal ideations, and experiencing some I guess what can

14  be inferred as depression.  But nowhere are there -- is

15  there mention of any significant mental health episodes or

16  issues in this life.

17       The defendant selectively disclosed information

18  about his mental health history.  He chose to tell Pretrial

19  Services about some of his bouts of depression and how he

20  sought counseling.  But he failed to disclose that in the

21  last ten years he has been Baker Acted at least twice.  That

22  is an act of involuntary commitment.  That is not something

23  you just forget to mention.

24       Now, starting with the first known Baker Act, I'd

25  like to call the Court's attention to what's been marked as

1    Government's Exhibit 5.  This is a Hillsborough County

2    Sheriff's Office report from January 13th, 2014.  If Your

3    Honor would turn to page four of the report, the narrative

4    section.  Now, it reads in quotes:  Upset by a current

5    divorce, the subject made statement that he would kill his

6    wife or himself.

7         The report goes on to say:  The subject refused

8    reviews voluntary evaluation and that he was placed under

9    Baker Act without incident or injury.

10        The next page, page five, another narrative from

11   the report, describes the defendant as angry and focused.

12        Now, all of this was apparently reported by a

13   witness, which is documented on page seven of the report.

14   She's apparently a friend of Mr. Brown's -- sorry, the

15   defendant and this witness became concerned that the

16   defendant may hurt himself or his wife citing a text message

17   that he sent, in quotes:  If I don't kill myself, I will

18   kill her.  It is all I think about, she is the enemy.

19        Now, moving on to the second Baker Act.  At this

20   time I'd like the Court -- to direct the Court's attention

21   to what's been marked as Government's Exhibit 6.  Now, this

22   is a Hillsborough County Sheriff's office missing person

23   report in February of 2019.

24        Turning to page seven of the report, you'll see

25   that the defendant's girlfriend, the same one that he

```
 1   currently lives with and who has apparently offered to
 2   Pretrial Services to be his custodian if he's released on
 3   bond, reported the defendant missing.  He, at this time, in
 4   February of 2019, was last seen on a bicycle towing a cart
 5   of his belongings.  His girlfriend told the police that he'd
 6   been diagnosed with depression and is suicidal.
 7           I just want to note again that in the Pretrial
 8   Services report, the defendant said he has no mental health
 9   diagnoses.
10           Reading along, the defendant's girlfriend reported
11   that he has a history of disappearing.  He apparently had
12   left the house like this several times before approximately
13   once a year for the last five years.  Your Honor, this goes
14   directly to risk of flight.
15           He suffers from severe depression -- my apologies,
16   Your Honor.
17           The defendant suffers from severe depression and
18   has suicidal ideations apparently related to his divorce and
19   his brother's suicide, which took place six months before
20   this incident.
21           Now, turning to page nine, the report goes on to
22   say that the defendant took a pistol with him when he left
23   his house.  It also explains that when the defendant leaves
24   his house like this, when he disappears, is when he's
25   feeling particularly suicidal.
```

22

```
 1              In one particular instance, as reported by his
 2    girlfriend, he apparently purchased a carbon monoxide kit,
 3    but he did not end up going through with it.
 4              Your Honor, at this time and with your permission,
 5    I'd like to review a few of the text messages that the
 6    defendant and his girlfriend during this incident, which she
 7    shared with the police.  They begin on page 29 of the
 8    report.
 9              Based on the content of these messages, Your
10    Honor, I defer to you and whether it's appropriate to read
11    it out loud or at sidebar.
12              THE COURT:  I don't think it's necessary for you
13    to read it, Ms. Asokan, I'm capable of reading it, it's
14    already been admitted into evidence.
15              MS. ASOKAN:  Understood, Your Honor.
16              I just want to hit a few of the points that are in
17    these messages.  They shed light on how severe his
18    depression was and how suicidal his thoughts were.
19              At one point he tells his girlfriend in the
20    message, I'm going to do what I need to do, then be done.
21              The next page he says:  I'm going where I'm going,
22    I'm going there alone.
23              And, finally, I just want to point out on page 33
24    he makes a reference to a person presumably his brother's
25    suicide.  He says he doesn't blame him for doing it.
```

1    Frankly, he was jealous that he beat me to it.

2         He even says:  I blame him for not killing another

3    woman, and the other F word.  Big mistake.

4         Your Honor, these text show that the defendant was

5    not well and sincerely wanted to hurt himself.  That he has

6    a history of it and he did not disclose this incident to

7    Pretrial Services is all the more alarming.

8         Now, the defendant was eventually found at a

9    hotel, as documented on page 40 of the report.  The police

10   found a handgun in the hotel room.  They then Baker Acted

11   him and took him to the VA and a risk protection order was

12   sought.  The defendant apparently told the police that he

13   did not actually intend to hurt himself.

14        Your Honor, the defendant was less than candid

15   with Pretrial Services about his mental health.  He has no

16   credibility on this issue.

17        The last thing I want to mention on the

18   defendant's mental health is an incident from September of

19   2019, the same year of his second known Baker Act -- the

20   same year of his second known Baker Act.  This was an

21   injunction that was sought against the defendant in what

22   appeared to be a domestic violence issue.

23        Your Honor, due to the short notice of the

24   detention hearing, I was unable to obtain the underlying

25   pleadings in the case, but I have a printout of the docket,

24

1   which is marked at Government's Exhibit 7.

2          If Your Honor, would look at the last page, it

3   shows that stayaway order was sought with respect to certain

4   individuals.  Your Honor, I have reason to believe and I

5   submit to the Court that these individuals share the same

6   last name as the defendant's current girlfriend.

7          Now, looking a the third page, a temporary

8   injunction was obtained against the defendant for stalking

9   violence.  We can also see that in November 2019 the

10  defendant moved to have his firearms returned implying that

11  they were taken away from him in connection with this

12  domestic violence issue.

13         In sum, the defendant has had at least three major

14  incidents in the last ten years that bear on his mental

15  health and stability.  None of them are mentioned in the

16  Pretrial Services report.  The September 2019 incident, the

17  two Baker Acts, these are precisely the kind of information

18  that Pretrial Services needs to know about in making its

19  recommendation to the Court as to bond or detention, but the

20  defendant chose to keep them to himself.

21         I now briefly want to touch on the defendant's

22  family ties.  He is divorced and his children live in

23  Missouri.  He lives with his girlfriend, who apparently is

24  his only family in the area.  His girlfriend is or was in

25  the process of selling their home at the time -- the home

 1   that they share at the time the search warrant was executed

 2   and the defendant was arrested.  She has apparently

 3   represented to Pretrial Services that she would cancel the

 4   sale, but we have no information or assurances on what their

 5   living situation will be moving forward.  They have the RV,

 6   which apparently is for the defendant's use and he's the

 7   only one who can drive it.  He is physically mobile in his

 8   residence.  And given his volatile past, his history of

 9   disappearing, Your Honor, these go directly to risk of

10   flight.

11          In sum, his affiliations with the Oath Keepers,

12   his apparent and sincere distrust of federal law enforcement

13   and government, the defendant's mental health history, which

14   is significant, and his lack of family ties favor detention.

15          Finally, Your Honor, I'd like to turn to the last

16   factor, the nature and seriousness of the danger to any

17   person or the community.

18          Your Honor, this is grave.  The defendant's

19   volatility, his history of mental health issues, and his

20   affiliation with a militia-type group, show that he poses a

21   danger to the community and to himself.

22          His participation in the Oath Keepers bears

23   repeating.  Your Honor is probably aware that several Oath

24   Keepers have been arrested in this District.  Many of his

25   colleagues are nearby.

1       Shortly after the defendant joined the Oath
2    Keepers, FBI agents interviewed him in December 2020 about
3    social media posts regarding recruiting people for a
4    potential civil war.  He was interviewed again after
5    January 6th regarding his involvement at the Capitol.  And
6    as we know from the podcast, the defendant is very
7    suspicious and distrusting of federal law enforcement.

8       Your Honor, if you'd please look at what's been
9    marked as Government's Exhibit 8.  This is a picture of a
10   sign that the defendant posted on the front door of his home
11   in March of this year after he is approached by federal
12   agents on at least two occasions.  The sign reads:  Dear
13   FBI, slash, DHS, Department of Homeland Security, slash,
14   USMS, United States Marshal Service, slash, HCSO,
15   Hillsborough County Sheriff's Office.  Re-read your oath.
16   You are being used as a pawn by the enemies of this Republic
17   and your liberties.  If you don't care and say to yourself,
18   quote, I'm just following orders, then go, expletive,
19   yourself.  P.S.:  Better bring a bigger tactical package.

20       Again, Your Honor, the defendant is directly
21   calling out federal law enforcement essentially saying to be
22   prepared for a showdown if they come back.  How is Pretrial
23   Services supposed to go to his house and check on him
24   knowing what the defendant's disposition is regarding
25   federal agents and federal law enforcement?

```
 1              At this time, I'd like to play a couple more short

 2   clips from the podcast, what's in Government's Exhibit 3.

 3   The podcast is over an hour long, so I won't take up the

 4   Court's time playing all of it, but the defendant's thoughts

 5   on the state of our country, his views of government, his

 6   military training, and technical knowledge provide necessary

 7   context regarding the dangerousness he poses to the

 8   community.  I'm going to start the recording at seven

 9   minutes and 45 seconds.  I'm actually going to start it at

10   seven minutes, 30 seconds, just for ease of playing on this

11   machine.

12              (A portion of Government's Exhibit No. 3. was

13   played.)

14              MS. ASOKAN:  For the record, I've paused the

15   podcast at Exhibit 3 at nine minutes and 19 seconds.

16              When asked why he hasn't been indicted yet, the

17   defendant said, I'm hard to catch, I'm hard to kill.  He

18   calls himself a 20-year expert in insurgencies.

19              I'm going to resume playing from nine minutes and

20   19 seconds.

21              (Government's Exhibit No. 3 continues playing.)

22              MS. ASOKAN:  For the record, I paused the

23   recording at ten minutes and 59 seconds.

24              Your Honor, there's more discussion like this

25   through the duration of the podcast and if -- I won't
```

```
 1   belabor the point now, Your Honor has the recording for

 2   himself.  Just two things I'd like to mention that you will

 3   hear in this recording:

 4          Later on, at about one hour, eight minutes, and

 5   12 seconds, you hear the defendant talk about switching

 6   wireless carriers, apparently not having time to do so

 7   between running from the FBI and trying to get good WiFi

 8   signal at his home.

 9          The last thing from the podcast I'd like to

10   mention is towards the end of the podcast, at around an hour

11   and 14 minutes, you will hear the defendant talking about an

12   impending FBI raid and getting his girlfriend to shoot her

13   gun straight.

14          With everything we heard, the Court should be

15   alarmed and extremely concerned about what the agents found

16   at the defendant's residence during the search last week.

17   Agents found approximately ten firearms and an estimated

18   7,000 to 8,000 rounds of ammunition during the search.

19          But let's start with the obvious.  As set forth in

20   the complaint affidavit, agents found two live military

21   ordnance grenades in the RV.  Live grenades.

22          THE COURT:  So can -- I'm sorry to interrupt you,

23   but can you please clarify as to what the nature of those

24   grenades were?  Because as I recall, the testimony at the

25   preliminary hearing, I believe the agent from ATF referenced
```

```
 1   that they may in fact be flash-bangs?

 2           MS. ASOKAN:  Your Honor, if I'm remembering

 3   correctly, I think initially agents believed that they might

 4   find flash-bangs in the defendant's -- on his property ahead

 5   of the search.  I'll show you another exhibit shortly that

 6   shows why they thought that.  So I think he was clarifying

 7   that he expected to see flash-bangs or expected to be there

 8   to examine flash-bangs, but what they found in fact were

 9   grenades.

10           THE COURT:  Thank you.

11           MS. ASOKAN:  Now, Your Honor, as to these

12   grenades, there is no sporting use for them.  There is only

13   one purpose for them and that's destruction.  Now, it's not

14   clear at this time how the defendant got them, but they're

15   the exclusive property of the military.  An inference

16   certainly may be drawn against him on this point.

17           Now, the defendant had these extremely dangerous

18   weapons in his home in a residential area.  Having weapons

19   like these shows a complete disregard for the safety of the

20   community.

21           Your Honor, I submit that worst of all, when the

22   defendant was arrested, he saw that a search was being

23   performed before he was taken to the jail.  He had every

24   opportunity to warn the agents that he had grenades in the

25   RV.  By some good fortune, nothing happened to the agents
```

 1    when they encountered the grenades and they were able to

 2    safely relocate them.

 3          But that's not the only type of -- that's not the

 4    only type of restricted weapon that was found during the

 5    search.  I'm showing what has been marked as Government's

 6    Exhibit 2D.  Agents executing the search also found bear

 7    spray, large cannisters of it.  And at this point, Your

 8    Honor, this many months away from January 6th, it's public

 9    knowledge from -- based on public reporting that bear spray

10    was used.

11          Agents also found manuals -- agents also found

12    training manuals that should concern the Court.  I'm showing

13    what's been marked as Government's Exhibit 2E.  You can see

14    that this document is titled Unconventional Warfare.  Now,

15    we just heard the defendant talk about this in the podcast,

16    about his expertise and understanding on conventional

17    warfare.  He seems to fancy himself an expert on this topic

18    presumably based on his Special Forces training.

19          I'm now showing what's been marked as Government's

20    Exhibit 2F.  It's a photo of a Special Forces Sniper

21    Training and Employment Manual.  Your Honor, this is just

22    another piece of evidence that goes to the defendant's

23    capabilities, his understandings, and his skill using

24    firearms.

25          Now, to be very clear, Your Honor, the mere fact

```
 1   that the defendant was in the military in no way speaks to

 2   his dangerousness.  Rather, in the context of the

 3   defendant's professed views about the government and the

 4   arsenal of weapons that was found in his home, the defendant

 5   has the expertise and knowledge in how to use a variety of

 6   weapons.

 7            Also found in the home were items establishing

 8   that the defendant is a flight risk, that he's been

 9   methodically preparing to live off the grid.  I'm showing

10   what's been marked as Exhibit -- Government's Exhibit 2G.

11   This is a photo that was taken during the search of what

12   appears to be the defendant's home office.  I'm just going

13   to zoom in on the whiteboard.

14            The items listed on the board, the firearms, the

15   food, the clothing, the resources, Your Honor, I think it's

16   fair to characterize the defendant as what we know as

17   preppers.  These track -- these items listed on the board

18   track the statements he's made about an imminent war and

19   being prepared and being ready.  These are all things that

20   will allow him to live off the grid and on the lam.

21            If you look closely, Your Honor, and I won't

22   belabor this, you have it in front of you, he's mentioned

23   things to shoot, a list of firearms and weapons, ammunition,

24   including flash-bangs, which is what agents believed they

25   would find when they executed the search.  We also see a
```

1  list of clothing, information on shelter, and again, the
2  food.

3          Now, as just another example of the defendant's
4  preparedness to live off the grid and evade -- in
5  preparedness to be out of law enforcement's reach, I'm
6  showing what is marked as Government's Exhibit 2H.  Now,
7  this is just one picture of hundreds of rounds of
8  ammunition -- thousands of rounds of ammunition, rather,
9  that were found during the search.  Essentially, a
10 stockpile.  And not just any ammunition, it's clear from
11 this photo that these are not your regular gun enthusiast's
12 bullets.  The bullets depicted here can do grave damage.

13         Finally, Your Honor, I'm showing what's been
14 marked as Government's Exhibit 2I.  We're looking at stacks
15 of cash that were found in the defendant's master bedroom.
16 It's my understanding this cash amounts to approximately
17 $6,000.  The defendant has resources, the preparation, the
18 money, the RV.  The defendant has means to flee.  Indeed, it
19 looks like he's been preparing for it for quite some time.

20         Your Honor, as you mentioned last week, all of the
21 evidence presented must be viewed in totality.  Based on the
22 totality of the evidence presented today, this defendant is
23 a danger to the community and a flight risk.  His
24 affiliation with the Oath Keepers, his stockpile of weapons,
25 his capabilities in training.  He's skilled in the art of

1  deception.  We have no reason to believe that any of his

2  representations as to compliance or to cooperate with

3  Pretrial Services are to be believed.

4  His mental health history is significant and shows

5  that he has a history of being unstable and disappearing.

6  He has a serious history of suicidal ideations.  His

7  comments about federal law enforcement suggests that he's

8  been waiting for a showdown.  In his mind, exactly what's

9  happening right now is what he's been preparing for.  He has

10  no regard for our system of government or even what seems

11  our criminal justice system.

12  Your Honor, there are no conditions that will

13  reasonably assure his appearance as required and the safety

14  of the community or even himself in light of his mental

15  health history.  The defendant should be detained pending

16  trial.

17  THE COURT:  So do you have the audio clip from the

18  podcast in which he was discussing the plans for an expected

19  raid by the FBI?

20  MS. ASOKAN:  I do.  Would you like me to play it?

21  THE COURT:  I would.

22  MS. ASOKAN:  One moment.

23  For the record, I'm starting the recording at

24  one hour, 12 minutes, and 55 seconds.

25  (Playing recording.)

34

```
 1              MS. ASOKAN:  For the record, I paused the
 2   recording at one minute, 14 seconds -- sorry, one hour,
 3   14 minutes, and 25 seconds.
 4              THE COURT:  Anything further?
 5              MS. ASOKAN:  Nothing at this time, Your Honor.
 6              THE COURT:  Mr. Sansone, do you need a break or
 7   are you ready to proceed?
 8              MR. SANSONE:  I'm fine, Your Honor.
 9              THE COURT:  I'm sorry?
10              MR. SANSONE:  I'm fine.
11              THE COURT:  All right.  You may proceed.
12              Actually, one second, Mr. Sansone.
13              Whenever you're ready.
14              MR. SANSONE:  Yes.  May it please the Court.
15   Thank you, Your Honor.
16              Let me just start out by saying that Mr. Brown is
17   a 20-year Army veteran, spent 17 years in the Special
18   Forces.  He has absolutely no criminal background at all.
19   He never had one disciplinary proceeding in the military.
20   He has two bronze stars and he was honorably discharged.
21              And make no mistake, the government is using the
22   fact that he has special training by the United States
23   government against him now to try and convince this Court
24   that he's a danger to the community and he should be
25   incarcerated, though he has no history of violence.  And
```

1  I'll get to some of the allegations with the court -- state

2  court proceedings in a minute.

3      Judge, as the government correctly stated, there's

4  only two questions essentially before the Court, is whether

5  there's any conditions short of incarceration that would

6  satisfy the Court that he would not be a flight risk and

7  assure his appearance in court and a danger to the

8  community.  Let me quickly go to the circumstances of the

9  crime.

10      I think the trespass is not the one that the

11  government focused on, because essentially the allegations

12  in that complaint at this point is that he was -- they

13  believe that he was standing in an area where he wasn't

14  authorized to stand and it was a misdemeanor trespass out

15  of D.C.

16      Now, I know it's not -- the strength of the

17  evidence against them, I think part of that case and part of

18  the weapons case is definitely going to be how is a search

19  warrant issued on a misdemeanor trespass out of D.C.,

20  Mr. Brown's house, camper --

21      THE COURT:  Mr. Sansone, with all due respect, as

22  I mentioned to you at the preliminary hearing --

23      MR. SANSONE:  I'm just saying the strength of the

24  evidence, Judge.

25      THE COURT:  -- that's not an issue before the

1   Court.

2          MR. SANSONE:  I mean -- okay.  Well, all right.

3   Let's just --

4          THE COURT:  What you're arguing is pertaining to

5   suppression.  That's not something the Court can take into

6   consideration at a detention hearing.

7          MR. SANSONE:  Well, let's -- let's go to what they

8   found, the firearms that are -- that are in the house.  The

9   government has no evidence how long he'd had those.  He

10  could have had those for the past 20 years.  They have no

11  evidence that those have ever been fired.  He has no -- they

12  have no evidence he's ever used those before.  They have

13  absolutely no evidence -- those could have been sitting --

14  that sawed-off shotgun could have been sitting in his camper

15  for the past 15 years.  There's absolutely no evidence those

16  have ever been used or fired in any way, shape, manner, or

17  form.

18          So whether or not the evidence against him is

19  strong, the allegation is he has some weapons that weren't

20  registered.  But they're equating that to these weapons are

21  such a danger that there are no conditions.  One of the

22  conditions is he has to surrender -- Your Honor could do

23  that, he has to surrender absolutely everything he has.  And

24  that could be -- that would clearly be a condition that he

25  would readily agree to as part of this proceeding.  And I'll

```
 1   get to the conditions, Judge.

 2            But the government goes into why -- alleging that

 3   he was untruthful or he was not candid with Pretrial

 4   Services because he didn't tell them of his extensive mental

 5   health issues.  Well, let's with Exhibit No. 6, which is a

 6   2019 missing person report.

 7            His girlfriend filed a missing person report on

 8   February 12th of 2019.  First of all, this is two and a half

 9   years ago.  The very next day he was at a Quality Inn.  He

10   wasn't missing at all.  He said he wanted to be away from

11   his girlfriend, his brother had just committed suicide and

12   he needed some space.

13            Tampa Police Department, he voluntarily went to

14   the VA, spent three days there.  The Tampa Police Department

15   did file a risk protection order against Mr. Brown.

16            Now, I have one -- I did give this to the

17   government and I'll pass it up, Judge.  It's just one page.

18   Judge Ficarrotta, who is the Chief Judge at the 13th

19   Judicial Circuit, I have lots of experience with Judge

20   Ficarrotta, who is a very serious man.

21            THE COURT:  Mr. Sansone, I apologize for

22   interrupting you, sir.  May I mark this as Defendant's

23   Exhibit 1?

24            MR. SANSONE:  Yes, Defense Exhibit 1.  I'm sorry,

25   Your Honor.
```

```
 1            THE COURT:  Before we go any further, Ms. Asokan,
 2   any objection to Defense Exhibit No. 1?
 3            MS. ASOKAN:  No, Your Honor.
 4            THE COURT:  All right.  It'll be admitted.
 5            (Defendant's Exhibit No. 1 received in evidence.)
 6            MR. SANSONE:  This is the final order denying the
 7   Tampa Police Department's risk assessment protection order.
 8   This was just -- this is -- the government -- the United
 9   States alluded to the -- that Tampa Police sought this.
10            Now, you'll see under the petition is denied,
11   quote, the specific facts or finding for said denials are as
12   follows:
13            Based on the testimony of witnesses and
14   respondent -- who's Mr. Brown himself -- the Court finds
15   that respondent does not pose a significant risk of danger.
16            And then you'll see where it says, further
17   ordered:  It is further ordered that the firearms had to be
18   returned to him by the Tampa Police Department.
19            So two and a half years ago Judge Ficarrotta in
20   this Circuit found, as based on this 2019 missing person
21   report, that he was no danger and ordered the Tampa Police
22   to return his firearms.
23            Now, the government is using -- he was not
24   incarcerated then, but the government is attempting to use a
25   finding that he showed no danger to somehow incarcerate him
```

1   today and somehow suggest that the -- because he didn't

2   bring this up to Pretrial Services he was being less than

3   candid.

4           Let's go to the Exhibit 5, a 2014 Baker Act.

5   Seven years ago he was going through a difficult divorce and

6   he was Baker Acted.  He was released and what has happened

7   since that time?  He was never incarcerated, there's been no

8   issues at all.  He wasn't incarcerated seven years ago for

9   this, but the United States is using this seven-year-old

10  Baker Act to somehow show that he has a huge issue of mental

11  health.

12          And diagnosis, the government's only evidence that

13  he has depression I believe is he said he had depression and

14  his girlfriend said he had depression.  I haven't seen any

15  evidence that he has been diagnosed with clinical depression

16  by some mental health -- a psychiatrist or anybody.  Suffers

17  from depression.  He was going through a difficult divorce

18  seven years ago.

19          The 2019 that I was handed this morning, the

20  Government cites there's a battery.  First of all, this is a

21  civil temporary request for a restraining order.  They're

22  always granted initially and then the -- there's a time

23  where the temporary restraining order is issued and then

24  there's a hearing.

25          Now, I worked in Plant City, I worked for Judge

1  McNeil, who's a judicial officer, I was assigned to his

2  division, and I handled thousands of these in front of Judge

3  McNeil.  Judge McNeil was also a very serious judge when it

4  comes to this.  At the hearing, the restraining order was

5  dismissed and he was given his firearms back.  This was

6  filed ex parte by his girlfriend's sister.  After a hearing,

7  Judge McNeil dismissed it, his firearms should go back to

8  him.  So it's a dismissed temporary restraining order that

9  the United States of America is now trying to use in this

10  court to incarcerate him.  He has absolutely no criminal

11  history.  He should be incarcerated.  I literally can't

12  believe that they would use that as a factor to ask this

13  Court to incarcerate this man.

14        The Exhibit 3 podcast, I heard freedom of speech.

15  I did not hear him inciting any violence, I didn't hear him

16  directing any violence.  The government says he has a

17  mistrust of law enforcement, skeptical of law enforcement,

18  and somehow that should convince this Judge, this Court,

19  that he should be incarcerated because on a podcast where

20  he's exercising his First Amendment rights he expressed

21  skepticism with law enforcement.

22        Half of the jury venires I do in state court, the

23  people express skepticism, great skepticism, with law

24  enforcement.  But the United States of America is here

25  today, when Mr. Brown is exercising his free speech, there

```
 1    was no inciting -- they did not argue that this is outside
 2    of free speech, it's -- he's inciting people to riot.
 3    There's no evidence that he's trained anyone.  None.
 4    There's no evidence that he's trained tactical people and is
 5    preparing to do anything.  Skeptical of law enforcement.
 6    The United States, again, is asking this Court to jail a
 7    decorated veteran because he's skeptical of law enforcement.
 8    Our position is Exhibit 3 is freedom of speech and he should
 9    not be jailed for that.
10            Now, other factors.  Mr. Brown was serving at
11    Macdill.  He retired from Macdill Air Force Base and has
12    remained in Tampa ever since, as a lot of military do.  The
13    fact that his family doesn't live here, I don't know how
14    that equates to a checked column for the United States that
15    his family doesn't live here and, therefore, somehow that
16    equates with somehow flight risk.
17            Criminal history.  None.
18            History of drug or alcohol problems.  None.
19            On probation or parole when arrested.  No.
20            Serious danger to anyone.  The 2019 missing
21    persons came to absolutely nothing, the Judge returned the
22    firearms.
23            The 2014, seven years ago, Baker Act came to
24    nothing.
25            The 2019 temporary restraining order was denied.
```

| | |
|---|---|
| 1 | Given back his firearms. There is -- essentially, the |
| 2 | government's position seems to be because he had those |
| 3 | weapons, and he could have had them for decades, that makes |
| 4 | him a danger. |
| 5 | And as to a flight risk, Mr. Brown specifically |
| 6 | said on that podcast if he was indicted, he would intend to |
| 7 | take the stand and come to court and tell the Court what's |
| 8 | going on.  Contrary to being a flight risk, he essentially |
| 9 | said, I would love my opportunity if I was indicted to bring |
| 10 | these issues into a court of law. |
| 11 | Obviously, the government can't show that there's |
| 12 | been any failure to appears or anything like that, because |
| 13 | he's never been arrested before. |
| 14 | These are the conditions that the Judge could -- |
| 15 | that Your Honor could impose that the government says are |
| 16 | not sufficient:  You could order electronic monitoring; you |
| 17 | could ask him to surrender all of his weapons; you could ask |
| 18 | him to report on a regular basis to Probation.  And |
| 19 | electronic monitoring, obviously, if -- that would alleviate |
| 20 | a flight risk.  You could have restrictions on travel.  He |
| 21 | could turn in his passport.  He could comply with a curfew. |
| 22 | A surety bond.  And specifically, another factor is you |
| 23 | could actually have him, even though we don't think it's |
| 24 | needed, undergo a psychological or psychiatric evaluation |
| 25 | and have that reported to Pretrial Services. |

1          Now, our position, essentially, Your Honor, is
2    those conditions could satisfy this Court and two things
3    that Your Honor needs to address, which are to secure his
4    appearance and to keep any possible danger to the public.
5    There are many conditions that this Court can fashion short
6    of incarceration that would do those things.

7          And we, quite frankly, think that the evidence
8    that the government gave to Your Honor doesn't rise any way,
9    shape, or form near incarceration. And we don't think that
10   the evidence that the government supplied, I think it's
11   clear why Mr. Brown didn't tell Pretrial Services about a
12   2019 missing persons report when he was at the Quality Inn
13   and then nothing ever came of it. Or a temporary
14   restraining order filed by his girlfriend's sister where
15   nothing ever came of it. There's no reason for him to talk
16   to Pretrial Services about that. He wasn't being less than
17   candid.

18         And he actually told Pretrial Services in the past
19   he'd suffered from depression and in the past had suicidal
20   ideation, which is essentially the 2014 Baker Act. He
21   didn't hide from that.

22         So, Judge, it's -- our position is simple. You
23   have at your power a lot of tools to place upon Mr. Brown
24   short of incarceration that will satisfy those two factors.
25   We believe there are many tools this Court can use short of

1   incarceration.  Our position is the government's going after

2   him for essentially nonevents and exercising of free speech

3   does not rise to that level.

4          Also, in that podcast, when he says, I'm difficult

5   to find or difficult to kill, after that he laughs and then

6   says, okay, here's the reality, and he gets onto something

7   specific.  Now, Your Honor can take that as -- however you

8   want.  Our position is that's a joke, he's moving onto

9   something very specific and he talks about very specific

10   things that he has a problem with the government, not that

11   he's going to somehow engage in some type of tactical

12   warfare.

13          And this day, many agents came to his house.

14   There was no -- there were no shots fired, he was compliant,

15   and he was arrested.  Nothing happened.  It was a

16   non-incident when they came to his house to arrest him.

17          So we don't think there's any history of violence

18   that would rise to the level of Your honor deciding that

19   there were no conditions short of incarceration.

20          That's all I have, Your Honor.

21          THE COURT:  Mr. Sansone, I do have some questions

22   for you, sir.

23          MR. SANSONE:  Yes, Your Honor.  I'm sorry.

24          THE COURT:  All right.  If the Court were to

25   discount some of the statements that he made on the podcast,

```
 1    the statement about being hard to find, hard to kill being
 2    made in jest and this statement that he's -- something to
 3    the effect of his girlfriend -- he wished his girlfriend
 4    would go to the shooting range and learn how to shoot
 5    straight for the upcoming FBI raid, at both times the
 6    Court -- it did appear to the Court that he was saying --
 7    making those statements in jest.
 8             So even if the Court were to discount those
 9    statements and recognizing that the search warrant was
10    executed on his house, but the government had the element of
11    surprise when executing that search warrant, there's no
12    indication that Mr. Brown knew that the government was going
13    to execute a search warrant that day.  I'd like you to
14    address, which perhaps is most concerning to the Court,
15    Government's Exhibit 8 --
16             MR. SANSONE:  Eight?  Was that 8, Your Honor?
17             THE COURT:  Yes, sir.
18             MR. SANSONE:  Mr. Brown just indicated to me that
19    they didn't say he was coming to his house that morning, but
20    the agents had called him that morning, so they were
21    checking in on him.
22             THE COURT:  All right.
23             MR. SANSONE:  The morning of the search warrant.
24             THE COURT:  All right.  Now, according to the
25    government, if I understood Ms. Asokan correctly,
```

1   Government's Exhibit 8 is a picture of a sign that was

2   posted at the defendant's residence at one point and it's

3   addressed to the FBI, DHS, U.S. Marshals, and the

4   Hillsborough County Sheriff's Office.  It has a political

5   statement, which the Court is not concerned about, but what

6   the Court is concerned about is the P.S. at the bottom that

7   says:  Better bring a bigger tactical package.

8          Now, how is the Court supposed to take that

9   statement as anything other than a threat to law

10  enforcement, FBI, DHS, United States Marshal Service, and

11  the Hillsborough County Sheriff's Office, if they come to

12  visit him, they better bring a bigger tactical package?

13  What's the Court to make of that?

14         MR. SANSONE:  Well, look at his history.  He has

15  absolutely no history of violence.  Zero.  None.

16         THE COURT:  But what about that sign, that he's

17  putting the government on notice, putting the specific law

18  enforcement agencies on notice that if you come to his

19  house, where the sign is posted, you'd better bring a bigger

20  tactical package?

21         Quite frankly, Mr. Sansone, that's the biggest

22  thing that I'm grappling with, is how am I supposed to

23  fashion any kind of conditions of release where Mr. Brown

24  would be anywhere other than in a jail when he has flat out

25  put the government, law enforcement, on notice that if

1  they're going to come see him, they better bring a bigger

2  tactical package?

3        MR. SANSONE: But they did come and see him and

4  there was nothing. There is absolutely zero evidence of

5  violence in this man's background.

6        THE COURT: I understand and, quite frankly, the

7  Court would be inclined to try to come up with some

8  conditions of release in order for him to be out on bail

9  pending trial. But again, I'm reiterating, I don't know how

10 I can overcome his own statement to law enforcement

11 threatening them and putting them on notice that they need

12 to bring a bigger tactical package in a search warrant while

13 he's -- you've proffered that an agent had contacted him

14 that morning? There's been no evidence -- and you can speak

15 to your client if you'd like -- that he knew that they were

16 coming to execute a search warrant that day. They had the

17 element of surprise.

18        Now, if I'm to fashion any kind of condition of

19 release where Mr. Brown would be staying at his residence,

20 or any residence for that matter, he may not know -- or he

21 may be aware that Pretrial Services is going to have to

22 check up on him. And I'm to put an officer in danger and

23 they are to take into consideration his suggestion that they

24 bring a bigger tactical package when they come to do a check

25 on him?

| | |
|---|---|
| 1 | MR. SANSONE:  Well, Your Honor, you can obviously |
| 2 | take all of his firearms, you can take everything.  In the |
| 3 | history of this person, what I'm saying, the actual |
| 4 | background of everything that is Jeremy Brown, to take a |
| 5 | P.S., you'd better bring a tactical package, to I'm going to |
| 6 | incarcerate him, even though he has absolutely no history of |
| 7 | violence, he has -- those incidents that they used came to |
| 8 | absolutely nothing, but I'm going to take this P.S. and find |
| 9 | that there are -- that he should be incarcerated?  You could |
| 10 | read that many ways.  Better bring a tactical package. |
| 11 | THE COURT:  Please, tell me another way that the |
| 12 | Court should read it other than as a warning to law |
| 13 | enforcement that they better bring a bigger tactical package |
| 14 | when they come and see him. |
| 15 | MR. SANSONE:  Just as he said on the podcast, I'm |
| 16 | hard to find, I'm hard to kill. |
| 17 | THE COURT:  Which the Court was crediting him that |
| 18 | that was made in jest, but now you're suggesting that I |
| 19 | should take him at his word? |
| 20 | MR. SANSONE:  No, I'm saying how -- how could you |
| 21 | not -- it'd be the same thing as that, better bring a bigger |
| 22 | tactical package.  That is not equating to he is going to |
| 23 | assault anyone who comes, he's going to start firing on |
| 24 | anyone that comes to his house.  There's zero evidence of |
| 25 | that.  He has zero evidence of anything in his background |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

```
 1   that would suggest that.

 2           THE COURT:  I'll ask you one more time,

 3   Mr. Sansone.  What is the Court to believe he means by, law

 4   enforcement, you'd better bring a bigger tactical package?

 5           MR. SANSONE:  He doesn't -- he doesn't want -- you

 6   could view that many ways.

 7           THE COURT:  Give me one.  Give me one way I should

 8   view it other than --

 9           MR. SANSONE:  In jest.

10           THE COURT:  -- as a warning.

11           MR. SANSONE:  Of course, in jest.  You better

12   bring a bigger tactical package.  If you were watching

13   someone on the news and they said that, you'd say, well,

14   he's just threatened every single person in law enforcement

15   and he should be thrown in jail and there's absolutely no

16   conditions of bond, because when they were talking about if

17   someone comes to his house he said, you better bring a

18   bigger tactical package and, therefore, it doesn't matter

19   his military service, it doesn't matter that he doesn't have

20   any single, absolutely zero, history of violence at all,

21   that we're going to take that one statement, tactical

22   package, and we're going to jail him.

23           THE COURT:  I believe your client would like for

24   you to speak with him.

25           (Brief pause in proceedings.)
```

```
 1              MR. SANSONE:  He's just telling me that it's --
 2    this sign just has to do with he'd been targeted before.
 3    They asked -- they tried to recruit him, he turned them
 4    down.  Other friends of his had been arrested.  There were
 5    no issues of violence.  And he was just saying in jest, you
 6    better bring a big tactical package.  They had talked to him
 7    many times before, they were still calling him.  They called
 8    in the morning on January 6th, they called him on the
 9    morning of this.  He'd had -- actually had no bad
10    interactions with law enforcement.
11              They -- when they recruited him, when they called
12    him on January 6th, when they called him that morning, there
13    were no threats made to them, he didn't make any threats to
14    them.  There's no allegations that law enforcement ever felt
15    threatened by them at all.  He was just saying in the
16    broader scheme of having been trying to be recruited to talk
17    against the Oath Keepers, he said I didn't want to do that.
18    Other friends of him being arrested.  He said he knew they
19    were going to be coming at some point just because they kept
20    calling him.  They actually called him that morning to check
21    up on him.  No law enforcement has ever said that they felt
22    in danger.  And when they got there, there was no danger.
23              He said he was just using that as kind of a
24    back-and-forth saying, listen, I'm not going to cooperate.
25    Not like I'm going to shoot you, I'm just not going to
```

```
 1   become somebody who's going to talk against the Oath Keepers
 2   and all -- I'm not -- I'm not going to be doing that stuff.
 3   So he used that as just kind of a jest to law enforcement.
 4   But there's been no -- no allegation that he was ever, even
 5   in this situation in December, in January when he talked
 6   about it, that law enforcement has said that he was
 7   disrespectful, that they felt threatened, and nothing when
 8   they came to his house that he would have felt threatened.
 9            So, Your Honor, I think that would lend itself --
10   and the government has asked you to look at the totality.
11   And the totality of everything, who Mr. Brown is and the
12   lack of what he has done and even his interactions with the
13   FBI, there's been no allegations that there's been any
14   problems with his interactions with the FBI, that I would
15   ask you to take that more as just a statement, kind of stick
16   it in your eye, going back and forth.  And Your Honor can
17   take all of his firearms, have him searched, have the
18   residence searched, pre-searched, whatever.  There are
19   conditions to make sure that that -- if the Court has
20   concern that that's going to happen, that that's an issue,
21   that Your Honor can address that short of incarceration.
22            But Mr. Brown was just giving me kind of a larger
23   about why he put that.  He had been in contact with them
24   back and forth and just wasn't going to work with them, but
25   had no bearing that he was actually going to commit any
```

```
 1    violence, which he's never done in his past.
 2           THE COURT:  All right.  Let's move on to risk of
 3    flight.  Can you please address the Government's Exhibits 2G
 4    and 2I, which appears to me that your client was preparing
 5    to flee, from what I don't know, but was preparing to flee.
 6    He has a dry erase board full of his -- documenting his
 7    plans and his provisions and that's in Government's
 8    Exhibit 2G.  And then in Government's Exhibit 2I, he has a
 9    stash of cash, which was represented to the Court was
10    several thousand dollars.
11           MR. SANSONE:  Okay.  2I, he has $6,000 in cash.
12    I'm not sure --
13           THE COURT:  Combine 6I [sic], $6,000 in cash.
14           MR. SANSONE:  Right.
15           THE COURT:  And then his plans on his dry board in
16    2G indicating that he was planning on fleeing.  Now, for
17    what purpose -- what reason, it's unclear, but he was
18    preparing to flee.
19           MR. SANSONE:  It wasn't when he's been indicted by
20    a federal crime.  There are a lot of people who are what
21    they call preparers, preparing for some type of thing where
22    he might need to -- doesn't mean, well, now that he's been
23    indicted with a federal crime that he's now going to flee.
24    There's no history of him ever fleeing.  Even in the 2019
25    temporary restraining order, he showed up and argued in
```

```
1   front of Judge McNeil.  He's the one who argued in front of
2   Judge Ficarrotta on the 2019, when the police were seeking
3   some type of red flag against him.  He came to the
4   courthouse and argued that.
5           And $6,000 in cash, I mean, I don't know.  I mean,
6   I'm a cash guy, I actually have probably about that much in
7   my office right now.
8           THE COURT:  I wouldn't broadcast that,
9   Mr. Sansone.
10          MR. SANSONE:  But my point is, at that point, with
11  that board, a lot of people are preparers and it has nothing
12  to do with now that I'm on federal indictment I'm going to
13  flee.  Electronic monitoring and daily reporting or whatever
14  thing -- whatever Your Honor has an issue with that could
15  clearly address those issues.
16          THE COURT:  I believe your client would like to
17  speak to you again, Mr. Sansone.
18          MR. SANSONE:  Yes.
19          (Brief pause in proceedings.)
20          MR. SANSONE:  Your Honor, he was explaining just
21  that the cash came from an estate sale that they had just
22  had before and a lot of that is -- they do have an RV and
23  they're RVers and when you're an RVer, you go around and
24  you've got to take a lot of things and be prepared.  He said
25  he and his girlfriend are RVers.  Obviously, Your Honor
```

```
 1   could order that he not go into the RV, that he has, you
 2   know, a curfew at the home, can't leave the Middle District,
 3   all those different types of things.  But long-term RVers
 4   plan for long-term trips and need to take a lot of things.
 5               THE COURT:  Anything else, Mr. Sansone?
 6               MR. SANSONE:  No, Your Honor.
 7               THE COURT:  Thank you, sir.
 8               Ms. Asokan, anything further?
 9               MS. ASOKAN:  Yes, Your Honor, just briefly.
10               Your Honor, I mentioned this at the beginning of
11   my argument and you mentioned this on Friday.  The Court has
12   to look at the evidence in totality.  Now, the defense wants
13   us to look at one or two pieces in isolation and certainly
14   in a vacuum perhaps none of them should give the Court grave
15   concern.  But I want to emphasize that this is a totality
16   case.  Every piece of evidence that I presented before taken
17   together shows that this defendant poses a serious risk of
18   flight and a serious danger to the community, as well as to
19   himself.
20               Now, just briefly, I want to mention two things
21   that -- or I want to talk about two things that the defense
22   just mentioned about conditions of release.  Now, among the
23   conditions that the defense pointed out or suggested were
24   GPS monitoring and surrender of weapons.
25               As to GPS monitoring, the defendant, as we know,
```

```
 1   is trained, Special Forces.  He talked about in the podcast
 2   his expertise in communications and Signals.  Someone with
 3   his training could easily evade GPS monitoring.  That is not
 4   at all sufficient to guarantee his appearance.
 5            As to surrendering his weapons, Your Honor, we've
 6   been presented with Defense Exhibit 1 from the September
 7   2019 temporary restraining order that was sought against him
 8   and the list of firearms that he was -- that were taken away
 9   from him and that he was then -- that were then returned to
10   him.
11            If Your Honor would look at page three of that
12   exhibit, you see the firearms.  The defendant didn't
13   surrender the grenades during that proceeding.  This is not
14   a complete list of the firearms in his possession.  There is
15   no guarantee that by simply taking away the firearms that
16   they found during the search or in a subsequent search of
17   his home that the defendant wouldn't somehow have access to
18   additional firearms.
19            Lastly, Your Honor, on history of flight, the
20   defense just pointed out in the prior incidents, perhaps
21   specifically only the domestic violence dispute that he had
22   in September of 2019, that he was compliant, that he showed
23   up.  And they're right, the defendant doesn't have a
24   criminal history.
25            The defendant is facing serious federal felonies
```

56

1    in this case.  As I mentioned, these charges carry a maximum

2    penalty of ten years.  The defendant has never been faced

3    with offenses like this before in his time either in or

4    outside of the military.  I don't think at this time it's

5    appropriate to look back at those prior incidents as an

6    example of how he'll behave in this case.

7         And again, I would ask the Court to keep that in

8    mind and the totality of the evidence that was presented,

9    the preparedness, the evidence that he's going to flee, that

10   he has a history of disappearing and, frankly, Your Honor,

11   that he has not been candid with the Court.  We have no

12   reason to credit his credibility as to what he will and will

13   not do and cooperate with Pretrial Services.

14         Thank you, Your Honor.

15         THE COURT:  Thank you, Ms. Asokan.

16         All right.  After considering the government's

17   proffer, the evidence that was presented, the defense

18   response and the evidence that they presented as well,

19   considering the factors in 18 U.S.C. Section 3142(g), the

20   Court finds that there are no condition or set of conditions

21   that will reasonably assure the safety of any other person

22   of the community.

23         In particular, Mr. Brown, I'm concerned about the

24   safety of law enforcement and their interactions with you.

25   This is a very difficult decision for the Court, I'll say

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

1    that candidly.  The Court recognizes and appreciates your
2    service to this country, your exemplary service in Special
3    Forces, over 17 years in Special Forces and 20 years I
4    believe in the military.  The Court takes that into
5    consideration and gives that great weight, to be honest,
6    sir.

7           The Court is not concerned for purposes of
8    detention about your political views and that your views in
9    particular that perhaps are anti-establishment or
10   anti-government.

11          The Court's also not, in and of itself, concerned
12   about your lawful possession of firearms as well.  But as I
13   pointed out in my questioning to your counsel, I find that
14   your statement, the sign made in Government's Exhibit 8, is
15   a clear threat to law enforcement.  You identified the FBI,
16   Department of Homeland Security, the U.S. Marshals, and the
17   Hillsborough County Sheriff's Office and you flat out told
18   them that you better bring a bigger tactical package if they
19   were to come visit you.

20          And so none of the conditions that I can impose
21   are going to adequately and reasonably assure the safety of
22   law enforcement when they come visit you when you've made a
23   specific threat to them.  I can't require and ask of
24   Pretrial Services, just as an example, to wear tactical gear
25   when coming to check on you to see if you're complying with

1   the conditions of my release.

2          I'm required to try to find the least restrictive

3   and -- set of conditions or condition in order to reasonably

4   assure your appearance at all future court proceedings and

5   reasonably assure the safety of any other person, but given

6   the evidence in front of me and your own statement to law

7   enforcement, I can't find that I can reasonably assure their

8   safety.

9          I'll give you a moment to speak in a second, sir.

10          If anything were to happen to any law enforcement

11   personnel during the period of your pretrial release after

12   this having been brought to the Court's attention and me

13   being put on notice of your specific threat to them, then

14   they would have every right to blame me for putting them in

15   that position.  If there was any other condition that I

16   could impose in order to reasonably assure their safety,

17   sir, I would, but you have the means, you have the ability,

18   and you've made a specific threat to law enforcement and

19   that's something that I can't ignore.

20          So I am finding that there are no conditions of

21   release that will reasonably assure the safety of the

22   community, in particular the FBI, DHS, U.S. Marshals, and

23   Hillsborough County Sheriff's Office.  And I'll go one step

24   further and say the United States Pretrial Services agency,

25   which the Court would task with supervising you while on

1    pretrial release.

2            Therefore, I very reluctantly will order your

3    detention pending trial.

4            I will take a moment, though, to say that the

5    first allegations against you, the misdemeanors associated

6    with the January 6th Capitol, the Court is not detaining you

7    because of those charges.  Though the incident occurred

8    almost nine months to the day ago and there has been no

9    indication, there's certainly been no rush by law

10   enforcement to charge you with that offense, and there's

11   been no indication that you pose a threat -- you had the

12   opportunity -- to be quite frank, at the January 6th Capitol

13   insurrection, as it's being called, you had the opportunity

14   for violence, you had the opportunity to go a step further.

15   And some of the other people that have been charged in

16   association with that day did act violently and did go a

17   step further.  But you've been charged with two

18   misdemeanors, you have not been charged with anything

19   violent associated with that incident.

20           But with the current charges, the felonies that

21   you've been charged with here in the Middle District of

22   Florida, the gun-related offenses, and again, the specific

23   threat that you've made to law enforcement, I must order

24   your detention.

25           Now, you raised your hand that you wanted to

```
 1    address the Court.  Before I let you do so, I will remind
 2    you again of your right to remain silent.  Anything you say
 3    may be used against you.
 4              Do you understand your right to remain silent,
 5    Mr. Brown?
 6              THE DEFENDANT:  Yes, I do, Your Honor.
 7              THE COURT:  Mr. Brown, would you like to consult
 8    with your attorney before making any statement to the Court?
 9              THE DEFENDANT:  No, Your Honor, I'm confident that
10    what I have to say will be appropriate.
11              THE COURT:  All right.  I'll hear you.
12              THE DEFENDANT:  Your Honor, I do understand the
13    perspective in which you are looking at this, but again, I
14    also understand that you don't have the full context of what
15    this trial is actually about and the reasoning why it is my
16    desire, my full desire -- in fact, there's no amount of
17    money the government could even pay me to flee, because I
18    basically tried to prod the government into forcing me on
19    the stand, because I have knowledge of activities on behalf
20    of the government that I believe will help the 600-plus
21    Americans that are being held in prison without due process.
22              With that said, I would like to talk about the
23    sign.  But first I would like to talk about my relationship
24    with law enforcement over the course of my life.
25              One, I have many friends that are lifelong law
```

```
 1   enforcement officers and I have always respected law
 2   enforcement, those law enforcement officers that do their
 3   job every single day.  I spoke about that when I was in
 4   front of Judge Ficarrotta and I never had any animosity
 5   towards law enforcement for them performing their duties in
 6   a lawful manner.
 7             However, the actions of the Department of Homeland
 8   Security and the FBI's Joint Terrorism Task Force, of which
 9   I have worked closely with on numerous times to actually
10   interdict real terrorists globally, are not professional
11   activities.  That is why I went public on March 5th with the
12   recording of their recruitment tape of which they themselves
13   admitted I am a zero out of ten threat in any way.
14   Therefore, the fact that I even posted the sign itself as a
15   warning should be clear indication that it was not a threat
16   against them, but yet a professional jab, just like when
17   somebody tells me that they're from the Marine Corps and I
18   say, I'm sorry for your mistake.  It doesn't mean I do not
19   respect the Marine Corps, it is a simple jab, because I'm a
20   20-year retired Special Operations soldier and I have a
21   sense of humor that is based on that life experience.
22             But my actual interactions with law enforcement
23   are that I ran a limousine company for five years and I
24   donated limousine service to line-of-duty deaths, of which
25   one of them happened in Pinellas County and one happened in
```

 1   Tampa.  It was a great honor for me to be able to do this,

 2   because I greatly, again, respect law enforcement.

 3           So I do not believe that it is fair or in the

 4   context of this entire situation that a sign that I

 5   handwrote myself, posted hoping that someone would see it in

 6   the absence of -- we were away for that weekend, because

 7   again, I spent 20 years defending this country, defending

 8   the Constitution of the United States.  I'm not

 9   anti-government, I am anti-tyrannical government, I am anti

10   extra-constitutional government.

11           I have spent my life -- I have five daughters that

12   I spent most of their lives away from in defense of this

13   nation.  So it is absurd to believe that I would spend

14   20 years serving this country as a decorated combat veteran,

15   that I would run a company to where I donated full limousine

16   service to military, law enforcement, and line-of-duty

17   deaths, and that I would run for U.S. Congress in the

18   District of Florida 14 against Kathy Castor, because I don't

19   respect the form of government or that I don't respect law

20   enforcement that are to uphold their oaths and defend the

21   Constitution, not the orders of their bosses, but the rights

22   of the people.

23           And so this sign, which typically when I write

24   P.S. at the end of a text message or a sign, it's some type

25   of comical interlude or jab.  What I am saying in the actual

63

 1   named text of that sign is that if you're a law enforcement
 2   officer, please re-read your oath.  It says, I do solemnly
 3   swear to defend the Constitution, not the government,
 4   because the Constitution is what represents we, the people.
 5   And I believe in this time that that is a serious inspective
 6   that law enforcement needs to be taking, not only law
 7   enforcement, but firefighters, doctors, judges, service
 8   members, because there are a lot of things happening that
 9   are infringing on our constitutional rights.  And that was
10   the main point of my message.

11          My friend, Kenny, had just been apprehended by a
12   tactical team, which I personally believe is absurd that
13   these packages are being sent to apprehend guys at their own
14   houses.  None of them have been flight risk, none of them
15   had fired or even drawn a weapon, but, yet, we have 50
16   agents plus.  My girlfriend recorded it.  There were 25
17   vehicles at my house.  And it wasn't because they were
18   scared.  In fact, the two agents got out, were not even
19   wearing body armor and they told me that they weren't
20   scared.

21          So for the government to now, and their own
22   arresting agents show up, they, again, are leading us to
23   believe they were there only for the misdemeanor, but, of
24   course, because we have documentation that was left with my
25   girlfriend, they already have charges based on a search

 1  warrant that they had not even conducted.  They knew why

 2  they were there.  They were there to apprehend me.  And just

 3  like I told my attorney Friday when you issued the

 4  continuance, I said, I will not be granted bail, because

 5  this isn't about the evidence, it isn't about the testimony,

 6  it is about locking me away so that I stop talking.

 7          And so, Your Honor, I would graciously ask and I

 8  throw myself at the mercy of the Court, please do not take a

 9  single handwritten sign -- because I am a Green Beret, I do

10  know how to do things, and contrary to the government's

11  tongue-and-cheek statement that I think I'm an expert, no.

12  Special Forces, the Army Green Beret was designated by

13  John F. Kennedy is the Department of Defense (inaudible) for

14  unconventional warfare.  I am an expert at what's going on

15  in this country.  And it's not against the team here that's

16  formed by the government and it's not against the agents.

17  We even jokingly said in the car that I know they're doing

18  their job.

19          But at some point, you're asked sometimes in your

20  job to do something that just isn't right.  And I believe

21  that that's happening right now across this country and

22  families are being broken up.  One woman has had a

23  miscarriage and it's a family that was destroyed over a

24  political protest.  And for the government to file an arrest

25  warrant and a search warrant because they think that me

1    standing there prepared to provide medical aid to those

2    civilians that are being struck in the head with batons by

3    the Capitol Police is somehow me engaging in that insurgency

4    or trespassing and then wanting me to be quiet,

5    acknowledging the fact that they actually recruited me to be

6    a confidential informant to infiltrate an organization that

7    has no criminal history, an organization made up of former

8    law enforcement and former military with one mention, Oath

9    Keepers, to uphold your oath.  Because every day law

10   enforcement officers are asked to do things that in their

11   mind may not meet their oath.  And it's their discretionary

12   decision at that point to say I'm not going to do that.

13            And there is many evidence across the country of

14   officers making pointed statements and saying I'm no longer

15   going to arrest people for not wearing a mask, I'm no longer

16   going to arrest people for not doing this or not doing that,

17   because it violates my oath to the Constitution.  And that

18   oath is actually to the people of this country.

19            So, Your Honor, again, with the totality of my

20   life experience and my explanation of the entire context of

21   what is going on here, which I believe will be proven at

22   trial, I'm prepared to stay in prison as long as the

23   government thinks that I deserve to be there.  I fear no

24   prison, I've been trained by the government to endure way

25   worse.  I've actually enjoyed my time at the Pinellas County

| | |
|---|---|
| 1 | jail, because I've had an opportunity to engage with people |
| 2 | that I don't actually get to engage with on an everyday |
| 3 | basis. And I've told them each, why are you in here? Stop |
| 4 | coming back. Because they've all been back many, many |
| 5 | times. And they're the ones that have taught me how to do |
| 6 | things. |
| 7 | That's not what I fear. What I fear is the |
| 8 | slippery slope of a government that believes that because |
| 9 | you're exercising your First Amendment right to free speech |
| 10 | that they can just come in and ruin your life and hold you |
| 11 | indefinitely, like many have been held for over six months |
| 12 | now awaiting their due process. That's not right. |
| 13 | And I am anxious to go to trial against the |
| 14 | government, but I do not feel that it is fair to me, to my |
| 15 | girlfriend, to my dogs, to my community, who does not fear |
| 16 | me. In fact, they respect me and rely on me. To the |
| 17 | sheriff's deputies that normally come to our house -- |
| 18 | because we don't live in a good neighborhood -- on a regular |
| 19 | basis and receive assistance from me. I provide them with |
| 20 | surveillance footage when an incident happens across the |
| 21 | way. The residents of those homes rely on my ability to |
| 22 | confront hazards and dangers, because they maybe not -- they |
| 23 | maybe not have the courage to do it themselves. |
| 24 | And so I wish I would have the opportunity to |
| 25 | bring the community that the government states should be in |

1  fear of me in here to testify on my behalf, but I wasn't
2  given that opportunity at that level of preparedness.  But
3  if we were, I guarantee that 100 percent of my community,
4  the people that live in and around me and have for over
5  eight years, would testify that they feel safer with me
6  there, not in danger.  And I know that my girlfriend would
7  do that.

8         And so, Your Honor, again, I ask for you to
9  reconsider.  I will do any of the steps, because I have no
10 concern about flight at all.  I will gladly take another
11 psychological evaluation, of which I've received at least
12 five throughout the course of my military career.  But my
13 experience, my possession of things that were given to me by
14 the government, my training manuals, I am a Special Forces
15 sniper, I do not -- I do not believe that that should be
16 used against me, Your Honor.  So again, please, I ask you to
17 reconsider.

18        THE COURT:  All right.  Thank you, Mr. Brown.  And
19 I have reconsidered and I agree with you on certain things
20 that you have stated.  I am not detaining you because of
21 your political views, I am not detaining you because of a
22 manual that you received while in the military, I'm not
23 retaining you because you lawfully possess some firearms.  I
24 am not trying to suppress your speech.  In fact, I've given
25 you an opportunity here in open court today to say whatever

1   you'd like to say. And this is being recorded, as you know.
2   I am not detaining you for any of those reasons, sir. I do
3   not believe that you are a risk of flight -- or I should say
4   I believe there are conditions that could be imposed to
5   minimize your risk of flight and reasonably assure your
6   appearance at all future court proceedings. I believe you
7   do want your day in court and I believe you do want to let
8   the public hear what you have to say about the charges,
9   particularly those that are pending in the District of
10  Columbia.
11          But again, sir, as I questioned your attorney, I
12  cannot overcome your own statement. And I understand what
13  you're telling me, that this is made in jest, that this is a
14  playful jab at law enforcement. I don't view this as a
15  playful jab. If it was, it was poorly done, sir, to be
16  quite frank with you. This does not come across to me as a
17  jab, it comes across to me as a flatout threat to law
18  enforcement. And when you are threatening law enforcement
19  in their interactions with you, I can't place them in that
20  kind of situation. Just as you wouldn't want someone
21  placing you in that situation if the roles were reversed.
22          THE DEFENDANT: Well, I --
23          THE COURT: So, sir, I've heard you, I've heard
24  you speak and I've told you what my ruling is and I've
25  reconsidered that ruling, but I am going to order your

1  detention.

2          Now, that being said, Mr. Brown, if new

3  information becomes available that would have a material

4  impact on the Court's decision as to whether there are

5  conditions of release that could be imposed, your attorney

6  may move to reopen this hearing at any time.  So if there's

7  new information you do not have with you here today that you

8  think would have a material impact on the Court's decision,

9  then I encourage you to speak with your attorney and he may

10  move to reopen it and I'll reconsider bond at that time.

11          But based on the information that's been presented

12  to me here at this hearing, which is quite substantial, the

13  Court finds that you are to be detained for the reasons that

14  are stated and for the other reasons which the Court may put

15  in its written order of detention.

16          Is there any further from the government,

17  Ms. Asokan?

18          MS. ASOKAN:  No, Your Honor.

19          THE COURT:  Mr. Sansone?

20          MR. SANSONE:  No, Your Honor.

21          THE COURT:  All right.  Thank you.  We're

22  adjourned.

23                   (Proceedings concluded.)

24

25

                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                          TAMPA DIVISION

70

1  UNITED STATES DISTRICT COURT )
                                )
2  MIDDLE DISTRICT OF FLORIDA   )

3

**REPORTER TRANSCRIPT CERTIFICATE**

4

5      I, Howard W. Jones, Official Court Reporter for the
   United States District Court, Middle District of Florida,
   certify, pursuant to *Section 753, Title 28, United States*
6  *Code*, that the foregoing is a true and correct transcription
   of the stenographic notes taken by the undersigned in the
7  above-entitled matter (Pages 1 through 69 inclusive) and
   that the transcript page format is in conformance with the
8  regulations of the Judicial Conference of the United States
   of America.

9

10                          /s    *Howard W. Jones*

11                          _____
                            Howard W. Jones, RDR, RMR, FCRR
                            Official Court Reporter
12                          United States District Court
                            Middle District of Florida
13                          Tampa Division
                            Date:  11/04/21

14

15

16

17

18

19

20

21

22

23

24

25

**U.S. District Court**
**Middle District of Florida**
**Tampa Division**

## GOVERNMENT EXHIBIT

**Exhibit No.:** 18

Case No.: 8:21-cr-348-SCB-SPF

UNITED STATES OF AMERICA

vs.

Jeremy Brown

Date Identified: 12/14/21

Date Admitted: 12/14/21

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                    **Case No.: 8:21-CR-348-T-SCB-SPF**

**JEREMY BROWN**

_____/

## MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S DETENTION ORDER[1]

COMES NOW, the Defendant, JEREMY BROWN, pursuant to 18 U.S.C. § 3145(b), and files this Motion for Revocation of the Magistrate Judge's Detention Order (Dkt. 19). Undersigned counsel respectfully requests that this Honorable Court find that the Magistrate Judge erred in his factual and legal findings, reverse the Detention Order, and conduct a new detention hearing before this Court. In support, Mr. Brown respectfully states as follows:

### I.    Procedural and Factual History

1. On October 1, 2021 Mr. Brown was charged via criminal complaint with entering and remaining on a restricted building or grounds in violation of 18 U.S.C. §1752(a)(1), and disorderly and disruptive conduct in a restricted building or grounds in violation of 18 U.S.C. §1752(a)(2),

---

[1] Counsel notes that the magistrate judge is currently assessing whether to reopen Mr. Brown's detention hearing. Mr. Brown filed a Motion for Pre-Trial Release. Doc. 27. If the magistrate

8:21-mj-1990-SPF. This case is pending in Washington D.C.

2. On October 1, 2021, Mr. Brown was charged via criminal complaint with possessing firearms not registered to him in violation of 26 U.S.C. § 5861(d). 8:21-mj-1991-SPF.

3. On October 1, 2021, Mr. Brown made his initial appearance before the Court. At that time the Government requested detention based on 18 U.S.C. § 3142(f)(1)(C), and the Court continued the hearing until October 5, 2021.

4. After a hearing on October 5, 2021, this Court issued an Order of Detention finding "that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community." Doc. 19. The Court stated that it was "particularly troubled by a sign Brown placed on the door of his residence in which he warned that 'FBI/DHS/USMS/HSCO' that they: 'Better bring a bigger Tactical PACKAGE." The Court took this as a direct threat to law enforcement.

I.  October 5, 2021 Detention Hearing

At the hearing, the United States submitted documentary evidence to the Court to attempt to show that this decorated military Special Forces veteran is a

---

judge re-opens the detention hearing and issues an order of release upon certain conditions, this

2

danger to himself and the community. Most of the documentary evidence submitted by the government should be given little to no weight by this Court.

A.     Exhibit 5

At the hearing, the United States admitted a 2014 Baker Act report. Doc. 17, USA Exhibit 5. At the hearing, this Court was apprised that seven (7) years ago, Mr. Brown was going through a very difficult divorce. As such, law enforcement thought best to Baker Act him, and Mr. Brown was taken without injury or incident. We submit that this incident seven (7) years ago sheds no light on whether Mr. Brown has current mental health issues or is a danger to himself or others.

B.     Exhibit 6

Also, at the hearing, the government presented to the Court a February 2019 missing person report. Id., USA Exhibit 6. The defense explained to the Court that Mr. Brown was not missing; rather, he was located at a Quality Inn the very next day and was at the hotel because he needed to be alone after his brother's suicide. Defense submitted evidence that Hillsborough County Chief Judge Ronald Ficarrota heard Tampa Police Department's Petition for Risk Protection, which was filed by the Police after they found Mr. Brown at the Quality Inn. Doc. 18, Exhibit 1. Judge Ficarotta specifically found that "[b]ased on testimony of

---

appeal would become moot.

witnesses and Respondent the Court finds that the Respondent does not pose a significant risk of danger." Id. The court ordered that Tampa police return Mr. Brown's firearms. Mr. Brown submits that the evidence that the United States has provided the Court in Exhibit 6 neither shows he is a danger to himself nor to others.

### C.    Exhibit 7

In Exhibit 7, the United States put before the Court what it deemed as evidence of Mr. Brown's violent past when it placed into evidence a 2019 docket sheet from state court. Doc. 17, Exhibit 7. The docket sheet shows that a female (Ms. Aldridge's sister) filed a petition for a restraining order against Mr. Brown. Judge Art McNeil in Plant City held a hearing, dismissed the petition as insufficient, and ordered the police to return Mr. Brown's firearms. Mr. Brown submits that this exhibit neither shows he is a danger to himself nor to others.

### D.    Exhibit 8

Exhibit 8, which is a sign Mr. Brown had in the window of his home, troubled the Court. Id., Exhibit 8. The sign shown in Exhibit 8 was only in Mr. Brown's window for approximately two weeks in March 2021, when Mr. Brown was out of town. When Mr. Brown returned home, Mr. Brown took the sign out of his window seven (7) months before law enforcement came to his house to arrest him for a misdemeanor trespass out of Washington D.C. As explained the to Court

4

by Mr. Brown, the "P.S. Better Bring a Bigger Tactical PACKAGE" was said in
jest not as a threat of violence to law enforcement. There is absolutely no evidence
in Mr. Brown's history that he poses a threat to anyone. To the contrary, he spent
20 years in active military service, 17 years in the special forces and received two
Bronze Stars for his meritorious service in combat.

## II.     **Argument and Memorandum of Law**

A review of the Magistrate Judge's decision denying pretrial release is *de
novo*. See United States v. Allen, 891 F. Supp. 594, 597 (S.D. Fla. 1995). The
Magistrate Judge erred in his findings, because the judge did not adequately
consider the alternatives to incarnation set forth by Mr. Brown.

At the hearing, Mr. Brown presented the following conditions and
arguments for release pursuant to 18 U.S.C. § 3142(c). Mr. Brown submits that
that the following conditions of release are sufficient to assure Mr. Brown's
appearing in court and will assure the safety of the public and law enforcement:

- Electronic monitoring: While the government alluded at the detention
  hearing that Mr. Brown knows how to circumvent GPS monitoring
  because of his special training, this statement was wholly without
  basis or evidentiary support. Mr. Brown will absolutely abide by
  electronic monitoring.

- Report to probation on a regular basis: Mr. Brown will report to probation as often as this Court requires.

- Searches and Seizures: Mr. Brown and Ms. Albridge (his girlfriend) agree to have their home searched prior to his release and surrender any weapons found in the home. Tylene Aldridge, the owner of the home, agrees to any searches and to surrender and to remove any and all weapons from the home.

- Secured Appearance Bond: Ms. Aldridge is willing to put her home up as collateral to secure an appearance bond. This issue was not raised before the magistrate judge as it was not known at the time of the hearing.

- Restrictions on travel: Mr. Brown will surrender his passport and will remain in the Middle District of Florida during the pendency of this case.

- Curfew: Mr. Brown will abide by any curfew that this Court imposes.

- Drug testing: Mr. Brown will submit to any drug testing that the Court requires. There is no evidence that Mr. Brown has an issue with drugs or alcohol.

- Psychological testing: Even though the government claimed at the detention hearing that Mr. Brown suffers from fairly serious mental

health issues, the United States presented no evidence from a doctor,

psychologist or any documentation as to any type of mental health

issue Mr. Brown might be suffering from.  In addition, as explained in

detail above, the 2014 Baker Act from seven (7) years ago when he

was going through a divorce and the 2019 missing person report,

when he was not even missing, are not evidence that Mr. Brown

currently has mental health issues. That said, Mr. Brown is willing to

submit to any mental health or psychological exam that this Court

requires.

Accordingly, based on the forgoing, we move this Court to revoke the

magistrate judge's order of detention, and either release Mr. Brown on the above

conditions of release, or conduct a separate independent detention hearing.

## IV.   **Conclusion**

WHEREFORE, for the reasons stated herein, Defendant respectfully

requests that this Honorable Court reverse the Magistrate Judge's Detention Order

and grant Mr. Brown release or a new detention hearing before this Court.

I HEREBY CERTIFY that a copy of the foregoing motion has been

furnished by electronic filing using the CM/ECF system to Risha Asokan, United

States Attorney's Office, this 3d day of November, 2021.

Respectfully submitted,

s/William Sansone
WILLIAM SANSONE, ESQUIRE
Sansone Law, P.A.
609 West De Leon Street
Tampa, FL  33606
Telephone: (813) 361-0874
Facsimile: (813) 251-1808
Email: sansonew@gmail.com
Florida Bar # 781231

8