UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                                          Case No.  8:21-cr-348-SCB-SPF

JEREMY BROWN

_____/

## ORDER

Before the Court is Defendant Jeremy Brown's Motion for Reconsideration of Defendant's Motion for Pretrial Release ("Motion for Reconsideration") (Doc. 49) and the United States' response in opposition (Doc. 50).  The Court held a hearing on December 14-16, 2021 ("December Evidentiary Hearing"), at which the parties proffered the evidence, including through live testimony, each would present at a reopened detention hearing.  In addition to the reasons stated in open court on December 16, 2021, Brown's Motion for Reconsideration is DENIED for the reasons that follow:

## DISCUSSION

On October 5, 2021, the Court held a detention hearing pursuant to 18 U.S.C. § 3142(f).  After considering the factors set forth in 18 U.S.C. § 3142(g) and the information presented at the detention hearing, the Court concluded that Brown must be detained pending trial because the United States had proven by clear and convincing evidence that no condition or combination of conditions of release would reasonably assure the safety of any other person and the community. (Doc. 19).  In particular, the Court found that

Brown posed a danger to law enforcement officials, including those who would be tasked with supervising Brown should he be released on bond. (*Id.*).

Three weeks later, Brown filed a Motion for Pretrial Release (Doc. 27), which the Court construed as a motion to reopen his detention hearing pursuant to 18 U.S.C. § 3142(f). The Court denied Brown's motion because he failed to satisfy the statutory standard for reopening his detention hearing. 18 U.S.C. § 3142(f). Indeed, the "new" evidence proffered by Brown was either known to him at the time of the original detention hearing or immaterial to the issue of whether there are conditions of release that will reasonably assure the appearance of Brown as required and the safety of any other person and the community. *Id.* Accordingly, the Court found that Brown offered nothing "in the nature of new evidence that would cause the Court to reopen the hearing or change the outcome." (Doc. 44 at 2-3).

Brown now moves the Court to reconsider its Order (Doc. 44) denying without prejudice his Motion for Pretrial Release (Doc. 27). Because Brown's motion was denied without prejudice, the Court will analyze Brown's pending motion as both a motion for reconsideration as well as a renewed motion to reopen his detention hearing. Under either standard, the motion is due to be denied. In the alternative, even if the Court were to reopen the detention hearing and accept the evidence proffered at the December Evidentiary Hearing, the Court again finds that Brown should be detained pending trial.

**I.     Motion for Reconsideration**

Reconsideration of a previous order is an extraordinary remedy that should be employed sparingly. "Although the Federal Rules of Criminal Procedure do not

specifically authorize motions for reconsideration, both the Supreme Court and [the Eleventh Circuit] have permitted parties to file such motions in criminal cases." *Serrano v. United States*, 411 F. App'x 253, 255 (11th Cir. 2011). In deciding motions for reconsideration in criminal cases, courts in this district have generally relied on the standards applicable to motions for reconsideration filed in civil cases pursuant to Rule 59, Federal Rules of Civil Procedure. *See United States v. Brown*, No. 3:18-CR-89-J-34JRK, 2019 WL 7067091, at *1 (M.D. Fla. Dec. 23, 2019) (collecting cases). "The only grounds for granting a Rule 59 motion are newly discovered evidence or manifest errors of law or fact." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (quotations and citations omitted). Accordingly, "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice" is each a proper reason for reconsideration. *Lamar Advertising of Mobile, Inc. v. City of Lakeland, Fla.*, 189 F.R.D. 480, 489 (M.D. Fla. 1999). A motion for reconsideration, however, cannot be used to relitigate old matters, raise argument, or present evidence that could have been raised prior to the entry of the order. *See Arthur*, 500 F.3d at 1343.

      Here, there is no basis for reconsideration. As stated by the United States, Brown has failed to establish: "(1) an intervening change in law (2) the discovery of new evidence that was not available at the time this Court denied the motion to reopen his detention hearing; or (3) the need to correct clear error or manifest injustice." (Doc. 50). As a result, the Court declines to reconsider its Order (Doc. 44) denying without prejudice Brown's Motion for Pretrial Release (Doc. 27).

## II.     Motion to Reopen Detention Hearing

To the extent Brown's Motion for Reconsideration may be construed as a motion to reopen his detention hearing, the motion is likewise denied. Under 18 U.S.C. § 3142(f), a detention hearing "may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). This statutory "provision is, in effect, a codification of a court's inherent reconsideration authority tempered by the understanding that, to promote finality, preserve judicial resources, and discourage piecemeal presentations, a court should not reconsider a decision based on information that could have been presented the first time around." *United States v. Pon*, 2014 WL 3340584, at *3, 9 (M.D. Fla. May 29, 2014).

In his Motion for Reconsideration, Brown states that "[t]he main purpose for the witnesses that [he] wishes to bring to the Court's attention at the reopening of his detention hearing are witnesses who will speak about Exhibit 8, which was entered into evidence at the initial detention hearing." (Doc. 49 at 2-3). While Brown acknowledges that "it is true that these six witnesses, who are long time friends and colleagues of [] Brown, were certainly known to him prior to the detention hearing," he contends that "their anticipated testimony at the reopening of a detention hearing, concerning Exhibit 8, was not known or knowable prior to the initial detention hearing." (Doc. 49 at 6). Specifically, "Brown intends to call these witnesses to explain to the Court how they interpret Exhibit 8 in light

4

of their knowledge of Mr. Brown and how the Court misinterpreted the language of Exhibit 8." (*Id.* at 4-5). Exhibit 8 (Doc. 17-15) is the following picture law enforcement took of a sign Brown created and posted on his door:



As stated in its Order of Detention (Doc. 19), "*[i]n addition to other evidence presented at the [detention] hearing*, the Court [was] particularly troubled by [the] sign Brown placed on the door of his residence in which he warned the 'FBI/DHS/USMS/HCSO' that they: 'Better bring a bigger Tactical PACKAGE.'" (Doc. 19 at 2) (emphasis added). Prior to his detention hearing, Brown certainly knew he made the sign[1] and knew the United States intended to offer it as evidence.[2] Yet Brown did not call these known friends and colleagues to testify about their interpretation of the sign, nor did he seek a continuance to arrange for their testimony.

Brown asserts that "the Court's interpretation [of Exhibit 8] was not known until the hearing was being conducted, and Mr. Brown's friends and colleagues did not receive[] a copy of Exhibit 8, along with the Court's stated interpretation of Exhibit 8, until after the hearing." (Doc. 49). Brown also argues that he could not have anticipated the Court's "concern for the safety for those who would supervise Mr. Brown if granted bond." (*Id.*). Brown's contentions miss the mark. All the evidence Brown now wishes to present was known to him at the time of his first detention hearing. While Brown may regret his decision to not call his friends to testify at that hearing, it does not mean the evidence was "not known" to him. Moreover, the proposed lay opinion testimony of Brown's friends would not have a material bearing on the issue of whether conditions of release would reasonably assure Brown's appearance as required and the safety of any other person and

---

[1] Brown stated at the hearing that it was "a sign that I handwrote myself, posted . . ." (Doc. 31 at 62:4-5).
[2] Brown concedes that Exhibit 8 was sent to his counsel the night before the detention hearing. (Doc. 49 at 3).

6

the community. As a result, Brown has failed to meet the statutory requirements for reopening his detention hearing under 18 U.S.C. § 3142(f).

### III. In the Alternative, Order of Detention Reaffirmed After Considering New Proffered Evidence

While Brown failed meet the standard for reopening his detention hearing, the Court permitted the parties to proffer evidence at the December Evidentiary Hearing. After considering the newly proffered evidence, however, the Court finds that a reopened detention hearing would result in the same outcome.

**A. Summary of the Evidence Submitted by Brown**

*1. Testimony of Meredith Jones*

Meredith Jones testified that she met Brown through her husband, Scott Olson, approximately 10 years ago. (Doc. 77, Tr. 27:9-12). Jones considers Brown and his girlfriend, Tylene Aldridge, "to be almost extended family." (*Id.*, Tr. 27:20-28:8). Jones described Brown as someone "without pretense," "candid, very honest," "witty," with a "snarky sense of humor," and "very generous." (*Id.*, Tr. 28:14-29:9).

With respect to the sign previously marked as Exhibit 8 (Doc. 17-15), Jones saw it for the first time after Brown's initial detention hearing (Doc. 77, Tr. 28:14-29:9). But she had previously discussed the sign with Brown and Olson in May 2021. (*Id.*, Tr. 31:1-6). Jones recalls that Brown "was laughing about it, he thought it was quite humorous." (*Id.*, Tr. 31:7-15). Jones, however, had no other specific recollection about anything else Brown said about the sign. (*Id.*, Tr. 48:3-9).

7

At no point did Jones interpret the sign as a threat, nor does she believe that was Brown's intent. (*Id.*, Tr. 31:9-20). Rather, Jones interpreted Brown's warning to law enforcement that they "Better bring a bigger Tactical PACKAGE" as a reference to male anatomy. (*Id.*, Tr. 32:21-23). Alternatively, "to say 'tactical package', if you're talking preparedness in military terms would simply mean the right people, the right resources, whatever it is that you need to achieve an objective." (*Id.*, Tr. 46:12-48:2). Jones "imagine[s] he probably also didn't expect that anyone ever – would ever read it and that it would just be his little way of venting and getting a little jab in." (*Id.*, Tr.33:7-22).

Finally, Jones admitted that Aldridge told her that she believed a federal agent's spouse worked at the same company as Jones. (*Id.*, Tr. 41:2-10). According to Jones, Aldridge asked her if she knew the agent's spouse. (*Id.*). Jones, however, denied that Aldridge asked her to do research on the agent's spouse.[3] (*Id.*, Tr. 40:23-41:1).

   2. *Testimony of Scott Olson*

Olson met Brown in 1994 when they went to Special Forces selection together. (*Id.*, Tr.51:18-23). Brown and Olson lived together for seven months at Fort Bragg and he has known Brown ever since. (*Id.*, Tr. 51:23-52:4). Over the past three or four years, Olson states that they have "been an integral part of each other's lives," and "constantly call each other." (*Id.*, Tr. 52:20-53:11).

---

[3] The Court does not find Jones's denial credible. As shown in Government's Exhibit 9H-T (S-Doc. 71), Jones was with Aldridge when Aldridge told Brown: "So, I have Meredith here . . . I have Meredith looking this up."

8

Olson did not see Exhibit 8 (Doc. 17-15) until after Brown's initial detention hearing. (Doc. 77, Tr. 55:13-56:6). While Olson does not recall whether he spoke to Brown about the sign in-person or on the telephone, he does recall Brown telling him about the sign in May or June of 2021. (*Id.*, Tr. 56:10-57:4). Specifically, Brown told Olson: "yeah, I put that they better bring a bigger tactical package," and then Brown started laughing. (*Id.*). Olson took that statement as a "double entendre," meaning "[a] bigger tactical package, like a bigger d[*]ck for lack of a better term." (*Id.*, Tr. 59:23-60:8). According to Olson, the other meaning of "a tactical package is, as [Brown] speaks in military terms a lot, it's what you bring on target to – it could be small, it could be big, it could be planes, bombs, whatever." (*Id.*, Tr. 77:9-21).

In Olson's opinion, Brown put up the sign as "a ribbing or a jest or the fact that he has already been talking to these two FBI guys . . . he'd had conversations with these guys before. It's not, 'hey, if the FBI ever comes here, good luck', it's, 'hey, you two.'" (*Id.*, Tr. 60:7-18). Olson "think[s] this means stop bringing two people around . . . either arrest [Brown] or don't come back. (*Id.*, Tr. 77:9-21). But when Brown's attorney pointed out that the sign was addressed to other law enforcement agencies, Olson responded, "I don't know about the rest of it, I hadn't thought about that." (*Id.*, Tr. 60:19-22). On cross-examination, Olson speculated that Brown just addressed the sign to a bunch of law enforcement agencies because Brown did not know who would be coming to arrest him. (*Id.*, Tr. 80:16-18). Olson ultimately admitted that Brown wrote the sign "without any of us sitting in this courtroom knowing his intent." (*Id.*, Tr. 82:2-9).

9

During his initial detention hearing, Brown's attorney proffered that Brown "never had one disciplinary proceeding in the military." (Doc. 31, Tr. 34:19). Contrary to this representation, Olson testified that Brown received a General Officer Memorandum of Reprimand barring him from service in the United States Army. (Doc. 77, Tr. 76:13-77:11).

Finally, Olson testified that the kill radius of an M67 grenade (the type found in Brown's RV) is 15-meters. (*Id.*, Tr. 69:20-21).

    3.    *Testimony of Brian Ferraccio*

Ferraccio spent 26 years in law enforcement before recently quitting to pursue other ventures. (Doc. 77, Tr. 95:9-11). Ferraccio met Brown about 35 years ago when they were teenagers. (*Id.*, Tr. 96:16-20). According to Ferraccio, Brown is very supportive of law enforcement and has specifically told Ferraccio "[t]hat he is pro law enforcement." (*Id.*, Tr. 98:3-10).

Ferraccio saw the sign for the first time after Brown's initial detention hearing in October 2021. (*Id.*, Tr. 100:19-101:3). Ferraccio never had a conversation with Brown about the sign. (*Id.*, Tr. 108:18-20). Knowing Brown, however, Ferraccio took the phrase "better bring a bigger tactical package" as a "euphemism" for bringing a bigger set of "[b]alls, testicles"— male anatomy. (*Id.*, Tr. 104:18-105:17). "[B]ased on knowing Mr. Brown and everything like that, [Ferraccio] did not view that as a threat." (*Id.*, Tr. 107:11-13). But Ferraccio acknowledged that one "would assume that if it was addressed to Federal agencies and they were to do something, whether to execute a search warrant or

10

have an arrest warrant for Mr. Brown, that they come in heavy, very heavily armed. . ." (*Id.*, Tr. 111:1-9).

### 4. Testimony of Keith Pecha

Pecha currently works as a contractor for the Special Operations Command on the Oversight and Review Board. (*Id.*, Tr. 113-23-114:9). Pecha previously served for 27 years in the United States Army. (*Id.*, Tr. 114:12-18). Pecha first met Brown in 1996 when they attended the Special Forces Qualification Course together. (*Id.*, Tr.114:19-21). Pecha knows Brown "to be a true Patriot" and someone who "loves his country, wants what's best for it and – and all of it's citizens." (*Id.*, Tr. 116:16-21).

Pechas was first shown Brown's sign after his initial detention hearing. (*Id.*, Tr. 117:13-118:3). Knowing Brown, Pechas views the sign as "poke" and not as a threat. (*Id.*, Tr. 121:12-16). But Pechas admitted that his opinion of the sign is pure speculation. (*Id.*, Tr. 127:2-4). Pechas can see how someone who did not know Brown could perceive the sign as a threat. (*Id.*, Tr. 128:1-5).

With respect to M67 grenades, Pechas acknowledged that the purpose of a grenade is to kill and injure. (*Id.*, Tr. 125:11-12). He testified that the lethal range of an M67 grenade is about 10 to 15 meters. (*Id.*, Tr. 125:13-15). And had Pechas known that Brown had the M67 grenades, he would have counseled him that: "hey, you need to get rid of these." (*Id.*, Tr. 128:13-129:3).

### 5. Testimony of Cathi Chamberlin

On September 30, 2021, Chamberlin went to Brown's residence to pick up something she had previously purchased at his garage sale. (*Id.*, Tr. 132:2-13). Brown

11

told Chamberlin that he had been contacted by the FBI that morning. (*Id.*, Tr.132:19-25). While Chamberlin cannot recall Brown's exact words, she got the "very clear impression that he would not have been surprised" if law enforcement came to his house. (*Id.*, Tr. 133:11-15). Later that day, Brown was arrested. (*Id.*, Tr. 134:8-9).

    6. *Defense Exhibits*

        a. <u>Exhibit 1</u> (Doc. 73-1): A copy of the sign entered into evidence as Exhibit 8 (Doc. 17-15) during Brown's initial detention hearing.

        b. <u>Exhibits 2A, B, C, D</u> (Doc. 73-2): Pictures taken of law enforcement agents at Brown's residence.

        c. <u>Exhibit 3</u> (Doc. 73-3): A video taken during Brown's arrest and an audio recording of Brown's conversations with law enforcement agents in December 2020.

    **B. Summary of the Evidence Submitted by the United States (Doc. 70-1)**

    1. <u>Exhibit 9A/9A-T</u>: In a recorded jail call, Brown states that the judge is "likely gonna grant me bond under conditions that I will refuse because it would be violations of my constitutional rights and I will be basically held in jail on principle."

    2. <u>Exhibit 9B-T</u>: In a recorded jail call, Brown discusses his refusal to comply with a search warrant for his DNA. Brown states: "We're not just gonna give in just because they say and just because we know the outcome if it goes, we still don't just, give up. . . and I like were playi- like we can play the delay tactic as well. . . It's all ridiculous. But my- the bo-bottom line is, Bill, we have to, maximize our delay tactics as well just like they're doing."

3. <u>Exhibit 9C-T</u>:  In a recorded jail call, Brown discusses with Olson his plan to use delay tactics because he believes the government is also using delay tactics in his case.

4. <u>Exhibit 9D-T</u>:  In a recorded jail call, Brown discusses his "moral dilemma" of whether to accept bail with conditions he believes are unconstitutional or to reject bail.

5. <u>Exhibit 9E-T</u>:   In a recorded jail call, Brown speculates that he will be released on bail but with "a bunch of restrictions on [him] that again are unconstitutional like an ankle monitor or seizing all [his] firearms . . . [and] have Tylene also give up her weapons."

6. <u>Exhibit 9F-T</u>: In a recorded call from jail, Brown speculates that a gag order will be part of his conditions of release and laughs: "that's going to go really well."

7. <u>Exhibit 9G-T</u>:  In a recorded call from jail, Brown states that "the sign was an if, then statement. If you violate the law, you better- you better bring a bigger tactical package. That's it. . . It didn't say if- if you're- you just happen to be wearing a badge, I am going to attack you. It didn't say that."

8. <u>Exhibit 9H-T</u> (Doc. S-71):  In a recorded jail call, Aldridge tells Brown that she looked up the home address of one of the federal agents who investigated Brown. Aldridge then tells Brown she believes she found where the agent's spouse works and that Meredith Jones is going to look up the agent's spouse. Aldridge states: "So, I have Meredith here . . .I have Meredith looking this up." Brown later expresses frustration with the speed of his cases and suggests that "maybe I'll give out their f[*]cking home addresses. How about that?"  To which Aldridge replies, "I think you should . . . I got [the agent's]

13

address. I can look up others." When Aldridge starts to tell Brown about the agent's house, Brown states that he does not care about the agent's house because "the government rapes and steals from us and then they all live high on the hog. I get it. I already knew that. I don't need . . . to have it rubbed in my face. . . I'm sure [the other agents] probably live in nicer houses than us too."

9. <u>Exhibit 10</u>: Application and Search Warrant executed at Brown's residence. In the paragraph 60 of the affidavit, it states: "According to Defendant 4, Brown and other individuals associated with the Oath Keepers coordinated their activity via a Signal3 chat of Florida Oath Keepers. They caravanned in a recreational vehicle (the "RV") that was, according to Defendant 4, loaded with a cache of weapons, ammunition, and gas. Defendant 4 followed the RV in BROWN'S girlfriend's van. Kelly Meggs, currently indicted for his role in the conspiracy and the leader of the Florida branch of the Oath Keepers, informed Defendant 4 that Brown was a 'loose cannon' and had explosives inside the RV. Defendant 4 positively identified Brown in the publicly available Twitter photo."

10. <u>Exhibit 11</u>: Picture of an M67 grenade recovered at Brown's residence.

11. <u>Exhibit 12</u>: Laboratory report confirming that the two grenades found at Brown's residence are "U.S. Military M67 fragmentation hand grenades."

12. <u>Exhibit 13</u>: A CD recovered from Brown's residence marked: SECRET.

13. <u>Exhibit 14</u>: Classified Information Nondisclosure Agreement signed by Brown.

  14. <u>Exhibit 15</u>: United States' Motion for Order to Show Cause, 8:21-mj-2169-JSS.

  15. <u>Exhibit 16</u>: Order to Show Cause, 8:21-mj-2169-JSS.

  16. <u>Exhibit 17</u>: Transcript of Brown's Detention Hearing.

  17. <u>Exhibit 18</u>: Motion for Revocation of Magistrate Judge's Detention Order.

**C. Summary of Statements by Brown in Open Court**

With respect to Aldridge conducting research on a federal agent and the agent's spouse, Brown stated that he did not believe Aldridge viewed the agent as a witness in his case. (Doc. 92, Tr. 64:3-23). But Brown acknowledged, that if Aldridge had viewed the agent as a witness, "that would create some concern." (*Id.*).

As to the M67 grenades found in his RV, Brown stated that the grenades "are not mine." (*Id.*, Tr. 64:24-65:10). "Special Forces guys don't carry M67 grenades in almost any operation." (*Id.*). Consequently, Brown "believe[s] that the lack of knowledge about our *tactical package*[4] has led the government to make a grave mistake to their case. (*Id.*) (emphasis added).

Brown clarified that his statements regarding the use of delay tactics is just him "holding the government accountable to [his] due process. That is it." (*Id.*, Tr. 65:11-18).

Brown stated that the General Officer Memorandum of Reprimand "was retaliation for exposing something. And it was basically they found dirty jokes that had went around SOCCENT, stored on my unclassified computer. And so they read me my

---

[4] Notably, Brown used the term "tactical package" when referring to weapons carried by members of the Special Forces.

15

rights and threatened to terminate my service prior to retirement, thus denying me benefits, or the same tactic that the government uses, or accept the General Officer Memorandum of Reprimand." (*Id.*, Tr. 88:11-17).

As to dangerousness, Brown stated: "The government is 100 percent justified in its fear of me, but not for the long list of false claims it has made before this Court. I hate war because I have fought in it. I detest violence because I have had to use it against my fellow man on behalf of this very government." (*Id.*, Tr. 73:6-10). "In this fight for liberty, I have no need for violence because I have God, the law, and the truth on my side." (*Id.*, Tr. 73:11-16). "I am absolutely not a physical threat, especially not now, because I have them right where I want them." (*Id.*, Tr. 87:2-8).

Brown represented that if he agrees with conditions of release imposed by the Court, he will not violate the conditions. (*Id.*, Tr. 76:19-6). If he disagrees with any condition of release, however, Brown stated that he would refuse the condition and "simply stay in jail." (*Id.*). For example, if the Court were to impose the condition that Brown shall not own or possess firearms, Brown would not agree to the conditions of release. (*Id.*, Tr. 83:17-84:5). Likewise, while Brown would agree to wear an ankle monitor, he would not accept any conditions of release that include a location restriction program such as home detention or curfew. (*Id.*, Tr. 84:6-87:8).

### D. Reaffirmed Order of Detention

After considering all of the evidence presented at both the October 5, 2021 detention hearing and the December Evidentiary Hearing, the arguments made by counsel, and the factors listed in 18 U.S.C. § 3142(g), the Court again finds that the United

States has proven by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community.

Brown is charged with four felonies that each carry penalties of up to 10 years' imprisonment. The United States estimates the sentencing guideline range to be 51 to 63 months. As charged in the Indictment, Brown was in possession of dangerous firearms and explosive devises, to include two M67 grenades with a lethal range of 10-15 meters. While Brown denies that the M67 grenades belong to him, the grenades were found in Brown's RV—the same RV Brown allegedly took to Washington, D.C. loaded with a cache of weapons, ammunition, and explosives.

The leader of the Florida branch of the Oath Keepers allegedly expressed concern that Brown was a "loose cannon." (Exhibit 10, 70-1). The United States shares this concern based on previous instances when Brown's mental health was called into question (Docs. 17-12, 17-13, 17-14). The Court notes, however, that Brown has never been formally diagnosed with a mental illness.

In the sign posted to his door, Brown made a credible threat to law enforcement. While Brown's friends speculate the sign was a playful "poke" or an attempt at "ribbing" the two federal agents who previously spoke with Brown, such a contention defies logic. Brown's sign was not addressed to the agents, but rather to the law enforcement agencies he believed might come to arrest him. As Brown stated, "the sign was an if, then statement. If you violate the law, you better- you better bring a bigger tactical package. That's it." (Exhibit 9G-T, Doc. 70-1). This leaves law enforcement to speculate as to

17

whether Brown has perceived some violation necessitating the need for them bring a bigger tactical package.

Brown's friends suggest that "a bigger tactical package" was just a crude reference to the male anatomy. But in open court, Brown used the term "tactical package" when referring to weapons carried by members of the Special Forces. Brown's use of the term is consistent with Olson's testimony that "a tactical package is, as [Brown] speaks in military terms a lot, it's what you bring on target to – it could be small, it could be big, it could be planes, bombs, whatever." (Doc. 77, Tr. 77:9-21). Or as Ferraccio put it, the federal agencies executing a search warrant or arrest warrant should "come in heavy, very heavily armed." (*Id.*, Tr. 111:1-9). The Court cannot reasonably assure the safety of law enforcement when posed with such a threat.

The fact that Brown was arrested without incident does not render his threat meaningless. While Brown may have suspected agents would be visiting him on the day of his arrest, he did not know they were coming to execute a search warrant and to arrest him. The agents wisely made the arrest outside— away from the RV containing the M67 grenades.

Moreover, the Court's conclusion is reinforced by Brown and his supporter's attempts to tamper with and intimidate a federal agent directly involved with Brown's case. When Brown learned that Aldridge and Jones were conducting research on a federal agent and the agent's spouse, Brown did not tell them stop. Rather, Brown stated, "maybe I'll give out their f[*]cking home addresses. How about that?" To which Aldridge replied,

18

"I think you should . . . I got [the agent's] address. I can look up others." (Exhibit 9H-T, Doc. S-71).

Finally, Brown has made clear that he will not accept any conditions of release that restrict his ability to own and possess firearms or that restrict his freedom of movement.

## CONCLUSION

Accordingly, for the reasons stated herein and in open court, Jeremy Brown's Motion for Reconsideration of Defendant's Motion for Pretrial Release is **DENIED** (Doc. 49).

**ORDERED** in Tampa, Florida, this 2nd day of February 2022.

SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE