## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                        **Case No.: 8:21-CR-348-T-SCB-SPF**

**JEREMY BROWN**

_____/

## DEFENSE'S AMENDED MOTION TO SUPPRESS;
## DEFENSE'S REQUEST FOR A FRANKS HEARING

**COMES NOW**, the Defendant, JEREMY BROWN, pursuant to Fed. R.

Crim. P. R. 12, and files this Motion to Suppress any and all evidence obtained as a

result of law enforcement's unlawful search(es) which occurred on September 30,

2021. More specifically, the Defense argues that the search warrant purportedly

authorizing the search of Mr. Brown's residence, recreational vehicle (R.V.), trailer,

and cell phone was issued unlawfully; the warrantless search of Mr. Brown's truck

was unlawful; and any evidence obtained as a result of Mr. Brown's incarceration

in this case (such as recorded jail calls, written communications, etc.) should be

suppressed because Mr. Brown has been held without a bond based on his unlawful

arrest and incarceration for the Middle District of Florida case.

In support thereof, the Defense submits as follows:

## A. <u>Factual and Procedural History</u>

1. On January 6, 2021, a joint session of Congress was scheduled at the Capitol building in Washington, D.C.

2. Various supporters of President Trump intended to appear at a "Stop the Seal" rally to protest the results of the election.

3. Mr. Brown, who served in the United States Army for 20 years, including 17 years in the Special Forces, planned to attend the rally.

4. Mr. Brown reached out to the Oath Keepers organization and let them know he was available to provide security to any other attendee that might require it.

5. On or about January 4, 2021, Mr. Brown, his girlfriend Tylene Aldridge, and a few other individuals met up in Tampa with the intent to drive in separate vehicles to the area of the Capitol for the rally.

6. Mr. Brown and his girlfriend drove in an R.V.  They parked the R.V. at a R.V. park that was roughly a 40-minute drive to the Capitol.  They had two acquaintances drive their van up for them so that they could ride around Washington D.C. in the van and leave the R.V. at the R.V. park.

7. Mr. Brown received security credentials from the Oath Keepers and was given permission to be inside a V.I.P. area of the rally.

8. On January 5, 2021, Mr. Brown provided security at the Supreme Court.

9. On January 6, 2021, Mr. Brown attended the rally as planned.  He was assigned to protect the mother of a speaker at the rally.

10. At one point, Mr. Brown was permitted inside the Secret Service area of the V.I.P. area.

11. At the rally, protests turned into riots and law enforcement officers and others were assaulted by the rioters. Some of the rioters pushed their way into the Capitol building.

12. Mr. Brown remained outside the Capitol building at all times. There is no evidence that he assaulted anyone, vandalized anything, encouraged others to act unlawfully, or possessed firearms at the rally.

13. Law enforcement agents called Mr. Brown on his cell phone on January 6, 2021 and on January 7, 2021. Mr. Brown informed the agents he attended the rally and provided security.

14. Law enforcement investigated Mr. Brown's presence at the Capitol on January 6, 2021 for nearly nine months thereafter.

15. Then, on September 29, 2021, Special Agent Hill submitted a criminal complaint against Mr. Brown to the Honorable Robin Meriweather, a magistrate judge in Washington D.C., alleging that on January 6, 2021, Mr. Brown committed a misdemeanor trespass in violation of 18 U.S.C. § 1752(a)(1) and disorderly and disruptive conduct in a restricted building in violation of 18 U.S.C. § 1752(a)(2). These charges were formally filed by Information in 21-MJ-619 on October 1, 2021 and remain pending today.

16. Also on September 29, 2021, Special Agent Hill submitted a search warrant application to the Honorable Zia Faruqui, a magistrate judge in Washington D.C.,

for Mr. Brown's property located in Tampa, Florida. The property to be searched included Mr. Brown's residence, R.V., black trailer, and personal cell phone. The Honorable Judge Faruqui issued the search warrant. *Exhibit A: Search Warrant Application; Exhibit B: Affidavit in Support of Application; Exhibit C: Search Warrant.*

17. On September 30, 2021, law enforcement arrived at Mr. Brown's residence in Tampa, Florida to arrest him for the misdemeanor offenses and to execute the search warrant on his home, R.V., black trailer, and cell phone.

18. Mr. Brown was not home when the officers arrived, but he arrived shortly after. He drove up in his truck and parked in the street outside his home. He exited his truck and left his cell phone inside.

19. The officers arrested Mr. Brown without incident on the arrest warrant for the misdemeanor charges.

20. Even though the truck was not listed as an item to be searched in the search warrant, officers went into the truck parked in the roadway and seized Mr. Brown's cell phone.

21. Mr. Brown's girlfriend, Ms. Aldridge, was present at the residence while law enforcement was there. Ms. Aldridge recorded a portion of the officers' activities on her cell phone. *Exhibit D: Cell Phone Video Recording.*

22. Law enforcement seized multiple items during the search. *Exhibit E: Receipt for Property Seized.*

23. On October 19, 2021, the United States filed an Indictment in this case against Mr. Brown charging five counts for unlawful possession of firearms and explosives. *See Doc. 21.* These items were produced during the search of Mr. Brown's property.

24. On April 12, 2022 the United States filed a Superseding Indictment against Mr. Brown charging him with various items found during the search of his property. Specifically, Count One: knowing possession of a firearm with a barrel of less than 18 inches in length, not registered to him in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871; Count Two: knowing possession of a firearm with a barrel of less than 16 inches in length, not registered to him in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871; Count Three: knowing possession of a destructive device – explosive grenade A – not registered to him in violation of 26 U.S.C. §§ 5841, 5861 (d), and 5871; Count Four: knowing possession of a destructive device – explosive grenade B – not registered to him in violation of 26 U.S.C. §§ 5841, 5861 (d), and 5871; Count Five: knowing storage of explosive material in a manner not in conformity with regulations in that grenades A and B were located in a recreational vehicle, which did not conform with the requirements of Type 1-5 storage facilities in violation of 18 U.S.C. §§ 842(j), 844(b), and 27 C.F.R. 555.201 et seq.; and Counts Six – Nine: while having unauthorized possession of, access to, and control over documents relating to the national defense, willful retention of the documents and failure to deliver them to the officer of the United States entitled

to receive it, to include (Count 6) – Threat Frequency Report dated October 13, 2002, (Count 7) IED Incident Report and Addendum dated January 6, 2005, (Count 8) Spider Device Testing Procedures and Results dated November 1, 2004, and (Count 9) Fragmentary Order dated January 14, 2005. *See Doc. 159.*

## B. Arguments and Memorandum of Law

It is submitted that the search warrant issued for Mr. Brown's property in the Middle District of Florida is invalid for the following reasons: 1) the magistrate judge in Washington D.C. lacked jurisdiction to issue a search of Mr. Brown's property located in the Middle District of Florida, 2) the good faith exception does not apply, 3) the magistrate judge was misled by an assertion in the application that the affiant would have known was false but for a reckless disregard for the truth, 4) the search warrant was based on stale information and otherwise lacked probable cause that law enforcement would find evidence of a crime.  Finally, it is submitted that the warrantless entry into Mr. Brown's truck to seize his cell phone was unlawful.

## 1. The Magistrate Judge for the District of Columbia Lacked Jurisdiction to Issue a Search Warrant for Mr. Brown's Residence and Property in the Middle District of Florida.

The Eleventh Circuit has held that "a warrant issued  in  defiance  of  its jurisdictional limitation is void - no warrant at all." United States v. Taylor, 935 F.3d  1279, 1287 (11th Cir. 2019) (internal citation omitted) (finding that the magistrate judge issued a warrant outside of its jurisdiction so the "warrant was void at

issuance"). The affidavit in support of the search warrant references jurisdiction for the magistrate judge in Washington D.C. to issue the search warrant for property located in Tampa, Florida under Fed. R. Crim. P. 41(b)(3) (Venue for a Warrant Application) and 18 U.S.C. § 2331(5)(b) (Definition of 'Domestic Terrorism')[1]. *Exhibit B: paragraph 3.*

Pursuant to Fed. R. Crim. P. 41(b)(3): "a magistrate judge – in an investigation of domestic terrorism or international terrorism - with authority in any district in which activities related to the terrorism may have occurred has authority to issue a warrant for a person or property within or outside that district." The term "domestic terrorism" is defined as activities that (A) involve acts dangerous to human life that are a violation of the criminal law of the United States or of any State; (B) appear to be intended –(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily within the territorial jurisdiction of the United States. *See* 18 U.S.C. § 2331(5). The Defense vigorously disputes that the facts alleged in the search warrant rise to the level of probable cause that Mr. Brown was involved in any offense that meets the definition of "domestic terrorism."

The search warrant application alleges possible violations of 1) 18 U.S.C. §

---

[1] As 18 U.S.C. § 2331(5)(b) is merely a definition of a term used in Rule 41(b)(3), it is clear that the only basis for the magistrate to claim jurisdiction over this matter is Rule 41(b)(3) itself.

371, the general conspiracy statute, 2) 18 U.S.C. § 231, transport of firearms or explosives for use in civil disorder, 3) 18 U.S.C. § 844 transportation of explosives, and 4) 18 U.S.C. § 1752, unlawful entry on restricted grounds. *Exhibit B.*

As explained below, the allegations in the search warrant affidavit fall far short of probable cause to support the first three charges[2]. The search warrant application is fairly lengthy and many allegations neither directly or indirectly involve Mr. Brown. As to any allegations that could possibly establish anything other than a misdemeanor offense – they are too attenuated as to Mr. Brown to establish "probable cause." An analysis of each paragraph is below and whether each paragraph establishes any probable cause that Mr. Brown was engaged in "domestic terrorism" which would give the magistrate judge venue to issue this search warrant.

The search warrant affidavit begins with an explanation of background information about political events leading up to January 6, 2021. Then, from paragraphs 10 – 47, the affiant details at length illegal activities of *other individuals* at the Capitol ("...known and unknown subjects broke windows...and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured...The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers. They also took police equipment from overrun police...and used them against law enforcement officers trying to protect

---

[2] It cannot reasonably be argued that the fourth charge, a misdemeanor trespass, is an offense that meets the definition of "domestic terrorism."

the U.S. Capitol and the people who were legitimately inside it.   At least one of the subjects carried a handgun with an extended magazine." *Exhibit A: paragraphs 28-29.*   Notably, there is no allegation that Mr. Brown was involved in any of these activities.   There is no allegation against Mr. Brown or any person that is known to closely associate with Mr. Brown.   There is not a single allegation that Mr. Brown conspired with these "known and unknown subjects" to engage in any acts that meet the definition of "domestic terrorism."   These paragraphs do not establish probable cause that Mr. Brown had committed criminal acts of domestic terrorism.

Paragraph 48 declares that subjects posted pictures, video and texts about their participation in the riot.   Many of these posts were later deleted.   Some subjects "fled their homes and went into hiding."   It is not alleged here that Mr. Brown, his family, or friends "participated in the riot," fled their homes or went into hiding.   This paragraph does not establish probable cause that Mr. Brown had committed criminal acts of domestic terrorism.

Paragraphs 49 – 54 describe the Oath Keepers organization and activities of some of the Oath Keepers.   Per the affiant, some members of this organization were at the rally on January 6, 2021.   Eight to ten of these Oath Keepers were captured on a video marching aggressively towards an entrance to the Capitol.   Mr. Brown is *not* one of these eight to ten individuals.   According to the affiant, more than a dozen Oath Keepers were later charged for their involvement in the January 6, 2021 riots.   Nothing in these paragraphs links Mr. Brown with the activities of any of the other individuals who were arrested.   This is merely an allegation that Mr. Brown belongs to a "large

but loosely organized collection of individuals" called the Oath Keepers.  Per the affiant, the Oath Keepers focus on recruiting current and former military, law enforcement, and first-responder personnel.  Simply being a member of the Oath Keepers and attending a rally that erupted into a riot does not establish probable cause that Mr. Brown was in a conspiracy to commit any offense that meets the definition of "domestic terrorism."

Finally, at paragraph 55 of the application, begins the "Facts Specific to Jeremy Brown." *Exhibit B: pg. 19.*  Paragraphs 55-57 allege facts that would support a misdemeanor trespass and/or disorderly conduct charge.  The Defense submits that facts supporting these misdemeanor offenses do not meet the criteria for "domestic terrorism" as defined in 18 U.S.C. § 2331(5)(b).  In paragraph 57, the affidavit states that "Brown remained at least one hundred feet past the barriers that law enforcement had initially set up to protect the Capitol." Even if this is true, this behavior does not fit within the definition of domestic terrorism.  Accordingly, it is submitted that none of the allegations in these paragraphs are a basis for the magistrate judge in Washington D.C. to issue a warrant to be executed outside his jurisdiction.

Paragraphs 58 - 61 reveal that over the course of her investigation, the affiant reviewed the contents of "a statement" made by a "Defendant 4"[3].  "Defendant 4" is described as a person that pled guilty to Conspiracy to Obstruct an Official Proceeding

---

[3] The affiant does *not* describe the statement as a "sworn" statement.  The type of statement is not described at all – whether it was made on social media, in an email or text to a friend, or in some other informal setting, etc.

relating to his conduct and the conduct of other Oath Keepers in breaching the US Capitol on January 6, 2021. Paragraph 59 states that according to "Defendant 4," he went to Mr. Brown's house to ride together to Washington D.C. Law enforcement corroborated this piece of information by reviewing ride share records that show "Defendant 4" entered Mr. Brown's home address into the ride share. These paragraphs do not establish probable cause that Mr. Brown had committed criminal acts of domestic terrorism.

Paragraph 60 indicates that Mr. Brown coordinated on a chat application "Signal" with others associated with the Oath Keepers to ride together to the rally[4]. Per "Defendant 4," they caravanned in a recreational vehicle that was "loaded with a cache of weapons, ammunition, and gas.[5]" Per "Defendant 4," he did not ride in the RV. Rather, "Defendant 4" rode in Mr. Brown's girlfriend's van. The affiant does not indicate that she corroborated this rumor from "Defendant 4." There is no explanation of whether, for instance, "Defendant 4" has a history of providing accurate tips to law enforcement. Perhaps in an attempt to weakly corroborate this rumor from "Defendant 4," the affiant comments that Kelly Meggs, an indicted conspirator, informed "Defendant 4" that Mr. Brown was a "loose cannon" and had "explosives" in the R.V[6]. How Kelly Meggs purportedly knew about these "explosives" in the R.V. is not mentioned by the affiant. There is no indication in the application for the search

---

[4] Signal is a free private messenger service that is available to the public to download from www.apps.apple.com and other sites. *Exhibit J: Website Printout.*

[5] It is not illegal per se to transport weapons, ammunition, or gas across state lines in an R.V.

[6] The affiant did not describe the "explosives."

warrant that Kelly Meggs rode to Washington D.C. with Mr. Brown or that he ever went into Mr. Brown's R.V.  It is submitted that these allegations are uncorroborated, non-specific, and do not establish probable cause that Mr. Brown had committed acts of "domestic terrorism."

Paragraph 61 indicates that the affiant reviewed the Signal chat that "Defendant 4" mentioned.  On December 23, 2020, Mr. Brown sent a message about coordinating with others to travel in a R.V. (which he nicknamed "Ground Force One") and a van and leave on January 3, 2021.  As a retired member of the Army, Mr. Brown used military lingo such as "we have gun ports to fill," and conduct "CTR" or close target reconnaissance, and "ERO" or engine running onload.  It is submitted here that the use of military lingo and reference to "gun ports to fill" falls far short of probable cause to establish that Mr. Brown was conspiring to commit, or did commit, any offense that meets the definition of domestic terrorism.

Paragraph 62 recites that the affiant read Mr. Brown's comments that he had written in an undisclosed medium.  He detailed his negative treatment by law enforcement when the riots broke out on January 6, 2021.  He stated he was shot in the neck with pepper balls and beaten with a night stick when he was trying to protect other civilians.  Mr. Brown wrote that the media and Congress were lying about the riots and complained that the riots involved unrestrained addiction to power. Paragraph 62 further recites comments from *other individuals* in a Signal chat.  The affiant indicates that not all of the messages from the chat were available, but for instance, one woman, Jessica Watkins, who had been indicted for Conspiracy and

Obstruction of an Official Proceeding commented that she was proud to go in and she had gone through the gates of hell. Ms. Watkins does not refer to Mr. Brown in her comment. It is submitted that these allegations do not establish probable cause that Mr. Brown had committed criminal acts of domestic terrorism.

Paragraph 63 recites that Mr. Brown posted from a social networking application about his plans to travel to Washington D.C. on January 3, 2021 in a R.V. and a van with some other individuals. He states "If you need transportation or Security, we can adjust to pick you up." This paragraph reveals only that Mr. Brown was planning to drive to Washington D.C. to attend a public rally. Certainly there is nothing unlawful about driving to attend a rally and coordinating with others to do so.

Paragraph 64 reveals that the affiant listened to Mr. Brown on a video podcast which was posted July 12, 2021. Mr. Brown declared on this podcast that he was present with Oath Keepers January 6, 2021, including some who had been arrested, he did not bring firearms to the riots as he had left them in Virginia beforehand and picked them up on his way home, and he discouraged Jessica Watkins from entering the Capitol. This paragraph does not establish probable cause that Mr. Brown was involved in acts of domestic terrorism.

Paragraph 65 indicates that Mr. Brown spoke with federal agents on his phone on January 6 and 7. Mr. Brown advised that he attended the rally. Mr. Brown explained he provided security there. He explained he had no knowledge about anyone that entered the Capitol. Again, this paragraph does not establish probable cause that Mr. Brown was involved in acts of domestic terrorism.

Paragraph 66 confirms what Mr. Brown told the agents – he was present at the rally. His cell phone pinged off a cell site in the geographical area of the Capitol. The affiant had no knowledge of Mr. Brown being inside the Capitol. The agent alleges that she has knowledge of the misdemeanor trespass – she states she has identified Mr. Brown within a restricted ground. This allegation relates to a trespass which again, is not a form of "domestic terrorism" as defined in 18 U.S.C. § 2331(5)(b).

Paragraphs 67 - 68 allege that Mr. Brown was putting his house up for sale. Agents verified this information by reviewing www.zillow.com. Paragraph 67 alleges that a photo of a white board inside the home has a list of items including food, clothing, shelter, currency, communicate, move, and shoot. In the "shoot" column there are firearms and ammunition listed and explosive devices such as "flash bangs." The affiant states that a "flash bang" is a prohibited explosive device. Significantly, the agent states that the white board is color coded and items written in black marker are "on hand." But this was not accurate – the image the agent attached to the affidavit was filtered and/or copied in such a way to make certain text appear black. The non-filtered image of the white board shows that "flash bangs" and all items written under the "Shoot" were written in red. *Exhibit F: Color Photo of White Board Provided as a Government Exhibit and Listed as Document Number 17-8 in case number 8:21-mj-01991.* The Defense submits that the affiant's statements here misled the magistrate when the affiant indicated the "flash bangs" and other items under the heading "Shoot" were "on hand" based on the color coding system. The Defense further submits that a white board with lists of items, including a list of weapons, falls far short of probable

cause that Mr. Brown was had committed criminal acts of domestic terrorism nearly nine months prior in Washington D.C.

Paragraph 69 reveals that the affiant spoke to a longtime acquaintance of Mr. Brown.  The acquaintance informed the affiant that he or she has no knowledge of Mr. Brown possessing or seeking out explosives such as 'flash bangs.'  The affiant also reveals that Mr. Brown is living both in the R.V. and the residence, and the R.V. is parked in the front of his house.  The R.V. is the same he used to travel to Washington, D.C.  The trailer was purchased after January 6, 2021.  This paragraph does not establish probable cause that Mr. Brown was involved in acts of domestic terrorism.

Paragraphs 70 - 71 reveal that the R.V. and trailer belong to Mr. Brown's girlfriend and that the affiant spoke with a "Witness 1" who claims an unidentified family member told "Witness 1" that this person had been inside Mr. Brown's home at some point in the past.  At that time, the house was not up for sale yet.  The house was "full of BROWN's possessions."  Per "Witness 1" the unidentified family member observed multiple boxes and weapons scattered throughout the house.  The affiant looked at the house listing on www.zillow.com and observed that now that the home was up for sale, the home is better organized.  "Witness 1" states that Mr. Brown alternates sleeping in the house and the R.V.  It is submitted that there is nothing nefarious about having an unorganized home with non-specified weapons scattered throughout[7].  It is submitted that these paragraphs do not establish probable cause that

---

[7] The unidentified family member of "Witness 1" did *not* describe the "weapons" as unlawful explosives or even as firearms.

Mr. Brown had committed criminal acts of domestic terrorism.

Paragraph 72 indicates the affiant's suspicion that Mr. Brown must have put his possessions inside the R.V. and trailer while the house is up for sale. While there is nothing nefarious about this, the affiant speculates that Mr. Brown's possessions include "potential evidence in this investigation" such as "electronics, guns, ammunition, and explosives." It is submitted that this speculation falls far short of meeting a probable cause standard that evidence of an act of domestic terrorism would be found at Mr. Brown's property in Tampa, FL.

Paragraphs 74-91 do not contain additional factual allegations. They generally describe that a cell phone would log Mr. Brown's activities and communications with others around the time of January 6, 2021.

Notably missing from the application are any allegations that Mr. Brown committed violence against any individual, directed anyone to commit violence at the rally, that he went into the Capitol building, that he vandalized any property, or directed others to go into the Capitol building. There is no allegation in the affidavit that Mr. Brown conspired with anyone to incite any type of violence. There is no allegation that anyone saw Mr. Brown in possession of a firearm or explosive while at the Capitol. There is no allegation that anyone saw the R.V. anywhere near the Capitol.

In sum, there are no allegations in the affidavit that Mr. Brown's actions on and around January 6, 2021: "appear to be intended - (i) to intimidate or coerce a

civilian population, (ii) to influence the policy of a government by intimidation or coercion, or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." See 18 U.S.C. § 2331(5).

It is submitted that the affiant was stretching to create probable cause to search Mr. Brown's property. Because there is no evidence or suggestion that Mr. Brown was violent, the affiant details violent acts of others but provides no nexus to Mr. Brown. The affiant details that members of the Oath Keepers were observed walking aggressively in a line towards the Capitol building but again, provides no nexus to Mr. Brown. The few speculative allegations that the affiant uses to attempt to invoke the Washington D.C. magistrate judge's jurisdiction related to "domestic terrorism" are that (a) "Defendant 4" gave an unsworn statement to an unknown person via an unknown medium that he saw a cache of non-specific "weapons" in an R.V. that Mr. Brown was taking up to Washington D.C. for the rally (b) Kelly Meggs informed "Defendant 4" that Mr. Brown was a "loose cannon" and said Mr. Brown had non-specific "explosives" inside the R.V. (c) Mr. Brown went on a Signal text application and referenced a "Ground Force One" departure plan to attend the January 6, 2021 rally and mentioned, amongst other things, that he had gun ports left to fill, (d) the inaccurate assertion that Mr. Brown had a white board with a notation in color coding that he had "flash bangs" on hand some eight or more months after the riots broke out at the rally in Washington D.C., and (e) at an unknown time, Mr. Brown had unspecified weapons laying around his unorganized house. Not only are these

allegations insufficiently corroborated, they are insufficiently detailed. For instance, the "cache of weapons" is not described, nor is there any indication of where the weapons were located in the R.V. or how "Defendant 4" was able to see them, or any indication of if the "weapons" were "illegal weapons" or firearms or some other form of weapon. Similarly, the "explosives" are not described, nor is their location within the R.V., or an explanation of how Mr. Meggs knew about the "explosives." Finally, there is no description of the "weapons" the unnamed family member of "Witness 1" saw strewn about Mr. Brown's residence or whether that happened years or months prior to putting the house up for sale.

Paragraph 92 of the affidavit states that the affiant alleged there was probable cause to believe that there was evidence of the following crimes as to Mr. Brown: a general conspiracy pursuant to 18 U.S.C. § 371 and an unlawful misdemeanor trespass pursuant to 18 U.S.C. § 1752 (a)(l). The affiant also references § 1752(a)(2) which is a misdemeanor disorderly conduct offense. *Exhibit B: paragraph 92.* It is submitted that the affiant's conclusion is inaccurate – there was no probable cause that Mr. Brown was involved in any "conspiracy" to commit any illegal act whatsoever. The allegations in the affidavit show that Mr. Brown coordinated with others to attend a rally and nothing more. The Defense submits that the affiant did not establish probable cause that Mr. Brown's property in the Middle District of Florida contained evidence of criminal acts of domestic terrorism.

The Defense respectfully submits that it has established that the magistrate judge in Washington D.C. did not have jurisdiction under Rule 41(b)(3) to issue the search warrant

for Mr. Brown's property in the Middle District of Florida.  Accordingly, this Court should find that all evidence seized as a result of the search warrant must be suppressed.

### 2.  <u>The Good Faith Exception does not Apply.</u>

In <u>United States v. Taylor</u>, the reviewing court found that a magistrate judge exceeded her statutory jurisdiction in using a warrant and thus, the warrant was void at issuance.  935 F.3d 1279 (11th Cir. 2019).  Even so, the Eleventh Circuit determined that the good faith exception can apply in a situation involving a void warrant.  <u>Id.</u> Relying on <u>United States v. Leon,</u> 468 U.S. 897, 923 (1984), the <u>Taylor</u> court held that the exclusionary rule's purpose of deterring culpable police misconduct means that there is no reason to distinguish good faith reliance on a void warrant from a warrant deemed defective.  <u>Id.</u> at 1290-1291.  Thus, it held that the good faith exception to the exclusionary rule can apply when police officers reasonably rely on a warrant later determined to have been void ab initio.  <u>Id.</u>

In <u>Leon,</u> the Supreme Court laid out several situations in which the good-faith exception should *not* apply: (1) where the magistrate judge was misled by information in a warrant application that the applicant knew was false or would have known was false but for a reckless disregard of the truth; (2) where the magistrate "wholly abandoned" her judicial role; (3) where the affidavit supporting the warrant application was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) where the warrant was "so facially deficient" that officers could not have reasonably presumed it to be valid.  468 U.S. at 923.

Here, the Defense asserts that the good faith exception should not apply because the magistrate was misled by information in the warrant application that the affiant would have known was false but for a reckless disregard for the truth and because the affidavit supporting the warrant application was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.

3. **The Magistrate Judge was Misled by an Assertion in the Application that the Affiant would have Known was False but for a Reckless Disregard for the Truth.**

The image of the white board that the affiant submitted with her application was filtered and/or copied in such a way that allowed the affiant to inaccurately claim that it showed that Mr. Brown had "flash bangs" on hand.    The Government utilized a correctly-colored photograph of the white board as an exhibit in case number 8:21-mj-01991-SPF. *Exhibit F: Government's Exhibit of Photograph with White Board.* The Defense submits that even if the affiant only reviewed a filtered photograph that was copied in such a way that the writing appeared black, the affiant did so in reckless disregard of the truth. The Defense respectfully submits that it is common knowledge that images taken from the internet are typically filtered. If the affiant pulled a filtered photograph off the internet from www.zillow.com and wanted to use the color in the photograph as evidence against Mr. Brown to attempt to obtain a search warrant, the affiant at least should have noted for the magistrate judge that she had never seen an unfiltered photograph of the white board (if that was true).  Again, the affiant did not

corroborate or otherwise follow up on this accusation by reviewing an unfiltered photograph.

The Defense submits that the affidavit was lacking in probable cause that Mr. Brown had possessed any illegal explosives that he would use in an act of domestic terrorism, so this inaccurate statement by the affiant must have contributed to the magistrate judge's determination both that he could permissibly issue a search warrant outside his jurisdiction and that the affidavit established probable cause to search Mr. Brown's property.

### 4.  The Affidavit was Lacking in Probable Cause.

The search warrant affidavit did not supply the necessary probable cause that a search of Mr. Brown's property would result in evidence of criminal activity. "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999). The staleness doctrine "requires that the information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues." United States v. Bervaldi, 226 F.3d 1256, 1264 (11th Cir. 2000). When determining staleness, courts should consider the length of time, "nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." Id. at 1265 (internal citations omitted). In considering the nature of the crime, the Eleventh Circuit has

distinguished between criminal activity which is protracted and continuous and that which is isolated. Id. at 1265. "The circuits hold that where an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." Bervaldi, 226 F.3d at 1265 (internal citation omitted).

Here, the affiant applied for the warrant to search for evidence of conspiracy, transport of firearms or explosives for use in civil disorder, transportation of explosives, and unlawful entry on restricted buildings or grounds. *Exhibit A.* The affiant alleges that Mr. Brown is suspected of transporting firearms or explosives for use in civil disorder on January 6, 2021 as well as that he trespassed and was disorderly on January 6, 2021. There are no allegations that Mr. Brown was continuously transporting firearms and/or explosives for use in other riots, or that he intended to trespass at a government building at a future rally. These offenses are discrete offenses that occurred nearly nine months prior in another jurisdiction.

Stale information can establish probable cause if "the government's affidavit updates, substantiates, or corroborates the stale material." United States v. Jiminez, 224 F.3d 1243, 1249 (11th Cir. 2000)(internal quotations omitted). Here, the Government was unable to substantiate or update the stale material, other than the speculatory allegations and the inaccurate allegation that have been discussed above. Law enforcement attempted to substantiate or update the stale material with a variety of database investigation tools, including BaseJumper, Business Filings, CHS Check, Clearwater, DIVS, DMV,

DWS, DaLAs, Guardian, NCIC, NetTalon, Photographic websites, Public search engines, Sentinel, Social Media, TIDE, Telephone applications, and Web Crawlers. *Exhibit H: Unclassified/LES Document generated July 20, 2021.* None of these investigatory tools revealed any evidence that Mr. Brown continued to possess evidence in the Middle District of Florida that he was involved in acts of domestic terrorism on January 6, 2021 in Washington D.C.

"The focus in a warrant application is usually on whether the suspect committed a crime and whether evidence of the crime is to be found at his home or business." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002)(internal citation omitted). As discussed above, the application for the warrant did not establish probable cause for any crime of domestic terrorism, and based on what amounts to only a misdemeanor trespass, there is no probable cause that evidence of this misdemeanor trespass would be found nine months later at his home nearly a thousand miles away.

Again, as analyzed above under issue one, it is submitted that the affiant was stretching to create probable cause to search Mr. Brown's property. None of the witnesses that the affidavit relied upon ("Defendant 4," "Kelly Meggs," or the "unidentified family member of Witness 1") had been tested in the past as to their credibility, trustworthiness, and history of providing accurate information. Even if the allegation from these individuals is true, the warrant application still fails to establish that there is a fair probability of finding evidence of a non-continuous offense in Mr. Brown's property in Florida nearly nine months later. The reference to a "flash bang" on a white board is not necessarily even a reference to an illegal object. The term "flash

bang" encompasses many different types of devices. "Flash bangs" are light and noise distraction devices and those are readily available for purchase on the Internet through many sources. *Exhibit G: Printout of Website with Flash Bang Devices for Sale.*

The Eleventh Circuit has held that "[w]arrant applications based upon stale information fail to create probable cause that similar or other improper conduct is continuing." United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994)(internal citation omitted). Here, law enforcement had information that nearly nine months prior, Kelly Meggs told "Defendant 4" there were explosives in Mr. Brown's R.V. that he used to drive to the rally in Washington D.C. The only possible updated information was that months later, a white board in Mr. Brown's living room had the phrase "flash bangs" written on it. The affidavit gave the reviewing magistrate no updated information as to why law enforcement believed that nearly nine months later "similar or other improper conduct is continuing" at his home in Florida. Id. This cannot satisfy the probable cause requirement to a warrant application.

The affidavit is woefully vague as to the allegations against Mr. Brown and it is deficient in establishing the probable cause necessary for the reviewing magistrate judge to issue a search warrant of Mr. Brown's property in Tampa, Florida. Furthermore, the search warrant was completely lacking in jurisdiction authority as it was issued by a magistrate judge in Washington D.C. to search property in Tampa, Florida based on these vague allegations. Finally, law enforcement was aware that they had been investigating Mr. Brown for the past nearly nine months and found no evidence that Mr. Brown was involved in acts of domestic terrorism. Therefore, this Court should find that the search

was conducted without a valid warrant, and the warrant application was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.

### 5. The Warrantless Search of Mr. Brown's Truck was Unlawful.

Mr. Brown drove up to his residence while officers were executing the search warrant. As captured on the video from Ms. Aldridge's cell phone, law enforcement agents commented that Mr. Brown left his cell phone inside his truck when he exited. *Exhibit D*. Mr. Brown parked the truck in the roadway outside his house.

There was no search warrant for the truck. In United States v. Alva, the reviewing court held that the search of a defendant's vehicle, which arrived on the premises while officers were searching, was lawful based on a warrant authorizing the search of "any and all motor vehicles found parked on premises." 885 F.2d 250 (5th Cir. 1989). Here, the warrant detailed specifically that law enforcement could search Mr. Brown's residence, R.V., trailer, and cell phone but did not mention the truck. Furthermore, Mr. Brown parked on a street outside his house and did not pull into the driveway.

In United States v. Tamari, the reviewing court considered a situation where the officers had a search warrant for vehicles on a property. 454 F.3d 1259, 1260 (11th Cir. 2006). The warrant authorized agents to search the property, including "[v]ehicles or vessels or trailers registered to or owned by the occupants of the place to be searched, or under the care, custody or control or on the property on which the place to be searched is situated." Id. at 1260. While officers were searching, the defendant drove onto the property in a yellow Hummer. Law enforcement searched the Hummer and found evidence

that he was involved in a conspiracy to distribute and possess controlled substances. Id. at 1261.   At a motion to suppress hearing, the defendant argued the search of his Hummer was unlawful. Id. The trial court denied the motion, concluding the vehicle was subject to the search under the warrant's authorization to search "[v]ehicles ... on the property on which the place to be searched is situated." United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006). This is not the case here, where the warrant specified which property and vehicles were subject to search.

In Tamari, the reviewing court further analyzed the issue under the automobile exception to the warrant requirement. Id. at 1264. The court held that the automobile exception would apply regardless because the vehicle was operational and there was probable cause to believe the vehicle contained evidence of a crime. Id. The court detailed the evidence in support of probable cause as "Agents were searching a parcel of rural, isolated property they had probable cause to believe was part of a large-scale drug conspiracy. After they seized cocaine, cash, and firearms on the premises, a yellow Hummer drove onto the property, the same type of vehicle agents suspected was driven by Humberto Febles, the head of the drug conspiracy. In fact, when Tamari changed his story regarding the vehicle's owner, he claimed a man named Humberto loaned him the Hummer. Upon request, Tamari was unable to produce any identification or vehicle registration. Further, when asked about his purpose on the property, Tamari proffered the untenable explanation that he was there to see a man about some animals. Given the totality of these circumstances, a reasonable agent could deduce with fair probability that the Hummer contained contraband or evidence of a crime." Id.

Here, the Defense submits that the search warrant did not list the truck to be searched because the affiant did not have any evidence that the truck was involved in any criminal acts or contained evidence of any criminal acts.  Furthermore, Mr. Brown did not drive onto the property; rather, he parked on the street.   Mr. Brown's case is factually distinguishable from Tamari and Alva and thus the Defense asserts that the warrantless search of Mr. Brown's truck was unlawful. Tamari, 454 F.3d 1259; Alva, 885 F.2d 250.


### 6.   The Defense Requests a Franks Hearing.

Under Franks v. Delaware, "a defendant may challenge the veracity of an affidavit in support of a search warrant if he has a substantial preliminary showing that (1) the affiant deliberately or recklessly included false statements, or failed to include material information in the affidavit; and (2) the challenged statement or omission was essential to the finding of probable cause." United States v. Arbolaez, 450 F.3d 1283, 1293 (11th Cir. 2006)(citing Franks v. Delaware, 438 U.S. 154, 155 (1978).

The Eleventh Circuit has described the substantiality requirement as follows: "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise

reliable statements of witnesses should be furnished, or their absence satisfactorily explained[8]." See Arbolaez, 450 F.3d at 1294 (internal citations omitted).

Here, the affiant did not include in the search warrant application the following material that was obtained after January 6 as part of the F.B.I. investigation into Mr. Brown:

( a ) the contents of a July 28, 2021 podcast in which Mr. Brown participated wherein he stated in his opinion "The war is here...but he is not calling for violence." *Exhibit I: Summary Transcript of Podcast at pg. 6, paragraph 2 (quotes taken from transcription created by law enforcement).* When asked about solutions to "win this war," Mr. Brown said the solution is "no different than happiness in life – figure out what you are good at and find a way to make money on it or use it to survive." He also advises to stop shopping at corporate conglomerates. *Exhibit I: pp. 7-8.* In the podcast, Mr. Brown states that he "backs law enforcement officers that back up their oath to support the constitution, not arresting people for wearing a mask or beating up citizens." *Exhibit I: pg. 8.*

(b) Law enforcement conducted extensive investigation through a variety of

---

[8] At the evidentiary hearing, the defendant must meet a "preponderance of the evidence" standard in establishing the allegations of perjury or reckless disregard for the truth. United States v. Novaton, 271 F.3d 968, 986 (11th Cir. 2001).

database investigation tools, including BaseJumper, Business Filings, CHS Check, Clearwater, DIVS, DMV, DWS, DaLAs, Guardian, NCIC, NetTalon, Photographic websites, Public search engines, Sentinel, Social Media, TIDE, Telephone applications, and Web Crawlers. *Exhibit H.* None of these investigatory tools revealed any evidence that Mr. Brown continued to possess evidence in the Middle District of Florida that he was involved in acts of domestic terrorism on January 6, 2021 in Washington D.C.

As argued in issue three above, it is submitted that the affiant either recklessly or deliberately included a false statement in the affidavit (the coloring of the writing on the white board), that the affiant did not disclose that all efforts of other investigation had failed to produce any evidence that Mr. Brown was involved in acts of domestic terrorism, and that law enforcement did not reveal the contents of a podcast in which Mr. Brown publicly declared he was not calling for violence and supports law enforcement officers that follow their oath to support the constitution. It is submitted that all these issues contributed to the magistrate judge's finding of probable cause. The allegations in the affidavit against Mr. Brown specifically as to the offense of domestic terrorism are so weak that it cannot be stated that the magistrate judge would have issued the search warrant outside his jurisdiction nearly nine months after the riots but for these issues.

For these reasons, the Defense requests a <u>Franks</u> hearing and the Defense has submitted the evidence in support of this request at Exhibit F, H, and I.  <u>See Franks,</u> 438 U.S. at 155.

## Conclusion

For the reasons stated herein, Defendant respectfully requests that this Honorable Court grant this motion to suppress all evidence obtained as a result of the unlawfully issued search warrant and the unlawfully executed search of Mr. Brown's property.  This includes all evidence found at Mr. Brown's residence, in his R.V., trailer, and on his cell phone.  This additionally includes all evidence obtained as a result of Mr. Brown's incarceration since September 30, 2021, which includes recorded jail calls and any written communications to or from Mr. Brown at the jail.  Mr. Brown is held without bond based on the allegations and unlawfully obtained evidence in this Middle District case.  It cannot reasonably be argued that he would have been held without a bond in the misdemeanor case pending in Washington D.C.  Therefore, any evidence obtained as a result of Mr. Brown's continuing incarceration must be suppressed.

It is submitted that if this Honorable Court were to find that the magistrate judge in Washington D.C. had jurisdiction to issue the search warrant of Mr. Brown's property, then this would mean that any member of a group that coordinated amongst themselves to attend the rally on January 6, 2021 would be subject to a search of that individual's home.  All law enforcement would have to do acquire a search warrant for any of these group members' properties in the United States is allege that someone made an unsworn statement in an unknown medium that the individual had "explosives" or a

"cache of weapons" in a vehicle driven to attend the rally, and without further corroboration, a magistrate judge could issue a search warrant outside his jurisdiction.

Additionally, as discussed above, Mr. Brown requests a <u>Franks</u> Hearing and further requests that this Honorable Court grant this motion to suppress.

<u><b>CERTIFICATE OF SERVICE</b></u>

**I HEREBY CERTIFY** that a copy of the foregoing motion has been furnished by electronic filing using the CM/ECF system to all interested parties on this 23rd day of June 2022.

Respectfully submitted,

Melissa A. Loesch
FL Bar No: 0884251
Attorney for the Defendant
Roger Futerman & Associates
13620 49th Street North
Clearwater, FL 33762
Telephone: (727) 344-5511
futermanlaw@yahoo.com