UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

                     Case No.: 8:21-cr-348-SCB-SPF

v.

JEREMY BROWN

### UNITED STATES' RESPONSE TO THE DEFENDANT'S AMENDED MOTION TO SUPPRESS

The searches at issue in this case were based on a valid search warrant, supported by probable cause, and signed by a neutral and detached magistrate judge with authority to issue the warrant. The Court, therefore, should deny the Defendant's Amended Motion to Suppress. Doc. 186. Moreover, because the Defendant has not identified any material factual disputes, an evidentiary hearing is not warranted.

## I.    BACKGROUND

On September 29, 2021, Magistrate Judge Zia M. Faruqui in the District of Columbia authorized a search warrant of the Defendant's "Residence," "Recreational Vehicle" (R.V.), "Black Trailer," and "Cell Phone," which were located in the Middle District of Florida, to search for evidence of violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 231(a)(2) (transport of firearms or explosives for use in civil disorder), 18 U.S.C. § 844(a)(2) (transportation of explosives), and 18 U.S.C. § 1752(a) (unlawful entry on restricted buildings or grounds). *See* Exh. 1. The search warrant related to the Defendant's involvement in the January 6, 2021 events at the U.S. Capitol Building.

Agents executed the warrant on September 30, 2021. In the Defendant's residence and R.V., they found unregistered short-barrel firearms, grenades, and

classified information, leading to the charges in this case. On April 12, 2022, the Defendant was charged by Superseding Indictment with two counts of possessing unregistered firearms and two counts of possession of unregistered explosive devices, in violation of 26 U.S.C. §§ 5861(d) and 5871; improper storage of grenades, in violation of 18 U.S.C. §§ 842(j) and 844(b); and four counts of unauthorized retention of national defense information, in violation of 18 U.S.C. § 793(e). Doc. 159.

## II.    LEGAL STANDARD

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend IV. Probable cause to support a search warrant exists when the totality of the circumstances set forth in the affidavit allows the conclusion that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The Supreme Court has made clear that "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." *Id.* at 236. Rather, a reviewing court should pay "great deference" to the magistrate judge and limit its review to a determination of whether "the magistrate had a substantial basis for concluding that probable cause existed." *Id.* at 238-39.

## III.    ANALYSIS

The Defendant argues that (1) the magistrate judge did not have jurisdiction to issue the search warrant, *see* Doc. 186 at 5-17; (2) the affidavit in support of the warrant lacked probable cause, *id.* at 17-21; (3) the seizure of his cell phone from his

vehicle was unlawful, *id.* at 21-23; and (4) the affidavit contained material factual omissions and that, therefore, a hearing is warranted pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). None of these arguments prevails.

    **A.**    **The magistrate judge had authority to issue the search warrant in the District of Columbia because the warrant was pertinent to an "investigation of domestic terrorism."**

        **1.  Legal standard and definitions.**

Under Rule 41(b), "venue" confers "jurisdiction" to issue a search warrant. *See U.S. v. Thorne*, No. CR 18-389 (BAH), 2021 WL 2682631, at *41 & n.16 (D.D.C. June 30, 2021). An issuing magistrate must find that Rule 41(b)'s venue provision is satisfied pursuant to a "reason to believe" standard. *See id.* at *30.[1]

The search warrant in this case was authorized under Rule 41(b)(3), which provides:

> Venue for a Warrant Application. At the request of a federal law enforcement officer or an attorney for the government: . . . a magistrate judge—in an investigation of domestic terrorism or international terrorism—with authority in any district in which activities related to the terrorism may have occurred has authority to issue a warrant for a person or property within or outside that district.

According to Rule 41(a)(2)(D), the phrase "domestic terrorism" in Rule 41(b)(3) is defined in 18 U.S.C. § 2331(5), which defines "domestic terrorism" as activities that:

> (A) involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;
>
> (B) appear to be intended—
> > (i)    to intimidate or coerce a civil population;
> > (ii)   to influence the policy of a government by intimidation or coercion; or
> > (iii)  to affect the conduct a government by mass destruction, assassination, or kidnapping; and

---

[1] The government submits that the instant application satisfies the *higher* standard of probable cause; it thus refers to the probable cause standard throughout this brief.

(C) occur primarily within the territorial jurisdiction of the United States.

**2. Under Rule 41(b)(3), the proper inquiry focuses on the "investigation" rather than the specific offenses for which evidence is sought.**

Rule 41(b)(3) provides venue to a magistrate judge "in an investigation of . . . terrorism," so long as any "activities related to the terrorism" occurred in the magistrate judge's district. The Rule is not limited to any specific crime – nor does it require that a search warrant issued as part of a domestic terrorism investigation must itself allege acts that constitute domestic terrorism. The Defendant's arguments, however, focus on the "offenses" identified in the affidavit rather than the investigation of which they were a part. Indeed, on every page dedicated to his jurisdictional challenge, the Defendant repeats some variation of the argument that the affidavit does not establish that "Mr. Brown was involved in any offense that meets the definition of domestic terrorism." Doc. 186 at 6; *see also id.* at 7, 8, 9, 10, 11, 12, 13, 14, 15, 16. This argument contravenes the plain language of Rule 41(b)(3), as well as its structure, purpose, and legislative history.

Rule 41(a)(2)(D), which defines the phrase "domestic terrorism" by reference to Section 2331(5), encompasses "activities" rather than specified crimes. And Rule 41(b)(3) refers to "investigation" of those "activities." Thus, when the government seeks evidence in a domestic terrorism investigation, and the magistrate has "authority" in the "district in which activities related to the terrorism may have occurred," nothing in these provisions requires or authorizes the judge to limit the warrant to search for evidence of specific crimes. Fed. R. Crim. P. 41(b)(3).

Indeed, Rule 41 conspicuously does not reference the statute that defines "[f]ederal crimes of terrorism." 18 U.S.C. § 2332b(g)(5). Other statutes make clear that Congress knew how to refer to a broad act of terrorism without reference to a specific crime of terrorism. *See, e.g.*, 18 U.S.C. § 226 (criminalizing bribery with "intent to commit . . . terrorism" as defined in § 2331); 18 U.S.C. § 1505 (enhancing penalty for obstruction of proceedings if "offense involves . . . terrorism" as defined in § 2331); 18 U.S.C. § 1425 (enhancing penalty for unlawfully procuring citizenship if "offense was committed to facilitate an act of international terrorism" as defined in § 2331). As with these statutes, when Congress enacted Rule 41(b)(3), it made clear that the triggering event was the act of terrorism (and here, the "investigation" into that act), not a specific statutory violation.

The structure of Rule 41 supports this conclusion. The Rule first explains who can issue a warrant and in what circumstances (sections (b) and (c)), then how the warrant is issued and executed (sections (d), (e), and (f)), and finally what to do with the warrant and the evidence after the seizure (sections (g), (h), and (i)). Section (b) is therefore the first step in the process, and it ensures that the magistrate has jurisdiction to consider the warrant. Section (b) is not limited by the remaining sections of Rule 41. To the contrary, once a magistrate judge determines that she has jurisdiction to consider and issue the warrant—pursuant to one of the subsections of section (b), as described below—there are no further limitations on the authority of the magistrate judge related to her jurisdiction or the type of offense under investigation.

Moreover, the structure of Rule 41(b) confirms that Rule 41(b)(3) was intended to expand a magistrate's traditional territorial reach. Section (b) provides a magistrate

with jurisdiction to issue a warrant if certain prerequisites are met. The first, and most common, in subsection (b)(1), grants a magistrate venue to issue a warrant if the property or person is physically located within the judicial district. Subsections (b)(2) through (b)(6) expand the magistrate judge's jurisdiction, granting authority to issue warrants to search and seize property and persons who may be physically located outside the judicial district. Subsection (b)(2) allows a magistrate to issue a warrant for property or a person even if the property or person might be moved outside the district before the warrant is executed, and subsection (b)(4) similarly allows a magistrate to issue a warrant to install a tracking device in the district even if the device is moved out of the district. Subsection (b)(5) provides a magistrate with venue to issue a warrant for property located outside the legal jurisdiction of any state or district. And subsection (b)(6) grants a magistrate jurisdiction to issue a warrant for remote access to search electronic storage media, even if the media is stored outside the judge's district.

Similarly, subsection (b)(3) expands the magistrate's typical jurisdiction, giving her the authority to issue warrants to search and seize property that is located outside the district so long as the warrant seeks evidence in an investigation of terrorism and "activities related to the terrorism may have occurred" in her district. Rule 41(b)(3) is not cabined to evidence of specific offenses but rather provides venue for a warrant authorizing the search of out-of-district property in a terrorism "investigation."

Put differently, subsections (b)(1) and (b)(3) vest magistrates with venue in different ways. Subsection (b)(1), the territorial venue provision, vests a magistrate with jurisdiction to issue a warrant if the object of the warrant is located in the same judicial district.

Subsection (b)(3) vests a magistrate with jurisdiction to issue a warrant, regardless of the item's location, if she is in a district in which "activities related to the terrorism may have occurred." Thus, under subsection (b)(3), a magistrate's jurisdiction may be satisfied by the location of the terrorism activities rather than the location of the evidence.

Finally, Rule 41(b)(3)'s legislative history supports a conclusion that a warrant need not be limited to seeking evidence of terrorism offenses. In 2001, with the passage of the USA PATRIOT Act, Congress amended Rule 41 in the following manner:

> inserting after "executed" the following: "and (3) in an investigation of domestic terrorism or international terrorism (as defined in section 2331 of title 18, United States Code), by a Federal magistrate judge in any district in which activities related to the terrorism may have occurred, for a search of property or for a person within or outside the district."

Pub. L. 107–56, 115 Stat. 272, § 219 (Oct. 26, 2001) (Section 219 is entitled "Single-Jurisdiction Search Warrants for Terrorism").

Congress recognized that Rule 41(b)'s typical requirement "that a search warrant be obtained within the judicial district where the property to be searched is located . . . causes unnecessary delays and burdens law enforcement officers investigating terrorist activities that have occurred across multiple judicial districts." House Committee on the Judiciary, *Report on USA PATRIOT Act of 2001 to Accompany H.R. 2975*, Rept. 107-236, Part 1, at p.72 (Oct. 11, 2002). Appreciating that "delays can have serious adverse consequences on an ongoing terrorism investigation," Congress amended Rule 41(b) "to provide that in an investigation of domestic or international terrorism a search warrant can be obtained in any district court of the United States . . . having jurisdiction over the offense being investigated." *Id.*

7

The intended purpose of Rule 41(b)(3) is therefore to ensure investigative efficiency and expediency in terrorism investigations. Limiting the provision to confer jurisdiction only over warrants seeking evidence of specific predicate terrorism offenses would frustrate that objective. Terrorist activities commonly involve multiple overlapping crimes, which are not themselves "terrorism offenses," such as certain offenses relating to firearms or explosives, obstructing justice, or money laundering. Requiring law enforcement to seek multiple search warrants in various districts depending on where the property is located and which predicate offense the evidence pertains to is the precise inefficiency that Rule 41(b)(3) sought to remedy.

Thus, the magistrate judge had authority to authorize the search warrant here because the warrant pertained to an "investigation of domestic terrorism" and "activities related to the terrorism may have occurred" in the District of Columbia.

### 3. There was probable cause to believe that the investigation of the offenses cited in the Affidavit pertained to an "investigation of domestic terrorism" that had occurred in the District of Columbia.

The magistrate judge reasonably determined that the search warrant pertained to an "investigation of domestic terrorism" and that "activities related to the terrorism occurred" in Washington, D.C. The facts contained in the affidavit established that the search warrant application was related to the government's investigation of the events on January 6, 2021, when a mob stormed the U.S. Capitol while a Joint Session of Congress convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election. *See* Exh. 1 at 5-15. The investigation of the January 6 attack constitutes a domestic terrorism investigation as defined by 18 U.S.C. § 2331(5). The

facts contained in the affidavit also established that the offenses identified in the search warrant were part of the investigation into that act of domestic terrorism.

First, the affidavit contained facts establishing that the events of January 6 "involve[d] acts dangerous to human life" that were "a violation of the criminal laws of the United States." 18 U.S.C. § 2331(5)(A). The affidavit stated that "known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol," and that "Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters." Exh. 1 at 26. A crowd "forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement," in an apparent "coordinated" effort. *Id.* at 27. Shortly thereafter, rioters "broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol," and, "[o]nce inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers," injuring and hospitalizing many officers. *Id.* at 28. The affidavit stated that the "subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers," and "took police equipment from overrun police including shields and police batons and used them against law enforcement officers trying to protect the U.S. Capitol." *Id.* at 28.

These are plainly acts that threatened human life and violated federal law, including 18 U.S.C. §§ 111(a) and (b) (assaulting, resisting, or impeding certain officers using a dangerous weapon and inflicting bodily injury); 1752 (a)(1), (2) and (b)(1)(A)

(entering and remaining in a restricted building or grounds with a deadly or dangerous weapon and engaging in physical violence); and § 5104(c)(2)(F) (violent entry and disorderly conduct in a capitol building).

Next, the actions on January 6 "appear[ed] to be intended to influence the policy of a government by intimidation or coercion." 18 U.S.C. § 2331(5)(B)(ii). The affidavit details that the above acts of violence at the U.S. Capitol occurred while a Joint Session of Congress "convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election." Exh. 1 at 22. Due to the riots and violence, at approximately 2:20 p.m., members of Congress and Vice President Mike Pence "were instructed to – and did – evacuate the chambers." *Id.* at 28. "USCP ordered a similar lockdown in the House chamber" while individuals attempted to break in from the outside. *Id.* Approximately ten minutes later, the "USCP ordered the evacuation of lawmakers, Vice President Mike Pence," and others, "for their safety." *Id.* at 29. Based on the riots, trespassing, and acts of violence, "all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m." *Id.* at 31. The actions of the rioters were intended to stop a proceeding integral to the transfer of presidential power from one presidential administration to the next. Thus, the criminal acts of violence, rioting, and trespassing were intended to "influence the policy" of the U.S. Government "by intimidation or coercion."[2]

---

[2] Numerous courts in the District of Columbia have recognized that the intent of the riots and violence was to disrupt the certification of the 2020 presidential election. *See, e.g.*, *U.S. v. Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662, at *9 (D.D.C. Feb. 26, 2021) (observing that many of the individuals who comprised the violent mob sought to "create[ ] mayhem on Capitol grounds and interfere with the Capitol Police, all in furtherance of the goal of disrupting Congress's fulfillment of its constitutional duty to certify the vote count of the Electoral College and thus interfering with—or even

Finally, the affidavit plainly satisfied the final prong of the domestic terrorism definition in 18 U.S.C. § 2331(5)(C), that the events described above took place "within the territorial jurisdiction of the United States." *See* Exh. 1 at 21.

Thus, the facts alleged in the affidavit established that the investigation into the January 6 attack on the U.S. Capitol was a domestic terrorism investigation under Section 2331(5). As the attack occurred in Washington, D.C., any magistrate judge in that judicial district had "authority to issue a warrant for a person or property within *or outside* th[e] district." Fed. R. Crim. P. 41(b)(3) (emphasis added).

The search warrant also established probable cause to believe that the offenses it identified – "violations of 18 USC 371 (conspiracy); 18 USC 231(a)(2) (transport of firearms or explosives for use in civil disorder; 18 USC 844(a)(2) (transportation of explosives) and 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds)" committed "by JEREMY BROWN and/or other identified and unidentified persons," Exh. 1 at 20 – were part of an "investigation of domestic terrorism," Fed R. Crim P. 41(b)(3), that is, the investigation into the January 6 violence described above.

The affidavit alleged that the Defendant was present and trespassed at the Capitol on January 6, 2021, while wearing "full military gear, including a helmet, radio, a tactical vest, and prominently displayed large surgical trauma shears." Exh. 1 at 37-38. When confronted by officers and directed to move back, Brown did not

---

preventing—the peaceful transition of power"); *U.S. v. Cua*, No. 21-107 (RDM), 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) ("[H]undreds . . . took over the United States Capitol; caused the Vice President of the United States, the Congress, and their staffs to flee . . . ; engaged in violent attacks on law enforcement officers . . . and delayed the solemn process of certifying a presidential election.").

comply voluntarily and only moved "when pushed with police baton sticks." *Id.* at 39. The affidavit contained a photograph from police body camera footage showing an officer pushing the Defendant back out of the restricted area. *Id.*

The affidavit further alleged that the Defendant coordinated preparations for the event with members of the Oath Keepers using messaging applications. *Id.* The affidavit explained that members of the Oath Keepers "were among individuals and groups who forcibly entered the Capitol on January 6, 2021." *Id.* at 34. Video footage showed a "stack" – or military formation – of Oath Keepers "wearing helmets, reinforced vests, and clothing with Oath Keepers logos and insignia . . . forcing their way to the front of the crowd gathered around a set of doors to the Capitol." *Id.* One individual wore an Oath Keepers patch next to a patch that read, "I don't believe in anything. I'm just here for the violence." *Id.* at 36. More than a dozen Oath Keepers had been charged for their involvement in the January 6 riots. *Id.*

An individual identified in the affidavit as "Defendant 4"[3] further told law enforcement that the Defendant had traveled to Washington, D.C., with other Oath Keepers in an R.V. that was "loaded with a cache of weapons, ammunition, and gas." *Id.* at 39-40. Kelly Meggs, a leader of the Oath Keepers, told Defendant 4 that the Defendant had explosives inside of the R.V. *Id.* at 40.[4]

---

[3] On July 20, 2021, pursuant to a cooperation agreement, Defendant 4 pled guilty to conspiracy and obstruction of an official proceeding. The search warrant incorrectly stated that Kelly Meggs described the Defendant as a "loose cannon," when, in fact, Defendant 4 made this statement himself.

[4] The Defendant attacks Defendant 4's credibility, yet fails to mention that law enforcement did, in fact, find explosives and firearms inside of the R.V.

Law enforcement corroborated Defendant 4's statements by determining that he had used a ride-share application to travel to the Defendant's residence, and by reviewing messages the Defendant had sent. *Id.* at 39-40. In these messages, the Defendant shared his plans to drive himself and other Oath Keepers from his "house" to the Capitol in his R.V. *Id.* at 40. The Defendant's messages stated that there were "[p]lenty of Gun Ports left to fill" and that there would be "Pre Combat Inspections" before the R.V. departed. *Id.* The Defendant further wrote that, once in Washington, D.C., they would conduct "Close Target Reconnaissance." *Id.* While the Defendant dismisses this language as innocent use of military jargon, *see* Doc. 186 at 11, the magistrate judge was not required to do so, particularly when viewed in light of the militaristic acts of the Oath Keepers on January 6, *see* Exh. 1 at 34-35.

The Defendant also made public statements after January 6, admitting that he was "present with Oath Keepers on January 6." *Id.* at 42. He stated that, before the riots, he had "deposited his guns with other Oath Keepers in Virginia and retrieved them after the riots," thus confirming that he had, in fact, transported firearms. *Id.*

In summary, the affidavit established the following: the Defendant was a member of the Oath Keepers, several of whom violently entered the Capitol on January 6 and had been charged with and/or convicted of conspiring to obstruct the certification of the 2020 presidential election; the Defendant coordinated with the Oath Keepers prior to January 6 to facilitate travel to Washington, D.C.; the Defendant supplied an R.V., which was loaded with firearms, ammunition, and possibly explosives for the trip to Washington, D.C.; the Defendant traveled with

13

other Oath Keepers to Washington, D.C., intending to conduct "Close Target Reconnaissance" before January 6; and the Defendant trespassed at the Capitol and refused to leave the area until he was physically removed by law enforcement. Accordingly, abundant evidence supported the magistrate judge's conclusion that the proposed search warrant was pertinent to the January 6, 2021 domestic terrorism investigation and, therefore, that he had authority to issue the warrant.

## B.    Abundant probable cause supported the warrant.

In addition to the evidence discussed above, the affidavit disclosed additional evidence supporting a finding of probable cause to search the Defendant's residence, trailer, R.V., and cell phone. The affidavit contained substantial evidence that the Defendant trespassed at the U.S. Capitol, including tips, news footage, photographs, a cooperating defendant's statements, and cell phone location evidence. *See* Exh. 1 at 36-42. The affidavit described the Defendant's "distinctive attire" at the Capitol: "full military gear, including a helmet, radio, a tactical vest," as well as "zip ties attached to his belt, . . . a radio, surgical trauma shears, and tactical gear." *Id.* at 38-39.

Moreover, the affidavit included information tying the Defendant's January 6 activities to his residence, R.V., and cell phone. For example, agents corroborated Defendant 4's statement that he had used a ride-share service to travel to the Defendant's house in preparation for traveling to Washington D.C. *Id.* at 39. Defendant 4 also stated that the Defendant's R.V. was "loaded with a cache of weapons, ammunition, and gas" for the trip. *Id.* The Defendant's own messages further corroborated Defendant 4's statements. On December 23, 2020, the Defendant

messaged a group of Oath Keepers, "We have a RV an Van going. Plenty of Gun
Ports left to fill. We can pick you up." *Id.* On January 1, 2021, the Defendant wrote,
"[i]f you can, come to my house anytime Saturday" to "load plan, route plan, and
conduct . . . Pre Combat Inspections." *Id.* at 40.

At the time that the affidavit was submitted to the magistrate judge, the
Defendant had listed his residence for sale on the real-estate website Zillow. *Id.* at 43.
The Zillow advertisement contained photographs of the residence's interior, which
included a photograph of a white board that listed numerous firearms and explosives,
including "flash bangs." *Id.* at 43. According to the legend at the bottom of the white
board, items written in black ink were "on hand." *Id.* In the photograph, which was
reproduced in the affidavit, it appeared that the list of firearms and explosives was
written in black ink, suggesting that they were in the Defendant's possession at the
time the photograph was posted. *Id.* at 43-44. The affidavit also cited Witness 1's
statement that, before the residence was put up for sale on Zillow, there had been
"multiple boxes and weapons scattered throughout the house." *Id.* at 45.

The affidavit noted that the Defendant was still residing at the residence and
that law enforcement had observed the R.V. and trailer parked in front of the residence
as recently as September 21, 2021. *Id.* at 44. Agents also observed the Defendant
leaving the residence within a week of the time the affidavit was submitted. *Id.* at 46.
According to Witness 1, the Defendant alternated sleeping in the residence and the
R.V. *Id.* at 45. The affidavit alleged that, because the Defendant was in the process of
moving and had recently purchased the trailer, it was "probable that many of [his]

possessions, including electronics, guns, ammunition, and explosives, which constitute potential evidence in the investigation, have been moved to the RV or the Trailer." *Id.*

### C.     The evidence in the affidavit was not stale.

The Defendant attacks the probable cause in the search warrant, arguing that there was no reason to believe that evidence would still be present at the residence "nearly nine months" after January 6, 2021. This argument is without merit.

Under the Eleventh Circuit's "staleness doctrine," "the information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues." *U.S. v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000). There are no rigid rules for determining when information in an affidavit becomes stale; rather, staleness must be evaluated "on the peculiar facts of each case." *Id.* at 1265 (internal quotation mark omitted). The Eleventh Circuit has identified several useful factors in determining whether information in an affidavit is too stale to support a finding of probable clause, including: the "length of time" between the events outlined in the affidavit and the date the search warrant is sought, the "nature of the suspected crime (discrete crimes or ongoing conspiracy)," the "habits of the accused," the "character of the items sought," and the "nature and function of the premises to be searched." *Id.* (internal quotation marks omitted).

The factors identified by the Eleventh Circuit support the magistrate judge's finding of probable cause. First, the length of time between January 6, 2021, and execution of the Search Warrant on September 30, 2021, was well within the Eleventh Circuit's determination of a reasonable delay between criminal activity and search.

*See, e.g., U.S. v. Hooshmand,* 931 F.2d 725, 735–36 (11th Cir. 1991) (11 months); *U.S. v. Domme,* 753 F.2d 950, 953–55 (11th Cir. 1985) (9 months); *U.S. v. McBurnette*, 382 F. App'x 813, 815-816 (11th Cir. 2010) (2 years).

Second, the nature and circumstances of the criminal acts support the magistrate's probable cause determination. The Defendant and fellow Oath Keepers planned their actions at the Capitol for weeks before the riots and discussed their actions at the Capitol for months afterward. *See* Exh. 1 at 39-42. The affidavit included facts, such as the munitions list on the white board and Witness 1's statements, suggesting that the Defendant continued to seek and hoard a cache of weapons long after January 6. *Id.* at 43. Thus, the affidavit did not recite a "mere isolated violation," but rather recited facts "indicating protracted or continuous conduct," for which "time is of less significance." *Bervaldi*, 226 F.3d at 1265 (quotation mark omitted).

Third, the habits of the Defendant also supported the conclusion that the residence and vehicles likely contained evidence of criminal activity. For example, Witness 1 confirmed that the Defendant still had weapons "scattered throughout the house" after January 6. *Id.* at 45. It was likely, therefore, that evidence of his crimes would be found in the residence, even nine months after January 6.

Fourth, the character of the items sought also supported the inference that evidence of the Defendant's conduct would be present in his residence, R.V., trailer, and cell phone. The search warrant authorized the seizure of, among other evidence: "protective/tactical gear worn during the offenses, . . . firearms, explosives, precursor materials, or other weapons"; "materials, devices, tools, plans, or strategies" used to

enter the U.S. Capitol Building; communication devices, including radios and walkie talkies; and evidence of affiliation or communication with the Oath Keepers. Exh. 1 at 11-13. Weapons, explosives, tactical gear, and radios are expensive, non-disposable items that are generally kept and used for years and not discarded lightly. Messages with the Oath Keepers, which were stored on the Defendant's cell phone, would not degrade or disappear over time unless deleted. Under these circumstances, there was a fair probability that, even nine months after January 6, these types of evidence would have been found during the search – as they, in fact, ultimately were.

Fifth and finally, the nature and function of the premises to be searched strongly supported an inference that the residence and vehicles still contained evidence of weapons and explosives at the time of search. The Defendant used the residence as a staging area for the Oath Keepers before January 6, and used the R.V to transport individuals and weaponry. Moreover, the surveillance and witness statements established that the residence and R.V. likely were still being used to store weapons, ammunition, clothing, tactical gear, and other non-disposable equipment.

Because the affidavit established probable cause to believe that evidence of the Defendant's crimes would be found in his residence, R.V., trailer, and cell phone at the time the warrant was issued, the Defendant's staleness challenge fails.

**D.   Law enforcement officers lawfully seized the Defendant's cell phone from his vehicle.**

In order for a warrantless investigatory search of an automobile to be constitutional, (1) the automobile must be readily mobile, and (2) there must be probable cause to believe that it contains contraband or evidence of a crime. *U.S. v.*

*Lanzon*, 639 F.3d 1293, 1299-1300 (11th Cir. 2011). The first element is satisfied if the vehicle is operational. *See U.S. v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003). To establish the second prong, the government need only show that, under the totality of the circumstances, there was a "fair probability" that evidence of a crime would be found in the vehicle. *U.S. v. Tamari*, 454 F.3d 1259, 1262 (11th Cir. 2006).

The facts proffered by the Defendant are correct – the Defendant parked his truck on the roadway at the bottom of the driveway, officers arrested him pursuant to an arrest warrant from the District of Columbia as he stepped out of the vehicle, and officers then observed his cell phone in the vehicle and seized it. *See* Doc. 186 at 21. Because officers had just observed the Defendant driving the vehicle, they reasonably concluded that the vehicle was operational. *See Watts*, 329 F.3d at 1286.

The search warrant authorized the seizure of "a cellular phone . . . which is to be seized from the person of Jeremy Brown . . . [or] vicinity of Jeremy Brown." Exh. 1 at 10 (Att. D to warrant).[5] When law enforcement officers observed a cell phone in the vehicle that he had just left moments earlier, they undoubtedly had probable cause to believe that the vehicle contained evidence of a crime. Indeed, unlike during most warrantless entries into vehicles, in this case the officers already had the benefit of a judicial finding of probable cause to seize the cell phone. Accordingly, the officers lawfully entered the Defendant's vehicle to seize his cellular telephone.

---

[5] The affidavit explained that officers anticipated arresting the Defendant "when he is away from . . . the residence, RV, or trailer." *Id.* at 46. Authority to seize the cellular telephone therefore was not limited to its presence in the residence, R.V., or trailer.

**D.    Law enforcement officers relied on the search warrant in good faith.**

Even if the Court determines that Rule 41(b)(3) did not authorize the magistrate judge to issue the search warrant, it should nevertheless deny the Defendant's motion under the good faith exception to the exclusionary rule. Under the "good faith" exception, evidence will not be suppressed if law enforcement "reasonably rel[ied] on a warrant issued by a detached and neutral magistrate." *U.S. v. Leon*, 468 U.S. 897, 913 (1984). This exception exists because "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 922. This exception applies "in all but four limited sets of circumstances": (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned h[er] judicial role"; (3) "where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) "where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *U.S. v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002).

The Eleventh Circuit has also held that the good faith exception applies to search warrants issued for property outside of a magistrate judge's jurisdiction. *See U.S. v. Taylor*, 935 F.3d 1279, 1290–92 (11th Cir. 2019). In this context, the inquiry is

the same as in the ordinary good faith analysis – whether "a reasonably well-trained officer would have known that a search was illegal." *Id.* at 1290 (marks omitted).

In relying on the search warrant issued by the magistrate judge, the agents acted in good faith. In fact, the Defendant does not point to any exception that would prevent the good faith exception from applying here. There is no contention – apart from vague, conclusory allegations in his request for a *Franks* hearing – that there was materially false information in the affidavit. There is no allegation or evidence that the magistrate judge abandoned his judicial role. As discussed above, the warrant contained abundant probable cause relating to the Defendant's actions leading up to January 6 and good-faith attempts by law enforcement to corroborate and refresh that probable cause with post-January 6 evidence. Finally, the Defendant does not allege that the warrant was facially deficient. The agents, therefore, acted in good faith in relying on the duly reviewed and approved search warrant, and suppression is not an appropriate remedy in this case. *See Martin*, 297 F.3d at 1313.[6]

This conclusion similarly applies to the Defendant's jurisdictional argument. For the reasons explained above, there was substantial evidence establishing that the search warrant was pertinent to a domestic terrorism investigation and, therefore, the affiant could seek it in the District of Columbia, where the acts of terrorism occurred. Moreover, the affiant did not attempt to mislead the magistrate judge – the search warrant application, affidavit, attachments, and the search warrant all clearly stated

---

[6] No evidentiary hearing is necessary on this issue because extrinsic evidence is not necessary to support a finding of good faith. *See U.S. v. Robinson*, 336 F.3d 1293, 1297 (11th Cir. 2003).

that the property was located in the Middle District of Florida. *See* Exh. 1 at 1, 2, 3, 4, 6, 8, 10, 20. The affiant accurately quoted the pertinent legal provisions as well. *Id.* at 20-21. Moreover, there was no countervailing legal authority that contradicted the United States' position on jurisdiction. Accordingly, the agents were justified in relying on the magistrate's determination that he had authority to issue the warrant.

For these reasons, the Court should deny the Defendant's motion to suppress under the good faith exception as well.

**E.    A *Franks* hearing is neither necessary nor appropriate.**

To be entitled to a *Franks* hearing, a defendant must make a "substantial preliminary showing" that: (1) that the affiant deliberately or recklessly included a false statement, or failed to include material information, in the warrant affidavit; and (2) that the allegedly false statement or omission was necessary to the finding of probable cause. *U.S. v. Arbolaez*, 450 F.3d 1283, 1293 (11th Cir. 2006) (quoting *Franks v. Delaware,* 438 U.S. 154, 155–56 (1978)). "Allegations of negligence or innocent mistake are insufficient." *Franks,* 438 U.S. at 171. Moreover, the defendant's attack "must be more than conclusory" and the allegations of deliberate falsehood or reckless disregard for the truth "must be accompanied by an offer of proof." *Id.* at 171. "Even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." *U.S. v. Sarras,* 575 F.3d 1191, 1218 (11th Cir. 2009) (quotation marks and brackets omitted). The Defendant bears the burden of showing that probable cause would have been lacking absent those misrepresentations or omissions. *Id.*

The Defendant requests a *Franks* hearing, arguing that the affidavit omitted or misrepresented three pieces of information. The first is a public podcast interview in which the Defendant stated that, although "the war is here," he did not "call[] for violence" and that he "backs law enforcement officers that back up their oath to support the constitution, not arresting people for wearing a mask or beating up citizens." Doc. 186 at 24. This statement occurred six months after January 6, 2021, and, therefore, it cannot be material here. Moreover, the podcast statements had no bearing on whether evidence of his crimes or the crimes of others related to the January 6 investigation would be located in his residence, his R.V., or his cell phone. Finally, on that very same podcast, the Defendant called for violence against law enforcement in stating, "If I could just get her [Brown's girlfriend] to go to the gun range and learn how to shoot her gun straight I'd feel a lot better about the impending FBI visit." Def. Exh. I at 9. This alleged omission would, therefore, have no bearing on probable cause, especially when considered in the full context of the podcast.

The second piece of allegedly omitted evidence relates to law enforcement's online database checks. The statement at issue appears to be on page 6 of Defense Exhibit H: "Between 31 March 2021 and 5 April 2021, queries of these selectors were conducted through [online databases]. To the extent that derogatory information is not referenced above, results in these databases were negative for additional derogatory information." The Defendant does not explain what these databases are or what evidence they were expected to uncover, much less how the absence of *additional*

derogatory information in these databases undercuts the allegations in the affidavit.[7]
Thus, the results of the database queries were immaterial to the allegations in the
warrant, and including their results in the affidavit would not have affected the
magistrate judge's determination of probable cause.

Finally, the Defendant argues that the affidavit included a false statement
relating to the coloring of the writing on the white board in the Defendant's Zillow
post. *See* Doc. 186 at 24. The Defendant uploaded the photograph to a publicly
available website, where law enforcement observed it. The affidavit included a color
photograph of the writing on the white board: the words "Good," Better," "Best," and
"On Hand" appear to be red, blue, green, and black, respectively. The Defendant
ostensibly is arguing that the color of the photograph was altered when it was posted
online, making the weapons listed on the white board appear to be written in black
marker, suggesting that they were "On hand," although they appear to be written in
red marker in photographs taken during the search of the residence. *Compare* Exh. 1 at
43 (weapons appear in black marker, while the word "Good" and other items in the
third column are in red marker ), *with* Def. Exh. F (weapons appear in red marker). At
most, this is an allegation of an "innocent mistake," which is "insufficient" to warrant
a *Franks* hearing. *See Franks*, 438 U.S. at 171. To the extent that the Defendant is
alleging that law enforcement intentionally altered the photograph, any such argument

---

[7] These databases revealed derogatory information including: the Defendant resided at the search
premises, was in contact with Oath Keepers using his cell phone, and phone location information and
facial recognition software confirmed that he trespassed at the Capitol. Def. Exh. H at 7-8.

is refuted by a review of the online version of the photograph. *See* Exh. 2.[8]

In any event, even if the color of the white board had been correctly captured on the website and relayed in the affidavit, it would not have "prevented a finding of probable cause." *Sarras*, 575 F.3d at 1218. When viewed in light of the other evidence – including Witness 1's statements – suggesting that there were numerous firearms at the residence, the question of whether the Defendant's white-board arsenal was "on hand" or aspirational does not materially affect the probable cause analysis.

For these reasons, the Defendant has not made "a substantial preliminary showing" that the affidavit misrepresented or omitted any facts, much less that any omission affected the magistrate judge's probable cause finding. *Franks*, 438 U.S. at 155-56. Accordingly, the Court should deny his request for a *Franks* hearing.

## III.    CONCLUSION

In view of the foregoing, the United States respectfully requests that the Court deny the Defendant's Motion to Suppress without an evidentiary hearing.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:    */s/ Daniel J. Marcet*
Daniel J. Marcet, AUSA
Florida Bar No. 0114104
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
E-mail: Daniel.Marcet@usdoj.gov

---

[8] This photograph is available at <https://www.realtor.com/realestateandhomes-detail/4804-10th-Ave-S_Tampa_FL_33619_M99588-30122> (last visited July 6, 2022 at approximately 3:00 p.m.).

**U.S. v. Jeremy Brown**                     **Case No. 8:21-cr-348-SCB-SPF**

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Roger Futerman, Esq.

> */s/ Daniel J. Marcet*
> Daniel J. Marcet
> Assistant United States Attorney
> Florida Bar No. 0114104
> 400 N. Tampa St., Ste. 3200
> Tampa, FL 33602-4798
> Telephone: (813) 274-6000
> Facsimile: (813) 274-6358
> E-mail: Daniel.Marcet@usdoj.gov