UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

Case No.: 8:21-cr-348-SCB-SPF(s)(s)

v.

JEREMY BROWN

## UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM

During his military career, the United States Army placed significant trust in the Defendant, Jeremy Brown. The Defendant abused that position of trust to steal grenades and classified information. For nearly a decade after leaving the Army, he kept these stolen items in unsecured locations, putting others in danger. When given a chance to return the stolen classified information to Air Force investigators, the Defendant instead lied. After his arrest in this case, the Defendant repeatedly flouted routine court orders. At trial, the Defendant lied extensively under oath, falsely testifying that the stolen grenades were not his and that the stolen classified document was not, in fact, classified. For these reasons, as elaborated below, the United States respectfully submits that the Court should sentence the Defendant to 108 months in prison, which is the high end of the Sentencing Guidelines range.

## I.     FACTS

### a. Offense Conduct

The evidence at trial established the following facts in support of the counts of conviction, among others:[1]

The Defendant served in the United States Army from 1992 until 2012. *See* GX36; GX37. The Army placed significant trust in the Defendant throughout his career. For example, the Defendant served as a "weapons sergeant" for several years. *See* GX39; GX40; GX41. In his role as weapons sergeants, the Defendant was trained and trusted to transport hazardous materials, which enabled him to remove explosives, including M67 fragmentation grenades, from ammunition supply points. *See* GX55; Trial Tr., Vol. III at 545-48 (testimony of U.S. Joint Munitions Command Investigator Jacob Pries). The Defendant was also responsible for his unit's light and heavy weapons utilization and ammunition accountability, each of which would have included M67 fragmentation grenades. *See* GX 40; Trial Tr., Vol. III at 616 (testimony of Ronald Brown).

Throughout his career, the Defendant held a Top Secret security clearance and was trusted to handle the United States' most sensitive national defense information. In order to obtain and maintain a security clearance, the Defendant signed numerous Non-Disclosure Agreements (NDAs) and received frequent trainings on the proper

---

[1] Citations to the Trial Transcript will be referenced as "Trial. Tr., Vol. [volume number] at [page number]." Citations to the Government's trial exhibits will be referenced as "GX [Exhibit number]." Citations to the Presentence Investigation Report will be referenced as "PSI ¶ [Paragraph number]."

handling of classified materials. *See* GX 34; GX 35. The NDAs made clear to the Defendant, in no uncertain terms, the trust reposed in him, stating, for example: "I understand and accept that being granted access to classified information, *special confidence and trust shall be placed in me by the United States Government*." GX34 ¶ 1 (emphasis added). The NDAs also cautioned the Defendant that "unauthorized disclosure, unauthorized retention, or negligent handling of classified information by me could cause damage or irreparable injury to the United States or could be used to advantage by a foreign nation." *Id.* ¶ 3. And the NDAs expressly warned the Defendant that, if he did not return all classified materials in his possession, it "may be a violation of Section 793, Title 18, United States Code, a United States criminal law." *Id.* ¶ 7.

On September 30, 2021, federal agents executed a search warrant at the Defendant's residence in connection with his participation in the January 6 attack on the U.S. Capitol. PSI ¶ 21.[2]  Inside the Defendant's bedroom, agents located personal items belonging to the Defendant as well as an AR-15 rifle with a barrel substantially shorter than 16 inches, which the Defendant had not registered. *Id.* ¶ 22.

---

[2] The Defendant has repeatedly stated in interviews that he participated in the events of January 6 as a member of the Oath Keepers. To the extent the Defendant now denies these facts in his objections to the PSI, the United States hereby provides the cited video, which was previously provided to the Court by the defense, as well as the accompanying transcript for the Court's consideration. *See* Just Another Channel, *BREAKING: FBI Attempts To Recruit Former Green Beret to Infiltrate Oath Keepers, Proudboys, PRE 1/6!*, Banned.video (March 5, 2021), available at <https://banned.video/watch?id=6042e0452b9ec530ff1459e2>.

Inside the Defendant's girlfriend's Recreational Vehicle ("R.V."), agents located numerous personal items belonging to the Defendant, as well as a sawed-off shotgun with a barrel substantially less than 18 inches, which the Defendant had not registered. *Id.* In a briefcase located on the same couch as that shotgun, Detective Belvin Sanchez found a folder containing a classified Trip Report concerning soldier Bowe Bergdahl that the Defendant had authored shortly before leaving the Army. *Id.* ¶ 24; Trial Tr., Vol. I at 206-07. In the rear bedroom of the R.V., Detective Sanchez located a chest rig belonging to the Defendant. PSI ¶ 22. Inside the side pockets of the chest rig, agents located two live M-67 fragmentation grenades. *Id.*; Trial Tr., Vol. I at 208-11. The search was paused, and Bomb Technicians Chris Nicolussi and Charlie George photographed and recovered the grenades. *Id.*; Trial Tr., Vol. II at 298-302. The grenades and the firearm were not, and had never been, registered to the Defendant or to anybody else in the National Firearm Registration and Transfer Record. PSI ¶ 23.

The FBI laboratory tested the grenades found in the Defendant's chest rig, and determined that they were, in fact, live M-67 fragmentation grenades. *Id.* According to Department of Defense records, the two M-67 fragmentation grenades that the Defendant possessed had been manufactured for the United States Army. *See id.*; *see also* GX27. The Army had shipped the grenades to ammunition supply points in both Afghanistan and Iraq, countries where the Defendant had deployed during his career. GX27.

Bureau of Alcohol, Tobacco, Firearms, and Explosives expert witness Michael O'Lena testified that the Defendant's manner of storing the grenades was not in conformity with federal regulation. He cited the fact that the construction of the R.V. where the grenades were stored was insufficient to protect the surrounding area from harm if the grenades detonated. Trial Tr., Vol. III at 584-85. He further cited the fact that the lock on the R.V. was not sufficient to prevent theft of the explosives. *Id.* at 585. He also observed that the grenades were stored far too close to public highways and occupied residences, placing the public at risk. *Id.* at 586.

According to expert witness Richard Chorpening from United States Central Command (CENTCOM), where the Defendant was employed at the time that he authored the classified Trip Report, numerous paragraphs of the Trip Report disclosed classified tactics, techniques, and procedures relating to the collection and handling of human intelligence by the Department of Defense. PSI ¶ 25; Trial Tr., Vol. V at 788-92. Indeed, Mr. Chorpening testified that information in the document, if disclosed, could lead to the arrest, torture, and killing of a confidential human source discussed in the document. Trial Tr., Vol. V at 789. Mr. Chorpening further explained that the document contained classified information, regardless of whether it was a draft or a final version of the document. *Id.* at 791-92.

Air Force Office of Special Investigations (OSI) Special Agent Andrew Koundarakis testified that, in October of 2017, he had interviewed the Defendant based on a tip that, after leaving the military, the Defendant had retained a classified Trip Report concerning soldier Bowe Bergdahl. Trial Tr., Vol. III at 712. According

to Special Agent Koundarakis, the Defendant acknowledged that he had drafted a classified Trip Report, but he denied possession of any classified Trip Report or any other classified information. *Id.* at 713-14. The Defendant admitted that he may have mentioned the classified Trip Report to a colleague, but he repeated that he did not possess the document. *Id.* at 715. The Defendant permitted agents to search his storage unit, but refused to consent to a search of his residence. *Id.* During trial, the Government provided Special Agent Koundarakis a copy of the classified Trip Report seized from the Defendant's R.V. *Id.* at 718. Special Agent Koundarakis stated that if he had recovered that document in October of 2017, he would have immediately seized it and returned it to a Top Secret secure storage location at Central Command because it contained human source information. *Id.*

### b.  Defendant's Testimony at Trial

At trial, the Defendant falsely denied that he knowingly possessed the grenades in his chest rig, and he falsely claimed that the classified Trip Report was merely a "formatting draft." The Defendant testified that he had never seen the grenades before he received photographs in discovery in this case, and that he had never put the grenades in the R.V. *See* Trial Tr., Vol. V at 918-20. The Defendant further testified that he would never endanger his family and pets by storing grenades in such a reckless manner. *Id.* at 920. On cross-examination, the Defendant admitted that he owned the vest containing the grenades, and that he had moved the vest from

his storage unit into the R.V. shortly before it was found by the agents. *Id.* at 945-946.

Regarding the classified Trip Report, the Defendant initially claimed that he had "taken steps with that document to declassify it, meaning remove any actual classified material." *Id.* at 901. In the next breath, he contradicted that claim, stating that the document "is nothing but a formatting template draft" that he had created on his unclassified computer – meaning that there never should have been any classified information in the document to remove, as he had initially claimed. *Id.* The Defendant further testified that, while he had discussed the general topic of the classified Trip Report with a journalist, he had not, in fact, discussed the Report itself. *Id.* at 898 ("No, I didn't discuss any document.").

On cross-examination, the Defendant admitted that he had placed the classified Trip Report in his briefcase in March of 2021, nearly nine years after leaving the military. *Id.* at 937-938. He further admitted that, not only had he discussed the Trip Report with a journalist, but he had in fact been attempting to sell a story about the contents of the classified Trip Report to journalists for years. *Id.* at 938 ("The only discussion of this document was a conversation I had with [journalist] Jack Murphy. Now, I have talked over the years with other journalists, not at the extent that I talked to Jack, because I know Jack's background. He's a special operator, so therefore the discussion was much more in-depth with Jack, but still on a very vague level. Other journalists I spoke to, I would only refer to I have a

story, if you'd be interested."). Fortunately, in spite of his efforts, the Defendant "never found a journalist that was interested." *Id.*

The Defendant admitted that he understood the sensitivity of information surrounding confidential human sources, and acknowledged that disclosure of such information could lead to the sources being arrested, imprisoned, and killed. *Id.* at 965. The Defendant further stated that he believed that his military career had been ended in retaliation for his authorship of the Trip Report. *Id.* at 973.

With respect to his 2017 interview with the OSI agents, the Defendant admitted that he had understood that the investigators were looking for a classified Trip Report about Bowe Bergdahl, and that the Trip Report in his possession "appears classified and relates to Bowe Bergdahl," but that he did not tell the investigators that he possessed the Trip Report. *Id.* at 939-940. He explained that he did not believe that the Trip Report in his possession (an apparently classified Trip Report concerning Bowe Bergdahl) fell within the category of documents about which the investigators were asking (classified Trip Reports concerning Bowe Bergdahl). *Id.*

## II.     OBSTRUCTION OF JUSTICE ENHANCEMENT

United States Sentencing Guideline Section 3C1.1 provides for a two-level increase to the defendant's base offense level if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing" of his offense of conviction, and "(2) the obstructive conduct related to . . . the defendant's offense of conviction

and any relevant conduct." USSG § 3C1.1. The Application Notes to section 3C1.1 list examples of conduct warranting the enhancement, including "committing, suborning, or attempting to suborn perjury." *Id.* § 3C1.1, comment. (n.4(B)).

A defendant's testimony constitutes perjury when the testimony: (1) is made under oath; (2) is false; (3) is material; and (4) is "given with the willful intent to provide false testimony and not a result of mistake, confusion, or faulty memory." *United States v. Singh,* 291 F.3d 756, 763 n.4 (11th Cir. 2002). For purposes of section 3C1.1, "material . . . means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." USSG § 3C1.1, comment. (n.6). To apply the enhancement based on a defendant's false testimony, "a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, by perjury." *United States v. Feldman*, 931 F.3d 1245, 1262 (11th Cir. 2019) (quotation omitted and alteration adopted). "That is, the district court must make findings sufficient to establish that the defendant gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.* (quotation omitted and alteration adopted).

The evidence at trial, resulting in the jury's guilty verdict to Counts 3, 4, and 5, plainly establishes that the Defendant's claim that he did not knowingly possess the grenades was willfully false and material to the issues presented at trial. Counts 3 and 4 charged the Defendant with knowing possession of the unregistered grenades, and

Count 5 charged the Defendant with improper storage of the grenades. The testimony of Detective Belvin Sanchez, who found the grenades, as well as the testimony of, and photographs taken by, the bomb technicians Chris Nicolussi and Charlie George, established that the grenades were located in the pockets of the Defendant's chest rig. The circumstantial evidence concerning the origin of the grenades within the United States Army and the Defendant's position as a weapons sergeant established that the Defendant would have had access to M-67 fragmentation grenades during his career. The Defendant admitted that the chest rig was his and that he had moved it into the R.V. shortly before the search, yet he vehemently denied that he had ever seen the grenades before. The Defendant's false denial was not the result of a mistake or accident, and was instead a willful attempt to mislead the jury into returning a verdict of acquittal. Fortunately, the jury saw through the Defendant's lies and found him guilty of all counts related to the grenades.

The testimony of the CENTCOM expert witness, which resulted in the jury's guilty verdict as to Count 10, plainly establishes that the Defendant's testimony about the classified Trip Report was willfully and materially false. In order to find the Defendant guilty of Count 10, the jury had to determine whether the Defendant possessed the classified Trip Report, knowing that it did, in fact, contain national defense information. As expert witness Richard Chorpening discussed in great detail, the copy of the Trip Report seized from the Defendant's R.V. – regardless of whether it was a draft or a final version – contained serious, damaging national defense

information on each page, including information that could have led to the arrest, torture, and murder of a human source discussed therein. And as OSI Agent Koundarakis testified, had the Defendant showed the Trip Report to him in 2017, he would have immediately seized it and placed it into the Top Secret vault at CENTCOM. The Defendant's self-contradictory, incoherent story about the document being a "formatting draft" that he nevertheless saved for nearly a decade, shopped to reporters, lied to hide from investigators, and placed in pride-of-place in his briefcase nine years after his retirement, was willfully and materially false.

For these reasons, the United States respectfully requests that the Court enter specific factual findings to support the conclusion that the Defendant willfully made false material statements under oath in an attempt to obstruct justice within the meaning of USSG§ 3C1.1.

## III.   APPLICATION OF 3553(a) FACTORS

The United States respectfully submits that a sentence of 108 months in prison, to be followed by three years of supervised release, is "sufficient, but not greater that necessary" to serve the purposes set forth in 18 U.S.C. § 3553(a).

First, looking to the "nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), the Defendant's crimes of conviction were serious offenses that placed others in danger. The Defendant's illegally short, unregistered firearms were "easier to conceal" than a lawful shotgun or rifle would have been. Trial Tr., Vol. II at 294 (testimony of ATF Special Agent Chris Nicolussi). The grenades that the Defendant unlawfully possessed in a highly populated, residential area were designed to explode

and cause "the steel body to fragment into hundreds of small metal pieces, which are projected out at very high velocities in a 360-degree pattern" in order to "kill or cause casualties." *Id.* at 372 (testimony of FBI explosives expert Travis McCrady). And the classified Trip Report, which the Defendant possessed in an unlocked briefcase in his R.V., placed a confidential human source who worked with the U.S. Army at risk of "being located, incarcerated, tortured, [and] killed." Trial Tr., Vol V. at 789 (testimony of CENTCOM expert witness Richard Chorpening).

Next, the Defendant's "history and characteristics," 18 U.S.C. § 3553(a)(1), do not weigh in favor of leniency. To be sure, the Defendant served in the United States Army for 20 years. The evidence at trial, however, showed that the Defendant repeatedly violated the trust placed in him by the military. He flouted the regulations surrounding safe handling of munitions and the trust placed in him as a weapons sergeant, instead taking two U.S. Army M-67 fragmentation grenades and storing them in an unsafe manner in a residential neighborhood. And, at the end of his career, he took advantage of the "special confidence and trust" that was placed in him by the United States Government when he was granted access to classified information. GX34 ¶1. He chose to violate his oath in order to steal a classified Trip Report that contained serious, potentially damaging national defense information. Moreover, in 2017, he attempted to sell a story about the contents of the document to journalists, and then refused to return the document to CENTCOM when given the

opportunity. Thus, the trial evidence establishes that the Defendant took advantage of his position in the U.S. military to commit the charged crimes.[3]

The need for the sentence imposed to reflect the seriousness of the offense and promote respect for the law, 18 U.S.C. § 3553(a)(2)(A), further supports imposition of a significant sentence. The Defendant's course of conduct shows complete and utter disrespect for the law and a failure to recognize the seriousness of his crimes. During his military career, he exploited his position to steal grenades and classified information. For years, he stored the grenades in a manner that he knew placed his family, pets, and passersby at risk of death by explosion. He stored the classified Trip Report in an unsecure location, placing the military secrets contained therein at risk of disclosure, and the human source identified therein at risk of arrest, torture, and murder. When offered an opportunity to return the classified Trip Report, the Defendant lied to Air Force investigators to prevent them from finding the document. Regarding the unregistered short-barreled rifle and shotgun, the Defendant admitted that he knowingly failed to register the firearms, apparently because he simply did not like the law requiring that they be registered. Trial Tr.,

---

[3] Ironically, the Defendant participated in the January 6 assault on the U.S. Capitol as a member of the "Oath Keepers," a group that purports to advocate that law enforcement and military members should adhere to their constitutional oaths, *see* PSI ¶ 20 n.2, while the evidence demonstrated that the Defendant was constitutionally incapable of keeping any oaths himself. Indeed, this case alone showed that the Defendant has violated the following solemn oaths, among others: the oath he took as a member the United States military by abusing his position to steal grenades and classified information; the oaths he swore in numerous classified Non-Disclosure Agreements by retaining classified information; and his oath to tell the truth during his testimony at trial.

Vol. V at 924 (Defendant acknowledging that he knew the firearms had to be registered).

The Defendant's flagrant disregard for the law continued after his arrest in September of 2021. Over the course of several months, the Defendant repeatedly disobeyed court orders, demonstrating on multiple occasions that he does not respect the laws of the United States or the authority of this Court. In December 2021, the Defendant refused to comply with a duly issued search warrant for a buccal swab. Doc. 70-1 at 536-539. It was not until the government obtained an order to show cause, Doc. 70-1 at 541, and Magistrate Judge Flynn ordered compliance in person that the Defendant agreed "under protest" to give a saliva sample, Dec. 14, 2021 Motion Hearing Tr. at 20. Then, during the renewed detention hearing that same week – a hearing that the Defendant requested so that he could be released on bond – the Defendant admitted to the Court that he would "refuse to accept bond and remain in jail" rather than comply with a condition of release, that, in his view, would violate his constitutional rights. Dec. 15, 2021, Motion Hearing Tr. at 75. A month later, the Defendant disobeyed the Court's order that he deposit $12,300 in the Court's registry by January 31, 2022, because, according to the Defendant, "the order was not legal." March 25, 2022 Evid. Hr'g Tr. at 164. Judge Flynn, after conducting an evidentiary hearing, subsequently found the Defendant in contempt for moving money that he had raised online to a "trust" to circumvent the Court's order, and for failing to comply with the order to reimburse the Treasury for CJA funds. *Id.* at 171–72.

At the trial, the Defendant committed extensive perjury, as outlined above, all in an attempt to evade responsibility for his actions. The Defendant's course of conduct over the past decade, culminating in his repeated lies under oath at trial, shows a complete lack of respect for the law, and merits a substantial term of imprisonment.

Finally, the "kinds of sentence and the sentencing range established for" these offenses, 18 U.S.C. § 3553(a)(4), further support a substantial term of imprisonment in this case. For his offenses of conviction, the Defendant faces a total possible term of imprisonment of 51 years in prison. A sentence of 108 months is within the sentencing guidelines range, and it is far below the potential statutory maximum 51 years in prison.

## CONCLUSION

In view of the foregoing, the United States respectfully requests that the Court sentence the Defendant to 108 months in prison, to be followed by three years of supervised release.

<div style="margin-left:40%">

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:   */s/ Daniel J. Marcet*
      Daniel J. Marcet, AUSA
      Florida Bar No. 0114104
      400 N. Tampa St., Ste. 3200
      Tampa, FL 33602-4798
      Telephone: (813) 274-6000
      E-mail: Daniel.Marcet@usdoj.gov

</div>

By:    */s/ Risha Asokan*
Risha Asokan, AUSA
Florida Bar No.1003398
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
E-mail: risha.asokan2@usdoj.gov

By:    */s/ Menno Goedman*
Menno Goedman
Trial Attorney
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 451-7626
Email: Menno.Goedman@usdoj.gov

**U.S. v. Jeremy Brown**                          **Case No. 8:21-cr-348-SCB-SPF**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 24, 2023, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

Roger Futerman, Esq.

<div style="margin-left: 40%;">

<u>/s/ Daniel J. Marcet</u>
Daniel J. Marcet
Assistant United States Attorney
Florida Bar No. 0114104
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: Daniel.Marcet@usdoj.gov

</div>