IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
UNITED STATES OF AMERICA       \*
                               \*    Case No. 8:21-cr-348
vs.                            \*
                               \*    April 7, 2023
JEREMY BROWN                    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


<u>SENTENCING HEARING</u>

Heard in Courtroom 7A
Sam M. Gibbons United States Courthouse
801 N. Florida Avenue
Tampa, FL
April 7, 2023


<u>BEFORE THE HONORABLE SUSAN C. BUCKLEW</u>

<u>UNITED STATES DISTRICT JUDGE</u>




Official Court Reporter:       Tana J. Hess, CRR, FCRR, RMR
                               U.S. District Court Reporter
                               Middle District of Florida
                               Tampa Division
                               801 N. Florida Avenue
                               Tampa, FL  33602
                               813.301.5207
                               tana_hess@flmd.uscourts.gov


Proceedings recorded by mechanical stenography using
computer-aided transcription software.

APPEARANCES:


FOR THE GOVERNMENT:

        Daniel J. Marcet
        U.S. Attorney's Office- FLM
        400 N. Tampa Street
        Suite 3200
        Tampa, FL  33602
        813.274.6028
        daniel.marcet@usdoj.gov

        Cherie L. Krigsman
        US Attorney's Office - FLM
        400 N. Tampa Street
        Suite 3200
        Tampa, FL  33602
        813.274.6000
        cherie.krigsman@usdoj.gov

        Risha Asokan
        DOJ - USAO
        400 N. Tampa Street
        Suite 3200
        Tampa, FL  33602
        813.274.6000
        risha.asokan2@usdoj.gov

FOR THE DEFENDANT:

        Roger Futerman
        Melissa A. Loesch
        Roger D. Futerman & Associates
        13620 49th Street N
        Suite 201
        Clearwater, FL  33762
        727.344.5511
        futermanlaw@yahoo.com

```
9:01AM    1              (Call to order of the Court.)
9:02AM    2         THE COURT:  Good morning.
9:02AM    3         MR. FUTERMAN:  Good morning, Your Honor.
9:02AM    4         MR. MARCET:  Good morning.
9:02AM    5         THE COURT:  All right.  The matter that is set this
9:02AM    6  morning and set for sentencing is United States of America
9:02AM    7  versus Jeremy Brown, and the case number is 21-348.
9:02AM    8              Let me begin by asking counsel to state their
9:02AM    9  appearances, and we'll start with counsel for the United
9:02AM   10  States.
9:02AM   11         MR. MARCET:  Good morning, Your Honor.  Daniel
9:02AM   12  Marcet, Risha Asokan, and Cherie Krigsman on behalf of the
9:02AM   13  United States, and with us at counsel table is Homeland
9:02AM   14  Security Investigations Special Agent Timothy Campbell.
9:02AM   15         THE COURT:  And did you introduce Ms. Krigsman?
9:02AM   16         MR. MARCET:  I think I did.
9:03AM   17         THE COURT:  Okay.  I missed that.  All right.  Thank
9:03AM   18  you.  And Mr. Futerman?
9:03AM   19         MR. FUTERMAN:  Good morning, Your Honor.  Roger
9:03AM   20  Futerman on behalf of Mr. Brown.  Mr. Brown is seated to my
9:03AM   21  left, and to my far is my senior associate Melissa Loesch.
9:03AM   22         THE COURT:  Good morning.
9:03AM   23         MS. LOESCH:  Good morning.
9:03AM   24         THE COURT:  Mr. Brown, I'm going to ask if you'll
9:03AM   25  stand back up, please, sir, and I'm going to ask the courtroom
```

9:03AM 1 deputy to swear you in.

9:03AM 2 **COURTROOM DEPUTY:** Yes, Your Honor. Please raise

9:03AM 3 your right hand.

9:03AM 4 (Defendant sworn.)

9:03AM 5 **COURTROOM DEPUTY:** Please state your name for the

9:03AM 6 record.

9:03AM 7 **THE DEFENDANT:** Jeremy Michael Brown.

9:03AM 8 **COURTROOM DEPUTY:** Thank you. You may put your hand

9:03AM 9 down, but please remain standing.

9:03AM 10 **THE COURT:** Mr. Brown, I'm going to ask you a few

9:03AM 11 preliminary questions. I do this in every single case before

9:03AM 12 we begin the sentencing.

9:03AM 13 In the past 24 hours, have you had any

9:03AM 14 medication of any kind?

9:03AM 15 **THE DEFENDANT:** No, Your Honor.

9:03AM 16 **THE COURT:** You're not taking any kind of medicine

9:03AM 17 for anything?

9:03AM 18 **THE DEFENDANT:** No, Your Honor.

9:03AM 19 **THE COURT:** All right. The second question has to do

9:03AM 20 with the presentence investigation report that was prepared by

9:04AM 21 the probation office. The probation officer who prepared the

9:04AM 22 report is seated over here in the jury box. I have read

9:04AM 23 through that report. Have you read through that report?

9:04AM 24 **THE DEFENDANT:** Yes, I have, Your Honor.

9:04AM 25 **THE COURT:** Have you been able to have sufficient

| | | |
|---|---|---|
| 9:04AM | 1 | time to discuss it with your attorney? |
| 9:04AM | 2 | **THE DEFENDANT:**  Yes, we discussed it, Your Honor. |
| 9:04AM | 3 | **THE COURT:**  Do you need any more time to speak with |
| 9:04AM | 4 | him before we start this morning? |
| 9:04AM | 5 | **THE DEFENDANT:**  No, Your Honor. |
| 9:04AM | 6 | **THE COURT:**  Okay.  And really that question was |
| 9:04AM | 7 | directed to you.  Do you want any more time with Mr. Futerman |
| 9:04AM | 8 | or Ms. Loesch before we start? |
| 9:04AM | 9 | **THE DEFENDANT:**  I think we've said everything that |
| 9:04AM | 10 | can be said, Your Honor. |
| 9:04AM | 11 | **THE COURT:**  Okay.  All right.  Thank you, sir.  You |
| 9:04AM | 12 | may have a seat. |
| 9:04AM | 13 | Let me go through a couple of things before we |
| 9:04AM | 14 | actually get started.  I want to make sure that I have all the |
| 9:04AM | 15 | filings that were made in this case, so let me just go through |
| 9:04AM | 16 | them briefly.  I have the United States' sentencing memorandum |
| 9:05AM | 17 | and attachments that was filed on March the 24th.  I have the |
| 9:05AM | 18 | Defendant's sentencing memorandum and attachments filed on |
| 9:05AM | 19 | 3/27.  I have the United States' response to Defendant's |
| 9:05AM | 20 | sentencing memorandum and attachments filed on March 30th.  I |
| 9:05AM | 21 | have numerous letters, some of which were sent directly to |
| 9:05AM | 22 | chambers.  Others were forwarded by Ms. Aldridge.  I have read |
| 9:05AM | 23 | all of them; had some duplicates, but I have read all of those |
| 9:05AM | 24 | letters. |
| 9:05AM | 25 | There was also a preliminary motion for |

9:05AM 1 forfeiture seeking the forfeiture of a -- the shotgun, the

9:05AM 2 rifle, and the two grenades, and I entered a preliminary order

9:05AM 3 granting that forfeiture.

9:05AM 4 So with that said, let me ask the Government,

9:06AM 5 Mr. Marcet, has the Government filed anything that I haven't

9:06AM 6 gone through?

9:06AM 7 **MR. MARCET:** No, Your Honor.

9:06AM 8 **THE COURT:** Okay. Mr. Futerman, has the defense?

9:06AM 9 **MR. FUTERMAN:** No, Your Honor.

9:06AM 10 **THE COURT:** Okay. Then everything -- I have read

9:06AM 11 everything that has been filed. I've read the sentencing

9:06AM 12 memorandums, the attachments. I've read all of the letters

9:06AM 13 that were sent. And incidentally, if they were sent to

9:06AM 14 chambers, I made sure you all were copied with those letters.

9:06AM 15 So even though the letters were sent to me, I sent a copy to

9:06AM 16 counsel.

9:06AM 17 All right. Let me just talk a minute about the

9:06AM 18 presentence investigation report. Sorry, there's a lot of

9:06AM 19 paperwork up here. Mr. Brown, on -- in December, specifically

9:07AM 20 on December the 12th, 2022, a jury found you guilty of

9:07AM 21 knowingly possessing an unregistered shotgun having a barrel

9:07AM 22 less than 18 inches; found you guilty to possession of an

9:07AM 23 unregistered rifle having a barrel of less than 16 inches;

9:07AM 24 guilty of Count 3 of an explosive grenade; guilty of a second

9:07AM 25 explosive grenade; knowingly storing explosive materials, the

9:07AM 1  grenades, in violation of Attorney General regulations; and

9:07AM 2  then they also found you guilty in Count 10 of willful

9:07AM 3  retention of a document relating to the national defense, what

9:07AM 4  we had called throughout the trip report, dated September 1st,

9:07AM 5  2011.

9:08AM 6          The probation officer has prepared a presentence

9:08AM 7  investigation report that includes a number of things.  It

9:08AM 8  includes an advisory guideline calculation, and she has gone

9:08AM 9  through the offenses and has calculated the advisory guidelines

9:08AM 10 to a total offense level of 29.  The criminal history category

9:08AM 11 is I.  Mr. Brown has no criminal history.  And under those

9:08AM 12 guidelines, the range of imprisonment is 87 to 108 months.

9:08AM 13         I should say that one of the offenses that

9:08AM 14 Mr. Brown was convicted of, the storage offense, which I

9:08AM 15 believe was Count 5, is a misdemeanor.  The others are felony

9:08AM 16 offenses.

9:08AM 17         She has also in the presentence report given me

9:09AM 18 what she believed was a summary of the facts of this case, and

9:09AM 19 obviously I'm familiar with the facts of this case, having

9:09AM 20 tried the case back in December, but that's always part of the

9:09AM 21 presentence investigation report.  And she's also interviewed

9:09AM 22 Mr. Brown and talked with him to get some personal data, and

9:09AM 23 that is contained in the presentence investigation report as

9:09AM 24 well.  Education, employment, any history of substance abuse

9:09AM 25 should there have been any, financial conditions, ability to

9:09AM 1    pay, and at some point I want to ask a question about that.

9:09AM 2    But at any rate, that's what's contained in the presentence

9:09AM 3    investigation report.

9:09AM 4            According to the addendum the probation officer

9:09AM 5    has filed, the Government has no unresolved objections; is that

9:10AM 6    correct?

9:10AM 7            MR. MARCET:  That's correct, Your Honor.

9:10AM 8            THE COURT:  Okay.  And, Mr. Futerman, the Defendant

9:10AM 9    does have two, and I'm going to read them as the probation

9:10AM 10   officer has styled them.

9:10AM 11           One is to the objection -- one is to the

9:10AM 12   increase in the advisory guidelines for obstruction of justice

9:10AM 13   under 3C1.1 and has summarized the objection as follows:  The

9:10AM 14   Defendant submits through defense counsel that the two-level

9:10AM 15   enhancement for obstruction of justice is not applicable, and

9:10AM 16   that -- that objection, as I understand it, still remains, but

9:10AM 17   I'll ask that question.

9:10AM 18           And the other is a -- an objection to

9:10AM 19   paragraph 75 in the presentence report.  This is the paragraph

9:10AM 20   that has to do with the Oath Keepers, and it also has a

9:11AM 21   footnote, and the objection is that this information is not

9:11AM 22   relevant.

9:11AM 23           Those are the two objections to the guidelines

9:11AM 24   in the presentence report.

9:11AM 25           MR. FUTERMAN:  So, Your Honor, on document 341 -- and

9:11AM 1   can I approach the Court with a copy?  It might be easier to

9:11AM 2   visually see it than pull it up to compare.

9:11AM 3               **THE COURT:**  All right.

9:11AM 4               **MR. FUTERMAN:**  I made the Government aware and I made

9:11AM 5   Ms. Campbell from probation aware, and I've just old-fashioned

9:11AM 6   highlighted the slight additions that don't actually affect the

9:11AM 7   guidelines, but Mr. Brown wanted me to point this out for the

9:11AM 8   Court and ask the Court to strike this.

9:11AM 9               **THE COURT:**  Okay.

9:11AM 10              **MR. FUTERMAN:**  So document --

9:11AM 11              **THE COURT:**  And I should have said, I only read the

9:11AM 12  final presentence investigation report, the one that is dated

9:11AM 13  or revised on 3/30/2023.

9:12AM 14              **MR. FUTERMAN:**  Yes.  Thank you, Your Honor.  So

9:12AM 15  document 341 had a provisional or initial request to object to

9:12AM 16  anything in that report.  The deadline was 3/16, and I filed a

9:12AM 17  response on 3/16 with numerous fairly minute objections in some

9:12AM 18  respects, which I'm presuming based on Court's recitation that

9:12AM 19  the PSI is now amended, such as five children, not four,

9:12AM 20  various other things.  But what is more consequential to

9:12AM 21  Mr. Brown is on the 3/16 deadline, compared to the 3/30

9:12AM 22  document that was filed, there are two additional categories,

9:12AM 23  and actually three paragraphs and one financial difference that

9:12AM 24  was -- I never had a chance to respond to because I never saw

9:12AM 25  this until 3/30.  So it's only when I started looking through

1    every paragraph, I saw that probation added these details that

2    were not in the initial report.

3                So we'd ask the Court to strike these

4    paragraphs.  It does not affect the sentencing guidelines, but

5    we think it should be struck because it was not included in the

6    original report, and Mr. Brown has an objection to that.

7                So I can start firstly with paragraph -- really

8    it's number 2 is a little easier.  But if we compare document

9    341 and 346, the Court saw in 346, there is an asset line, and

10   it relates to online fundraising platform GiveSendGo, which now

11   has Mr. Brown as an additional $169,925 in assets.  That was

12   not included under the asset line in the original report of 3/3

13   and the deadline by 3/16.  So document 341, I've tabbed it for

14   the Court, you can see that was not on there.  So we would have

15   objected to that because we think it's a trust, not in his

16   control, so it's not an asset.  So we would ask that to be

17   struck.

18           THE COURT:  Okay.  And I had -- was going to have a

19   question about that as well.  But go ahead with the others.

20           MR. FUTERMAN:  And then -- Your Honor, thank you.

21   The other additional paragraphs that were not in the report

22   that I had an opportunity to object to is under mental and

23   emotional health, paragraph 78 and 79 on page 14 in the

24   original document, document 341, that I've tabbed for the Court

25   number 1 and highlighted, and then the 3/30 document includes

paragraph 82, 83, and 84 that discusses some Baker Act information that Mr. Brown disputes as to a correct factual recitation of those events.  So -- it doesn't affect the guidelines.  I don't think we need to spend a lot of time arguing about the facts of that.  I haven't been given today any supporting documents or since this amendment.  I just ask that it be struck.  They were not included in the original one, and I wasn't given notice that, "Hey, we're now adding these." I had to go through each paragraph and catch that.

And so I would ask that the additional basically opinions and discussions in paragraph 82 and 83 and 84 just be struck from the --

THE COURT:  Okay.  I will note that, but you got it at the same time I got it.  So if you had a concern, you should have made it an objection.

MR. FUTERMAN:  I understand, but I was looking through each paragraph.  I didn't anticipate there would be these additional paragraphs just added.  So I'm looking through guidelines, I'm looking through the material stuff, and then when I sent to Mr. Brown, we discussed it.  He pointed that out to me as we went through it, and I said, "I will object to the Court."  We're talking a few days ago.

So I thought this was the proper platform to object because I'm not -- it doesn't seem that often that probation adds these paragraphs, such as an asset line which is

1    not something you're necessarily looking for when you're going

2    through the material PSI.  So maybe -- I apologize, and I

3    should have written an objection a couple of days ago, three

4    days ago.  I understand.  I just wanted you to be aware of it.

5    Mr. Brown brought it out, and I would ask the Court to strike

6    it as it wasn't added on the original document that I filed on

7    the deadline, which was 3/16, with all the objections that had

8    been made.

9         THE COURT:  So that would be the Baker Act

10   information that says he was Baker Acted on two separate

11   occasions?

12        MR. FUTERMAN:  Correct, 82, 83, and 84.  Those are

13   opinion statements.

14        THE COURT:  He -- I'm sorry.  Is he claiming he

15   wasn't Baker Acted on both of those occasions or one occasion?

16        MR. FUTERMAN:  It wasn't a Baker Act adjudication.

17   It wasn't as clear-cut as that.  He was taken into custody.

18   He's claiming that the -- paragraph 82 is a completely false

19   statement as it relates to testimony from his ex-wife.  There's

20   not -- you know, that's a fairly acrimonious relationship.  So

21   he claims that on 82, that there was -- that was not accurate,

22   and that on 83, there was no -- there was -- and 84, there was

23   no ever Baker Act finding or any finding that there were any

24   Baker Act issues.  And he was immediately released in a few

25   hours on one of those occasions and shortly thereafter on

another occasion.  And what he doesn't want, being sentenced to the Bureau of Prisons, for this to be in his file because it could affect various things, and I understand that position.

THE COURT:  Well, yeah.  And I was going to recommend mental health counseling just because he's been Baker Acted on two occasions, which -- or Baker Acted because you're a danger to yourself or others.  So let me inquire of the probation officer.  If you would stand?

THE PROBATION OFFICER:  Yes, Your Honor.

THE COURT:  And would you state your name?

THE PROBATION OFFICER:  Tyler Campbell, Your Honor.

THE COURT:  Okay.  Ms. Campbell -- and as I said earlier, I only read the final presentence investigation report, and certainly the attorneys should read the final presentence investigation report as well to make sure there's no additions, corrections, or changes that might have been made based on their contacting you or based on information that you have found, but there are some differences in the mental health, emotional health, in the two sentence -- or the two presentence investigation reports.  In the original one it says the Defendant reported to PTS that he attended voluntarily counseling in 2016 to address him -- or assist him in addressing emotional problems associated with his divorce.  The Defendant reported he attended the sessions for three months, and the Defendant communicated experiencing general suicidal

9:18AM 1 ideations during that time, but he never attempted to harm

9:18AM 2 himself.

9:19AM 3      And it's -- it's changed somewhat.  The

9:19AM 4 Defendant reported to PTS that he attended voluntarily --

9:19AM 5 voluntary counseling in 2016, and essentially that paragraph is

9:19AM 6 the same, and so is paragraph 80 incidental to 79.  But then we

9:19AM 7 have records from PCJ.  PCJ is what?

9:19AM 8      **THE PROBATION OFFICER:**  Pinellas County Jail, Your

9:19AM 9 Honor.

9:19AM 10      **THE COURT:**  Pinellas County Jail reflect that the

9:19AM 11 Defendant suffers from unspecified adjustment disorder, and --

9:19AM 12 well, Mr. Futerman --

9:19AM 13      **MR. FUTERMAN:**  81 was included in the previous

9:19AM 14 paragraph on --

9:19AM 15      **THE COURT:**  So you're not objecting to that?

9:19AM 16      **MR. FUTERMAN:**  Not that line, correct.

9:19AM 17      **THE COURT:**  All right.  The records from the Tampa

9:19AM 18 Police Department reveal that on January 13th, 2014, the

9:19AM 19 Defendant was Baker Acted after he made statements he would

9:19AM 20 kill his wife and/or himself, and he was transferred to the

9:20AM 21 Crisis Center.  What is the basis for the statement that he was

9:20AM 22 Baker Acted?

9:20AM 23      **THE PROBATION OFFICER:**  Your Honor, upon initial

9:20AM 24 disclosure of the presentence report, I received records from

9:20AM 25 the Hillsborough County Sheriff with the Baker Act information

| | |
|---|---|
| 9:20AM | 1 |

in the report, so it was subsequently added to the revised PSI

9:20AM  2  or the Court packet.

9:20AM  3          THE COURT:  All right.  And do you have those records

9:20AM  4  with you?

9:20AM  5          THE PROBATION OFFICER:  Yes, Your Honor.

9:20AM  6          THE COURT:  At some point I'm going to ask you -- are

9:20AM  7  they on your computer?

9:20AM  8          THE PROBATION OFFICER:  Yes, Your Honor.

9:20AM  9          MR. MARCET:  Your Honor?

9:20AM  10          THE COURT:  All right.

9:20AM  11          MR. MARCET:  I think these records were filed in this

9:20AM  12  case as well at the original detention hearing as Government's

9:20AM  13  Exhibit 5 and 6 way back in October of 2021.  So these have

9:20AM  14  been -- these were in discovery as well.

9:20AM  15          THE COURT:  Okay.  You don't have a copy of them with

9:20AM  16  you?  I didn't know there was going to be --

9:20AM  17          MR. MARCET:  On my computer as well, Judge.

9:20AM  18          THE COURT:  Okay.

9:20AM  19          MR. FUTERMAN:  I think the distinction -- those

9:20AM  20  original documents I had some familiarity with.  I wasn't there

9:21AM  21  initially, but there wasn't the adjudication finding.  There

9:21AM  22  wasn't any adjudication of Baker Act.  There wasn't any holding

9:21AM  23  in that situation.

9:21AM  24          THE COURT:  I don't know -- I don't understand what

9:21AM  25  you mean holding.  Like, a police officer Baker Acts normally

| | |
|---|---|
| 9:21AM | 1 |
| 9:21AM | 2 |
| 9:21AM | 3 |

or the jail Baker Acts, and they swear out a -- you know, that
he's a danger to himself or others, and he's taken to the
hospital or the Crisis Center.

MR. FUTERMAN: Correct. And then sometimes they're
quickly released within hours, or there's a hearing and there's
a determination. I don't know because I never got those
additional copies that madam probation officer said she
received. I never got these between 3/16 and today. I've
never got those additional documents since the initial
objection, so I don't know what's in them. I'm just echoing
what Mr. Brown is indicating in the report. When he sees the
second report, he sees these new paragraphs, he has a different
slant on things. I don't have either a record -- they probably
should have been sent to me so I had a chance to look at them
and discuss them. I think they should be struck. You get
records and you change the report and add a paragraph, there
should be some sort of notice.

THE COURT: There was notice. You had the
presentence report.

MR. FUTERMAN: Well, we had, yes, the initial one,
and then when we received the second --

THE COURT: You got the second one, too.

MR. FUTERMAN: Right. I understand. The second one,
then I took to Mr. Brown, and he said -- we go through each
line. So I ask that it be struck. If the Court wants to look

| | | |
|---|---|---|
| 9:22AM | 1 | at those documents in camera, I understand. |
| 9:22AM | 2 | THE COURT: All right. In order to look at them in |
| 9:22AM | 3 | camera, I'm going to have to leave the bench, and so at the |
| 9:22AM | 4 | first break, I will do that. Could you tell me -- |
| 9:22AM | 5 | MR. FUTERMAN: And I don't have an objection to the |
| 9:22AM | 6 | Court post facto making a decision because it doesn't affect |
| 9:22AM | 7 | the guidelines on whether they should be in or not. |
| 9:22AM | 8 | THE COURT: Oh, okay. |
| 9:22AM | 9 | MR. FUTERMAN: I have no objection post-sentencing |
| 9:22AM | 10 | because it doesn't affect -- |
| 9:22AM | 11 | THE COURT: So I can go back after sentencing -- |
| 9:22AM | 12 | MR. FUTERMAN: Yes. |
| 9:22AM | 13 | THE COURT: -- and look at them, and if I think |
| 9:22AM | 14 | there's not sufficient evidence to put it in there, take it |
| 9:22AM | 15 | out. |
| 9:22AM | 16 | MR. FUTERMAN: Absolutely. |
| 9:22AM | 17 | THE COURT: All right. Mr. Goedman, again, give me |
| 9:23AM | 18 | the document numbers that you think they've been filed in. |
| 9:23AM | 19 | MR. MARCET: Mr. Goedman, unfortunately, is not with |
| 9:23AM | 20 | us. |
| 9:23AM | 21 | THE COURT: Where is Mr. Goedman? |
| 9:23AM | 22 | MR. MARCET: He is on maternity leave. |
| 9:23AM | 23 | THE COURT: All right. |
| 9:23AM | 24 | MR. MARCET: It's document 17-12 and 17-13, according |
| 9:23AM | 25 | to Ms. Asokan, who just pulled it up on her phone. |

**THE COURT:** Okay. Thank you. I can go back and look it up. All right. Thank you.

The other objection, again, that doesn't affect the guidelines, but I did want to at some point ask about it as well has to do with the -- well, I'd refer to it as a GoFundMe account, but it's actually described in the presentence report as GiveSendGo, and it's $169,925 that apparently has been raised in online fundraising, and I'm somewhat familiar with this because this was an issue in front of the magistrate judge where Mr. Brown had to reimburse the treasury of the Court for his Court-appointed attorney, and he objected to that and actually was held in contempt, I think, before he would do it. And so there was testimony about -- from a lawyer that I was unfamiliar with, about a trust, and -- but obviously it was able to -- he got into the trust to pay the funds into the court, but -- so I'm not sure. You say this is a trust, but it's not related to him at all?

**MR. FUTERMAN:** What Mr. Brown has indicated to me is it's a trust not controlled by him in any way. So it is controlled by his girlfriend, but they're not married, and so I don't think as a matter of law we can count that as an asset. If Ms. Aldridge decides today that she's breaking up with Mr. Brown and decides to spend the funds as the trustee in any way, those are no longer assets. I don't anticipate that happening obviously, but just as a matter of law, I don't think

9:25AM 1    you can hold someone else as an asset when you don't control

9:25AM 2    the trust.

9:25AM 3           THE COURT:  Okay.  So essentially -- let me just make

9:25AM 4    sure I understand this because obviously I wasn't involved when

9:25AM 5    the magistrate judge was handling this.  This is essentially a

9:25AM 6    fund that I'm familiar with, they call GoFundMe funds, where

9:25AM 7    someone -- or people have given money to Mr. Brown for what?

9:25AM 8           MR. FUTERMAN:  And I wasn't involved in that either.

9:25AM 9    This was prior counsel, so I'm not infinitely familiar with

9:25AM 10   that past procedure or the trust rules as it relates.  I am

9:25AM 11   familiar with Judge Flynn's ruling in the particular case and

9:25AM 12   Ms. Aldridge reimbursing that account -- that money from

9:25AM 13   different avenues.

9:25AM 14           This, my understanding is that -- like the

9:25AM 15   Court's aware, we both have the same common understanding -- is

9:25AM 16   a Go Raise Me fund.  People donate.  It can be used for

9:26AM 17   different legal fees, I believe.  I believe, as indicated, he

9:26AM 18   has hired Mr. Ufferman, who is a very respected lawyer out of

9:26AM 19   Tallahassee.  I have not had a discussion with him how much

9:26AM 20   he's charged.  There are transcript costs that I know

9:26AM 21   Ms. Aldridge has been paying for and various other things.  I

9:26AM 22   don't know exactly how that money is being used other than for

9:26AM 23   his appellate defense and legal fees and various other things.

9:26AM 24   So when I saw it and discussed it, I don't think it can be

9:26AM 25   counted as an asset unless he controls it, unless he's the

9:26AM 1 legal trustee. I don't know if you wanted to take any

9:26AM 2 testimony about his control of that. I think you can -- you

9:26AM 3 can raise funds on behalf of John Smith, but if Jim Smith is

9:26AM 4 the one that controls it, John Smith can't count that as an

9:26AM 5 asset.

9:26AM 6        **THE COURT:** Well, are the funds raised for

9:26AM 7 Mr. Brown's legal fees, his defense? Is that what they're for?

9:27AM 8        **MR. FUTERMAN:** I believe so. That's what I've been

9:27AM 9 told they are raised for, yes, appellate fees, yes.

9:27AM 10        **THE COURT:** All right. That's interesting that there

9:27AM 11 would be $169,000 in there.

9:27AM 12        All right, Mr. Marcet, what's your position as

9:27AM 13 to whether it should be listed as an asset?

9:27AM 14        **MR. FUTERMAN:** Before Mr. Marcet responds, let me

9:27AM 15 just be clear, I don't know because I saw this -- because I've

9:27AM 16 heard different versions of how much actual liquid is still in

9:27AM 17 that fund. I don't know where probation got that from. I

9:27AM 18 don't know if there's any money left.

9:27AM 19        **THE COURT:** Good idea. Let's start there, and then

9:27AM 20 I'll come to you, Mr. Marcet. Let me ask the probation

9:27AM 21 officer, where does the information that he has an asset, an

9:27AM 22 online funding platform, GiveSendGo, and there is $169,925 in

9:27AM 23 that?

9:27AM 24        **THE PROBATION OFFICER:** As of the date of this

9:27AM 25 report, Your Honor, if you go to the GiveSendGo website, that's

the amount that was listed under Mr. Brown.  That's where that amount came from.  It could have adjusted between now and the 30th when this report was filed -- or the 29th.

        THE COURT:  Okay.  But other than the amount, is it -- you wouldn't have any information on how it's held or anything like that?

        THE PROBATION OFFICER:  No, Your Honor.

        THE COURT:  Okay.  Thank you.

        MR. FUTERMAN:  And I also think for clarification -- maybe Ms. Campbell can agree with this.  I think that's the tally versus what's actually been expended out of there.

        THE PROBATION OFFICER:  I can only see what's in the account, Your Honor.  I can't see how any amount is expended or anything of that nature.

        THE COURT:  Okay.  So when you looked there was $169,925 in there?

        THE PROBATION OFFICER:  Correct, Your Honor.

        THE COURT:  Okay.

        MR. FUTERMAN:  That is what's been collected, not what's in the account.

        THE COURT:  Is that what's been collected or what's in the account?

        MR. FUTERMAN:  The tally.

        THE PROBATION OFFICER:  Your Honor, I don't want to speak on that.  This is my first time ever seeing a GiveSendGo.

As you stated, I'm familiar with GoFundMe, so this was completely different, Your Honor.  So I don't want to speak on something I don't really have knowledge on.

THE COURT:  Okay.

THE PROBATION OFFICER:  Except that --

THE COURT:  Let me ask you, Mr. Futerman, how much is in the account at this point?

MR. FUTERMAN:  I don't want to make that representation specifically, but my understanding in receiving some -- maybe Ms. Aldridge, who is the trustee, could maybe give some better information about that, but I don't believe -- I think that's what's been tallied and collected.  She's the trustee.  She could tell you how much is actually left in that account if you want to take testimony from her.

THE COURT:  Okay.

MR. FUTERMAN:  So I don't want to make that representation.

THE COURT:  Okay.  So you don't think it's $169,000. You think it's less than that?

MR. FUTERMAN:  I don't know if there's very much left in that account period.  From what I've been told before the hearing, I don't believe there is very much left, but I'd rather have direct testimony from her.

THE COURT:  Okay.  Thank you.  Thank you.

THE PROBATION OFFICER:  I'm sorry, Your Honor.  I

don't know if you -- I don't know the procedure, but I just
pulled up the account, and the amount actually says, "Raised,
181,435." So the amount is different today as far as what's
raised.

        THE COURT: So that's the amount raised.

        THE PROBATION OFFICER: Correct.

        THE COURT: Okay. All right.

        Mr. Marcet, what's the position of the United
States as far as whether this should be listed as an asset of
the Defendant's?

        MR. MARCET: I think in terms of whether the money in
the account is his asset, I think it is. We don't know -- I
mean, I think Judge Flynn determined that long ago when he held
Mr. Brown in contempt for not depositing money from the trust
which he controlled. And Ms. Asokan and Ms. Krigsman spent
many, many hours litigating that issue in front of Judge Flynn,
and they can speak more on his findings if Your Honor is
interested in that.

        I do think obviously if a bulk of the money has
been spent on attorney's fees, then the number would be lower.
It wouldn't be 169, or could be higher. It could be 181 now.
And I'll say I don't intend to ask for a fine. I don't intend
to --

        THE COURT: Okay.

        MR. MARCET: But I will say what does concern me is

9:31AM 1  that the Defendant owes nearly $22,000 in child support

9:31AM 2  arrearage, and I would ask that the Court incorporate some --

9:31AM 3  some condition of supervised release that he try to pay his

9:31AM 4  child support arrearage, and if he does have tens of thousands

9:31AM 5  of dollars available to him, that would be relevant down the

9:31AM 6  line as to whether he's complying with his supervised release.

9:31AM 7  But apart from that, I don't intend to ask for a fine.  There's

9:31AM 8  no -- this isn't a fraud case.  There's not going to be any

9:31AM 9  financial forfeiture or anything like that.

9:31AM 10        MR. FUTERMAN:  And he certainly doesn't have an

9:31AM 11  objection.  He's going to do everything he can to pay child

9:31AM 12  support on supervised release, so that's not an issue either

9:31AM 13  for us.

9:31AM 14        THE COURT:  Okay.  So the objection is -- what is the

9:31AM 15  objection?  Is the objection as to the amount, or listing it

9:31AM 16  period under the assets?

9:32AM 17        MR. FUTERMAN:  Listing it period as an asset.

9:32AM 18        THE COURT:  Do you have any objection to my removing

9:32AM 19  it, Mr. Marcet?

9:32AM 20        MR. MARCET:  No, Your Honor.

9:32AM 21        THE COURT:  Okay.  Then we'll take it out.  That was

9:32AM 22  easy enough.

9:32AM 23        All right.  And it would have become an issue

9:32AM 24  had I imposed or was I going to impose a fine, but the

9:32AM 25  Government is not seeking a fine, and it would become an issue

if the Defendant was going to object to a condition that he pay child support -- the child support amount that he owes, but since you're not objecting to that, then we'll pull it out.

And I will go back and check the records on the mental and emotional health, and if I think something needs to be corrected in the final presentence investigation report, I'll alert the probation officer to make that correction.

Okay. Mr. Futerman, I think those were the two issues that were not brought up in the addendum. Did we get both of them? Are those two --

MR. FUTERMAN: You did, Your Honor.

THE COURT: All right. Then let's talk about the objections that you do have. One, the obstruction of justice, which is a substantive objection because it does affect the advisory guidelines; the other, the information about the Oath Keepers, which really has no effect on the guidelines at all. But -- so I'll let you go ahead and begin.

MR. FUTERMAN: Thank you, Your Honor. And I won't spend long expanding upon what I've written in the memorandum. I've advised Mr. Brown the normal course in my experience in the Middle District that -- and probably most federal jurisdictions, that if a defendant testifies and the jury comes back with an adverse ruling, there is often a presumption to put obstruction, and I've always maintained that objection, that maybe the jury gets it wrong, and the Defendant wasn't

| | | |
|---|---|---|
| 9:33AM | 1 | lying, and then the obstruction wouldn't apply because it's |
| 9:33AM | 2 | obviously based on essentially the premise of the jury finding |
| 9:34AM | 3 | is the thrust of it.  So I just make that same objection; that |
| 9:34AM | 4 | I see obstruction, true obstruction if the Defendant tries to |
| 9:34AM | 5 | pull witnesses or tries to obstruct the course of justice or |
| 9:34AM | 6 | does something in the courtroom that's obstructive.  I think we |
| 9:34AM | 7 | can all agree that during the trial, during your observations |
| 9:34AM | 8 | of Mr. Brown, he's acted as a gentleman.  He's always been |
| 9:34AM | 9 | polite. |
| 9:34AM | 10 | THE COURT:  I agree with that. |
| 9:34AM | 11 | MR. FUTERMAN:  And so I make the objection for the |
| 9:34AM | 12 | record.  Although it's generally applied, I just hope one day |
| 9:34AM | 13 | the Eleventh Circuit says just because a jury disagrees with |
| 9:34AM | 14 | the jury findings, it's not obstruction. |
| 9:34AM | 15 | THE COURT:  All right.  Mr. Marcet? |
| 9:34AM | 16 | MR. MARCET:  Your Honor, as we laid out in our |
| 9:34AM | 17 | original memorandum, we'd ask that you make the detailed |
| 9:34AM | 18 | finding required by the Eleventh Circuit to support this |
| 9:34AM | 19 | enhancement.  Here the Defendant looked the jury in the eyes |
| 9:34AM | 20 | and repeatedly lied and lied and lied. |
| 9:34AM | 21 | And it's not just the jury's verdict that shows |
| 9:34AM | 22 | that.  It's the other evidence.  The Defendant claimed he'd |
| 9:34AM | 23 | never seen these grenades before, but he admitted he owned the |
| 9:35AM | 24 | vest that they were in, and the agents testified credibly, as |
| 9:35AM | 25 | the jury found, that the grenades were in his vest that he |

owned.  The Defendant also had access to the exact kind of grenades as his role as a weapons sergeant in the military.  He had the training necessary to take those grenades.  Nobody else with access to that RV had those same qualifications.  Those were the Defendant's grenades, he knew they were there, and that's what the jury verdict shows.

And the same with respect to Count 10.  The Defendant testified that he had removed all the classified information.  His story was completely nonsensical as I went in some detail in the -- in the sentencing memo, but it's simple enough just to point to the fact that the classified information expert testified in paragraph by paragraph that virtually every paragraph of that document still had classified information in it, and the jury credited that testimony beyond a reasonable doubt.

So the Defendant's testimony was false, it was material, it was made under oath, and it was designed to obstruct justice.

THE COURT:  Okay.  And in answer -- in addressing your comment regarding when someone goes to trial, this is a normal enhancement.  Only if they take the stand and lie is it a -- is it an enhancement, and then in this case, as Mr. Marcet pointed out, the jury found the Defendant guilty of possession of the two grenades.  And Mr. Brown -- I went back and read Mr. Brown's testimony just so I would be sure.  He testified on

two occasions, "I've never seen those grenades," and before

Defendant even received discovery in the case, "I proclaimed

they were not my grenades, and, again, no, I've never seen

those grenades."  The jury found beyond a reasonable doubt that

he possessed those grenades in Counts 3 and 4, I believe.

And his testimony only suggests that they were

planted by someone, and I'm sure the suggestion was that they

were planted by law enforcement because how else could they

have been there?  But at any rate, it was an intent to mislead

the jury and obstruct justice.  And, as I said, the jury found

beyond a reasonable doubt that they were his grenades, at least

to the extent that he possessed them since they were in his RV

and in his -- or the RV that he has -- it's actually his

girlfriend's RV, but he drives the RV because apparently she

doesn't drive the RV.  So -- and it's a mutual RV, for want of

a better word.

And also I would agree that the other issue that

he testified falsely about at trial was the trip report, and I

believe that was Count 10, and he says -- in answer to

either -- and I didn't write this down -- the Government's

question or in answer to Mr. Futerman's question -- but anyway,

I wrote the page number down, 165, line 14.  "And you did not

tell the agents that you had this?"  And his answer was, "No,

because the agents asked if I had a classified -- if I had

classified material, and this document is not classified

9:38AM 1  material." And obviously, the testimony from the expert was it

9:38AM 2  was classified material, and the jury believed that and

9:38AM 3  credited that.

9:38AM 4          So on two occasions he attempted -- at least

9:38AM 5  those two occasions -- to mislead the jury and was not

9:38AM 6  truthful. So I think the obstruction of justice applies in

9:38AM 7  this case.

9:38AM 8          Now, what is -- what's the really reason because

9:38AM 9  I don't think -- even by your own admission, Mr. Futerman, he

9:39AM 10  said he was a member of the Oath Keepers. Now there may be

9:39AM 11  some dispute about how much time, but what's your dispute about

9:39AM 12  having it in the presentence report?

9:39AM 13      MR. FUTERMAN: I think in further communications with

9:39AM 14  Mr. Brown, I think he was -- he agreed he was a member for

9:39AM 15  about a month prior to law enforcement contacting him and

9:39AM 16  asking him to work for law enforcement. I think his

9:39AM 17  characterization about the organization he has an objection to.

9:39AM 18  And so I'm just echoing -- it's a de minimis, relatively de

9:39AM 19  minimis aspect of the sentence, someone's characterization of a

9:39AM 20  group you were a member of for a month, but he did want me to

9:39AM 21  at least explain to that; that he didn't agree with the

9:39AM 22  characterization, and I'll leave it at that, Your Honor.

9:39AM 23      THE COURT: Okay. Mr. Marcet?

9:39AM 24      MR. MARCET: I think this is an accurate description

9:39AM 25  of the Oath Keepers. We do have a witness who can testify to

| | |
|---|---|
| 9:40AM | 1 |
| 9:40AM | 2 |

that effect, but if there's a particular phrase or something
that Mr. Brown is objecting to that he believes is not
accurate, but, I mean, I think this is how the Oath Keepers
widely describe themselves.  I don't think it's particularly
argumentative.

THE COURT:  Okay.  Well, paragraph number 75 does
state that discovery material revealed that the Defendant was a
member of the Oath Keepers group period, and he stated he was a
member of the Oath Keepers group for a short period of time.
And then the footnote goes on to describe what the Oath Keepers
is, and I appreciate it, for whoever's benefit is reading the
presentence report.  The Oath Keepers is a large but loosely
organized collection of individuals, some of whom are
associated with militias.  Some members of the Oath Keepers
believe that the federal government has been coopted by a
shadowy conspiracy that is trying to strip American citizens of
their rights.  The Oath Keepers will accept anyone as members.
They explicitly focus on recruiting current and former
military, law enforcement, and first responder personnel.  The
organization's name alludes the oath sworn by members of the
military and police to defend the Constitution and judges from
all enemies, foreign and domestic.

So I don't mind taking the footnote out if
that's what you would like me to do.

MR. FUTERMAN:  Thank you, Your Honor.

| | |
|---|---|
| 9:41AM | 1 |

**THE COURT:** I'll strike the footnote. It's I guess primarily for my benefit anyway in case I don't know about it, but I do, and I'm going to leave the paragraph in.

Okay. The Government had no objections to the facts or the guidelines. I may have asked this; is that correct, Mr. Marcet?

**MR. MARCET:** It is, Your Honor.

**THE COURT:** Okay. So we're now going to proceed to sentencing in the case, and what will help -- I would like to do this -- is that the advisory guidelines as we now -- since I've overruled the objection to the obstruction of the justice, are, as the probation officer has computed them, total offense level is a 29, criminal history I. Range of imprisonment is 87 months to 108 months.

And according to the memorandum that the defense filed, they are seeking a sentence below the advisory guidelines, and according to the memorandum the Government filed, they're seeking a sentence at the top of the guidelines. So we're in two different places.

So, Mr. Futerman, I'm going to let you begin, and you can make any argument you'd like to make. You can call any witnesses you'd like to call that might go to what a proper sentence should be in this case and whether I should vary downward, and I'll let you begin.

**MR. FUTERMAN:** Thank you, Your Honor. Your Honor, I

had some brief argument and extension or expansion from the memorandums which I know the Court's obviously read before now, so I won't be repetitive to that. But I think it is worth stressing some of the micro factors or the macro factors I brought up in the memorandum.

20 years serving the country with risking life and limb in the Special Forces, and in the previous document filed as Exhibit B on the defense's memorandum, in the small print is the extent of bravery that Mr. Brown exhibited while serving this country. And this is not a -- just a general soldier who didn't serve in combat. And I point to the Exhibit B in terms of, first of all, when you look at remarks, during his illustrious, brave career, there is a line in paragraph 18 of our Exhibit B of the memorandum that says, "Served in designated imminent danger pay area. Served in Afghanistan, served in Bolivia, served in Columbia, served in Malaysia, served in Iraq." And multiple times not only has he witnessed awful things -- that luckily many of us have been spared from seeing -- he put his own self at risk, and that's noteworthy.

And what's noteworthy is then the actual medals: Bronze star medal, commendation medal, service achievement medal, achievement medal, service medal, expeditionary medal. I think there was a couple of bronze stars.

And that's what I've never seen in my

experience -- I'm sure the Court has -- is then esteemed members of our national -- people that we look up to write letters on behalf of Mr. Brown.  Not just friends and family members, which you see all the time, not his mother that you're going to hear from, but members of the United States Congress and members of the State Representatives of this Florida jurisdiction, and I think that's noteworthy.  They know the facts.  This has been a well publicized case.  They know Mr. Brown's statements.  Mr. Brown has given many podcasts from the jail, many interviews from the jail.  Yet they went out on a limb.

And I think it's worth just highlighting a couple of comments from different United States Congressmen and State Representatives.  And I'm just going to highlight three letters.  One was Exhibit E from Congressman Luna, who indicated, "Mr. Brown served our country honorably for 20 years and retired an E-8 master sergeant, a level of advancement only achieved by the highest caliber soldiers serving in the already elite ranks of Special Forces.  Mr. Brown voluntarily chose to dedicate the best years of his life," and I think the testimony was he was about 18 when he went into the military --

**THE COURT:**  Right out of high school.

**MR. FUTERMAN:**  Right out of high school, right.  "To serve our great nation, making countless sacrifices while striving to uphold the standards of the best learned soldiers

9:46AM 1   in the United States military." And finally, Congressman Luna

9:46AM 2   says, "As American citizens who enjoy the fruits of those

9:46AM 3   sacrifices, I believe we would be remiss if we did not consider

9:46AM 4   Mr. Brown's service and sacrificing -- and sacrifice," excuse

9:46AM 5   me, "when deciding his fate," and addresses that directly to

9:46AM 6   the Honorable Judge Bucklew.

9:46AM 7       The second letter from United States Congressman

9:46AM 8   Bilirakis indicates that he was a former Vice-Chairman of the

9:46AM 9   U.S. House of Representatives Committee on Veterans' Affairs.

9:46AM 10       THE COURT: Meaning Congressman Bilirakis.

9:46AM 11       MR. FUTERMAN: Yes, Your Honor. Also attached as one

9:46AM 12   of my additional exhibits I think that was received after

9:46AM 13   initial memorandum, I quote, "I constantly find myself in awe

9:47AM 14   of the sacrifices and efforts that have been made on behalf of

9:47AM 15   our great country, by the men and women who have worn the

9:47AM 16   uniform of the armed services. He was part of an elite group

9:47AM 17   of soldiers who undertook activities in defense of America that

9:47AM 18   required exceptional courage, discipline, and devotion to the

9:47AM 19   country. He was raised by his grandfather, who was a Navy

9:47AM 20   veteran and served in World War II. He has lived an exemplary

9:47AM 21   life with no incidents of violence and no criminal history.

9:47AM 22   After he tragically lost his brother to suicide, Jeremy

9:47AM 23   immediately stepped in to raise his nephew after being granted

9:47AM 24   legal custody." He asked the Court, "In determining an

9:47AM 25   appropriate sentence for someone with no prior criminal record

who served his country honorably."

I think those are very strong, noteworthy statements from someone I think we all have a lot of respect for.

And then finally, from Berny, Florida House Representative, Jacques, he wrote to the Court recently and what he said just in one sentence I think is important. "As a Green Beret, Mr. Brown was deployed four times to combat zones and was twice awarded the bronze star. I've been -- finally, I've been very impressed by the accounts of Mr. Brown's great conduct while incarcerated during the case. Many have described Mr. Brown as a model prisoner."

And that is something also that's I think noteworthy to the Court; not only how he has behaved in front of you, in front of the trial. In an emotional trial, we didn't have any outbursts. We didn't have any reactions. We didn't have any of that.

THE COURT: I agree.

MR. FUTERMAN: But also how he's conducted himself in the jail. I often unfortunately at sentencing have the State Attorney's Office or sometimes the federal government see disciplinary reviews, DRs, fights, different things even in jail that shows that he was obstructionist in the jail or made it difficult with the people that were looking after him. This has been far from it. Everyone has wished him well. Whenever

9:49AM 1  I visited him, the deputies and the marshals and the people

9:49AM 2  inside of custody have wished him well.

9:49AM 3  And while people may have different views of the

9:49AM 4  facts and what he did, his behavior postarrest I think is

9:49AM 5  something for the Court to consider as the representative

9:49AM 6  indicated, in addition to the other factors that I mentioned to

9:49AM 7  the Court.

9:49AM 8  The Government does say in its response that we

9:49AM 9  should kind of discourage and not take into account all these

9:49AM 10  great efforts because in 2011 he was reprimanded and not

9:49AM 11  allowed to enlist because he uploaded files which clearly

9:49AM 12  contained music videos primarily and other videos and some

9:49AM 13  images of some women, and they called it pornographic, which

9:49AM 14  they were, and it was wrong when he changed servers, as you

9:49AM 15  heard, that those got uploaded.  He got reprimanded.

9:50AM 16  **THE COURT:**  It was a pretty strong reprimand, so it

9:50AM 17  must have been a fairly egregious event.

9:50AM 18  **MR. FUTERMAN:**  Well, it's something he shouldn't have

9:50AM 19  done obviously.  You shouldn't upload music videos or images of

9:50AM 20  women of course, absolutely.  And when the transfer went over,

9:50AM 21  he should have been cognizant of that.  And as a consequence,

9:50AM 22  he was honorably discharged, but not allowed to reenlist, and

9:50AM 23  that was back in 2011.

9:50AM 24  But I think the Government gives a lot more

9:50AM 25  emphasis on that act in comparison to the 20 years that he

9:50AM 1 served this country, and I think that we don't want that

9:50AM 2 blemish to take away what are unusual actions. You don't see

9:50AM 3 before you for sentencing someone with this type of level of

9:50AM 4 bravery for 20 years, this level of sacrifices for 20 years.

9:50AM 5 You just don't see that -- I don't see that -- from the Special

9:50AM 6 Forces. And hence, the --

9:50AM 7         **THE COURT:** I don't either. I agree with that.

9:50AM 8         **MR. FUTERMAN:** Right. And I don't have any other

9:50AM 9 additional argument in support of the variance down.

9:51AM 10         3553 factors, I'd ask the Court to strongly

9:51AM 11 consider the factors, and the history and the characteristics

9:51AM 12 is I think one of the most important things for the Court to

9:51AM 13 look at.

9:51AM 14         And I do have a few -- just four witnesses that

9:51AM 15 would like to address the Court. Some of them have written

9:51AM 16 letters to the Court, so they may be duplicate, in essence.

9:51AM 17 One of them is his mother, who has not written. She's given

9:51AM 18 some scribbled notes, so I'll see what she says. And then

9:51AM 19 after the Government responds, Mr. Brown would like to briefly

9:51AM 20 allocute before you sentence him.

9:51AM 21         **THE COURT:** All right.

9:51AM 22         **MR. FUTERMAN:** Thank you, Your Honor. So the first

9:51AM 23 person I'd like to call is Meredith Olsen. Ms. Olsen is the

9:51AM 24 wife of the Special Forces witness who testified in court.

9:51AM 25         **THE COURT:** I recall.

9:51AM 1         **MR. FUTERMAN:** If she could come forward, Your Honor.

9:51AM 2         **THE COURT:** Ms. Olsen, if you'll come forward,

9:51AM 3 please. Ms. Olsen, nothing personal, but it's hard to see you

9:51AM 4 over that screen.

9:52AM 5         **MR. FUTERMAN:** Do you want her to stand over here and

9:52AM 6 I'll move back?

9:52AM 7         **THE COURT:** I don't know. Are you going to show a

9:52AM 8 video or anything?

9:52AM 9         **MR. FUTERMAN:** No.

9:52AM 10         **THE COURT:** Okay. Does it fold down, Ms. Black?

9:52AM 11         **COURTROOM DEPUTY:** The one at the podium?

9:52AM 12         **THE COURT:** The screen.

9:52AM 13         **COURTROOM DEPUTY:** Not at the podium, Judge.

9:52AM 14         **THE COURT:** Not the one on the podium?

9:52AM 15         **COURTROOM DEPUTY:** No.

9:52AM 16         **THE COURT:** Okay.

9:52AM 17         **COURTROOM DEPUTY:** She can stand at the side, Judge.

9:52AM 18         **THE COURT:** What?

9:52AM 19         **COURTROOM DEPUTY:** She can stand at the side.

9:52AM 20         **MR. FUTERMAN:** Okay. It picks up the sound on the

9:52AM 21 side apparently.

9:52AM 22         **THE COURT:** I can see you at the side. All right.

9:52AM 23 Would you swear her in, please?

9:52AM 24         **COURTROOM DEPUTY:** Yes, Your Honor. Please raise

9:52AM 25 your right hand.

9:52AM  1                    (Witness sworn.)

9:52AM  2              **COURTROOM DEPUTY:**  Please state your name for the

9:52AM  3    record and spell your name.

9:52AM  4              **MS. JONES:**  Meredith Jones, M-e-r-e-d-i-t-h, and last

9:52AM  5    names Jones, J-o-n-e-s.

9:52AM  6              **COURTROOM DEPUTY:**  Thank you.

9:52AM  7              **THE COURT:**  Ms. Jones, I'm assuming you're going to

9:52AM  8    do this, but one of the first things you need to tell me is,

9:52AM  9    even though Mr. Futerman has kind of told me, how you know

9:53AM  10   Mr. Brown.

9:53AM  11             **MS. JONES:**  Yes, Your Honor.  So my view of Jeremy

9:53AM  12   has been shaped over a decade.  I've known Jeremy through my

9:53AM  13   husband who served with him in the military in Special Forces.

9:53AM  14   My husband served 27 years in Special Forces and retired at the

9:53AM  15   highest enlisted rank.  He knows Jeremy well, and I know Jeremy

9:53AM  16   through him, through that introduction.  But my opinion of

9:53AM  17   Jeremy is my own, and it's shaped by my individual interactions

9:53AM  18   with Jeremy and what I've observed over the years, and I feel

9:53AM  19   it's important for me to share that with the Court because

9:53AM  20   you've seen just a small snapshot of who Jeremy is, and I would

9:53AM  21   like to kind of share that longer prospective.

9:53AM  22             **THE COURT:**  I'm sorry.  No sitting on the floor.

9:53AM  23   People have to sit in -- in seats.  If there's not enough room,

9:53AM  24   there's not enough room.

9:53AM  25             Okay.  I'm sorry I interrupted you.  Go ahead.

| | |
|---|---|
| 9:54AM | 1 |

**THE WITNESS:** So with that, I want to first say that I have been over the years very impressed by Jeremy's character, and for me to say that says a lot. Jeremy does not take the easy way out, and, Your Honor, you may have seen this in court. Jeremy is very principled, very insistent. One example that did come out in court is when Jeremy was encouraged to lie -- and several people had encouraged him to lie -- he refused. This is perhaps frustrating to some, but I do understand that that is why Jeremy readily admitted to the two weapons charges that were in front of him, and that's also why I believe when he said he was not guilty of other ones, that he was not, in fact, lying. As hard as that may have been to believe for a jury, my experiences with Jeremy over the years would lead me to also believe him.

**THE COURT:** Okay. It doesn't do any good for you to talk about whether the jury was right or wrong, and you may believe it, but the main thing was what the jury believed.

**MS. JONES:** I understand. I understand. That more speaks to I think the idea of obstruction, but I'm not here to argue or debate; just to present what I understand, what I believe.

Now, I will say one of the other things that Jeremy does is he's consistently served the community. He's done a lot. He's been a voluntary EMT, firefighter. He's worked with so many different people, and even in the jail, it

9:55 AM    1    didn't surprise me to learn that he was trying to help his
9:55 AM    2    fellow inmates by counseling them, talking to them, encouraging
9:55 AM    3    them, encouraging them to change their lives.  So that does not
9:55 AM    4    surprise me at all.  That is who Jeremy is, and that's
9:55 AM    5    consistent with my experiences with him over the years.

9:55 AM    6         I would say some of Jeremy's most frustrating
9:55 AM    7    traits are probably also his best.  I understand that when
9:55 AM    8    you're looking at sentencing, remorse is one of those things,
9:55 AM    9    and I understand that Jeremy is probably going to continue to
9:56 AM   10    insist on his innocence, and I know that that's frustrating,
9:56 AM   11    and it may seem defiant, but my understanding of Jeremy is that
9:56 AM   12    that principled approach and that commitment to truth would
9:56 AM   13    lead him to simply not compromise when he does know the truth.
9:56 AM   14    And really only Jeremy knows what the truth is.

9:56 AM   15         Now, I have had over the years many ideological
9:56 AM   16    and political debates with Jeremy.  We do not see eye to eye
9:56 AM   17    politically on a number of issues, but one thing we do see eye
9:56 AM   18    to eye on is his view on nonviolence, which I share.  Jeremy
9:56 AM   19    over the years, one might think, would have been pro-war and
9:56 AM   20    pro-violence as an approach, but his military service has led
9:56 AM   21    him to denounce violence all together.  I can confidently say,
9:56 AM   22    Your Honor, that Jeremy would never commit an act of violence
9:56 AM   23    against another individual.  It would take only the most
9:56 AM   24    extreme circumstance of life and death for Jeremy to actually
9:56 AM   25    act, even in self-defense.  That's how Jeremy is, and that's

his behavior, and I believe you've seen that as well over the course of the trial in how he's behaved himself, even in prison.

Now, Jeremy, of course, has no history of violence. If he were to be out in society, I certainly would not fear. Even as the petite little person that I am, I would not fear in any way. In fact, I would look forward to the good that Jeremy could do in society, which is what he was doing in many ways. He received a recognition from the Sheriff's Office in Pinellas County for all of the work that he had done over the years. And, again, that is who Jeremy is.

I would just ask that you consider his -- the totality of his character when you decide sentencing and understand that of all the people in prison -- I believe that Jeremy can do a lot of good in prison, but I believe there's a lot more good that he can do if he were free.

THE COURT: Thank you.

MR. FUTERMAN: Your Honor, I believe that there's two other people before his mother that would like to speak. One is Cathi Chamberlain, who has written the Court a letter before. Ms. Chamberlain, come forward.

THE COURT: I'm going to ask the courtroom deputy to swear you in.

MS. CHAMBERLAIN: Yes.

COURTROOM DEPUTY: Please raise your right hand.

9:58AM 1                    (Witness sworn.)

9:58AM 2            **COURTROOM DEPUTY:**  Please state your name for the

9:58AM 3    record and spell your name.

9:58AM 4            **MS. CHAMBERLAIN:**  Cathi Chamberlain, C-a-t-h-i,

9:58AM 5    C-h-a-m-b-e-r-l-a-i-n.

9:58AM 6            **COURTROOM DEPUTY:**  Thank you.

9:58AM 7            **MS. CHAMBERLAIN:**  Good morning, Your Honor.

9:58AM 8            **THE COURT:**  Good morning.

9:58AM 9            **MS. CHAMBERLAIN:**  And thank you for the opportunity

9:58AM 10   to allow me to speak in defense of Jeremy Brown.

9:58AM 11                As an investigative researcher and author, I

9:58AM 12   know there are always two sides to every story.  The truth

9:59AM 13   means everything to me.

9:59AM 14           **THE COURT:**  Can you tell me how you know Jeremy

9:59AM 15   Brown?

9:59AM 16           **MS. CHAMBERLAIN:**  Yes, I was just on that one.

9:59AM 17           **THE COURT:**  Okay.

9:59AM 18           **MS. CHAMBERLAIN:**  When I interviewed Jeremy Brown on

9:59AM 19   my podcast before his arrest, my interest was more about the

9:59AM 20   fairness of our criminal justice system than about him, who I

9:59AM 21   hardly knew at that time.  Since then, I've learned way more

9:59AM 22   than I bargained for, and I found Mr. Brown to be honest to a

9:59AM 23   fault.  His distinguished and undeniably honorable military

9:59AM 24   career of 20 years has been irreparably tarnished since his

9:59AM 25   arrest.

| | |
|---|---|
| 9:59AM | 1 |
| 9:59AM | 2 |
| 9:59AM | 3 |
| 9:59AM | 4 |
| 9:59AM | 5 |
| 9:59AM | 6 |
| 10:00AM | 7 |
| 10:00AM | 8 |
| 10:00AM | 9 |
| 10:00AM | 10 |
| 10:00AM | 11 |
| 10:00AM | 12 |
| 10:00AM | 13 |
| 10:00AM | 14 |
| 10:00AM | 15 |
| 10:00AM | 16 |
| 10:00AM | 17 |
| 10:00AM | 18 |
| 10:00AM | 19 |
| 10:00AM | 20 |
| 10:01AM | 21 |
| 10:01AM | 22 |
| 10:01AM | 23 |
| 10:01AM | 24 |
| 10:01AM | 25 |

1    Having never been arrested of a crime before

2  now, he spent his first 14 months in maximum security while

3  still considered innocent, or at least should have been.  To

4  the thousands following his story, something feels seriously

5  wrong with this treatment.  Many are shocked by how the justice

6  system we grew up to trust now operates.

7    At the beginning of his trial, we were promised

8  to be shown how evidence was planted during the raid on his

9  home as Jeremy has maintained from the beginning and how the

10  Government was retaliating against him for becoming a

11  whistleblower against their attempts to recruit him as a spy.

12  We saw none of that in the trial.  Instead, we heard stories

13  meant to make us believe Mr. Brown is a threat to society.  His

14  supporters were not fooled.  Grenades that Jeremy has

15  consistently denied were his since the beginning that the FBI's

16  own forensics lab failed to tie to him, and that the military

17  itself never charged him with stealing simply defies logic for

18  me.

19    And to find him guilty of being in possession of

20  a classified document that was merely a template of the real

21  deal, according to him -- and I believe him -- something feels

22  disturbingly wrong with the way this entire case has unfolded.

23    **THE COURT:**  May I suggest to you that you're not

24  doing him any good at all.

25    **MS. CHAMBERLAIN:**  Okay.  That's just my opinion.

10:01AM 1       **THE COURT:**  I understand.  I'm just telling you

10:01AM 2   you're not doing him any good by criticizing the jury or

10:01AM 3   criticizing how the case -- you believe the case should have

10:01AM 4   unfolded or that sort of thing.  You know, it would do good if

10:01AM 5   you could tell me why it is that you think that he deserves a

10:01AM 6   lesser sentence, that kind of thing.

10:01AM 7       **MS. CHAMBERLAIN:**  Okay.  Which is coming as well.

10:01AM 8           I think we're a very divided people today,

10:01AM 9   evidenced by Jeremy's run for a Florida house seat in 2022 from

10:02AM 10  jail, where 42 percent of Hillsborough County residents voted

10:02AM 11  for him; not despite his incarceration, but because of it.  And

10:02AM 12  I think your leniency in this case could go a long way in

10:02AM 13  restoring faith in our criminal justice system.

10:02AM 14          Having never committed one act of violence, to

10:02AM 15  my knowledge, against his countrymen or the lawmen who arrested

10:02AM 16  him, Jeremy is hardly the threat he's been made out to be.  And

10:02AM 17  from what I understand, he has been a model prisoner during his

10:02AM 18  time behind bars, helping many of his fellow inmates.  That's

10:02AM 19  the real Jeremy Brown that I have learned to know.

10:02AM 20          So I respectfully ask for you to consider

10:02AM 21  Mr. Brown's distinguished military service, the 17 months he's

10:02AM 22  already served, and the omission of facts when sentencing him

10:03AM 23  today.  I hope you'll also consider his five young daughters

10:03AM 24  who would be denied their health insurance along with other

10:03AM 25  military dependent support and irreplaceable time with their

10:03AM 1 | father.

10:03AM 2 | For the sake of fairness, erring on the side of

10:03AM 3 | caution --

10:03AM 4 | THE COURT: You realize, of course, that according to

10:03AM 5 | Mr. Brown, he's estranged from his daughters?

10:03AM 6 | MS. CHAMBERLAIN: Yes, and this is partly --

10:03AM 7 | THE COURT: Okay.

10:03AM 8 | MS. CHAMBERLAIN: -- a part of that as well, and I

10:03AM 9 | was estranged from my father for a long time when I was

10:03AM 10 | younger, and --

10:03AM 11 | THE COURT: Well, and I'm not -- and I understand.

10:03AM 12 | I'm just saying, it doesn't make a lot of sense to say he has

10:03AM 13 | this time to be with his daughters when he's estranged from

10:03AM 14 | them, and he hasn't been with them, so --

10:03AM 15 | MS. CHAMBERLAIN: Yeah. I'm hoping to see that

10:03AM 16 | change in the future, and only if he is in a position will that

10:04AM 17 | change.

10:04AM 18 | At any rate, I believe time served for Master

10:04AM 19 | Sergeant Jeremy Brown. It's past time for this nonviolence war

10:04AM 20 | hero to come home.

10:04AM 21 | THE COURT: Thank you.

10:04AM 22 | MS. CHAMBERLAIN: Thank you, Your Honor.

10:04AM 23 | MR. FUTERMAN: Your Honor, I think his mother would

10:04AM 24 | like to address the Court also.

10:04AM 25 | I also have not seen these notes.

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
| 10:04AM  | 1  | **THE COURT:**  What?                                                   |
| 10:04AM  | 2  | **MR. FUTERMAN:**  I have not seen this -- these notes                  |
| 10:04AM  | 3  | that -- she has written them down.                                     |
| 10:04AM  | 4  | **THE COURT:**  And I'm going to swear you in as well.                  |
| 10:04AM  | 5  | So if you'll raise your right hand, the clerk up here -- over           |
| 10:04AM  | 6  | here.  Over here.  She's going to swear you in.                         |
| 10:05AM  | 7  | (Witness sworn.)                                                        |
| 10:05AM  | 8  | **COURTROOM DEPUTY:**  Please state your name for the                   |
| 10:05AM  | 9  | record and spell your name.                                             |
| 10:05AM  | 10 | **MS. BROWN:**  I'm Lisa Brown.  I'm Jeremy's mama.                     |
| 10:05AM  | 11 | **COURTROOM DEPUTY:**  Please spell your name.  Please                  |
| 10:05AM  | 12 | spell your name.                                                        |
| 10:05AM  | 13 | **MS. BROWN:**  L-i-s-a, B-r-o-w-n.                                     |
| 10:05AM  | 14 | **COURTROOM DEPUTY:**  Thank you.                                       |
| 10:05AM  | 15 | **THE COURT:**  Go ahead, Ms. Brown.  You can tell me                   |
| 10:05AM  | 16 | whatever you want.                                                      |
| 10:05AM  | 17 | **MS. BROWN:**  Well, I'm Jeremy's mama.  He is my first                |
| 10:05AM  | 18 | born of three children.  He has a sister, and he had a younger          |
| 10:05AM  | 19 | brother who committed suicide due to the fact of a woman.               |
| 10:05AM  | 20 | Jeremy -- I know him better than anybody in                             |
| 10:06AM  | 21 | here, and this man right there is no criminal.  He is a good            |
| 10:06AM  | 22 | man.  He's a good father, and the only reason that he is not            |
| 10:06AM  | 23 | seeing his children is because of the woman that he was married         |
| 10:06AM  | 24 | to that defamed him, told him -- told her high powered women            |
| 10:06AM  | 25 | down here in Tampa to spread the word that he was stolen valor.         |

**THE COURT:** That he was what?

**THE MOTHER:** Stolen valor, where they pretend like they're a military person, but they're not. So him not being able to see his children is strictly on her because he loves his children. I want y'all to know that, all of you.

This has been hell to me. I'm not in the best health. I asked after I had my surgery if he could come up to help me. I was denied that by you people. I almost died. Tylene showed me a picture of my daughter up against my face, and I was wondering why was she like that? She was telling me goodbye because I almost didn't make it. I came this close to dying, and my son was locked up under false pretenses.

I'm really -- I'm a mad mother right now because I know my child. I know him. From the time he was two years old up until he graduated from high school, it was military, military, military. I had moved to Raleigh, North Carolina, and he was up there, but the high school that he started in didn't have a ROTC program, so he asked if he could go back and stay with his grandfather so he could be in the ROTC program, and I said yes.

So that's why he has so much love -- he has love for this country. He wanted to be a warrior for this country, and, of course, he graduated at the age of 17. They could not take him until he was 18, and during that time he took the EMT. He passed that, but they couldn't give him a certificate yet

because he wasn't old enough to get the certificate, but he did get it later on. But he even volunteered fire department.

For them to call him a criminal is sickening. He's a good man. He served this country. He lost best friends. He lost the man that was his best man at his wedding way back when to this other crazy woman, and when they -- he -- he's even been to his grave site.

He's helped another lady, Jody, that her son was killed over there, and he went up to go to the funeral, but none of the military had contacted her about the -- all the rights that they have from being -- having a funeral of a military person. He -- he took over the funeral for her and made sure that everything was on board, that he got his flag draped and everything.

He came from a military family. My grandfather was Navy. My dad was Navy. His uncle is a retired lieutenant colonel in the Army, so he always wanted to be a military man.

But he loves this country, and he loves his family. And, you know, this -- always talking about him being estranged to his children is because his ex is a lunatic. I'm sorry, but I'm telling the truth on that because she even told me -- I asked her, I said, "You're not planning on leaving Tampa?" "No, no, I'll never do that because I know it will kill Jeremy if I took the kids away." And she snuck the kids out of this country -- out of this state.

10:11AM
10:11AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM
10:14AM
10:14AM
10:14AM

1    So -- but he loves his children, but she -- her

2  mission was to tear him apart, ruin him with his children, and

3  some of them won't even communicate with him, but it doesn't

4  mean that he doesn't love his child.

5    And I -- Tylene has been a strength for him.

6  She has been by him through thick and thin, through all this

7  stuff.  It has cost her money.  And, you know, they were

8  talking about this trust thing, which that goes over my head,

9  but they don't have that kind of money.

10    In Afghanistan, they were stationed near an

11  orphanage for the little kids that had lost their parents and

12  everything.  Well, he writes me going, "Mama, can you get, you

13  know, any balls and candy or books or something and send over?"

14  So I got with the newspaper, and they put an article in there,

15  so they were getting boxes of candy and balls and toys, and

16  some author must have sent a book -- I don't know what the book

17  was, I can't remember -- sent a book over there for the kids.

18  And so -- but he -- you know, he loved those children.  Every

19  time they went by, they tried to give them candy or balls, and

20  they're so excited, and they're playing and, you know, taking

21  their minds off they've lost their parents.  They lost their

22  family, and he wanted to help them.

23    And then another time he calls me, "Mama, can

24  you get me some Hawaiian shirts?"  And I'm going, "What do you

25  want Hawaiian shirts for?"  He wanted his team to stand out in

the softball, when they played softball, so his team was the only one that had Hawaiian shirts.  I went to thrift stores and wherever I could find to get Hawaiian shirts for him.

And then when my son took his life, it was Jeremy and Tylene came down and helped me with that.  They arranged -- help me arrange the funeral and everything.  My youngest son was 40 years old, had three children, and, of course, he ended up with a woman was not faithful, and he just couldn't take any more, and he killed himself.

Jeremy came, and I was asked about donating in the -- I never thought I would ever, ever have to even hear those words about donating organs and everything.  I'm supposed to die before my children.

**THE COURT:**  Now what are you talking about?

**THE MOTHER:**  My youngest son, when they finished with his body, Jeremy went to the hospital and brought him to the funeral home in honor of him.  Like a military guy would escort a military soldier that died, he escorted his brother to the funeral home.

So we've had tragedies, and what's going on right now is a tragedy.

Your Honor, I don't have a whole lot of time left.  I am going -- leaving Tuesday because I've got two heart doctor's appointments on Wednesday.  They want to do two other surgeries on me.

|          |    |                                                                  |
|----------|----|------------------------------------------------------------------|
| 10:16AM  | 1  | So I'm asking that you take it -- he's a good                    |
| 10:16AM  | 2  | man, and I'm so sorry that people have told you that he's not    |
| 10:17AM  | 3  | because I know his heart.  I've seen it.                         |
| 10:17AM  | 4  | I think that's all I can actually say right now.                |
| 10:17AM  | 5  | THE COURT:  Okay.  Thank you.                                    |
| 10:17AM  | 6  | MR. FUTERMAN:  I know lots of people want to speak, I            |
| 10:17AM  | 7  | think it's appropriate not to call any more witnesses at this   |
| 10:17AM  | 8  | point.  You've read many letters, and I think it's -- what I'd   |
| 10:17AM  | 9  | like to do, Your Honor, is after the Government makes any        |
| 10:17AM  | 10 | rebuttal or any argument against a variance down -- I have       |
| 10:17AM  | 11 | asked for a variance down.  I hadn't discussed that, but I --    |
| 10:17AM  | 12 | THE COURT:  I know they're going to make an argument             |
| 10:17AM  | 13 | against it because they're asking for a high end guideline      |
| 10:17AM  | 14 | sentence.                                                        |
| 10:17AM  | 15 | MR. FUTERMAN:  Right.  After they make that argument,            |
| 10:17AM  | 16 | he would like to allocute, and I would like to make a few brief |
| 10:17AM  | 17 | responses to their argument.                                    |
| 10:17AM  | 18 | THE COURT:  Okay.  Thank you.  Okay.  Mr. Goedman?              |
| 10:17AM  | 19 | I'm sorry, Mr. Marcet?  Done that twice now.                    |
| 10:18AM  | 20 | MR. MARCET:  May I approach the lectern, Your Honor?            |
| 10:18AM  | 21 | THE COURT:  And you look nothing alike.                         |
| 10:18AM  | 22 | MR. MARCET:  It's a compliment to me, so I won't               |
| 10:18AM  | 23 | complain.                                                        |
| 10:18AM  | 24 | So, Your Honor, you're correct.  We're asking              |
| 10:18AM  | 25 | for a sentence at the high end of the guidelines of 108 months. |

So I think first to talk about the crimes here, these are serious crimes that the Defendant exploited his position in the Special Forces to commit. The Defendant was trained and trusted to handle some of our nation's most dangerous weapons; trained and trusted in handling explosives, in handling the exact M67 fragmentation grenades that he possessed in this case, and he violated that trust. He violated that special position that he held as a primary weapons sergeant in choosing to take these highly dangerous weapons.

And he talked -- or his counsel talked about putting his own life on the line for this country, and he did that, but by taking those grenades and putting them in a residential neighborhood with children in a highly populated civilian area with his girlfriend, Ms. Aldridge, with other family members, and with the law enforcement officers who ultimately had to seize those grenades, he placed a lot of other people's lives at risk too.

As the expert witnesses in this case explained, these grenades were designed to explode and cause the steel body to fragment into hundreds of small metal pieces, which are projected out at very high velocities in a 360-degree pattern in order to kill or cause casualties. The people who live near Mr. Brown, Mr. Brown's girlfriend, did not ask to be put in harm's way like that. And yet he did that in spite of his

extensive training.

And I found it interesting, a lot of the letters that were sent to Your Honor, in fact, expressed horror at this conduct. You had one letter from a weeping mom who wrote quote, "A tenured honorable Special Forces veteran would be the first to acknowledge the inherent danger in keeping such an item at hand."

And Cam Norton, another author of a letter who actually himself had multiple combat tours, said quote, "As a weapons specialist who has been in combat multiple times, I find it unimaginable that he," the Defendant, "would be so careless as to leave two live hand grenades on the floor of his RV where his girlfriend or any guest could unknowingly pick up the vest and possibly detonate one or both hand grenades." That's exactly right, Your Honor. The Defendant placed people, real people in his life who he cared about, at risk of death by explosion.

We also talk about the stolen classified documents. The Defendant, again, throughout the course of his career, had great trust placed in him; as a member of the Special Forces was granted the highest clearance that can be granted, and he violated that trust. He violated the numerous nondisclosure agreements that he signed throughout his career, disclosure agreements that told him, "If this information is mishandled, you're placing this nation's security at risk."

Knowing all of that, he took one of the documents.  He kept it
in an unsecured RV, and according to his own testimony, he was
trying to shop a story about the subject of that document to
numerous journalists over the years.  And when he was caught,
when those journalists told investigators what he had done, he
lied, and he lied, and he hid that document.  Why?  Because it
was important to him to keep it, for whatever purpose, but he
knew it was improper, and he knew it placed a human being, the
confidential human source who was discussed in that document, a
person who trusted the Defendant, who trusted our armed forces
to keep him safe, put that person at risk of arrest, torture,
and murder at the hands of the Taliban in Afghanistan.

       We've also heard a lot about the Defendant being
someone who's never violated the law.  Judge, this is not an
isolated misstep by the Defendant.  This case shows a pattern
of conduct going back over a decade.  We know the classified
information and the grenades were stolen at some point prior to
2012 when he left the military, so that's over a decade of
criminal conduct in which the Defendant took steps to lie and
hide and conceal that criminal conduct until ultimately by
happenstance it was uncovered, in this case when the search
warrant was executed.

       We know that after stealing that story, the
Defendant engaged in further criminal conduct trying to shop
that story about the classified document to journalists.

| | | |
|---|---|---|
| 10:22AM | 1 | We know that in 2017, six years ago, he |
| 10:22AM | 2 | committed another federal crime.  He lied to federal |
| 10:22AM | 3 | investigators in the scope of an investigation, trying to |
| 10:22AM | 4 | recover that classified information.  He told them he knew the |
| 10:22AM | 5 | exact document they were talking about, and he didn't have it |
| 10:23AM | 6 | when he knew full well that he had the document and that it was |
| 10:23AM | 7 | classified. |
| 10:23AM | 8 | We also know that at some point after that, he |
| 10:23AM | 9 | came into possession of these short barrel weapons.  He knew |
| 10:23AM | 10 | they had to be registered, and he simply chose not to do that, |
| 10:23AM | 11 | again, constantly substituting his own judgment for the law, |
| 10:23AM | 12 | for Court orders, and for doing the right thing. |
| 10:23AM | 13 | We know he then participated in the January 6th |
| 10:23AM | 14 | riots, and while he did not go into the Capitol, Your Honor saw |
| 10:23AM | 15 | the videos of what he did; repeatedly leaning against the |
| 10:23AM | 16 | Capitol police officers trying to clear the area, officers who |
| 10:23AM | 17 | the Defendant, as a 20-year Special Forces veteran, knew were |
| 10:23AM | 18 | in serious danger given what was going on around them and given |
| 10:23AM | 19 | how outnumbered they were.  Instead of deescalating the |
| 10:23AM | 20 | situation and leaving, he taunted them, he jawed at them, and |
| 10:23AM | 21 | he ultimately recorded that interview saying, "Well, we were |
| 10:23AM | 22 | peaceful this time.  Next time we won't be." |
| 10:23AM | 23 | Then in this case, we've heard that he was a |
| 10:24AM | 24 | model prisoner.  Judge, you know that's not the case.  We've |
| 10:24AM | 25 | seen his repeated obstructive conduct since his arrest in this |

case.  We've seen him refusing to comply with DNA warrants.
We've seen him refusing to comply with Court orders to deposit
funds that got to the point after a series of hearings that
Judge Flynn had to actually find him in contempt to get him to
comply.  Again, multiple continued inappropriate illegal
misconduct over a lengthy period of time.

And then finally at the trial in this case,
under oath, the Defendant looked the jury in the eye and lied
and lied and lied, all in an attempt, a further attempt to
evade responsibility for these crimes.

And finally, talking about the Defendant's
military career, he served this country for 20 years, Your
Honor.  But when you read those glowing remarks from his
supervisors, remember they didn't know -- they didn't know when
they wrote that he had maintained 100 percent ammunition
accountability that he had, in fact, taken two M67
fragmentation grenades and stored them in a civilian
neighborhood.  They didn't know when they commented on his
integrity that he had taken a classified document and that he
was planning to shop it to journalists and that he was planning
to lie about it to investigators to hide it.  They didn't know
those things, Your Honor.

And how do we know they wouldn't have written
those reviews if they had known he committed those serious
crimes?  Because we see what happens when he uploads files of

pornography to the server.  As Your Honor pointed out, that was an extremely harsh sanction for that crime or for that action in violation of military policy.  So had they know the truth about the Defendant, had they known that he had stolen those grenades, that he had stolen that classified information, those reviews would have been different.

And, Your Honor, for the Defendant to now come before you and seek to wrap himself in the flag of this country, to point to his service as a mitigating factor when that service is exactly what he exploited to commit these crimes is not only completely disingenuous, it's entirely illogical.  He used that service as a sword to commit these crimes.  He can't now use it as a shield to evade punishment.

So for all those reasons, Your Honor, given the severity of these crimes, given the lengthy course of conduct continuing throughout this case of obstruction of justice, the United States respectfully submits that a sentence at the high end of the guidelines is appropriate.  Thank you.

THE COURT:  Mr. Futerman, you wanted to respond?

MR. FUTERMAN:  Yes, Your Honor.  I think I'll have Mr. Brown allocute and then respond, if that's appropriate.

THE COURT:  Okay.  Either way you'd like to do it.

MR. FUTERMAN:  Thank you.

THE COURT:  Mr. Brown, you want to stand at the podium, or you can stand where you are, either one.

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 10:26AM  | 1  | THE DEFENDANT:  I'll stand at the podium, Your Honor.          |
| 10:26AM  | 2  | THE COURT:  All right.  You swore him previously.  Go          |
| 10:27AM  | 3  | ahead.                                                        |
| 10:27AM  | 4  | THE DEFENDANT:  Good morning, Your Honor.                     |
| 10:27AM  | 5  | THE COURT:  Good morning, Mr. Brown.                          |
| 10:27AM  | 6  | THE DEFENDANT:  Before we start, I would like to              |
| 10:27AM  | 7  | thank all of the American citizens that have shown up to hear |
| 10:27AM  | 8  | this proceeding and to show their support for me and my family. |
| 10:27AM  | 9  | I would also like to thank you for the opportunity to speak.  |
| 10:27AM  | 10 | I directed Mr. Futerman not to review any of the             |
| 10:27AM  | 11 | statements because I do not believe in the manipulation or the |
| 10:27AM  | 12 | directing of people's free speech.  I wanted them to speak     |
| 10:27AM  | 13 | freely about what they felt, what they believe, what they think |
| 10:28AM  | 14 | of me, what they think of the Department of Justice and the    |
| 10:28AM  | 15 | FBI.                                                          |
| 10:28AM  | 16 | The greatest dangers to liberty lurk in                      |
| 10:28AM  | 17 | insidious encroachments by men of zeal, well meaning, but     |
| 10:28AM  | 18 | without understanding.  Supreme Court Justice Louis Brandeis   |
| 10:28AM  | 19 | from the dissent in Olmstead v. United States, a Fourth        |
| 10:28AM  | 20 | Amendment case from 1928.  It was later corrected, a mere 39   |
| 10:28AM  | 21 | years later.                                                 |
| 10:28AM  | 22 | As early as I can remember, I knew I was going               |
| 10:28AM  | 23 | to be a soldier.  It was never in doubt, and the only person  |
| 10:28AM  | 24 | ever to come close to changing my path, Tom Cruise as Maverick. |
| 10:28AM  | 25 | He almost tricked me into becoming a Naval aviator in the     |

eighth grade.  My girlfriend has dated both a Green Beret and a

Blue Angel, and I would hope her testimony would be that I won.

So I think I made the right choice.

At the age of 14, I moved away from my mother,

as she testified to, to live with my grandfather, a World

War II Navy veteran, because the high school in his town

offered Navy Junior ROTC.  In just three years, I achieved what

was designed to take four years.  I was promoted to Commander

of the entire program.

At age 17, with my mother's permission and

signature, I enlisted in the United States Army's delayed entry

program, and on October 27th, 1992, I left my small hometown of

less than 5,000 people and joined the United States Army and

never looked back.

I passed Infantry School, Airborne School, then

tried out for and was selected to First Ranger Battalion, 75th

Ranger Regimen, the Army's most elite infantry unit and part of

the special operations community.

In less than three years, I was promoted to the

noncommissioned officer corps as a sergeant and ranger rifle

team leader.  Less than a year later, I had attended Special

Forces assessment and selection and was selected as a Special

Forces weapons sergeant and had begun training to become one of

the worlds most legendary warriors, a Green Beret.

In July of 1997, at the age of 22, I was on my

first Special Forces Operational Detachment Alpha, SFOD A.  At that time, I was the second youngest Green Beret in the entire force.  My friend and Special Forces brother and Ranger brother, Sergeant Major Retired Scott Olsen was the youngest.

By 1998, I was in my first classified war zone in a country that doesn't even appear on my official military record.

By May of 2007, I had progressed within Special Forces from an E-5 sergeant to an E-8 master sergeant or team sergeant.  On a 12-man Special Forces team, there is only one master sergeant.

During my 20-year special operations career, I spent a quarter of it at my highest rank, a rank less than 10 percent of all Green Berets ever achieve.

I took my life's mission and my sworn oath to this nation extremely serious, and to this very day I still do.

In this trial, complete strangers that know nothing about me or my service have attempted to tarnish that service with mischaracterizations and flat-out lies, but my service cannot be tarnished by lesser men.  The written records of that service have been provided for you to examine.  20 years of quantifiable accomplishments on behalf of this nation recorded in evaluation reports and combat award narratives written by Rangers and Green Berets who led me, lived in shitholes with me, fought, bled, and cried beside me, and

unfortunately sometimes mourned our fallen with me.

These are the men that 16 out of 17 times sign their names to evaluations that identified my service as among the best in an elite force that makes up less than 1 percent of the United States military.

But my leaders aren't the only ones with those observations. One of my soldiers became an investigative journalist and New York Times best selling author. Jack Murphy in his memoir *Murphy's Law*, published in 2019 after I had spoken to him about exposing the Obama administration's treason, wrote this on page 259.

"Something else I've grown to appreciate over the years is the leadership that I worked under in Ranger Battalion and in Special Forces. In my work as a journalist, I've uncovered the dark side of the military enough times to become cynical. I have fallen from the special faith that exists between a soldier and his army. I no longer believe. However, when I look back at squad leader Ken, platoon sergeant Van Nuys, ODA team leader Marcus, and team sergeant Jeremy, I realize how incredible -- how incredibly fortunate I was to have ethical leaders. At the time, they may have come across as strong or even harsh, but they were fair and made sure I stayed on the right path. Now that I've seen what looks like -- now that I've seen what it looks like when soldiers are left unsupervised and unaccountable, I appreciate these men

even more."

This is what the men I've served with know about me.  These prosecutors have made false claims to this Court and are -- that are easily proven false.  They have repeated several times that I was barred from reenlistment.  Yet this can be proven wrong simply by looking at the official record of my separation, my DD214.  In block 18, it clearly states, "Subject to active duty recall by the secretary of the Army." In blocks 23 through 28, it cites army regulation 635-200 Chapter 12 and shows I honorably retired with the separation code of Romeo Bravo Delta and a reentry code of 4 Romeo.  These are the same codes on Sergeant Major Retired Olsen's and Lieutenant Colonel Retired Pecky's (phonetic) DD214, which means sufficient service for retirement and that I cannot reenter because I've retired.

There are numerous codes that can be found in AR 635-200 that details many reasons for separation and barring reentry.  I have none of these codes.  I am honorably retired. There is nothing honorable with the DOJ's fraud on this Court and the American people.

THE COURT:  Mr. Brown, are you saying that you could have rejoined after serving your 20 years if you had wanted to?

THE DEFENDANT:  No, Your Honor, because I retired. That's --

THE COURT:  That's not my question.  My question is

10:36AM 1  could you have rejoined and not retired?

10:36AM 2          **THE DEFENDANT:**  That was never an option for me, so I

10:36AM 3  never explored it, Your Honor.  I came to Tampa --

10:36AM 4          **THE COURT:**  You're not answering my question.  You

10:37AM 5  just read a bunch of codes.  Isn't the truth that you could not

10:37AM 6  rejoin?

10:37AM 7          **THE DEFENDANT:**  No, Your Honor, or else it would be

10:37AM 8  annotated in the reentry code.

10:37AM 9          **THE COURT:**  Oh, so you are saying you could have

10:37AM 10 rejoined the Army and chosen not to retire?

10:37AM 11         **THE DEFENDANT:**  I'm stating Army regulation --

10:37AM 12         **THE COURT:**  All right.  You're not answering my

10:37AM 13 question.  Go ahead.

10:37AM 14         **THE DEFENDANT:**  Your Honor, this is not the only

10:37AM 15 fraud they have committed on your court.  They intentionally

10:37AM 16 played a partial phone call that was cut off two minutes into

10:37AM 17 my girlfriend's weary description of the prior day's events.

10:37AM 18 With this incomplete conversation, they told the jury my

10:37AM 19 silence was an admission of my guilt.  This was a malicious

10:37AM 20 trick because they knew after many attempts I found a good

10:37AM 21 phone and completed a full 25-minute call that this DOJ kept

10:37AM 22 from the jury.  In that call, you will hear me calm because the

10:38AM 23 love of my life was exhausted and afraid.  You hear me clearly

10:38AM 24 respond once she finished her full description that their story

10:38AM 25 was quote "bullshit."

One more tiny detail. I own numerous legally purchased smoke and airsoft grenades. So the term "grenade" used by the girlfriend of a retired Green Beret did not phase me or cause a reaction. The information in the full call that there were live M67 frag grenades that needed to be detonated received my appropriate response, quote, "That's bullshit." Unimaginable is 100% correct. Only the DOJ and FBI would try to sell such a tale.

Lastly, is the pretrial efforts to distance this case from any testimony about January 6th and the illegal recruitment of me prior to January 6th and at best the FBI's prior knowledge of the events of January 6th and at worst their direct involvement in commanding control of these events. Yet now when there are no rules of evidence or chance to cross-examine their claims, they proclaimed it was always about January 6th.

THE COURT: It was you all that didn't want to go into January 6th. It was the defense.

THE DEFENDANT: There was only one person in this courtroom that wanted me to go into January 6th, and that was me.

THE COURT: Well, for whatever reason, you chose not to do it. But go ahead.

THE DEFENDANT: I understand exactly what happened, Your Honor. This is nothing more than legal system bait and

switch.

Judge Bucklew, you and I have taken the same oath, to support and defend the same Constitution and the same rights and liberties it protects, and we've taken this oath for very likely the same reasons:  To secure the blessings of liberty for ourselves and our children.

You and I both have children we love that have chosen lifestyles that some people and some laws have not agreed with.  You took a stand against a state law because you believed it violated your child's liberty, and now that law is no more.  I applaud your stand for liberty.

I am making that same stand right now against the FBI's violation of everyone's liberty in hopes of stopping these insidious encroachments upon mine and my children's rights, and they have targeted me, arrested me, and are seeking to destroy me.

The truth will come out, and it's coming out more and more each day.  When it does, the questions will be who knew, and when did they know?

Judge Bucklew, these prosecutors have attempted to deceive you and the jury with enough success to receive and secure a flawed conviction.  Now, they are hoping you don't understand what this trial is a part of or the true reason for this malicious persecution.  But if you give me a chance by giving me a sentence of time served, I will not rest until the

truth is fully exposed.

Today is my 555th day in jail, 482 of which I was held in maximum security. But with a sentence of time served, you will free me to continue to expose the truth, to correct this false conviction through the appellate process, and to uphold our oath to support and defend the Constitution of this great nation.

I pledge to you my life, my fortune, and my sacred honor that when the final story of this chapter in our nation's history is written, you will be proud that your judgment today will have been the tipping point towards justice.

Your Honor, I thank you for this opportunity to speak on the record and to be heard by the American people. It has actually been a pleasure and an honor to work with you in this case.

De oppresso liber, and may God bless and restore the United States of America. Thank you, Your Honor.

THE COURT: Thank you, Mr. Brown.

Mr. Futerman, you wanted to make some follow-up remarks?

MR. FUTERMAN: Just briefly. Just a couple of follow-up comments to the Government's position of why they think the high end of the guidelines is appropriate and why I really disagree with them and ask the Court to vary down from

10:44AM 1    the bottom of the guidelines.

10:44AM 2              They brought up Mr. Brown's Special Forces as a

10:44AM 3    characteristic for asking for the high end, but, of course, as

10:44AM 4    the Court is aware, there's a two-level enhancement for abuse

10:44AM 5    of trust that got him to 87 months.  That's almost a cumulative

10:44AM 6    argument.

10:44AM 7              We talked about the cases.  I think we can all

10:44AM 8    agree, Count 1 and Count 2 were stipulated to by the defense at

10:44AM 9    trial.  These were guns that he owned, one from his dead

10:44AM 10   brother and another one.  They weren't sinister in nature.

10:44AM 11   They were just marginally owned.

10:44AM 12             Count 3 and Count 1 -- Count 1, Count 2, Count 3

10:44AM 13   and 4 would all have been legal if he would have paid a $200

10:44AM 14   fee and register.  So the irony about the emotional statements

10:44AM 15   about that, these would all have been legal counts -- 1, 2, 3,

10:44AM 16   4 -- if he had paid a fee and registered them.

10:44AM 17        THE COURT:  Well, you're minimizing something,

10:44AM 18   Mr. Futerman.  It's more than that.  You know, they have to be

10:44AM 19   registered because of the type of firearms that they are.  You

10:45AM 20   know, they're inherently dangerous.  A short barreled shotgun

10:45AM 21   and a short barreled rifle make them easier to conceal.  That's

10:45AM 22   the whole purpose of requiring registration.

10:45AM 23             People can't just have grenades sitting around

10:45AM 24   in an RV out in the middle of a residential area, and yes, I'm

10:45AM 25   not -- I'm not sure what's required in registering a grenade.

In fact, it was shocking to me you could have grenades, even if registered, but the point is that it's -- you know, it's not fair to just minimize this and say, "Well, if you'd just have paid the fee, everything would have been fine."

MR. FUTERMAN:  I agree with the Court 100%.  I just wanted to put it in the context, and maybe that is a minimization that is too far on one scale, but I did want to put it in the context.

Count 5, of course, was a misdemeanor in terms of its potential storage, and I think there is some at least acknowledgment when we talk about the storage, that it was a misdemeanor.

The Government testified documents.  He was acquitted by 6, 7 -- excuse me, 6, 7, 8.  So we're talking about a document, and I think there is a distinction because it's something he authored, and also the Government talked about the information.  That was something he authored.  He was passionate about that soldier that he was involved in.  It was 2011.  The information was stale.  I think the court will -- I hope the Court will agree that the Government's characterization that he was trying to use this information in 2017 either to sell it or to get sort of fame was not the case.  This was something he felt principled about, right or wrong, passionate about, right or wrong, something he was involved in, and he wanted to speak out about it, but he certainly didn't

10:46AM 1  try to get any money out of this in 2017.  He had it since

10:46AM 2  2011, and there was -- I think that's a distinction of terms of

10:46AM 3  their characterization of that particular authored document.

10:47AM 4          THE COURT:  Well, you know, with respect to that

10:47AM 5  count, we probably wouldn't even be here if when the

10:47AM 6  investigator went out and asked him about the document, he had

10:47AM 7  just turned over --

10:47AM 8          MR. FUTERMAN:  I agree 100%.

10:47AM 9          THE COURT:  -- instead of lying.  I mean, you know,

10:47AM 10 we wouldn't be here on that in all probability.

10:47AM 11         MR. FUTERMAN:  I agree.  You're right.  And that

10:47AM 12 boosted his guidelines significantly --

10:47AM 13         THE COURT:  It did.

10:47AM 14         MR. FUTERMAN:  -- because of that one authored

10:47AM 15 document.  If they had found him not guilty of that authored

10:47AM 16 document, he would have essentially been very close in the

10:47AM 17 guidelines to what he has served.  And so the significance of

10:47AM 18 that finding was significantly impacted in the guidelines,

10:47AM 19 which is something for the Court.  And there's a lot of

10:47AM 20 emotions, there's a lot of views in this case, but I know the

10:47AM 21 Court will look at the 3553 factors and recognize that one

10:47AM 22 authored document boosts him significantly from about 24 months

10:47AM 23 to the 87 months.

10:47AM 24         So I am asking the Court to consider under the

10:47AM 25 3553 factors what this Court has also recognized the

extraordinary and aberrational service of this man and the

comments by both United States Congressman and Congresswoman

and State Representative in the support of the variance, and

I'm asking the Court to consider that.

We can't just -- I know you won't -- brush under

the rug this extraordinary brave career of 20 years.  Although

there's a punishment component based on the jury's finding, the

Government's request for the high end of the guidelines is not

appropriate given what you know about his characteristics and

the support he's received and the reasons for the support he's

received.

I am asking Court to vary down from the 87

months to an appropriate sentence which will also include some

of the discussions that you talked in supervised release with

some of the counseling and various other things at the back end

to that sentence, Your Honor.

**THE COURT:**  Thank you.

**MR. FUTERMAN:**  Thank you.

**THE COURT:**  Mr. Marcet, anything else on behalf of

the United States before I impose sentence?

**MR. MARCET:**  Your Honor, just about the question you

raised about registering the grenades.  A, these grenades were

stolen from the U.S. Army, so there would have been no way to

register them.  B, he would have needed to build an entire

bunker to safely house them, as the ATF agent testified to, and

so it's kind of -- it's not merely a failure to register.  It's

the taking of these dangerous weapons and the storing of them

in a completely unsafe manner.

        THE COURT:  All right.  Anything else from anyone

before I proceed with sentencing?

        MR. FUTERMAN:  No, Your Honor.

        THE COURT:  Okay.  Mr. Marcet, any reason I shouldn't

proceed with sentencing?

        MR. MARCET:  No, Your Honor.  Just to clarify though,

the paragraphs 82, 83, and 84 of the PSI, you'll take care of

that later?

        THE COURT:  Yes.  And that's a good place to start.

I'm going to instruct the probation officer to strike the

footnote in the presentence investigation report.  Hold on and

I'll go to the page.  It's on page 13, but the rest of

paragraph 75 stays in.

        THE PROBATION OFFICER:  Yes, Your Honor.

        THE COURT:  I'm also going to -- hold on here, find

the correct paragraph.  I'm going to ask the probation officer

to delete from an asset the asset online fundraising GiveSendGo

in the amount of $169,925.

        THE PROBATION OFFICER:  Yes, Your Honor.

        THE COURT:  And as far as the Baker Act

information -- and I'm referring I believe on page 14 to

paragraph 82 and 83 -- I need to look at that.

THE PROBATION OFFICER:  Yes, Your Honor.

THE COURT:  Okay.  One question I did have for you, Mr. Futerman, and perhaps the -- you know without having asked, the presentence report says the Defendant communicated that the Vet -- Office of Veterans' Affairs declared him 30 percent disabled due to combat injuries.  What is that based on?

MR. FUTERMAN:  Do you mean in terms of what specific injuries, or do you mean --

THE COURT:  Yeah.  Well, he gets a 30 percent disablement apparently.  He's considered 30 percent disabled by the Veterans' Affairs.  I'm looking at him.  I don't see him physically.  Is that a mental or a physical?

MR. FUTERMAN:  My understanding -- and I haven't verified this, but my understanding is there was a VA ruling specifically on the issue, and it was based on physical combat issues.

THE COURT:  Okay.  Thank you.  All right.  Mr. Brown, if you will stand, please, I'm going to impose sentence at this time.

A lot of what I'm going to say I've already said, but there's a sentencing statement that I normally go through, and so I'm just going to follow the sentencing statement.

Mr. Brown, on December the 12th, 2022, a jury found you guilty of Count 1 of the Second Superseding

Indictment charging you with possession of an unregistered
shotgun having a barrel less than 18 inches.

Count 2, they found you guilty of Count 2
charging you with possession of an unregistered rifle having a
barrel less than 16 inches.

They found you guilty of Counts 3 and 4,
possession of unregistered explosive grenades.

They found you guilty of Count 5, and this is
the misdemeanor we were talking about, improper storage of
explosive material.

And they also found you guilty of Count 10,
willful retention of a national defense document.

And we've now reached the stage of the
proceedings where it's my duty and my job to impose sentence.
You've told me you've been over the presentence report with
Mr. Futerman, and I too have read the presentence report.
There was an objection to the obstruction of justice
enhancement, which I have overruled. There was also an
objection regarding paragraph 75 and the footnote on that page,
and I have ruled on that as well.

There were several oral objections which we have
gone through, none of which had any -- anything to do or made
any -- would make any difference in the sentence that I'm going
to impose.

The only objection that really had an effect on

10:54AM
10:54AM
10:54AM
10:54AM
10:54AM
10:54AM
10:54AM
10:54AM
10:54AM
10:55AM
10:55AM
10:55AM
10:55AM
10:55AM
10:55AM
10:55AM
10:55AM
10:55AM
10:55AM
10:55AM
10:55AM
10:55AM
10:55AM
10:55AM
10:56AM

1  the sentence was the obstruction of justice objection.

2        So I'm going to adopt the facts with the changes

3  that I've made and the guideline calculations that are in the

4  presentence investigation report.  So I'm going to determine

5  that the advisory guidelines, the total offense level is a 29.

6  The criminal history category is I.  That means you have

7  absolutely no criminal history.  The range of imprisonment is

8  87 to 108 months.  1 to 3 years is the supervised release range

9  as to Counts 1 through 4 and 10, and there's a one-year term of

10  supervised release as to Count 5.

11        There is a fine range, $30,000 to $250,000.  I

12  am not going to impose a fine.  The Government has said they're

13  not going to ask for a fine, so I'm not imposing a fine in this

14  case.  So the issue of whether or not you have access to the

15  GoFundMe or the similar titled account is really not an issue.

16        There is a $525 special assessment, and that's

17  based on the number of counts that you were convicted of.  I

18  cannot waive that.  It is due and payable immediately.

19        I've been -- I asked both your counsel and I

20  asked the Government counsel if there's any reason why I should

21  not impose sentence at this time, and I was told by both

22  parties there is no reason.

23        Mr. Brown, I listened to everything that was

24  said this morning, and obviously I presided over the trial, so

25  I heard the testimony at the trial, and obviously I'm

10:56AM 1  considering the jury's verdict in this case of guilty on the

10:56AM 2  counts that I've already outlined.

10:56AM 3          You know, your attorney has asked that I vary

10:56AM 4  downward, and he's stated a number of reasons.  You're a

10:56AM 5  20-year veteran of the Army.  You served in Special Forces.

10:56AM 6  You had the rank of master sergeant.  Up until the end, all of

10:56AM 7  your evaluations were excellent.  You got two bronze stars

10:56AM 8  among other -- among other awards.  So certainly -- certainly I

10:56AM 9  can credit your service to the country for 20 years.

10:56AM 10         You have no criminal record, and that's very

10:57AM 11 unusual for defendants that are in front of me, but there are

10:57AM 12 also some cons.  You've absolutely accepted no responsibility

10:57AM 13 to what's -- you've done in this case, and you are defiant to

10:57AM 14 the end.  And you admitted to the sawed-off shotgun, the

10:57AM 15 possession of the sawed-off shotgun and the sawed-off rifle and

10:57AM 16 apparently knew that they were illegal without a permit but --

10:57AM 17 or a license, and you just didn't pay the registration.  But,

10:57AM 18 you know, I think it's diminishing the importance of the crime

10:57AM 19 by just saying, "Well, I just didn't pay the registration or

10:57AM 20 the license fee."

10:57AM 21         You've taken no responsibility for the grenades

10:57AM 22 whatsoever.  In fact, you have said they were not your

10:57AM 23 grenades, and you suggested, in so many words, that they have

10:58AM 24 been planted by either the FBI or some of the other people that

10:58AM 25 were searching your residence, which is ridiculous.

|          |    |                                                             |
|----------|----|-------------------------------------------------------------|
| 10:58AM  | 1  | There -- you -- the history in front of the |
| 10:58AM  | 2  | Court -- not this Court, I agree.  You were a perfect gentleman |
| 10:58AM  | 3  | at the trial, and you've acted appropriately here today, and |
| 10:58AM  | 4  | you certainly acted appropriately in the trial, but Judge Flynn |
| 10:58AM  | 5  | had to hold you in contempt of Court to get you to pay the |
| 10:58AM  | 6  | money that you owed.  You should have paid for the attorney |
| 10:58AM  | 7  | that represented you in the beginning.  You know, you've |
| 10:58AM  | 8  | essentially in many ways held yourself above the law, that |
| 10:58AM  | 9  | whatever you know and whatever you think is what is the right |
| 10:58AM  | 10 | thing, regardless of what may be the law. |
| 10:58AM  | 11 | You know, military career, there's no doubt your |
| 10:58AM  | 12 | military career was tarnished by what happened at the end, that |
| 10:59AM  | 13 | you uploaded the videos and photos, some of which was |
| 10:59AM  | 14 | pornography.  You were seen as what they called or you called a |
| 10:59AM  | 15 | gomer, which was very harshly worded and, you know, said you |
| 10:59AM  | 16 | were a discredit to -- to the noncommissioned officers and to |
| 10:59AM  | 17 | the U.S. Army. |
| 10:59AM  | 18 | You know, many of the letters that I got talked |
| 10:59AM  | 19 | about the fact you're a strong family man, which is really not |
| 10:59AM  | 20 | the case; maybe with your girlfriend, but certainly not as they |
| 10:59AM  | 21 | have written in the letters with your children. |
| 10:59AM  | 22 | So there's pros and cons on both sides as far as |
| 10:59AM  | 23 | what sentence that I should impose in this case, but I don't |
| 10:59AM  | 24 | think there's a reason to vary downward, and I'm not going to |
| 10:59AM  | 25 | vary downward. |

10:59AM 1        You know, I recognize that -- that your service

11:00AM 2   to the country up until perhaps the end was extraordinary, and

11:00AM 3   you won two bronze stars, among other things, and you got great

11:00AM 4   evaluations, but then you tarnished it to a good deal at the

11:00AM 5   end as well.

11:00AM 6        I'm not going to vary downwards, but I am going

11:00AM 7   to impose a sentence at the low end of the advisory guidelines.

11:00AM 8   I'm not going to impose a sentence at the high end of the

11:00AM 9   advisory guidelines.  And normally when a defendant goes to

11:00AM 10  trial, what happens is that they end up getting a sentence at

11:00AM 11  the high end of the guidelines because things come out during

11:00AM 12  trial that makes -- makes it more egregious.  So -- and it

11:00AM 13  didn't help your case that you got up and lied when you

11:00AM 14  testified, but the sentence that I am going to impose -- which

11:00AM 15  I think is a sentence that's sufficient but not greater than

11:00AM 16  necessary, recognizing your service to your country, but also

11:01AM 17  recognizing the egregiousness of the crimes that were committed

11:01AM 18  as well as your lying on the stand.  The sentence that I am

11:01AM 19  going to impose is 87 months in the Bureau of Prisons, which is

11:01AM 20  the low end of the advisory guidelines.  The 87 months will run

11:01AM 21  concurrent as to Counts 1 through 4 and Count 10.

11:01AM 22        As far as the sentence on Count 5, which is the

11:01AM 23  misdemeanor offense, I'm going to sentence you to time served

11:01AM 24  on that offense.

11:01AM 25        Upon release from imprisonment, I'll place you

on a term of three years of supervised release, and it will run concurrent as to Counts 1 through 4 and Count 10.  You'll have to comply with the standard conditions adopted by the Middle District of Florida for supervised release.

I am going to order mental health counseling because as far as I know, you were Baker Acted twice.  So I will need to go in and research that, but if they examine you and determine you do not need mental health counseling, then it won't be a part of your supervised release, but I am going to order that you be examined by a doctor to determine whether you need mental health counseling.

Because of the convictions, you'll also have to submit to a search of your person, residence, and place of business, any storage units under your control, computer or vehicle, anything under your control conducted by the United States Probation Office during your probationary or supervised release period, if they do it at a reasonable time in a reasonable manner and they have a reasonable suspicion there's contraband there or evidence of a violation of supervised release, and if you fail to do that, it could be a violation of supervised release.

You'll have to cooperate in the collection of DNA by the probation office.  The mandatory drug testing requirements are suspended.  You have no drug problem, so there will be no mandatory drug testing requirements and no drug

11:03AM
11:03AM
11:03AM
11:03AM
11:03AM
11:03AM
11:03AM
11:03AM
11:03AM
11:03AM
11:03AM
11:03AM
11:03AM
11:04AM
11:04AM
11:04AM
11:04AM
11:04AM
11:04AM
11:04AM
11:04AM
11:04AM
11:04AM
11:04AM
11:04AM

1   counseling.  However, you still are required to submit to

2   random drug testing while on supervised release should the

3   probation officer request it.

4          There is a forfeiture in this case, and the

5   forfeiture has to do with the shotgun, the rifle, and the

6   grenades, all of which were illegal, and I entered a

7   preliminary order.  It will become final with this sentencing.

8          Is there any objections to that, Mr. Futerman?

9          **MR. FUTERMAN:**  No, Your Honor.

10         **THE COURT:**  All right.  Then it will become final

11  with the sentencing here today.

12         As I've said earlier, you'll have to pay the

13  special assessment of the $525 which is due and payable

14  immediately.  In addition, I will waive the fine.  In this

15  case, the Government has stated they are not seeking a fine.

16         I've considered the 3553 factors in imposing

17  this sentence and have determined that this is a sentence

18  that's sufficient, but not greater than necessary.

19         Mr. Marcet, there's a -- at least one underlying

20  Indictment.  Do you move to dismiss it at this time?

21         **MR. MARCET:**  I haven't done that before, but, yes,

22  we'll move to dismiss the original Indictment and the

23  Superseding Indictment.

24         **THE COURT:**  Okay.  I will dismiss any underlying

25  indictments.

11:04AM 1      Mr. Futerman, this Court having pronounced

11:04AM 2 sentence, do you have any objections to the sentence or the

11:04AM 3 manner in which it was imposed, other than those that you've

11:04AM 4 raised?

11:04AM 5           MR. FUTERMAN:  No, Your Honor.

11:04AM 6           THE COURT:  Okay.  Do you have any recommendations?

11:04AM 7           MR. FUTERMAN:  Judge, we would ask one, Pensacola, if

11:05AM 8 possible; and two, Coleman.

11:05AM 9           THE COURT:  Okay.  Mr. Marcet, do you have any

11:05AM 10 objections to the sentence or the manner in which it was

11:05AM 11 imposed, other than those you've raised?

11:05AM 12           MR. MARCET:  No, Your Honor.  I may have missed it.

11:05AM 13 We had said earlier that everyone agreed there would be a

11:05AM 14 condition of supervision that he pay any outstanding child

11:05AM 15 support obligations.

11:05AM 16           THE COURT:  And I forgot to include that.  He has

11:05AM 17 agreed, and there is a -- there is an outstanding child support

11:05AM 18 owed, and let me go to the exact amount.  The probation officer

11:05AM 19 has stated in the presentence investigation report on page 18

11:05AM 20 that he owes $21,817 in back child support.  So I'm going to

11:05AM 21 make that a condition of the supervised release, that you pay

11:05AM 22 the arrearage, child support arrearage.

11:06AM 23           You have the right to appeal the sentence that

11:06AM 24 I've imposed.  Any notice of appeal must be filed within 14

11:06AM 25 days, or it's waived.  You had Court-appointed counsel in the

|         |    |                                                                    |
|---------|----|--------------------------------------------------------------------|
| 11:06AM | 1  | beginning, but then you've also had retained counsel, so I'm        |
| 11:06AM | 2  | assuming you can afford counsel to represent you in appeal.  If     |
| 11:06AM | 3  | that's different, then Mr. Futerman will need to file               |
| 11:06AM | 4  | something, but 14 days is the time frame in which you've got to     |
| 11:06AM | 5  | file a notice of appeal.                                            |
| 11:06AM | 6  | I will recommend Pensacola, number 1, and I'll                     |
| 11:06AM | 7  | recommend Coleman, number 2, as a -- as a facility.                |
| 11:06AM | 8  | Anything else?                                                     |
| 11:06AM | 9  | MR. FUTERMAN:  No, Your Honor.  Thank you.                          |
| 11:06AM | 10 | THE COURT:  Anything else to come before the Court                 |
| 11:06AM | 11 | period?                                                             |
| 11:06AM | 12 | MR. FUTERMAN:  No, Your Honor.                                      |
| 11:06AM | 13 | THE COURT:  Mr. Marcet?                                             |
| 11:06AM | 14 | MR. MARCET:  No, Your Honor.  Thank you.                            |
| 11:06AM | 15 | THE COURT:  All right.  Then this Court is adjourned.              |
| 11:06AM | 16 | Thank you.                                                         |
| 11:06AM | 17 | (End of proceedings.)                                              |
|         | 18 |                                                                    |
|         | 19 |                                                                    |
|         | 20 |                                                                    |
|         | 21 |                                                                    |
|         | 22 |                                                                    |
|         | 23 |                                                                    |
|         | 24 |                                                                    |
|         | 25 |                                                                    |

* * * * * * * * * * * * * * * * * * * *

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA


REPORTER TRANSCRIPT CERTIFICATE

I, Tana J. Hess, Official Court Reporter for the United States District Court, Middle District of Florida, certify, pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcription of the stenographic notes taken by the undersigned in the above-entitled matter (Pages 1 through 83 inclusive) and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States of America.

_____

Tana J. Hess, CRR, RMR, FCRR
Official Court Reporter
United States District Court
Middle District of Florida
Tampa Division
Date:  May 25, 2023